UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AOG Entertainment, Inc., et al.,[1] | : | Case No. 16-_____ (      ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

----------------------------------------------------------x

### DECLARATION OF PETER HURWITZ,
### PRESIDENT OF CERTAIN DEBTORS, IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Peter Hurwitz, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury

that:

1.      I am the President of CORE Entertainment Inc. ("**CORE**"), a corporation

incorporated under the laws of Delaware, and the ultimate parent of the other debtors and debtors

in possession in the above-captioned cases (collectively with CORE, the "**Debtors**").  I was

named President of CORE, as well as certain other Debtor entities, in September of 2014, after

serving as Executive Vice President and General Counsel of CORE and other Debtors since

February 2012.  In such capacities, I am familiar with the day-to-day operations, businesses and

financial affairs of the Debtors.

2.      On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy**

**Code**").  The Debtors intend to continue in the possession of their respective properties and the

management of their respective businesses as debtors in possession.

3.      In order to enable the Debtors to operate effectively postpetition and to

avoid adverse effects with respect to these chapter 11 cases, the Debtors have requested various

---

[1]      A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer
identification number is attached hereto as Schedule 1.  The Debtors' executive headquarters are located at
8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

types of relief in "first day" motions and applications (collectively, the "**First Day Motions**")

filed with the Court, including a motion seeking to have the Debtors' chapter 11 cases

consolidated for procedural purposes and jointly administered.

4.    I submit this declaration pursuant to Rule 1007 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Rules**"):  (a) in support of the relief

requested in the First Day Motions; (b) to explain to the Court and other interested parties the

circumstances that compelled the Debtors to seek relief under the Bankruptcy Code; and (c) to

provide certain information that I understand is required by Local Rule 1007-2.  Except as

otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge

and the knowledge I have acquired from those who report to me, consultation with other officers

of the Debtors, my review of relevant documents, or my opinion based upon experience,

knowledge and information concerning the Debtors' operations and financial condition.  If called

upon to testify, I could and would testify competently to the facts set forth herein.  I am duly

authorized to submit this declaration.

5.    Venue of these cases is proper in this jurisdiction.  The following Debtors

are incorporated or organized under New York law:  19 Recordings, Inc. and 19 Entertainment,

Inc.  Further, certain of the Debtors' "back-office" functions are administered from an office in

New York City.

6.    Part I of this declaration provides background with respect to the Debtors'

businesses, capital structure and reorganization efforts.  Part II sets forth the relevant facts in

support of the Debtors' First Day Motions.  Part III provides the information that I understand is

required by Local Rule 1007-2.

# I.  BACKGROUND

### A.  General.

7.     CORE and its Debtor and non-Debtor subsidiaries[2] (collectively, the "**Company**") own, produce, develop and commercially exploit entertainment content.  The Company's portfolio of world-class brands and entertainment properties includes participation in the "IDOL"-branded shows, including American Idol, Deutschland sucht den Superstar, Nouvelle Star and more than fifty other franchises shown around the world (collectively, the "**IDOLS**"), and the popular television series So You Think You Can Dance ("**SYTYCD**"), which is principally produced in the United States, but also has several formats around the world. The foundation of the Company's business is (i) exploitation of its intellectual property portfolio, including:  (1) the trademarks associated with a broad spectrum of television programs including SYTYCD and the IDOLS; (2) the trademarks and name, image and likeness rights principally associated with certain musical artists who rose to fame through American Idol; and (3) the copyright registrations for a wide range of media content and musical recordings by IDOLS artists; and (ii) development and production of content for television and other platforms.

8.     The Company's properties generate recurring revenue across multiple entertainment platforms, including music and television offerings, licensing and merchandising, talent management and live events.  The Company derives income by licensing its programming and the use of its trademarks and copyrighted materials to media distribution outlets, which use the marks and copyrighted material in promoting and airing the Company's programs on television.  The Company also earns revenue from the sale, broadcast and transmission of its artists' recordings, concerts and public appearances.

---

[2]      Sharp Entertainment Holdings, LLC and its subsidiaries, CORE's joint venture with B17 Entertainment, and certain unrestricted subsidiaries are not Debtors and not part of this chapter 11 process.

9.      Despite its long-running success, however, the Company has recently experienced deterioration in its financial performance, primarily attributable to the decline in ratings for American Idol and the corresponding decline in revenues from IDOLS-related broadcast fees, international tape sales for rebroadcasts, touring fees, sponsorships and IDOLS-related merchandise sales.  Following the ratings decline, FOX Broadcasting Company ("**FOX**") announced that the 2016 season, which recently concluded on April 7, 2016, would be the final season of American Idol on FOX.  As discussed in more detail below, the Company's unsustainable capital structure, inability thus far to replace the American Idol revenue streams and inability to consummate an out-of-court restructuring with its primary creditor constituencies ultimately gave rise to the Debtors' decision to commence these chapter 11 cases.

**B.     Key Business Lines.**

10.      The Company conducts its primary business activities through its subsidiary groups, including 19 Entertainment (as defined below).

11.      Debtors 19 Entertainment Limited[3] and 19 Entertainment Worldwide LLC and their respective subsidiaries (collectively, "**19 Entertainment**") own and produce television content.  Based in Los Angeles, 19 Entertainment is the Company's creative production, recording, touring, and artist management arm, responsible for properties, including the IDOLS shows and SYTYCD.

---

[3]      As discussed in more detail below, the Company, faced with a potential involuntary winding-up proceeding in the United Kingdom, is prepared to take all precautions necessary to remain focused on its chapter 11 reorganization efforts and to protect its valuable assets held by Debtor 19 Entertainment Limited in the United Kingdom.  To that end, in conjunction with its chapter 11 filing in the United States, the Company will commence an ancillary recognition proceeding under the Cross-Border Insolvency Regulations 2006, which implements the UNCITRAL Model Law in Great Britain, in the English High Court located in London, England.  While 19 Entertainment Limited is incorporated in the United Kingdom, the Company believes that its center of main interests is in the United States, and accordingly, the Company will be seeking recognition of these chapter 11 cases as a "foreign main proceeding."

(a)    <u>IDOLS.</u>

12.    Through 19 Entertainment, the Debtors own proprietary rights to the <u>IDOLS</u> television format, including <u>American Idol</u>, the singing competition series, which is one of the most influential shows in recent television and music history.  <u>IDOLS</u> is a televised talent contest for musical artists.  The performances on the program are critiqued by a panel of celebrity judges and the program allows the viewing audience to participate in and ultimately select the winning performer via text messaging, internet and telephone voting.  The audience participation generates a pre-established market for the winning artists and other finalists who 19 Entertainment then has the right to represent with respect to artist management, recording, music, touring and merchandising.

13.    The <u>IDOLS</u> format was developed and first broadcast in the United Kingdom in 2001 and in the United States, under the name <u>American Idol: The Search for a Superstar</u>, in 2002.  <u>IDOLS</u> has 62 unique versions and is collectively broadcast in over 100 countries.  The programs have launched the careers of numerous singers and performers nominated for and awarded Grammy, Oscar and Tony Awards, and have set the blueprint for a generation of competitive reality programs.  The popularity of the <u>IDOLS</u> brand around the world has historically generated substantial revenue for the Debtors across multiple media platforms.

14.    Though the 19 Entertainment entities are party to a variety of commercial relationships with their television and record label partners to produce, broadcast, distribute and finance shows based on the <u>IDOLS</u> brand, 19 Entertainment retains a substantial interest in all aspects of such shows and their multiple revenue streams through its wholly-owned subsidiaries both in the United States and the United Kingdom.  Accordingly, 19 Entertainment's assets include:

- **Ownership and Production Rights:** owns two-thirds of the intellectual property rights associated with the IDOLS brand and co-produces the show in the United States with FremantleMedia Limited (together with its affiliate, FremantleMedia North America, Inc., "**FremantleMedia**");[4]

- **Fees:** receives certain licensing, production and other fees and revenue from the sublicensing, production and marketing of the IDOLS brand;

- **Sponsorships:** receives a percentage of the revenue derived from on-air and off-air sponsorships, as well as sales of IDOLS branded-merchandise;

- **Recording Agreements:** owns the exclusive recording rights for a certain number of albums from the show's contestants and typically enters into recording agreements with the winner and certain of the finalists of American Idol. To that end, 19 Entertainment is currently party to long-term recording agreements with numerous best-selling former American Idol contestants, including Kelly Clarkson, Carrie Underwood, Chris Daughtry, Fantasia Barrino, Jordin Sparks, Scotty McCreery and Phillip Phillips;

- **Management Agreements:** owns the exclusive right to manage the finalists from the American Idol series in the United States. 19 Entertainment collects management fees from, among other things, the artists' performances and personal appearances; and

- **Tours**: owns the exclusive right to produce IDOLS tours, in addition to the exclusive licensing and merchandizing rights for such tours in the United States. 19 Entertainment has typically engaged the top finalists of the American Idol season as talent for a branded tour, produced by 19 Entertainment, in cities and venues across the United States and the world, although 19 Entertainment made the determination not to hold an IDOLS tour in 2016. Given the success of the IDOLS brand, touring has been a significant source of revenue for 19 Entertainment and helps expand the reach of the IDOLS brand.[5]

15. The IDOLS platform, which has been an entertainment juggernaut since its inception, is one of the centerpieces of the Company's business structure. Despite the program's longstanding success, however, the program experienced significant ratings declines in recent years and it was announced in May 2015 that American Idol will no longer air on FOX

---

[4]   FremantleMedia owns the remaining one-third of the IDOLS brand pursuant to a global television and distribution agreement with 19 Entertainment, however, the parties generally hold even economic stakes in the IDOLS brand. In the United States, the American Idol series aired on the FOX Network under agreements between 19 Entertainment, FremantleMedia and FOX that granted FOX the right to air American Idol.

[5]   Similar tours for SYTYCD have also served as a consistent source of revenue for 19 Entertainment.

in the United States following its fifteenth season, which recently concluded — a reality that contributed to the Company's decision to commence these cases.

       (b)      So You Think You Can Dance.

       16.      19 Entertainment also created and co-produces the television show SYTYCD, a talent competition for amateur dancers in a wide range of dance styles, which allows the viewing audience to participate in, and ultimately select, the winning performer via text messaging and telephonic voting.  The winner is voted "America's Favorite Dancer" and receives a cash prize.  Renewed for its thirteenth season, which is currently in production and is scheduled to premiere on May 30, 2016, SYTYCD has been a part of American television over the last decade.  Since its premiere in 2005, SYTYCD has continued to be one of the most popular shows on television.  It has taken the top spot in its time slots, won multiple Emmy awards, and become a social media phenomenon, generating over 70 million user votes per season.  The format for SYTYCD has been licensed internationally to over 24 different countries, a testament of the show's universal appeal and cross-cultural impact.

       17.      FOX has been granted a perpetual and exclusive license, including the right of first negotiation and last refusal, to broadcast SYTYCD.  For such rights, FOX pays 19 Entertainment a variable license fee per episodic hour and 19 Entertainment uses these fees to fund the production costs of the show.  19 Entertainment retains the balance of the FOX license fees after payment of production costs.  19 Entertainment also generates revenue from sales of the rights to rebroadcast the U.S. show to approximately 15 countries and the licensing of the format to produce country-specific formats in 5 foreign countries.  19 Entertainment pays a profit share to Dick Clark Productions and Nigel Lythgoe, with FOX also sharing in the profit on international tape and format sales.

