UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re:                                          :    Chapter 11
                                                :
AOG Entertainment, Inc., et al.,[1]             :    Case No. 16-11090 (SMB)
                                                :
                      Debtors.                  :    (Jointly Administered)
---------------------------------------------------------x

**DECLARATION OF PETER HURWITZ,
PRESIDENT OF CERTAIN DEBTORS, IN SUPPORT OF DEBTORS' MOTION
FOR AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO
AND PERFORM UNDER A RESTRUCTURING SUPPORT AGREEMENT**

I, Peter Hurwitz, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.  I am the President of CORE Entertainment Inc. ("**CORE**"), a corporation incorporated under the laws of Delaware, and the ultimate parent of the other debtors and debtors in possession in the above-captioned cases (collectively with CORE, the "**Debtors**"). I was named President of CORE, as well as certain other Debtor entities, in September of 2014, after serving as Executive Vice President and General Counsel of CORE and other Debtors since February 2012. In such capacities, I am familiar with the day-to-day operations, businesses and financial affairs of the Debtors.

2.  I submit this declaration in support of the *Debtors' Motion for an Order Authorizing the Debtors to Enter Into and Perform Under a Restructuring Support Agreement* [Docket No. 78] (the "**RSA Motion**").[2] Except as otherwise indicated, all facts set forth in this

---

[1] A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as Schedule 1 to the Declaration of Peter Hurwitz, President of Certain Debtors, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 3] and at http://www.kccllc.net/AOG. The Debtors' executive headquarters are located at 8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

[2] Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the RSA Motion.

declaration are based upon my personal knowledge and the knowledge I have acquired from those who report to me, consultation with other officers of the Debtors, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this declaration.

### A. The Restructuring Support Agreement Is the Product of Months of Extensive Negotiations.

3. It is my view that the RSA is critical to the Debtors' restructuring.  It provides the Debtors with an essential roadmap to emerge from chapter 11 in the most expeditious and efficient manner, while maximally protecting the value of the estates.  Realizing the necessity of a carefully structured plan to navigate the bankruptcy process, the Debtors and the Consenting Lenders have devoted significant time to negotiating the terms of the RSA.  The Debtors and Consenting Lenders realized that without a strategic plan in place, the Debtors' prospects for a successful emergence would be diminished.  The lack of a clear exit strategy would raise concerns with the Debtors' employees, talent, production counterparties, and vendors and would likely erode the estates' value.

4. To prevent this erosion in value, in the summer of 2015, the Debtors initiated discussions with the Consenting Lenders regarding a potential restructuring of the Debtors' outstanding secured debt obligations.  These discussions included the Debtors, Debtors' outside counsel Willkie Farr & Gallagher LLP ("**Willkie**"), Debtors' financial advisor Moelis & Co. ("**Moelis**"), and the Consenting Lenders and their counsel and financial advisors.

5. Negotiations continued over the course of the prepetition period.  During this time, the parties negotiated the terms of the RSA as well as the Plan and overall restructuring and traded many rounds of proposed term sheets.  In addition, the Debtors entered into

forbearance agreements on July 26, 2015, pursuant to which the Consenting Lenders agreed to forbear from exercising remedies under the FLTLA and SLTLA.  The parties extended the forbearance agreement six times leading up to the Petition Date, evidencing the parties' good faith efforts to craft a transaction structure that would preserve the estates' value.

6. After months of arms-length negotiations between the Debtors' management and advisors, and the advisors and principals of the Consenting Lenders, the Debtors reached an agreement in principle with the Consenting Lenders just prior to commencing these chapter 11 cases.  Moreover, the parties' fruitful negotiations, which began several months prior to the Petition Date, is further evidenced by the additional forbearance agreements entered into with the Consenting Lenders just prior to the Petition Date to avoid needing to file Sharp Entertainment Holdings, LLC and its subsidiaries, which are not Debtors and not part of these chapter 11 cases.

7. Such momentum continued into the days and weeks following the Petition Date, ultimately culminating in the execution of the RSA and Term Sheet between the Debtors and the Consenting Lenders.  Specifically, the Boards of Directors of CORE Entertainment Holdings Inc. and CORE Entertainment Inc. (collectively the "**CORE Boards**") met to consider the terms of the RSA on May 12 and 13, 2016.  In addition to the members of the CORE Boards, I was present along with other members of CORE management, and representatives from Willkie and Moelis were in attendance.  Prior to the meetings, the proposed RSA, the proposed Plan Term Sheet, the proposed LLC Term Sheet, and an executive summary of the proposed restructuring plan and RSA prepared by Willkie were distributed to the members of the CORE Boards for their review.  After a robust discussion of the RSA's terms and reaching a determination that the RSA represents the best available path for the Debtors' prompt emergence

from bankruptcy, at the May 13, 2016 meeting, the CORE Boards unanimously voted to authorize the Debtors to enter into the RSA.