C.    **History of Company.**

18.    CORE Media Group Inc. ("**CORE Media**") was formerly named CKX,

Inc. (and collectively with its subsidiaries, "**CKX**"), which was founded in 2005 and was a

publicly traded company.  CKX's other assets at the time included ownership of Elvis Presley

Enterprises ("**EPE**"), which owned 85% of the rights to trademarks and the name, image and

likeness of Elvis Presley, and the operation of the Graceland attraction (collectively, the "**Presley**

**Rights**"), Muhammed Ali Enterprises ("**MAE**"), which owned 80% of the rights to trademarks

and the name, image and likeness of boxer Muhammad Ali (the "**Ali Rights**"), a talent agency

located in Los Angeles, and a modeling agency in the United Kingdom.

19.    On June 21, 2011, Apollo CORE Holdings, L.P. ("**Apollo CORE**

**Holdings**"), an affiliate of investment funds managed by affiliates of Apollo Global

Management, LLC (collectively, "**Apollo**"), acquired indirect control of the Company through a

tender offer and subsequent merger of CKX.  At the time of the acquisition, the Company's

business plan was to invest capital to grow the revenue streams from the Ali Rights and Presley

Rights and to increase the Company's focus on development and acquisition of new content.

Following the acquisition, however, the board of directors and management team of the

Company determined that expansion of the Presley Rights and Ali Rights would require

significant capital and personnel investments, which would be inconsistent with the Company's

planned expansion into content development.  This hurdle, coupled with the Company's new

commitment to content development, led to the Company's determination to sell its interests in

EPE and MAE and to exit from the Company's other non-television related ventures, including

its talent and modeling agencies.  The Company planned to invest the proceeds from such

divestitures into content development and acquisition.

20.    As part of this transition, the Company shifted its strategic focus.  In 2012, CKX, Inc. rebranded itself as CORE Media Group Inc.  On July 17, 2012, CORE Media acquired a 100% ownership interest in Sharp Entertainment, LLC,[6] a leading reality television production company.  In addition, on November 8, 2013, the Company sold its interests in EPE and MAE.  The Company continued to seek further add-on investments in the market place with limited success due principally to the Company's (and its owners') determination that properties for sale in the market place were overvalued during this period.  Accordingly, the Company continued to focus its investments on development of new content and partnerships with developers of new content.

21.    As part of this overall strategy, the Company entered into several new partnerships and joint ventures to develop and produce content, and established CORE TV for internal development of new content and production of television programs, which include Sing It On for TV Guide Network, Euros of Hollywood for Bravo, Prison Wives Club for Lifetime and Hair Jacked for TruTV.  Additionally, the Company entered into production agreements and joint ventures with strategic partners such as B17 and Noreen Halpern, and entered (and subsequently exited from) development agreements with Andrew Glassman, Rob Lee, HazyMills, BigMinded, Tedy and others.[7]  To date, the Company's new content development and production efforts have not been profitable.

---

[6]    Sharp Entertainment Holdings, LLC and its subsidiaries are not Debtors and not part of this chapter 11 process.

[7]    The Company also established (and subsequently exited from) a business line to develop international television opportunities.

**D.    Recent Material Transactions.**

      **i.    Shared Services Agreement.**

      22.    In an effort to minimize administrative costs and take advantage of potential synergies, CORE Media's board approved its entering into the Services Agreement (the "**Shared Services Agreement**") with Endemol USA Holding, Inc. ("**Endemol**"),[8] a separate reality programming production company, on August 13, 2014, concurrently with the acquisition of indirect control of Endemol by affiliates of investment funds managed by Apollo.  Under the Shared Services Agreement, Endemol provided certain corporate and administrative services to CORE Media and its subsidiaries,[9] including, but not limited to, accounting, legal, finance, human resources, tax, audit, marketing, investor relations, and other administrative support services.  The Shared Services Agreement originally expired by its terms on August 13, 2019, unless earlier terminated in accordance with the terms of the Shared Services Agreement.  While CORE still retained certain employees, the employee base of CORE was reduced significantly after the Shared Services Agreement was entered into.

      23.    In addition, the Shared Services Agreement provided that Endemol support CORE Media's efforts in its development and investment in content by providing expertise in television production and distribution to CORE Media's in-house development teams.

      24.    CORE Media's payments to Endemol under the Shared Services Agreement were directly tied to the savings realized by reducing its costs.  In exchange for Endemol's services, CORE Media agreed to pay Endemol an annual $2,000,000 administrative

---

[8]     Endemol's production portfolio includes programs such as Big Brother and Deal or No Deal.

[9]     Under the Shared Services Agreement, Endemol also had the right to request CORE Media to perform certain services.

fee plus 50% of any savings realized by CORE Media and its subsidiaries by outsourcing such services to Endemol (as compared to the previous costs of procuring the same services from in-house staff or otherwise).

25.     On July 18, 2015, the Company elected to exercise its contractual right not to make the payment due under the Shared Services Agreement. The Company failed to cure the missed payment within thirty days after receiving notice from Endemol on July 22, 2015, and accordingly, the Company's failure to pay became an event of default under the Shared Services Agreement on August 21, 2015. The parties then negotiated, and on September 2, 2015, entered into, a Forbearance Agreement and Amendment to the Shared Services Agreement, pursuant to which the Shared Services Agreement terminated on December 31, 2015.[10]

### ii.     Transfer of Ownership to the Joint Venture.

26.     On December 12, 2014, 100% of the common shares of CORE Entertainment Holdings, Inc., CORE's direct parent, owned by Apollo CORE Holdings, together with the indirect interest of Endemol owned by affiliates of investment funds managed by Apollo, were contributed to AP NMT JV Newco B.V. (the "**Joint Venture**"). In addition, a subsidiary of Twenty First Century FOX, Inc. ("**21CF**") contributed its indirect equity ownership of the Shine Group, a separate reality television programming company,[11] to the Joint Venture. Although Endemol and Shine were consolidated in connection with this contribution,[12] CORE Holdings and its subsidiaries retained a separate capital structure under the ownership of the Joint Venture. Apollo maintains a 50% interest in the Joint Venture, with 21CF owning the remaining 50%.

---

[10]     The Company continued to rely upon Endemol for the services of a single key employee until April 15, 2016, at which point such individual became an employee of the Company.

[11]     Shine's portfolio includes programs such as MasterChef and The Biggest Loser.

[12]     The Endemol Shine Group provides the international sales and distribution structure for SYTYCD.

E.     **Debtors' Prepetition Capital Structure.**

27.     As of the Petition Date, the Debtors had approximately $398 million of consolidated outstanding indebtedness to third parties.  The components of the Debtors' outstanding indebtedness are summarized below:

i.     **First Lien Term Loan Facility.**

28.     CORE (f/k/a CKX Entertainment, Inc.) as borrower, CORE Media and the Debtor guarantors are party to a $200 million term loan facility pursuant to that certain First Lien Term Loan Agreement (the "**First Lien Term Loan Agreement**"), dated as of December 9, 2011, with the lenders party thereto and Goldman Sachs Bank USA, as Administrative and Syndication Agent (the "**First Lien Term Loan Facility**").  In December 2013, U.S. Bank National Association ("**U.S. Bank**") replaced Goldman Sachs as Administrative and Syndication Agent on behalf of the current lenders under the First Lien Term Loan Facility (the "**First Lien Agent**").  Pursuant to the First Lien Term Loan Agreement and related agreements, the lenders committed to lend the Debtors up to $200 million, bearing non-default interest at a rate of 9.0% per annum, conditioned, among other things, on the delivery of that certain (i) Master Guarantee Agreement, dated as of December 9, 2011, by CORE Entertainment Holding Inc. (f/k/a CKX Entertainment Holding, Inc.), as a guarantor and those certain subsidiaries of CORE party thereto from time to time (the "**Subsidiary Loan Parties**" and together with CORE and CORE Media, the "**Loan Parties**") in favor of the First Lien Agent, (ii) U.S. Collateral Agreement, dated as of December 9, 2011, by the Loan Parties in favor of the First Lien Agent (the "**First Lien Collateral Agreement**") and (iii) Second Lien Intercreditor Agreement by and among the First Lien Agent, the Second Lien Agent (as defined below), the agent under that certain Revolving Credit Agreement dated as of June 21, 2011, as amended and restated as of December 9, 2011, by and among CORE, CORE Media and the Subsidiary Loan Parties (the "**Second Lien**

**Intercreditor Agreement**").  No principal payments are due over the term of the First Lien

Term Loan Facility, which has a maturity date of June 21, 2017.

29.    The proceeds from the First Lien Term Loan Facility, coupled with the

proceeds from the Second Lien Term Loan Facility (as defined below), were used to refinance an

existing bridge loan facility in an aggregate principal amount of $360 million, which was entered

into in connection with the acquisition of the Company by Apollo in June 2011, and was set to

mature on June 21, 2012 (the "**Preexisting Bridge Facility**").

30.    Pursuant to the First Lien Collateral Agreement, the Loan Parties pledged

substantially all of their assets to secure all of the obligations under the First Lien Term Loan

Facility.  Specifically, in addition to their accounts, equipment and fixtures, the Loan Parties

pledged as security, among other things, (i) all of their equity interests (with certain restrictions)

in their operating subsidiaries, (ii) that certain Global Intercompany Note, dated as of June 21,

2011, by and among CORE and its subsidiaries issued in favor of the Loan Parties, and (iii) all of

their intellectual property, which are the rights essential to produce and market the Company's

programming, music and other content.

31.    As of the Petition Date, approximately $209 million including principal

and interest was currently outstanding under the First Lien Term Loan Facility.

As discussed in further detail below, an *ad hoc* group of lenders (the "**Ad Hoc Group**") party to

the First Lien Term Loan Agreement was formed and subsequently retained Klee, Tuchin,

Bogdanoff & Stern LLP and Houlihan Lokey Capital, Inc. as its advisors in this matter.  The Ad

Hoc Group is comprised of the following lenders (including funds and/or accounts managed

and/or controlled by such lenders): (1) Tennenbaum Capital Partners LLC, (2) Bayside Capital,

Inc., and (3) Hudson Bay Capital Management, LP.  In addition, the following lenders (including

funds and/or accounts managed and/or controlled by such lenders), while not members of the Ad

Hoc Group, are parties to a common interest/joint defense agreement with the Ad Hoc Group: (1)

Credit Suisse Asset Management, LLC and (2) CIT Bank N.A. The lenders referenced above

hold, in the aggregate, approximately 64% in principal amount of debt outstanding under the

First Lien Term Loan Agreement.  The Company has been in constant contact and negotiations

with the Ad Hoc Group and its advisors since early summer 2015.

ii.    **Second Lien Term Loan Facility.**

32.    CORE (f/k/a CKX Entertainment, Inc.) as borrower, CORE Media and the

Debtor guarantors are also party to a $160 million term loan facility pursuant to that certain

Second Lien Term Loan Agreement (the "**Second Lien Term Loan Agreement**" and, together

with the First Lien Term Loan Agreement, the "**Term Loan Agreements**"), dated as of

December 9, 2011, with the lenders party thereto and Goldman Sachs Bank USA, as

Administrative and Syndication Agent (the "**Second Lien Term Loan Facility**" and, together

with the First Lien Term Loan Facility, the "**Term Loan Facilities**").  In November 2012, U.S.

Bank subsequently replaced Goldman Sachs as Administrative and Syndication Agent on behalf

of the current lenders under the Second Lien Term Loan Facility (the "**Second Lien Agent**").