8. I believe that in the exercise of their sound business judgment, the CORE Boards determined that the reorganization set forth in the RSA provides the Debtors with the best opportunity to emerge from bankruptcy as expeditiously as possible and maximizes the value of their estates, thereby maximizing creditor recoveries.

**B.    The Terms of the RSA Are Reasonable and Fair.**

9. It is my view that the terms of the RSA represent a reasonable and fair deal that is the product of the lengthy arms-length negotiations described above. More specifically, based on my experience and the advice I received from Willkie and Moelis I believe that paying fees as contemplated by the RSA is reasonable and fair.

10. The RSA contemplates that the Plan will implement the transactions contemplated by the Term Sheet. Not only will this result in the significant deleveraging of the Debtors by approximately $385,000,000, pursuant to the Rights Offering it will also provide the reorganized Debtors with roughly a $18 million reinvestment, infusing the reorganized Debtors with essential operating liquidity.

11. As detailed above, I believe that this transaction is the result of a good faith negotiating process, approved by the CORE Boards as a sound exercise of their business judgment.

12. The RSA also includes a "fiduciary out" provision. Specifically, Section 4 of the RSA provides that "[i]n the event that the Company or its board of directors determine that their fiduciary duties require the Company to terminate this Agreement, the Company shall provide five (5) business days written notice to each of the Consenting Lenders . . . . Upon termination of this Agreement pursuant to this Section 4, all obligations of each Party hereunder

shall immediately terminate." I believe this provision is key to protecting the CORE Boards' ability to fulfill their fiduciary duties in administering these chapter 11 cases and pursuing a restructuring, and further reflects the fairness of this deal.

13. Crucially, the RSA requires the Consenting Lenders to vote in favor of the Plan (subject to the requirements and restrictions of applicable law),[3] and also prohibits such parties from, among other things, opposing confirmation of the Plan or approval of the Disclosure Statement. This support is a significant step toward the Debtors reaching agreement on the terms of a plan with their secured creditors, which is important to the Debtors' efficient and expeditious emergence from their restructuring process.

14. Moreover, the obligation to pay fees and expenses set forth in Section 9.19 of the RSA and the Term Sheet is a bargained for term that was necessary to secure the Consenting Lenders' commitment to the RSA. First, I do not believe that the Consenting Lenders would have agreed to the terms and conditions of the RSA without having their own fees and expenses reimbursed. Second, subject to appropriate checks, the fees are required to be reasonable and therefore will not unnecessarily deplete the value of the Debtors' estates. Specifically, the Consenting Lenders represent holders of 100% of the outstanding obligations under the FLTLA and SLTLA. Under the terms of the RSA, the holders under the FLTLA and SLTLA will receive 100% of the equity in the reorganized Debtors. Moreover, Section 9.19 of the RSA contemplates the payment of certain fees and expenses by the Debtors "on or prior to the Plan Effective Date." Thus, payment of the fees and expenses is not required until after the Plan has been confirmed and the Consenting Lenders own 100% of the company's equity, and

---

[3] It is my understanding that entry into the RSA does not constitute the solicitation of votes on a chapter 11 plan as such solicitation must comply with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules and all other applicable statutes, laws, regulations or orders.

- 5 -

payment will be made, effectively, from the lenders themselves after determining such fees are reasonable. In addition, the Official Committee of Unsecured Creditors is adequately protected by its reservation of all rights to object to the payment of these fees, if necessary. As such, I believe this consideration is fair and reasonable.

15. Accordingly, I believe that the RSA is in the Debtors' best interests and will maximize value for the benefit of the Debtors' estates.

*The remainder of this page is intentionally left blank.*

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 27, 2016
      West Hollywood, California

                                      AOG Entertainment, Inc., et al.,
                                      Debtors and Debtors in Possession

                                      /s/ Peter Hurwitz
                                      Peter Hurwitz
                                      President and/or Authorized Signatory of
                                      Debtors and Debtors in Possession