Under the Second Lien Term Loan Agreement and related agreements, the lenders committed to

lend the Debtors up to $160 million, bearing interest at a non-default rate of 13.5% per annum.

No principal payments are due over the term of the Second Lien Term Loan Facility, which has a

maturity date of June 21, 2018.

33.    The proceeds from the Second Lien Term Loan Facility, coupled with the

proceeds from the First Lien Term Loan Facility, were used to refinance the Preexisting Bridge

Facility.  The Company's obligations under the Second Lien Term Loan Facility are secured by

junior second priority liens upon and security interests in the same collateral securing the

obligations under the First Lien Term Loan Facility.  The relative rights of the lenders under the

Term Loan Facilities in such collateral are governed by the Second Lien Intercreditor Agreement.

34.    As of the Petition Date, approximately $189 million including principal and interest was currently outstanding under the Second Lien Term Loan Facility.

35.    As discussed in further detail below, Crestview Media Investors, L.P. ("**Crestview**"), as a lender under both the First Lien Term Loan Facility and the Second Lien Term Loan Facility, has retained Quinn Emanuel Urquhart & Sullivan, LLP and Millstein & Co. as its advisors in this matter.  Crestview holds approximately 34.8% of principal amount of debt outstanding under the First Lien Term Loan Facility and holds approximately 79.2% of principal amount of debt outstanding under the Second Lien Term Loan Facility.  The Company has been in constant contact and negotiations with Crestview and its advisors since early summer 2015.

**F.    Related-Party Transactions.**

**i.    Senior Unsecured Demand Promissory Note.**

36.    Debtor CORE Media is the issuer of that certain Senior Unsecured Demand Promissory Note, dated as of July 16, 2012, in favor of Apollo CORE Holdings, in the principal amount of $15 million (as amended, restated, or otherwise modified, the "**Senior Unsecured Note**").  The obligations under the Senior Unsecured Note bear interest at 8.0%.  On December 12, 2014, the Senior Unsecured Note was assigned to MediArena Holding B.V., which is a wholly-owned subsidiary of the Joint Venture.

37.    As of the Petition Date, approximately $17 million in principal and interest was currently outstanding with respect to the Senior Unsecured Note.

ii.    **Intercompany Revolver.**

38.    Pursuant to that certain Credit Agreement, dated as of November 26, 2013 (as amended, restated, or otherwise modified from time to time),[13] Debtor CORE Media, as borrower, entered into an intercompany unsecured revolving credit facility with one of the Debtors' non-Debtor affiliates — Elvis Blue Moon Holdings, LLC[14] — in the aggregate principal amount of $35 million (the "**Intercompany Revolving Credit Facility**").  The borrowing limit under the Intercompany Revolving Credit Facility was subsequently increased to $60 million.  The Intercompany Revolving Credit Facility, which bears interest at 5.0% per annum, has a maturity date of November 26, 2018.  As of the Petition Date, approximately $60 million was outstanding with respect to the Intercompany Revolving Credit Facility.

iii.    **Intercompany Note.**

39.    Debtor CORE Entertainment UK Limited (f/k/a CKX Entertainment UK Limited) has issued an intercompany unsecured note, dated as of June 21, 2011, in the principal amount of $360 million (the "**Intercompany Unsecured Note**") in favor of Debtor CORE Entertainment Cayman Limited (f/k/a CKX Entertainment Cayman Limited).  The Intercompany Unsecured Note, which bears interest at 9.0% per annum, has a maturity date of June 21, 2019.[15]

**G.    Equity Ownership.**

40.    The Joint Venture owns approximately 99.93% of the outstanding common stock in CORE Holdings, the ultimate parent of the Debtors.  The Promenade Trust holds 100% of the outstanding Series A Preferred Stock in CORE Holdings.  The issued and

---

[13]    CORE Media has entered into multiple credit agreements in respect of the intercompany borrowing.

[14]    Elvis Blue Moon Holdings, LLC ("**Elvis Blue Moon**") was designated by CORE as an "Unrestricted Subsidiary" as defined in and under the Term Loan Facilities and is therefore not an obligor thereunder.

[15]    The Intercompany Unsecured Note was put in place to more accurately evidence the business relationship between the entities.

outstanding Series B Preferred Stock is owned by certain former owners and related persons of a non-Debtor subsidiary.

**H.    Events Leading to Chapter 11 Cases.**

      **i.    Cancellation of *American Idol*.**

      41.    The decline in overall economics and the announced cancellation of the 2017 season of American Idol on FOX negatively impacted the revenues and profits of the Debtors' business.

      42.    The success of the IDOLS series, in particular American Idol, has been unparalleled.  For an unprecedented run from 2003 through 2010, the show received among the highest ratings on U.S. television.  The program's singing competition format, coupled with the show's ability to serve as a launching pad for the careers of numerous artists, embedded the show in the fabric of American pop culture.  By 2012, however, the show's ratings began to wane, in part due to the competitive landscape generally and the emergence of rival singing competition programs, and as a result the Company was unable to obtain comparable fees to prior years in a renegotiation of its contract with FOX.  The Company's business model relied heavily upon the continued appeal of the IDOLS and SYTYCD brands, particularly the American Idol series in the United States.  Since the Company's revenue stream from these television programs depends primarily upon such programs' continued acceptance by the public, a decline in the number of television viewers who watch the shows and a reduced number of the show's foreign adaptations is materially detrimental to the Debtors' businesses.  The result is lower advertising revenue for the networks that broadcast the Company's television brands, which in turn, harms the Company's ability to sell future format shows based on these brands.  As a consequence of this cycle, the Company's business, operating results and financial condition have suffered.

43.    In 2014, earnings from American Idol decreased $15 million from the prior year.  The program suffered fee reductions related to decreased ratings and increased production costs attributable to new creative changes that were implemented to boost the ailing ratings of the series.  Moreover, sponsorships, merchandise, tour ticket sales and rebroadcast sales of American Idol in foreign countries were all negatively affected by the program's decreased airtime and decline in popularity.

44.    The show's decline continued further into the 2015 season as well.  A further reduction of airtime (42 hours of American Idol ordered in 2015 as compared to 56.5 hours in 2014) resulted in corresponding decreases in premium production fees that the Debtors had been earning.  The Company also experienced increased hourly costs as certain fixed production costs had to be spread over fewer production hours.  The Company suffered a total revenue decrease of $35.6 million based on consolidated operating results for the first half of 2015 (as compared to the first half of 2014), reflecting lower revenue streams from American Idol as well as other television shows in the Debtors' portfolio.  Additional negative ripple effects included, among other things:  a decline in re-broadcast fees due to reduced broadcast hours; the loss of both Coca Cola and AT&T as main sponsors of American Idol; and the closure of the American Idol Experience theme park attraction at Walt Disney World.

45.    This decline culminated on May 11, 2015 in FOX announcing that it would no longer air the American Idol series in the United States after its fifteenth season (which began in January 2016).  In addition, on-air hours and resulting economics for the final season were further reduced from last season's schedule.  Given American Idol's role as a centerpiece of the Company's business model, this announcement has had a detrimental effect on IDOLS' television programming rights and set the Company on an inevitable path towards a restructuring of its balance sheet.

ii.    **Substantial Indebtedness.**

46.    Further, as discussed above, the Debtors have substantial indebtedness under the Term Loan Facilities.  As of the Petition Date, the Debtors had approximately $398 million of consolidated outstanding indebtedness related to the Term Loan Facilities.

iii.    **Inability to Replace Key Revenue Streams.**

47.    The Company's inability to replace key revenue generators has also contributed to the Debtors' decision to commence these chapter 11 cases.  Notably, the Company has been unable to replace the revenue generated by <u>American Idol</u> or the consistent, but much lower, revenue streams generated by the Ali Rights and the Presley Rights, which were sold in late 2013.  Despite the immediate gains received from these sales, the Company has not been able to acquire enough assets to offset the revenue drop off following the sales, and the development of new income-producing programming content has been slower than expected. While the Debtors have taken many steps to replace this lost revenue (including, as discussed above, entering into the B17 joint venture and the acquisition of Sharp Entertainment, LLC), to date, the Company has not secured new business lines sufficient to justify its balance sheet in order to service its outstanding debts.

iv.    **Acceleration of First Lien Term Loan Facility.**

48.    By letter dated April 13, 2015, U.S. Bank, in its role as First Lien Agent, alleged that certain defaults existed including that the creation of the Joint Venture and such entity's indirect ownership of the Debtors constituted defaults under the First Lien Term Loan Agreement.[16]  U.S. Bank further asserted that the Company's failure to cure such defaults within a 60-day period (<u>i.e.</u>, June 12, 2015) would result in an "Event of Default" under the First Lien

---

[16]    By letter dated March 25, 2015, U.S. Bank had previously raised similar allegations and demanded that the Company immediately produce several categories of information, which the Company promptly delivered shortly thereafter.  The Company disputed U.S. Bank's allegations of default at that time as well.

Term Loan Agreement.  U.S. Bank's counsel sent a similar letter on May 7, 2015 to the

Company's Board of Directors demanding that the purported defaults be cured.  The Company

responded to these letters on April 20, 2015 and May 15, 2015, respectively, contesting the

assertions raised by U.S. Bank, while expressing its willingness to provide U.S. Bank with

information that would demonstrate the lack of merit in U.S. Bank's position.

49.    U.S. Bank, by that certain Notice of Default and Acceleration dated June

17, 2015, stated that because the Company had not cured its purported defaults, U.S. Bank, on

behalf of the lenders under the First Lien Term Loan Facility, was accelerating the First Lien

Term Loan Facility and that all principal, interest and other liabilities thereunder were due and

payable immediately and that a default interest rate of 11.0% per annum would be applicable.

Counsel for the Company responded on June 18, 2015, disputing the alleged defaults and

rejecting the purported acceleration.

**v.    Missed Interest Payments Under the Second Lien Term Loan Facility.**

50.    The Company's interest payments under the First Lien Term Loan Facility

and Second Lien Term Loan Facility, totaling approximately $10 million, became due on June

11, 2015.  While the Debtors made the interest payment under the First Lien Term Loan

Facility,[17] the Debtors, recognizing that a restructuring could be imminent, elected not to make

the interest payment under the Second Lien Term Loan Facility.  The 30-day grace period to

make the interest payment under the Second Lien Term Loan Agreement expired on July 11,

2015.  Further, upon the expiration of this grace period, the Second Lien Term Loan Facility

became subject to acceleration.  The Debtors, however, continued to make interest payments

---

[17]    The interest payment made by the Debtors under the First Lien Term Loan Facility, which was due on
September 11, 2015, was made in the amount of $4,711,111.11, which amount included default interest
from September 1, 2015.

under the First Lien Term Loan Facility when such payments were due on September 11, 2015

and December 11, 2015.[18]

      **vi.**    **Simon Fuller and UK Recognition Proceeding.**

      51.    Issues surrounding the Company's relationship with Simon Fuller — the

Company's former director and Chief Executive Officer of the 19 Entertainment business and

creator of the <u>IDOLS</u>, <u>American Idol</u> and <u>SYTYCD</u> programs — has also contributed to its

decision to commence these chapter 11 cases.  On January 13, 2010, Mr. Fuller left his director

and officer positions and entered into a series of agreements with the Company, among other

things securing Mr. Fuller's long-term creative services as a consultant.  Specifically, Mr. Fuller

and Debtor 19 Entertainment Limited entered into that certain Consultancy Deed, dated as of

January 13, 2010 (the "**<u>Fuller Consultancy Deed</u>**"), pursuant to which the Company engaged

Mr. Fuller to provide services, including executive producer services, in respect of the

Company's <u>IDOLS</u> and <u>SYTYCD</u> programs.  In consideration for providing these services,

Mr. Fuller received, among other things, a profit share from each of the aforementioned

programs for the life of the programs as long as Mr. Fuller continues to provide consulting

services with respect to such programs.

      52.    On April 11, 2016, Mr. Fuller served a statutory demand on 19

Entertainment Limited — the Debtor counterparty to the Fuller Consultancy Deed that is

incorporated in the United Kingdom, yet has its center of main interests in the United States[19] —

pursuant to section 123(1)(a) of Great Britain's Insolvency Act 1986, demanding payment of

$2,949,000 under the Fuller Consultancy Deed.  If the statutory demand is not paid in full within

---

[18]      However, the Company did not make the interest payment under the First Lien Term Loan Facility due on
March 11, 2016 in accordance with the terms of the Forbearance Agreements (as defined below).

[19]      For example, as part of the Company's restructuring efforts in 2010, the Company closed its office in
London and relocated the 19 Entertainment headquarters to its Los Angeles, California office.

twenty-one days of its issuance, Mr. Fuller could commence winding-up proceedings in the

United Kingdom against Debtor 19 Entertainment Limited.[20]

53.    While the Debtors believe that the commencement of a foreign winding-up proceeding by Mr. Fuller would be stayed pursuant to the Bankruptcy Code's automatic stay, the Company is prepared to take all precautions necessary to prevent Mr. Fuller's actions to distract the Company's attention and resources away from its chapter 11 reorganization efforts or to jeopardize valuable assets held by Debtor 19 Entertainment Limited.  To that end, in conjunction with its chapter 11 filing in the United States, the Company will commence an ancillary recognition proceeding under the Cross-Border Insolvency Regulations 2006, which implements the UNCITRAL Model Law in Great Britain, in the English High Court located in London, England (the "**UK Court**" and such proceedings, the "**UK Proceeding**").  Given the fact that the Company believes that 19 Entertainment Limited's center of main interests is located in the United States, the Company will be seeking recognition of these chapter 11 cases by the UK Court as a "foreign main proceeding."[21]

### vii.    Debtors' Efforts to Negotiate a Comprehensive Restructuring.

54.    The Debtors enter chapter 11 having made meaningful restructuring progress.  With the concerns discussed above in mind, and recognizing the necessity of a balance sheet restructuring, the Debtors retained Moelis & Company LLC ("**Moelis**") as investment banker and financial advisor and Willkie Farr & Gallagher LLP as restructuring counsel in June 2015.  Since that time, the Company and its professionals have worked vigorously, seeking to

---

[20]    Due to a bank holiday in Great Britain, the earliest date on which Mr. Fuller could present a winding-up petition against 19 Entertainment Limited in reliance on the statutory demand is May 3, 2016.

[21]    In conjunction with the commencement of its chapter 11 cases, the Company will also initiate an adversary proceeding against Mr. Fuller and move for a temporary restraining order and preliminary injunction enjoining Mr. Fuller from taking any action to collect money he claims he is owed under the Fuller Consultancy Deed.

reach a resolution with its primary creditor constituencies.  Indeed, in order to negotiate a comprehensive financial restructuring of the Debtors, the Company and its advisors initiated a dialogue, and entered into confidentiality agreements, with certain prepetition secured lenders and/or their professionals.  Commencing on July 26, 2015, the Company entered into forbearance agreements (collectively and as amended, restated, extended or otherwise modified from time to time, the "**Forbearance Agreements**") with:  (a) certain lenders holding the requisite amount of loans under the First Lien Term Loan Facility; and (b) Crestview Media Investors, L.P., as lender under the First Lien Term Loan Facility and the Second Lien Term Loan Facility.  Pursuant to the Forbearance Agreements, the lenders party thereto agreed to forbear from exercising their remedies on account of any missed payments or certain alleged defaults under the Term Loan Agreements until the earlier of (a) April 30, 2016; and (b) certain events of default under the Forbearance Agreements.

55.    While the prepetition discussions with the lenders party to the Forbearance Agreements have progressed productively, when it ultimately became clear that reaching resolution on the terms of an out-of-court restructuring was not feasible, the Debtors determined that seeking protection under chapter 11 was in the best long-term interests of the Debtors and their stakeholders.  Notably, however, following an extensive, multi-track negotiation process, the Debtors have reached an agreement in principle to restructure the Debtors with the Ad Hoc Group and Crestview.  In light of this progress, the Company is confident that it will be able to finalize and document a global deal in the near term.  As such, the Company and its advisors are optimistic that a restructuring solution exists that benefits all creditors and parties in interest. Moreover, the parties' fruitful negotiations, which began several months ago, is further evidenced, in part, by the additional forbearance agreements with the Company's primary lender

constituents to avoid needing to file Sharp Entertainment Holdings, LLC and its subsidiaries, which are not Debtors and not part of this chapter 11 process.

## II.    SUMMARY OF FIRST DAY MOTIONS[22]

56.    To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file in the near term, the motions and applications described below.

57.    In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and will assist in their reorganization efforts.

### A.    Motions Related to Case Management.

#### i.    Joint Administration Motion.

58.    The Debtors seek the joint administration of their chapter 11 cases — forty-eight in total — for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration.  First, each of the Debtors is a co-obligor under the Debtors' prepetition credit facilities, either as a borrower or as a guarantor.  In addition, the treatment of certain contracts and business relationships of a single Debtor may impact the assets and operations of other Debtors.  Further, many of the motions, hearings, and other matters involved in these

---

[22]    Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

chapter 11 cases will affect all of the Debtors.  Hence, joint administration will reduce costs and

facilitate the administrative process by avoiding the need for duplicative hearings, notices,

applications and orders.  It is my understanding that no prejudice will befall any party by the

joint administration of the Debtors' cases as the relief sought therein is solely procedural and is

not intended to affect substantive rights.

### ii.    Case Management Motion.

59.    To ease the administrative burden of these cases on the Debtors' estates

and promote the efficient and orderly administration of these cases, the Debtors request entry of

an order:  (a) establishing noticing, case management and administrative procedures in the

Debtors' chapter 11 cases; (b) scheduling omnibus hearing dates; and (c) authorizing the Debtors

to establish procedures for notifying creditors of the commencement of these cases.  I believe

that the relief requested will reduce the administrative costs of these cases and is in the best

interests of the Debtors, their estates, their creditors and other parties in interest.

### iii.    Motion to Extend Deadline to File Schedules and Statements.

60.    Concurrently herewith, the Debtors filed a motion seeking a 30-day

extension of their deadline (i.e., to June 13, 2016) to file their Schedules of Assets and Liabilities

and Statements of Financial Affairs.

61.    Due to the complexity of the Debtors' businesses, the number of Debtor

entities, the substantial burden already imposed on the Debtors' management by the

commencement of these chapter 11 cases, the limited number of employees available to collect

the required information, and the fact that the Debtors have a substantial number of creditors, the

Debtors will be unable to complete their Schedules and Statements by the deadline set forth

pursuant to the Bankruptcy Code and the Bankruptcy Rules.  Therefore, I believe that good cause

exists for extending the deadline by which the Debtors must file their Schedules and Statements.

I understand that granting this motion is in the best interests of the Debtors' estates as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely reorganization process.

### B.   Applications and Motions Related to the Retention of Professionals.

### i.   Application to Employ and Retain Kurtzman Carson Consultants LLC.

62.   Concurrently herewith, the Debtors filed an application to retain Kurtzman Carson Consultants LLC ("**KCC**") as this Court's notice and claims agent for the Debtors' chapter 11 cases. I believe that the retention of KCC is critical because of the large number of creditors identified in these cases.

63.   I understand that KCC is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases. The Debtors solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting KCC and believe KCC's rates are reasonable given the quality of KCC's services and prior bankruptcy experience. Given the need for the services described above and KCC's expertise in providing such services, I believe that retaining KCC will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

64.   The Debtors also intend to file a separate application to retain KCC as an administrative agent to provide, among other things, certain solicitation and balloting services.

### ii.   Other Retention Applications.

65.   The Debtors also intend to file certain applications, upon the scheduling of a further hearing by the Court, to retain professionals who will assist the Debtors in the administration of these chapter 11 cases. Among certain other professionals, the Debtors will seek to retain: Willkie Farr & Gallagher LLP as bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases; Moelis & Company LLC as financial advisor and

investment banker; and PricewaterhouseCoopers LLP as independent auditors and tax

consultants.  The Debtors also intend to file a motion regarding interim compensation, seeking

authorization and establishing procedures for compensating and reimbursing professionals on a

monthly basis, on terms comparable to the procedures established in other chapter 11 cases in

this district.

66.     In addition, the Debtors intend to file a motion authorizing the Debtors to

retain certain professionals utilized in the ordinary course of their businesses without the

submission of separate retention applications and the issuance of separate orders approving the

retention of each individual professional and authorizing the Debtors to pay each professional in

accordance with the terms set forth in the motion without application to the Court by such

professional.

C.    **Motions Related to Financing of Operations**

i.    **Motion to Authorize Continued Use of the Debtors' Cash Management
System, Bank Accounts and Business Forms.**

67.     In the ordinary course of their businesses prior to the Petition Date, and as

is typical with business organizations of similar size and scope the Debtors maintain a

centralized cash management system to collect, transfer, and disburse funds generated through

their operations efficiently and to record such transactions accurately.

68.     It is my understanding that the U.S. Trustee Guidelines require chapter 11

debtors to, among other things, close all existing bank accounts and open new accounts which

must be designated debtor-in-possession bank accounts and obtain, establish and maintain

separate debtor-in-possession accounts.  The Debtors intend to request a waiver of such

requirements.

69.     I believe that the Debtors' existing cash management and intercompany

accounting procedures are essential to the orderly operation of the Debtors' businesses.  The cost

and expense of changing bank accounts and creating a new Cash Management System could cause confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could diminish the prospects for a successful reorganization.  Thus, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date, including transactions with their foreign and non-Debtor subsidiaries.

70.    In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements.  The Debtors believe their current Cash Management System meets those requirements.  Moreover, the Debtors request authority to continue performing, in their discretion,[23] their prepetition practices with respect to intercompany transactions and to grant administrative expenses status to obligations arising out of intercompany claims, including those with foreign and non-Debtor subsidiaries.  Thus, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date and to continue intercompany transfers in the ordinary course of business.

71.    I believe that allowing the Debtors to maintain their Cash Management System would be in the best interests of the Debtors' estates, creditors and other parties in interest.

---

[23]    Pursuant to that certain Forbearance Agreement, dated as of April 27, 2016, by and among the Sharp entities and the Ad Hoc Group and pursuant to that certain Forbearance Agreement, dated as of April 27, 2016, by and among the Sharp entities and Crestview, the Debtors are prohibited from transferring payments, property or assets to the Sharp entities or B17 Entertainment, LLC or any of its subsidiaries in excess of $150,000.

ii.      **Motion to Approve Debtor-in-Possession Financing.**

72.      The Debtors intend to seek authority (on a non-emergency basis) to enter
into a debtor-in-possession financing facility (the "**DIP Credit Facility**") with Elvis Blue Moon,
a non-Debtor affiliate.  The motion seeking authorization of the DIP Credit Facility (the "**DIP
Motion**") is not one of the motions for which the Debtors are seeking first day relief, and will be
put out on regular notice.

iii.     **Motion for Approval of Stipulation Authorizing Debtors to Use Cash and/or
Cash Collateral**

73.      Concurrently herewith and in conjunction with the intended DIP Motion,
the Debtors filed a motion for approval of a stipulation to use their cash and/or cash collateral
prior to the court's consideration and determination of the DIP Motion and to grant adequate
protection to the prepetition secured parties, all as described more fully in the motion and in
the stipulation.

74.      Certain of the lenders party to the First Lien Term Loan Agreement have
asserted that the Debtors' cash constitutes cash collateral of the prepetition secured parties and
requires their consent prior to use by the Debtors.  The Debtors dispute that such cash
constitutes cash collateral (except for $10 million of such cash that is contained in an account
subject to an account control agreement) and, to avoid disputes prior to the court's
consideration of the DIP Motion, engaged in good faith negotiations with the first lien lenders
and the administrative agent under the First Lien Term Loan Agreement, as well as with the
largest second lien lender.

75.      I believe that use of the cash is necessary in order to permit the orderly
continuation of the Debtors' businesses, preserve the going concern value of the Debtors and
their non-Debtor affiliates, make payroll and satisfy other working capital and general corporate

purposes, including those costs associates with these bankruptcy cases and the Debtors'

restructuring efforts.  The Debtors, certain first lien lenders constituting required lenders and the

required second lien lender have agreed, pending the court's consideration and determination of

the DIP Motion, to the Debtors' use of cash and/or cash collateral and to the provision of

adequate protection to the prepetition secured parties with respect to the First Lien Term Loan

Agreement and the Second Lien Term Loan Agreement.

76.    For the foregoing reasons, I believe that the cash collateral stipulation is

necessary under these circumstances and is in the best interest of the Debtors and their estates.

**D.    Motion for Authorization to Pay Certain Prepetition Claims of Employees.**

77.    Concurrently herewith, the Debtors have filed a motion seeking authority

to, among other things, satisfy certain of their prepetition obligations to their Employees,

Temporary Employees[24] who are paid through Staffing Agencies and Independent Contractors,

pay prepetition payroll-related taxes and withholdings associated with the Company's employee

wage claims and the employee benefit obligations, and other similar tax obligations, continue

any employee benefit programs in place as of the Petition Date (including satisfying any

prepetition obligations associated with such programs) and reimburse Employees for prepetition

travel and other business expenses that were incurred on behalf of the Debtors.  This relief is

critical to the Debtors' businesses and reorganization efforts.

---

[24]    Certain of the Debtors' current Temporary Employees are subject to a collective bargaining agreement with
The Directors Guild of America, The Screen Actors Guild — The American Federation of Television and
Radio Artists, and the International Alliance of Theatrical Stage Employees, Moving Picture Technicians,
Artists and Allied Crafts of the United States, Its Territories and Canada, AFL-CIO (collectively, the
"**Unions**").  The Debtors' monetary obligations with respect to the Unions for the Temporary Employees
are limited to withholdings for Union dues, which have historically been $5,000 or less in the aggregate per
payroll period, and are processed by the Staffing Agencies.  Additionally, while the Debtors have in the
past entered into collective bargaining agreements and/or letters of adherence agreements with The Writers
Guild of America, West, Inc., the Debtors do not currently have any Employees or Temporary Employees
that are represented by said union.

78.      In order to achieve a successful reorganization, it is essential that the Company's Employees, Temporary Employees and Independent Contractors, work with the same or greater degree of commitment and diligence as they did prior to the Petition Date.  The requested authority to continue to pay the Prepetition Employee Obligations, Temporary Employee Claims and Independent Contractor Claims and to maintain the current employee benefits programs is critical to ensure that:  (a) the Debtors can retain personnel knowledgeable about the Debtors' businesses; (b) the Debtors' Employees, Temporary Employees and Independent Contractors continue to provide quality services to the Debtors at a time when they are needed most; and (c) the Debtors remain competitive with comparable employers.

79.      If this motion were not granted, I believe that it would result in a significant deterioration in morale among Employees, which undoubtedly would have a devastating impact on the Debtors, the value of estate assets and the Debtors' ability to reorganize.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the Employees to the restructuring effort.  Prepetition Employee Obligations paid pursuant to the Proposed Interim Order will not exceed $12,850 for any individual employee, and no bonuses will be paid to employees within the first twenty-one days following the Petition Date.  I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their estates, their creditors and other parties in interest, and will enable the Debtors to continue to operate their businesses without disruption in an economic and efficient manner.

80.      Given the extended time period of the prepetition negotiations and the Company's declining revenue and business base, the Debtors' board became acutely concerned that it would not be able to retain key members of management.  Moreover, the creditors' myriad

proposals to restructure the Debtors all anticipated that the current senior executives would remain in their current positions post-restructuring.  In order to improve the likelihood of achieving this goal, the board's compensation committee authorized and approved a Key Employee Incentive Program (the "**KEIP**").  While not the subject of a "first day" motion, the Debtors would expect to file a motion and ask the Court to approve the KEIP shortly.

81.    For the reasons set forth above, I believe that granting the requested relief is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

### E.    Certain Other Motions.

#### i.    Motion to Authorize Payment of Prepetition Claims of Critical Vendors.

82.    Fundamentally, these chapter 11 cases were necessary to delever the Debtors' balance sheet and not to effect operational changes or fixes.  In order to continue operating their businesses, the Debtors must rely on certain vendors and suppliers (the "**Trade Claimants**") that provide the Debtors with certain specialized materials, services and talent, particularly with respect to television programs currently in production, that are critical to the Debtors' operations and financial viability.  Absent the cooperation of these Trade Claimants, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.

83.    In connection with determining which vendors are actually essential to the Debtors' business operations, the Debtors considered the following criteria, among other things: (a) whether the vendor in question is a sole source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors; (c) whether the Debtors are dependent upon such vendors to ensure the timely and successful completion of ongoing projects, particularly in instances where, given the fast-paced nature of the productions, such vendors'

services and expertise are integrated into the ongoing production of the Debtors' programs and

failure to replace such vendors would jeopardize production; (d) whether certain customizations,

specifications or volume requirements prevent the Debtors from obtaining services from

alternative sources within a reasonable timeframe, given the anticipated length of operations;

(e) whether, if a vendor is not a sole source provider, the Debtors have sufficient in-house

capabilities to continue operations while a replacement vendor is found and put in place;

(f) whether a vendor is otherwise contractually obligated to continue to provide services to the

Debtors; and (g) whether a vendor is likely to refuse to provide services to the Debtors

postpetition if its prepetition balances are not paid.

   84.  Based on the foregoing considerations, the Debtors identified Trade

Claimants whose cessation of services would negatively impact in short order the Debtors'

businesses (in particular, their ongoing programs currently in production) and, therefore, result in

irreparable harm to the Debtors' estates.  The Debtors believe that the Trade Claimants will

refuse to supply services to the Debtors postpetition unless some or all of these claims are paid,

and that immediate replacement of the Trade Claimants would be impracticable or, in some

cases, impossible.  Without authority to pay the Trade Claimants, the Debtors could be forced to

suspend operations immediately, which would be highly destructive to the seamless production

of the Programs and to the Debtors' efforts to maximize the value of their assets.  Accordingly,

the Debtors seek authorization to pay the Trade Claimants in the ordinary course of business.  As

of the Petition Date, the Debtors estimate, based on a thorough review of their books and

records, that the Trade Claims total approximately $781,000.  The Proposed Interim Order, if

entered, will grant the Debtors the authority to pay only a portion of the Trade Claims up to the

maximum amounts designated in the Proposed Interim Order.  I believe that the limited relief

requested on an interim basis, to be paid within the twenty-one (21) day period following the

Petition Date, is the absolute minimum amount necessary to avoid the immediate and irreparable

harm that would befall the Debtors' estates if the Debtors were unable to pay any Trade Claims

prior to the final hearing on the Motion.  While the Debtors are seeking limited relief on an

interim basis, I submit that the full relief requested pursuant to the Proposed Final Order is

critical to maximizing the value of the Debtors' estates beyond the initial interim period.

85.    For the reasons stated above, and explained more fully in the motion, I

believe that the relief sought therein is necessary for a successful reorganization and is in the best

interests of the Debtors, their estates, their creditors and other parties in interest.

**ii.    Motion for Authority to Pay Certain
Prepetition Sales, Use and Other Taxes and Regulatory Fees.**

86.    The Debtors seek entry of an order authorizing them to pay various

prepetition sales and use taxes (collectively, the "**Trust Fund Taxes**") and other taxes (the

"**Other Taxes**") to various federal, state, local and foreign authorities (collectively, the "**Taxing

Authorities**"), and certain licensing, permitting and regulatory fees (the "**Regulatory Fees**" and

together with the Trust Fund Taxes and the Other Taxes, the "**Taxes**") to certain federal, state,

local and foreign government agencies (collectively, the "**Regulatory Authorities**" and together

with the Taxing Authorities, the "**Applicable Authorities**") on a periodic basis, in each case, as

and when such obligations become due.  In the ordinary course of their businesses, the Debtors

collected Trust Fund Taxes and hold them for a period of time before remitting them to the

appropriate Taxing Authorities.  The Debtors are also required to pay Regulatory Fees,

including, but not limited to, certain business licensing and permit fees.  The Debtors also pay

certain Other Taxes, including, but not limited to, VAT Taxes, property taxes and state and local

income taxes, to certain Applicable Authorities on a periodic basis.

87.    Payment of the prepetition Taxes is critical to the Debtors' continued,

uninterrupted operations.  The Debtors' failure to pay these obligations may cause the Applicable

Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic

stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt

the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors'

estates.  Failure to pay the prepetition Taxes could also have a negative impact on the Debtors'

existing permits and licenses.  In addition, the Debtors believe that most of the prepetition Taxes

are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect

only the timing of the payments, and not the amount of the ultimate recovery.  As of the Petition

Date, the Debtors estimate, based on a thorough review of their books and records, that the Taxes

total approximately $765,000.  The Proposed Interim and Final Orders, if entered, will grant the

Debtors the authority to pay the Taxes in accordance with the Debtors' prepetition practices.

88.    I believe that the authority to pay the Applicable Authorities in accordance

with the Debtors' prepetition business practices is in the best interest of the Debtors and their

estates.

### iii.    Motion Enforcing the Protections of Sections 362, 365 and 525 of the Bankruptcy Code.

89.    To aid in the administration of the Debtors' bankruptcy cases and to

further their reorganization prospects, the Debtors are seeking an order that confirms the

application of three key protections provided by the Bankruptcy Code — the automatic stay

provisions of section 362, the *ipso facto* provisions of section 365 and the anti-discrimination

provisions of section 525.  The global nature of the Debtors' businesses and their dealings with

non-U.S. creditors who may be unfamiliar with the protections afforded chapter 11 debtors under

sections 362, 365 and 525 of the Bankruptcy Code require that an order implementing these

protections be entered by this Court.

90.    Many of the non-U.S. creditors affected by sections 362, 365 and 525 of

the Bankruptcy Code likely are not aware of the significant and necessary protections these

sections provide to the Debtors.  Further, the "automatic" and self-executing nature of these

protections may not be recognized promptly by foreign creditors or tribunals unless embodied in

an order of this Court.  Accordingly, the Debtors respectfully request that the Court issue an

order which restates the applicable provisions of sections 362, 365 and 525 of the Bankruptcy

Code.  Such an order, which the Debtors will be able to transmit to affected parties, will

maximize the protections afforded by such sections of the Bankruptcy Code.

91.    Accordingly, I believe that the relief requested therein is in the best

interests of the Debtors, their estates, and creditors and should be approved.

### III.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

92.    It is my understanding that Local Rule 1007-2 requires certain

information related to the Debtors, which is set forth below.

93.    Schedule 2 is the corporate organizational chart of the Debtors and their

non-Debtor affiliates.

94.    Exhibit A hereto provides that to the best of the Debtors' knowledge, as of

the Petition Date, two ad hoc committees or groups have been formed.

95.    Exhibit B hereto provides the following information with respect to each

of the holders of the Debtors' fifty (50) largest unsecured claims:  (a) each creditor's name,

address (including the number, street, apartment or suite number, and zip code, if not included in

the post office address) and telephone number; (b) the nature and approximate amount of such

creditor's claim; and (c) an indication of whether the claim is contingent, unliquidated, disputed,

or partially secured.

96.    Exhibit C hereto provides the following information with respect to the

holders of the five (5) largest secured claims against the Debtors:  (a) the creditor's name,

address (including the number, street, apartment or suite number, and zip code, if not included in

the post office address) and telephone number; (b) the amount of the claim; (c) a brief

description of such creditor's claim; (d) if known, an estimate of the value of the collateral

securing the claim; and (e) whether the claim or lien is contingent, unliquidated or disputed.

97.     Exhibit D hereto provides a summary of the Debtors' assets and liabilities.

98.     Exhibit E hereto provides that the outstanding equity interests of the

Debtors are privately held, and that there is no established public trading market for such equity

interests or the Debtors' debt securities.

99.     Exhibit F hereto sets forth a list of the property of the Debtors in the

possession or custody of a custodian, public officer, mortgagee, pledge, assignee of rents, or

secured creditor, or agent for any such entity.

100.     Exhibit G hereto sets forth a list of the owned or leased premises from

which the Debtors operate their businesses.

101.     Exhibit H hereto sets forth the location of the Debtors' substantial assets

and the location of their books and records.

102.     Exhibit I hereto sets forth the nature and present status of each action or

proceeding, pending or threatened, against the Debtors or their property where a judgment or

seizure of their property may be imminent.

103.     Exhibit J hereto provides a list of the names of the individuals who

comprise the Debtors' existing senior management, their tenure with the Debtors and a brief

summary of their relevant responsibilities and experience.

104.     Exhibit K hereto sets forth the estimated amount to be paid to:

(a) employees; (b) officers, stockholders and directors; and (c) financial and business consultants

retained by the Debtors, for the thirty (30) day period following the Petition Date.

105.    <u>Exhibit L</u> hereto sets forth a list of the Debtors' estimated cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the thirty (30) day period following the Petition Date.

## **CONCLUSION**

        In furtherance of their reorganization efforts, the Debtors respectfully request that

orders granting the relief requested in the First Day Motions be entered.

Dated:  April 28, 2016
        New York, New York

                                 AOG Entertainment, Inc., et al.,
                                 Debtors and Debtors in Possession

                                 /s/ Peter Hurwitz                 
                                 Peter Hurwitz
                                 President and/or Authorized Signatory of
                                 Debtors and Debtors in Possession

## **Schedule 1**

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| 19 Entertainment Limited (8517) | CORE Group Productions Limited (8504) |
| 19 Entertainment Worldwide LLC (1986) | CORE Media Group Inc. (8168) |
| 19 Entertainment, Inc. (0323) | CORE Media Group Productions Inc. (8505) |
| 19 Management Limited (8501) | CORE MG UK Holdings Limited (8518) |
| 19 Merchandising Limited (8512) | CTA Productions, Inc. (5879) |
| 19 Productions Limited (8490) | Dance Nation Productions Inc. (9622) |
| 19 Publishing Inc. (0800) | Double Vision Film Limited (8492) |
| 19 Recording Services, Inc. (0641) | EPE Holding Corporation (2295) |
| 19 Recordings Limited (8507) | Focus Enterprises, Inc. (4396) |
| 19 Recordings, Inc. (9492) | Fresh Start Productions, LLC (2204) |
| 19 Touring Limited (8499) | Gilded Entertainment, LLC (4153) |
| 19 Touring LLC (7157) | IICD LLC (N/A) |
| 19 TV Limited (8511) | J2K Productions, Inc. (2687) |
| 7th Floor Productions, LLC (9160) | Magma Productions, LLC (4711) |
| All Girl Productions (5760) | Masters of Dance Productions Inc. (3417) |
| Alta Loma Entertainment, LLC (3015) | Native Management Limited (6634) |
| AOG Entertainment, Inc. (4420) | Native Songs Limited (N/A) |
| Brilliant 19 Limited (N/A) | On the Road Productions (3468) |
| Clown Car Productions, LLC (5459) | Pioneer Production Services LLC (4822) |
| CORE Entertainment Cayman Limited (4886) | Sonic Transformation, LLC (7828) |
| CORE Entertainment Offeror, LLC (2685) | Southside Productions Inc. (1908) |
| CORE Entertainment UK Limited (2685) | Sunset View Productions, LLC (1692) |
| CORE Entertainment Inc. (4420) | SYTYCD DVD Productions Inc. (1976) |
| CORE G.O.A.T. Holding Corp. (3459) | This Land Productions, Inc. (9523) |

## Schedule 2

**Organizational Chart**



**CORE Media Group
Corporate Structure**

As of March 31, 2016

CORE Entertainment
Holdings Inc.
(DE) *

100%

CORE Entertainment Inc.
(DE)

100%                                    100%

CORE Entertainment UK Limited
(UK)

CORE Entertainment Cayman
Limited
(KY)

100%

CORE Entertainment Offeror
LLC
(DE)

100%

CORE Media Group Inc.
(DE)

100%            100%                100%                100%            100%

Sharp Entertainment
Holdings, LLC
(NY)*

CORE MG UK
Holdings Limited
(UK)

19 Entertainment
Worldwide LLC
(DE)

CORE
G.O.A.T.
Holding Corp.
(DE)

EPE
Holding Corporation
(DE)

Schedule D

19
EntertainmentLimited
(UK)

Schedule  B

G.O.A.T. Blue Moon
Parent, LLC
(DE) *

100%

Elvis Blue Moon Parent,
LLC
(DE) *

100%

Focus
Enterprises, Inc.
(CA)

Schedule A

G.O.A.T. Blue Moon
Holdings, LLC
(DE) *

100%

Elvis Blue Moon Holdings,
LLC
(DE) *

100%

AOG Entertainment, Inc.
(CA)

*Non-Debtor Entities



## Schedule A

19 Entertainment Limited (UK)
100%
Native Management Limited (UK)
100%
Native Songs Limited (UK)
TLS Management Limited (UK) *
50%
19 Entertainment, Inc. (NY)
19 Recording Services, Inc. (DE)
100%
19 Recordings, Inc. (NY)
100%
All Girl Productions (CA)
100%
J2K Productions, Inc. (CA)
100%
19 Touring LLC (DE)
100%
This Land Productions, Inc. •(DE)
100%
Dance Nation Productions, Inc. (DE)
100%
CTA Productions, Inc. (DE)
100%
Southside Productions, Inc. (DE)
100%
Masters of Dance Productions Inc. (DE)
100%
On The Road Productions (CA)
100%
IICD, LLC (DE)
100%
SYTYCD DVD Productions, Inc. (DE)
100%
19 Publishing Inc. (DE)
100%
19 TV Limited (UK)
100%
19 Merchandising Limited (UK)
100%
19 Management Ltd (UK)
100%
Brilliant 19 Limited (UK)
100%
19 Productions Limited (UK)
100%
Double Vision Film Limited (UK)
100%
19 Touring Limited (UK)
100%
19 Recordings Limited (UK)
100%
19 Fashionair Limited (UK) *
50%
*Non-Debtor Entities

**Schedule B**



**19 Entertainment Worldwide LLC (DE)**

**100%** — CORE Media Group Productions Inc. (CA)
- Schedule C

**100%** — Sonic Transformation, LLC (dba Rhythm and Cues) (CA)

**50%** — Big Red 2 Entertainment LLC (dba Nigel Lythgoe Productions) (DE) *
- **100%** Liverpool Productions LLC (DE) *
- **100%** Little Acorn Productions LLC (DE) *
- **100%** Manchester Productions LLC (DE) *

**50%** — Halfire-CORE JV* *(Inactive)*

**51%** — B17 Entertainment, LLC JV *
- **100%** West Side  Gear Company, LLC (DE) *
- **100%** Squadron Media, LLC (DE) *
- **100%** Copper Hill Entertainment, LLC (DE) *

***Non-Debtor Entities**

**Schedule C**



**CORE Media Group Productions Inc. (CA)**

100%

**CORE Group Productions ltd. (UK)**

100%
**7th Floor Productions, LLC (CA)**

100%
**Sunset View Productions, LLC (CA)**

100%
**Gilded Entertainment, LLC (CA)**

100%
**Alta Loma Entertainment, LLC (CA)**

100%
**Clown Car Productions, LLC (CA)**

100%
**Magma Productions, LLC (DE)**

100%
**Fresh Start Productions, LLC (CA)**

100%
**Pioneer Production Services LLC (CA)**

**\*Non-Debtor Entities**

Schedule D

Sharp Entertainment
Holdings, LLC
(NY)*

100%

100%

BP Production
Services, LLC
(NY)*

Sharp Entertainment,
LLC
(NY)*

100%

Sharp Digital, LLC
(NY)*

*Non-Debtor Entities

# EXHIBIT A

## Committees Organized Prior to the Order for Relief

To the best of the Debtors' knowledge and pursuant to Local Rule 1007-2(a)(3), as of the Petition Date, certain lenders party to the First Lien Term Loan Agreement, dated as of December 9, 2011, have formed an ad hoc group.  Such group is represented by Klee, Tuchin, Bogdanoff & Stern LLP and consists of the following lenders:

| Name of Lender | Address | Counsel for Lender |
| --- | --- | --- |
| Bayside Capital, Inc. | 1450 Brickell Avenue, 31st Floor Miami, FL 33131 | Klee, Tuchin, Bogdanoff & Stern LLP 1999 Avenue of the Stars Los Angeles, CA 90067 Attn: Lee R. Bogdanoff |
| Hudson Bay Capital Management LP | 777 Third Avenue, 30th Floor New York, NY 10017 | Klee, Tuchin, Bogdanoff & Stern LLP 1999 Avenue of the Stars Los Angeles, CA 90067 Attn: Lee R. Bogdanoff |
| Tennenbaum Capital Partners | 2951 28th Street, Suite 1000 Santa Monica, CA 90405 | Klee, Tuchin, Bogdanoff & Stern LLP 1999 Avenue of the Stars Los Angeles, CA 90067 Attn: Lee R. Bogdanoff |

The Debtors have also engaged in discussions with Crestview Media Investors, L.P. as lenders party to the First Lien Term Loan Agreement and Second Lien Term Loan Agreement, both dated as of December 9, 2011.  Such lender is represented by Quinn Emanuel Urquhart & Sullivan, LLP.

| Name of Lender | Address | Counsel for Lender |
| --- | --- | --- |
| Crestview Media Investors, L.P. | 667 Madison Avenue, 10th Floor New York, NY 10065 | Quinn Emanuel Urquhart & Sullivan, LLP 865 S. Figueroa Street, 10th Floor Los Angeles, CA 90017 Attn: Eric Winston |

**EXHIBIT B**

**50 Largest Unsecured Claims**
**(on a consolidated basis)**

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders          12/15

**A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 50 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1]<br><br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 1. Simon Fuller[3]<br>9000 W. Sunset Blvd.<br>West Hollywood, CA 90069 | Tel.: (310) 746-1919<br>Email: sf@xixentertainment.com | Profit Share Advance | | | $3,371,041.00[4] |
| 2. Marc Graboff[5]<br>1225 Corsica Dr.<br>Pacific Palisades, CA 90272<br><br>-and-<br><br>Edward Powers, Esq.<br>Zukerman Gore Brandeis and Crossman LLP<br>11 Times Square<br>New York, NY 10036 | Email:<br>marc.graboff@gmail.com<br><br>-and-<br><br>Tel.: (212) 223-6700<br>Fax.: (212) 223-6433 | Severance Payment | | | $1,319,875.00 |

---

[1]      These claim amounts represent maximum potential liabilities.  Actual amounts owed, if any, may be significantly lower.

[2]      This list does not include any claims for which security has been granted, regardless of whether the claims may be undersecured.

[3]      This individual is a former officer of the Debtors.  The Debtors reserve all rights to assert that this individual may be an insider as defined in 11 U.S.C. § 101(31).

[4]      For the avoidance of doubt, this amount represents $2.94 million due relating to 2015 and the accrual for first quarter 2016 services.

[5]      This individual is a former officer of the Debtors.  The Debtors reserve all rights to assert that this individual may be an insider as defined in 11 U.S.C. § 101(31).

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 3. Cravath, Swaine & Moore LLP<br>825 Eighth Ave.<br>New York, NY 10019 | Tel.: (212) 474-1000<br>Fax: (212) 474-3700 | Legal Fees | | | $370,826.00 |
| 4. Rhino Entertainment<br>3400 W. Olive Ave.<br>Burbank, CA 91505 | Tel.: (800) 546-3670 | Trade Debt | | | $139,759.00 |
| 5. Sony Music Entertainment<br>25 Madison Ave.<br>New York, NY 10010 | Tel.: (212) 833-6725 | Trade Debt | | | $170,625.50 |
| 6. Cumulus Media<br>3321 S. La Cienaga Blvd.<br>Los Angeles, CA 90016 | Tel.: (310) 840-2802 | Trade Debt | | | $156,038.53 |
| 7. Chainsaw, Inc.<br>940 N. Orange Dr., 2nd Fl.<br>Hollywood, CA 90038 | Attn: Hans Geiger, General Manager<br>Tel.: (323) 785-1550<br>Fax: (323) 785-1555<br>Email: hans@chainsawedit.com | Trade Debt | | | $155,000.00 |
| 8. Goldman Sachs<br>200 West St.<br>New York, NY 10282 | Tel.: (212) 902-1000 | Merger Fees | | | $82,073.00 |
| 9. Operational Consulting International<br>P.O. Box 88<br>Pasadena, CA 91102-0088 | Tel.: (626) 666-6139 | Trade Debt | | | $75,000.00 |
| 10. SDS RSI LLC<br>603 Second St.<br>Hermosa Beach, CA 90254 | Tel.: (310) 379-8168<br>Fax: (310) 798-0297 | Production Expenses | | | $75,000.00 |
| 11. Craig Robinson<br>c/o 3 Arts Entertainment, Inc.<br>9460 Wilshire Blvd., 7th Fl.<br>Beverly Hills, CA 90212 | Tel.: (310) 888-3200 | Talent | | | $70,000.00 |
| 12. Nicholas Godwyn<br>H.B. Dromond<br>106 Cheyne Walk<br>London, SWD 0DG<br>United Kingdom<br><br>-and- | | Trade Debt | | | $57,548.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| | Nicholas Godwyn c/o Harbottle & Lewis LLP Hanover House 14 Hanover Square London WISIHP | Tel.: + 44 (0)20 7667 5000 Fax: + 44 (0)20 7667 5100 | | | | |
| 13. | Lou's Boxworx Inc. 31858 Castaic Rd., #137 Castaic, CA 91384 | Tel.: (661) 257-3169 | Trade Debt | | | $52,000.00 |
| 14. | CBS Broadcasting Inc. 7800 Beverly Blvd. File 53755 Los Angeles, CA 90036 | Tel.: (818) 655-1533 and (323) 575-2345 | Trade Debt | | | $45,330.66 |
| 15. | Bexel 2701 N. Ontario St. Burbank, CA 91504 | Tel.: (818) 565-4322 Email: services@bexel.com | Trade Debt | | | $45,000.00 |
| 16. | Boschetti Management Group, Inc. 369 S. Beverly Dr. Beverly Hills, CA 90212 | Tel.: (310) 470-4700 Fax: (310) 601-4200 contact@boschettigroup.com | Trade Debt | | | $30,000.00 |
| 17. | GARD/JOSHUA c/o Dick Clark Productions acting as administrator 2900 Olympic Blvd., 2nd Fl. Santa Monica, CA 90404 | Attn: Renee Kibbler - Vice President, Clearances Tel.: (310) 255-4600 Fax: (310) 255-4661 | Trade Debt | | | $25,400.00 |
| 18. | International Travel Services 8306 Wilshire Blvd., Suite 2660 Beverly Hills, CA 90211 | Tel.: (310) 282-0000 | Trade Debt | | | $25,000.00 |
| 19. | ATK AudioTek 28238 Avenue Crocker Valencia, CA 91355 | Tel.: (661) 705-3700 Fax: (661) 705-3707 | Trade Debt | | | $23,065.00 |
| 20. | Pacifico or Clair Wireless & Intercom, LLC 7637 Haskell Ave. Van Nuys, CA 91406 | Tel.: (310) 497-4226 | Trade Debt | | | $23,000.00 |
| 21. | Imperial Studios 4357 Palmero Dr. Los Angeles, CA 90065 | Attn: Craig Tollifson Tel.: (323) 963-4670 Email: hello@imperialstudio.com | Trade Debt | | | $19,000.00 |

| Name of creditor and complete mailing address, including zip code | | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] | | |
|---|---|---|---|---|---|---|
| | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 22. | Soundtronics Wireless 111 W. Ash Ave. Burbank, CA 91502 | Attn: Dave Bellamy Tel.: (818) 848-3511 Email: dave@soundtronics.com | Trade Debt | | | $15,000.00 |
| 23. | Stephen Boss Productions, Inc. c/o A-Team Entertainment 11426 Ventura Blvd., 3rd Fl. Studio City, CA 91604 | Attn: Nelson Diaz Tel.: (310) 734-4930 Email: nelson@btbmgmt.com | Trade Debt | | | $12,000.00 |
| 24. | Gilbert Production Service 5540 Harbor St. Commerce, CA 90040 | Tel.: (323) 871-0006 Email: support@gilbertproductio n.net | Trade Debt | | | $10,600.00 |
| 25. | Imagem Holding Corp DBA: Rodgers & Hammerstein Organization 229 W. 28th St., 11th Fl. New York, NY 10001 | Tel.: (212) 541-6600 Fax: (212) 586-6155 Email: editor@rnh.com | Trade Debt | | | $9,562.50 |
| 26. | Irving Berlin Publishing LP DBA: Irving Berlin Music Company 1065 Avenue of the Americas New York, NY 10018 | Tel.: (212) 262-1800 Email: irvingberlin@rnh.com | Trade Debt | | | $9,000.00 |
| 27. | Medical Clinic for Immunization 660 W. Broadway St. Glendale, CA 91204 | Tel.: (323) 660-3722 Fax: (818) 502-1129 | Trade Debt | | | $9,900.00 |
| 28. | LA Party Rents Inc. 13520 Saticoy St. Van Nuys, CA 91402 | Attn: Jerry Nehus Tel.: (310) 785-0000 Email: jnehus@lapartyrents.com | Trade Debt | | | $7,500.00 |
| 29. | Metro Entertainment, Inc. 13423 Contour Dr. Sherman Oaks, CA 91423 | Attn: Brian Veskosky | Trade Debt | | | $7,500.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 30. | Children In Film, Inc. 11600 Ventura Blvd. Studio City, CA 91604 | Attn: Dana Riggs Tel.: (818) 432-7400 Email: contact@childreninfilm.com | Trade Debt | | | $6,000.00 |
| 31. | SIMPLIFY RECORDINGS c/o Dick Clark Productions acting as administrator 2900 Olympic Blvd., 2nd Fl. Santa Monica, CA 90404 | Attn: Renee Kibbler - Vice President, Clearances Tel.: (310) 255-4600 Fax:  (310) 255-4661 Email: licensing@simplifyrecordings.com | Trade Debt | | | $5,350.00 |
| 32. | Absolute Staging LLC 7896 Lilac Ln. Simi Valley, CA 93063 | Attn: Mark Jeffery Bauer Tel.: (805) 581-6456 Mobile: (805) 433-4854 | Trade Debt | | | $5,000.00 |
| 33. | CenterPlate 1 Independence Pointe Greenville, SC 29615 | Tel.: (323) 590-0704 | Trade Debt | | | $5,000.00 |
| 34. | Discount Media Products LLC P.O. Box 75614 Cleveland, OH 44101 | Tel.: (800) 996-2525 Fax: (323) 466-6815 | Trade Debt | | | $5,000.00 |
| 35. | Dutel Telecommunications 7041 Vineland Ave. North Hollywood, CA 91605 | Attn: Craig Hines Tel.: (818) 765-2799 Fax: (818) 765-3411 Email: craig@dutel.com | Trade Debt | | | $5,000.00 |
| 36. | Rogers & Cowan 8687 Melrose Ave., 7th Fl. Los Angeles, CA 90069 | Attn: Richard Davis Tel.: (310) 854-8258 Fax: (310) 854-8101 Email: inquiries@rogersandcowan.com | Trade Debt | | | $5,000.00 |
| 37. | High Output 495 Turnpike St. Canton, MA 02021 | Tel.: (781) 364-1800 Email: rentals@highoutput.com | Trade Debt | | | $5,000.00 |
| 38. | Cajual Entertainment, Inc 17 North Loomis St. Apt. 1M Chicago, IL 60607 | Attn: Curtis A Jones Tel.: (312) 421-8755 Email: Bruce Jones Jr. bruce@cajual.com | Trade Debt | | | $4,600.00 |
| 39. | Matador Recordings, LLC 304 Hudson St., #700 New York, NY 10013 | Attn:  Miwa Okumura Tel.: (212) 995-5882 Email: miwaokumura@beggars.com | Trade Debt | | | $4,500.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 40. | POSTMODERN JUKEBOX PRODUCTIONS, INC. c/o Dick Clark Productions acting as administrator 2900 Olympic Blvd., 2nd Fl. Santa Monica, CA 90404 | Attn: Renee Kibbler - Vice President, Clearances Tel.: (310) 255-4600 Fax: (310) 255-4661 | Trade Debt | | | $4,500.00 |
| 41. | Ultra Records, LLC 235 W. 23rd St. New York, NY 10011 | Tel.: (212) 343-2200 Email: info@ultrarecords.com | Trade Debt | | | $4,500.00 |
| 42. | Young Guns Publishing, LLC 1231A 17th Ave. S. Nashville, TN 37212 | Attn: Renee Kibbler - Vice President, Clearances Tel.: (310) 255-4600 Fax: (310) 255-4661 | Trade Debt | | | $4,200.00 |
| 43. | MASS APPEAL RECORDS, LLC c/o Dick Clark Productions acting as administrator 2900 Olympic Blvd., 2nd Fl. Santa Monica, CA 90404 | Attn: Renee Kibbler - Vice President, Clearances Tel.: (310) 255-4600 Fax: (310) 255-4661 | Trade Debt | | | $4,200.00 |
| 44. | Production Locations Inc. 9663 Santa Monica Blvd., #490 Beverly Hills, CA 90210 | Tel.: (323) 874-0404 Email: office@productionlocations.com | Trade Debt | | | $4,000.00 |
| 45. | Robert Sillerman[6] 157 E. 70th St. New York, NY 10021 | Email:  rfxs1@aol.com; Bethany.Gilmore@rfxs1.com | Separation Health Benefits | | | Contingent Unliquidated |
| 46. | Dick Clark Productions 2900 Olympic Blvd., 2nd Fl. Santa Monica, CA 90404 | Attn: Michael Kohn Tel.: (310) 255-4600 Fax: (310) 255-4661 | Profit Share | | | Contingent Unliquidated |
| 47. | FOX Broadcasting Company 10201 W. Pico Blvd., #100 Los Angeles, CA 90064 | Attn: Ira Kurgan Tel.: (310) 369-6000 Email: ira.kurgan@fox.com | Profit Share | | | Contingent Unliquidated |

---

[6]        This individual is a former officer of the Debtors.  The Debtors reserve all rights to assert that this individual may be an insider as defined in 11 U.S.C. § 101(31).

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[1] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured[2] | Deduction for value of collateral or setoff | Unsecured claim as of 4/27/2016 |
| 48. | Baby George Productions/Marvelous Productions c/o RBZ, LLP 11766 Wilshire Blvd., 9th Fl. Los Angeles, CA 90025 | Attn: Howard Bernstein Tel.: (310) 478-4148 Email: hbernstein@rbz.com | Profit Share | | | Contingent Unliquidated |
| 49. | Creative Artists Agency 2000 Avenue of the Stars Los Angeles, CA 90067 | Attn: Danny Grover Tel.: (424) 288-2000 Email: dgrover@caa.com | Profit Share | | | Contingent Unliquidated |
| 50. | FremantleMedia Group Ltd 1 Stephen St. London, United Kingdom W1T 1AL -and- FremantleMedia North America, Inc. 435 Hudson St., Suite 404 New York, NY 10014 | Attn: Gillian Ahluwalia Tel.: 011-44-20-7691-6742 Email: Gillian.Ahluwalia@fremantlemedia.com | Trade Debt | | | Contingent Unliquidated |

## EXHIBIT C

### Holders of Five Largest Secured Claims Against the Debtors[1]

| Creditor | Mailing Address and Phone Number | Approximate Amount of Claim[2] | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| U.S. Bank National Association, as administrative agent for the First Lien Term Loan Agreement | U.S. Bank National Association c/o John W. Weiss Alston & Bird LLP 90 Park Avenue New York, NY 10016 Tel.: 212-210-9412 Fax: 212-922-3860 john.weiss@alston.com | $209,000,000 | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | U (as to the amount of the unsecured / secured portion of such claim) |
| U.S. Bank National Association, as administrative agent for the Second Lien Term Loan Agreement | U.S. Bank National Association c/o John W. Weiss Alston & Bird LLP 90 Park Avenue New York, NY 10016 Tel.: 212-210-9412 Fax: 212-922-3860 john.weiss@alston.com | $189,000,000 | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | U (as to the amount of the unsecured / secured portion of such claim) |
| Sony Pictures Home Entertainment Inc. f/k/a Columbia TriStar Home Video, Inc. | Sony Pictures Home Entertainment Inc. 10202 West Washington Blvd. Culver City, CA 90232 | $906,000 | Secured interest in deposit resulting from the sale of movie rights related to film "Seeing Double," produced by Debtors | C/U/D |
| Citibank, N.A. | Citicorp North America, Inc. As Servicer for Citibank, N.A. 3800 Citibank Center, Bldg. B. 3rd Floor Tampa, FL 33610 | $927,454.16 | Deposit to secure letter of credit associated with Debtors' premises at 900 3rd Avenue, New York, NY | C/U/D |

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors.

[2]    These figures are as of April 28, 2016 and are inclusive of principal and accrued interest.

## EXHIBIT D

### Summary of Debtors' Assets and Liabilities
### on a consolidated basis, as of March 31, 2016

(Dollars amount in thousands)

| ASSETS | |
|---|---:|
| Current Assets: | |
| Cash and cash equivalents | 9,752 |
| Accounts receivable, net | 17,529 |
| Prepaid expenses and other current assets | 4,141 |
| Prepaid income taxes | 3,707 |
| Restricted cash | 10,168 |
| Note receivable | 318 |
| **Total Current Assets** | **45,615** |
| Property and Equipment | 193 |
| Other Assets | 1,775 |
| Other Intangible Assets, net | 25,814 |
| **Total Assets** | **$73,397** |
| | |
| **LIABILITIES** | |
| Current Liabilities: | |
| Accounts payable | 8,354 |
| Accrued expenses | 15,226 |
| Interest Payable | 35,283 |
| Merger consideration payable | 66 |
| Affiliate Company to Blue Moon Holding Subsidiaries | 74,282 |
| Affiliate  Company to (from )Sharp Entertainment and Subsidiaries | (13,732) |
| Affiliate Company to (from) from B17JV | (3,288) |
| Loan from related party | 15,000 |
| Short-term debt | 360,000 |
| Due to parent | 6,331 |
| Income tax payable | 101 |
| Deferred revenue | 6,440 |
| Other current liabilities | 1,574 |
| **Total current liabilities** | **505,965** |
| Long-Term Liabilities | 6,507 |
| | |
| Due to Parent | |
| **Total Liabilities** | **$512,472** |
| | |
| **COMMITMENTS AND CONTINGENCIES** | |
| Common Stock - $0.01 par value; authorized 10,000 shares, 1,100 shares issued and outstanding | - |
| Additional paid – in capital | 188,160 |
| Accumulated deficit | (627,019) |
| Accumulated other comprehensive loss | (216) |
| Total equity | (439,075) |
| | |
| **Total liabilities and deficit** | **$73,397** |

## EXHIBIT E

**Publicly Held Securities**

Local Bankruptcy Rule 1007-2(a)(7) requires the Debtors to identify the number and classes of shares of stock, debentures and other securities of the Debtors that are publicly held and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

The outstanding equity interests of the Debtors are privately held, and there is no established public trading market for such equity interests or the Debtors' debt securities.

## EXHIBIT F

### Debtors' Property Not in the Debtors' Possession

Local Bankruptcy Rule 1007-2(a)(8) requires the Debtors to list property in the possession or custody of any custodial, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, distributors and other related service providers, or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## EXHIBIT G

### Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| 19 Entertainment, Inc. | 8560 West Sunset Boulevard, 8th Floor<br>West Hollywood, CA 90069 | Leased |
| CORE Media Group Inc.[2] | 1071 Avenue of the Americas, 5th Floor<br>New York, NY 10018 | Leased |
| CORE Media Group Inc. | 900 Third Avenue, 23rd Floor<br>New York, NY 10022 | Leased |

---

[1]    The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

[2]    CORE Media Group Inc. subleases the listed premises from non-debtor affiliate Sharp Entertainment, LLC.

## EXHIBIT H

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, books and records, and nature, location, and value of any assets held by the Debtors outside the United States:

### Location of Debtors' Substantial Assets

8560 West Sunset Boulevard, 8th Floor
West Hollywood, CA 90069

1071 Avenue of the Americas, 5th Floor
New York, NY 10018

U.S. Bank, National Association
Milwaukee, WI

5800 Hannum Avenue, Suites 110 & 145
Culver City, CA 90230

### Location of the Debtors' Books and Records

8560 West Sunset Boulevard, 8th Floor
West Hollywood, CA 90069

1071 Avenue of the Americas, 5th Floor
New York, NY 10018

100 New Bridge Street
London, United Kingdom EC4V 6JA

### Debtors' Assets Outside of the United States

Certain of the Debtors have wholly-owned direct and indirect foreign subsidiaries that hold assets outside of the United States.

## **EXHIBIT I**

**Summary of Actions or Proceedings Pending Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the Debtors are involved in multiple pending or threatened litigations in various jurisdictions.  However, judgment against any of the Debtors is not imminent in any such litigation.  The Debtors will provide information regarding pending or threatened litigations in the Debtors' Statement of Financial Affairs and/or Schedules of Liabilities, as applicable.

<u>**EXHIBIT J**</u>

**Senior Management of the Debtors**

| Name | Tenure | Position | Experience/Responsibilities |
|------|--------|----------|------------------------------|
| Peter Hurwitz | September 2014 – Present | President | Mr. Hurwitz serves as President of most of the Debtors. Previously, he served as Executive Vice President and General Counsel of the Debtor CORE Media Group beginning in February 2012. Prior to joining the Debtors, he served as Executive Vice President, General Counsel for Martha Stewart Omnimedia and in the same role at The Weinstein Company. |
| Scott Frosch | October 2014 – Present | Chief Financial Officer | Mr. Frosch was named Chief Financial Officer of certain of the Debtors in October 2014 after holding various roles supporting the Debtors' accounting, financial planning and business activities starting in 2005. Prior to joining the Debtors, Mr. Frosch was the Senior Vice President of Finance and Controller of GT Brands. |
| Beverly Frank | 2009 – Present | Executive Vice President, Business Affairs and Operations | Ms. Frank is Executive Vice President of Business Affairs and Operations for Debtor 19 Entertainment, Inc. Ms. Frank joined the Debtors in 2009 as General Manager and Director of US Legal. Prior to joining the Debtors, Ms. Frank was Senior Counsel in the Los Angeles office of Proskauer Rose LLP. |
| Jason Morey | May 2012 – Present | Worldwide Head of Music | Mr. Morey serves as Executive Vice President, Worldwide Head of Music for Debtor 19 Entertainment, Inc. Prior to joining the Debtors, Mr. Morey was the President of the Morey Management Group, an entertainment company specializing in live entertainment and musical talent. |
| Kelly Pontano | November 2007 – Present | Senior Vice President and Associate General Counsel | Ms. Pontano serves as Senior Vice President and Associate General Counsel for most of the Debtors. Ms. Pontano joined the Debtors in 2007 as Associate Counsel. Prior to joining the Debtors, Ms. Pontano was an associate in the New York office of Willkie Farr & Gallagher LLP. |
| Michele Rosette | March 2007 – Present | Senior Vice President, Finance | Ms. Rosette serves as the Senior Vice President of finance at 19 Entertainment and provides financial analysis and management for the Company's TV, Music and talent management operations. Prior to joining 19 Entertainment Ms Rosette was the Vice President of Accounting and Controller for Concord Music. |

## EXHIBIT K

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (excluding officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)[1]** | $150,000 |
| **Payments to Officers, Directors, and Stockholders** | $255,000 |
| **Payments to Financial and Business Consultants** | $350,000[2] |

---

[1]    Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

[2]    Amount includes estimated fees only, and does not include expenses, which may ultimately be passed through to the Debtors by such consultants.  Further, the amount does not include estimated payments to auditors or ordinary course professionals, or any payments to advisors retained by other parties who do not represent the Debtors whose costs may be passed along to the Debtors.

## EXHIBIT L

**Debtors' Estimated Cash Receipts and Disbursements for the**
**Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

       Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $11,000,000 |
| **Cash Disbursements** | $5,000,000 |
| **Net Cash Gain/Loss** | $6,000,000 |

| | |
|---|---|
| **Unpaid Obligations** | $1,000,000 |
| **Uncollected Receivables** | $1,000,000 |