Craig A. Wolfe
Malani J. Cademartori
Jason R. Alderson
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| AOG Entertainment, Inc., *et al.*,[1] | Case No. 16-11090 (SMB) |
| Debtors. | (Jointly Administered) |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO (I) DISCLOSURE STATEMENT FOR JOINT CHAPTER
11 PLAN OF ORGANIZATION FOR AOG ENTERTAINMENT, INC. AND
ITS AFFILIATED DEBTORS; AND (II) MOTION FOR AN
ORDER APPROVING THE DISCLOSURE STATEMENT, SOLICITATION
AND VOTING PROCEDURES, AND RELATED RELIEF**

---

[1] As reported by the Debtors, a list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as Schedule 1 to the *Declaration of Peter Hurwitz, President of Certain Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 3] and at http://www.kccllc.net/AOG.  As further reported by the Debtors, the Debtors' executive headquarters are located at 8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................ - 1 -

Background ........................................................................................................ - 3 -

    A.    Generally ............................................................................... - 3 -

    B.    The Debtors' Prepetition Secured Debt Structure ............... - 3 -

    C.    The Interim Financing Orders and the Committee's Challenge Period .............. - 4 -

    D.    The Restructuring Support Agreement and Proposed Plan Process ................... - 6 -

    E.    Overview of the Solicitation Procedures in the Solicitation Procedures Motion ................................................................................ - 8 -

Objection ........................................................................................................... - 12 -

I.    The Solicitation Package Should Include the Committee Letter .................................. - 12 -

II.    Disclosure Statement Must be Modified to Clarify Death Trap Provisions ................. - 14 -

III.    Disclosure Statement and Solicitation Procedures Require Clarification and Modification Regarding the Third Party Release Opt Out ........................................... - 15 -

IV.    The Proposed Plan Cannot Strip the Committee's Members or Professionals of Their Qualified Immunity ........................................................................................ - 19 -

Reservation of Rights ........................................................................................ - 20 -

Conclusion ........................................................................................................ - 21 -

## TABLE OF AUTHORITIES

Page(s)

Cases

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*
    179 B.R. 24 (S.D.N.Y. 1995) ................................................................13

*In re Alaska Fur Gallery, Inc.*
    No. 09-00196 (DMD), 2011 WL 494425 (Bankr. D. Alaska Apr. 29, 2011) ........................14

*In re Atlanta W. VI*
    91 B.R. 620 (Bankr. N.D. Ga. 1988) ................................................................20

*In re Chassix Holdings, Inc.*
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) ................................................................3, 18

*In re Chassix Holdings, Inc., et al*
    Case No. 15-10578 (MEW) (Dkt. No. 327, Bankr. S.D.N.Y. Apr. 24, 2015) ........................14

*In re Copy Crafters Quickprint, Inc.*
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ................................................................15

*In re Drexel Burnham Lambert Group*
    140 B.R. 347 (S.D.N.Y. 1992) ................................................................15

*In re Ferretti*
    128 B.R. 16 ................................................................15

*In re Genco Shipping & Trading Ltd.*
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ................................................................18

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*
    337 F.3d 314 (3d Cir. 2003) ................................................................13

*In re McGee*
    No. 09-11860, 2010 WL 9463258 (Bankr. N.D. Ind. Apr. 21, 2010) ........................14

*In re Mcorp Fin., Inc.*
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ................................................................15

*Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*
    25 F.3d 1132 (2d Cir. 1994) ................................................................13

*Official Comm. of Unsecured Creditors v. Michelson*
    141 B.R. 715 (Bankr. E.D. Cal. 1992) ................................................................15

*Pan Am Corp. v. Delta Air Lines, Inc.*
  175 B.R. 438 (S.D.N.Y. 1994) ................................................................................20

*In re PWC Holding Corp.*
  228 F.3d 224 (3d. Cir. 2000) .................................................................................20

*In re Quigley Co., Inc.*
  377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...................................................................19

*In re U.S. Shipping Partners L.P. et al*
  Case No. 09-12722 (RDD) (Dkt. No. 375, Bankr. S.D.N.Y. Aug. 26, 2009) .........14

*In re Washington Mut. Inc.*
  442 B.R. 314 (Bankr.D.Del.2011) ..........................................................................18

*In re Zenith Elecs. Corp.*
  241 B.R. 92 (Bankr. D. Del. 1999) .........................................................................15

<u>Statutes</u>

Bankruptcy Code § 506(c) ........................................................................................5, 6

Bankruptcy Code § 552(b) ...........................................................................................6

Bankruptcy Code § 1103(c) ....................................................................................20, 21

Bankruptcy Code § 1125(a)(1) ................................................................................10, 13

Bankruptcy Code § 1126 .............................................................................................9

Bankruptcy Code § 1126(f) ........................................................................................12

The Official Committee of Unsecured Creditors (the "**Committee**") of the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), by and through their proposed attorneys, files this objection (the "**Objection**") to the (I) *Disclosure Statement for Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc., and its Affiliated Debtors* [Dkt. No. 145] (as may be amended or modified, the "**Disclosure Statement**"),[2] and (II) *Debtors' Motion for Order (A) Approving Disclosure Statement; (B) Establishing Date of Confirmation Hearing; (C) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (I) Approving Form and Manner of Solicitation Packages, (II) Approving Form and Manner of Notice of Confirmation Hearing, (III) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (IV) Approving Forms of Ballots, (V) Establishing Deadline for Receipt of Ballots, and (VI) Approving Procedures for Vote Tabulations; (D) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; (E) Approving Rights Offering Procedures; and (F) Granting Related Relief* [Dkt. No. 193] (the "**Solicitation Procedures Motion**").  In support of the Objection, the Committee respectfully represents as follows:[3]

### Preliminary Statement[4]

12.    The Committee opposes approval of both the Disclosure Statement and certain features in the Solicitation Procedures Motion and seeks authority to include in the Solicitation

---

[2] On June 17, 2016, the Debtors filed a notice of hearing to consider approval of the Disclosure Statement for July 26, 2016 at 10:00 a.m. (ET).

[3] Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to such terms in the Disclosure Statement and/or Solicitation Procedures Motion.

[4] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to such terms in the balance of this Objection below.

Package a letter addressing its concerns with the Disclosure Statement and Proposed Plan.  A

draft of the letter is attached hereto as **Exhibit A** (the "**Committee Letter**").[5]

13.    The Committee has worked since its appointment to negotiate constructively with

the Debtors and their secured lenders to resolve the Committee's significant issues with both the

economics and structure of the Proposed Plan.[6]  Although a resolution has not yet been reached,

the Committee is continuing to work with the Debtors and lenders to reformulate certain aspects

of the Proposed Plan with the goal of formulating a consensual plan.

14.    The Committee problems with the Disclosure Statement and Solicitation

Procedures Statement Motion that would remain unresolved through the inclusion of the

Committee Letter in the Solicitation Package, and must be modified or clarified before

solicitation of the Proposed Plan, include, without limitation, the following:

- The Proposed Plan's "death trap" for Class 5 general unsecured
  creditors must be clarified to ensure that:

  - Such creditors, and not the Prepetition Secured Lenders by
    way of their potentially significant deficiency claims, are
    in control of the death trap.  Currently, the lenders can
    cause the class to reject with the Debtors seeking to
    confirm the plan by cramming down Class 5.  This
    possibility is not disclosed.

  - Currently two sources of excess funds revert to the
    Reorganized Debtors.  The sources are any unused funds
    resulting from the 3.5% distribution cap for Class 5
    allowed claims and any unused portion of the amount
    allotted to the Convenience Class.  Although the
    Committee believes the failure to distribute these funds to
    Class 5 presents a confirmation problem, the Disclosure

---

[5] If the Committee is denied the right to include the Committee Letter in the Solicitation Package in the form attached hereto, the Committee reserves all rights to supplement this Objection, either before or at the hearing to consider the Disclosure Statement and Solicitation Procedures Motion, to address its concerns.

[6] The Committee reserves all of its rights to raise any and all objections it has or may have to the terms of the Proposed Plan, including to the extent that such objections are raised herein with respect to the adequacy of the Disclosure Statement or could have been raised herein.

Statement lacks adequate explanation regarding how this works and why it is appropriate.

- The release "opt out" described in the Disclosure Statement requires clarification and modification to provide that all creditors are given an opportunity to "opt out" regardless of voting entitlement. *See In re Chassix Holdings, Inc.* 533 B.R. 64 (Bankr. S.D.N.Y. 2015)*, discussed infra*. This can be achieved by creating an opt out election form under the Solicitation Procedures or modifying the Plan and accurately describing the effects of not taking or being given an opportunity to opt out in the Disclosure Statement.

- The Disclosure Statement currently describes a procedures whereby members of the Committee only receive exculpation if they opt into the releases by checking the box on the ballot. The Proposed Plan cannot be used to force the Committee to select between the proper exercise of its fiduciary duty by objecting to inappropriate Proposed Plan releases and maintaining qualified immunity for its members and professionals through exculpation.

## Background

### A.    Generally

15.    On April 28, 2016 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

16.    On May 17, 2016, the United States Trustee for the Southern District of New York appointed the Committee [Dkt. No. 114].

### B.    The Debtors' Prepetition Secured Debt Structure

17.    As of the Petition Date, the Debtors reported prepetition secured indebtedness of approximately $398 million, consisting of: (i) $209 million outstanding under a $200 million term loan facility maturing on June 21, 2017 (the "**First Lien Term Loan Facility**" or "**First Lien Lenders**"); and (ii) $189 million outstanding under a $160 million term loan facility maturing on June 21, 2018 (the "**Second Lien Term Loan Facility**" or "**Second Lien Lenders**," and together with the First Lien Term Loan Facility, the "**Term Loan Facilities**").

C.      **The Interim Financing Orders and the Committee's Challenge Period**

18.      The Debtors have sought authority on a final basis (the "**DIP Motion**")[7] to (i) obtain a revolving credit facility in the aggregate amount of $30 million (the "**DIP Financing**") from non-debtor affiliate Elvis Blue Moon Holdings, LLC (the "**DIP Lender**"), and (ii) use Cash Collateral (as defined in the Interim DIP Orders).  The DIP Motion was granted on an interim basis on June 3, and again on June 29, 2016.[8]  The DIP Motion is currently scheduled for final hearing on July 26, 2016 at 10:00 a.m. (ET).  The Committee opposes entry of certain aspects of the final DIP financing order and anticipates filing an objection to the same.

(i)      *Postpetition Financing*

19.      As security for the DIP Financing subject only to the Carve-Out (as defined in the Interim DIP Orders), the Debtors intend to grant the DIP Lender superpriority administrative expense protection and liens (collectively, the "**DIP Liens**") on property that includes unencumbered assets such as the proceeds from avoidance actions (collectively, the "**DIP Collateral**").  Avoidance actions are defined in the Interim DIP Orders to include (i) prepetition and postpetition commercial tort claims and (ii) any claims and causes of action of the Debtors or their estates arising under sections 502(d), 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code.

20.      The Debtors exclude the application of the equitable doctrine of marshalling against the DIP Lender with respect to the DIP Collateral.  The DIP Lender also enjoys a waiver of any surcharge against the DIP Collateral under section 506(c) of the Bankruptcy Code.

---

[7] Dkt. No. 67.
[8] On June 3, 2016, the Court entered an interim order providing the Debtors with authority to, among other things, borrow up to $6 million of the DIP Financing [Dkt. No. 124] (the "**First Interim DIP Order**").  On June 29, 2016, the Court entered a second interim order regarding DIP Motion [Dkt. No. 185] (the "**Second Interim DIP Order**," and together with the First Interim DIP Order, the "**Interim DIP Orders**").

(ii)    *Proposed Use of Cash Collateral*

21.    The lenders to the Term Loan Facilities (the "**Prepetition Secured Lenders**")
contend that all or substantially all of the Debtors' cash constitutes Cash Collateral, including the
substantial amounts of cash held by the DIP Lender.  Although the Debtors dispute the scope of
alleged Cash Collateral, they intend to grant the Prepetition Secured Lenders extensive adequate
protection packages consisting of liens on the DIP Collateral (including avoidance actions),
507(b) superpriority administrative expense claims, and the payment of fees and expenses for
numerous professionals.[9]

22.    In addition, under the DIP Motion, and as provided in the Interim DIP Orders, the
Debtors have stipulated to the aggregate amount of prepetition debt under the Term Loan
Facilities and the validity, enforceability and priority of the liens and security interests securing
the obligations under such facilities.  In connection therewith, the Debtors also intend to waive
with respect to the Prepetition Secured Lenders' prepetition collateral and adequate protection
liens the (i) ability to surcharge under section 506(c) of the Bankruptcy Code; (ii) equitable
doctrine of marshalling or any similar doctrine; and (iii) "equities of the case" exception under
section 552(b) of the Bankruptcy Code.

23.    The Interim DIP Orders provide the Committee with automatic standing to
commence any challenge to the validity, perfection, character and enforceability of the liens and
security interests securing the obligations under the Term Loan Facilities, subject to a $50,000
investigation budget and a 60-day timeframe measured from the entry of the Second Interim DIP
Order.  As a result, the Committee's 60-day challenge period expires on August 27, 2016.

---

[9] The Debtors' use of Cash Collateral was granted on an interim basis pursuant to that certain stipulated order
entered on May 3, 2016 [Dkt. No. 47], and on a second and third interim basis pursuant to the Interim DIP Orders.

D.    **The Restructuring Support Agreement and Proposed Plan Process**

24.    On May 20, 2016, the Debtors filed a motion ("**RSA Motion**")[10] for authority to enter into a restructuring support agreement (as amended, the "**RSA**") and implement a chapter 11 plan process pursuant to the terms of the term sheet annexed thereto (the "**RSA Plan**").[11]

25.    On June 17, 2016, the Debtors filed the Disclosure Statement, along with the *Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and its Affiliated Debtors* [Dkt. No. 144] (as may be amended or modified, the "**Proposed Plan**").[12]    Both the Disclosure Statement and Proposed Plan are intended to implement the RSA Plan.

26.    If the Proposed Plan is confirmed and becomes effective, all or substantially all of the equity in the reorganized Debtors will flow to the First Lien Lenders in exchange for the deleveraging of debt.    Specifically, pursuant to the RSA Plan the First Lien Lenders obtain 100% of the "New Class A LLC Units" of reorganized CORE Entertainment, subject to dilution by options and/or warrants.    This includes the warrants provided to the Second Lien Lenders for up to 22.5% of "New Class A LLC Units."    The Proposed Plan also entitles the First Lien Lenders to *pro rata* distributions of $32.5 million in cash, with certain of these lenders intending to reinvest their allocation (approximately $18 million) into the reorganized Debtors.    Following the effective date of the Proposed Plan, the reorganized Debtors intend to implement a management incentive plan that will provide options for up to 12.5% of the "New Class A LLC Units" of the reorganized company.

27.    Proposed recoveries for general unsecured creditors under the Proposed Plan consist of (i) *pro rata* distributions of $850,000 in aggregate cash, capped such that no creditors

---

[10] Dkt. No. 78.
[11] Since the filing of the RSA Motion, there have been at least four amendments to the RSA, including as recently as on July 18, 2016 [Dkt. No. 228].
[12] On June 29, 2016, the Court entered an order approving the RSA Motion [Dkt. No. 184].

holding Allowed claims in such class can recover more than 3.5% on account of such Allowed claim, and (ii) participation rights in a litigation trust pursuant to a formula along with the participation of the Prepetition Secured Lenders on account of their alleged deficiency claims. The Proposed Plan also includes a mechanism providing that (a) if Class 5 votes to accept the Proposed Plan, general unsecured creditors will also receive that portion of the $850,000 that would have been distributed to the Prepetition Secured Lenders for alleged deficiency claims, and, conversely, (b) if Class 5 does not vote to accept the Proposed Plan, the Prepetition Secured Lenders' portion of the $850,000 which would have been available for distribution to other Class 5 creditors, will instead be retained by the Debtors -- ultimately for the benefit of the Prepetition Secured Lenders who will receive the equity in the Reorganized Debtors.

28.    The Proposed Plan further provides for a Convenience Class of holders of general unsecured claims in an Allowed amount of $10,000 or less, and for those holders of unsecured claims greater than $10,000 that opt into the Convenience Class by voluntarily reducing their claims to $10,000.  The Proposed Plan provides that creditors in the Convenience Class will be paid in full in Cash in satisfaction of their Claims; *provided, however*, that in the event the aggregate total of all Allowed Convenience Claims exceeds $350,000, each holder of an Allowed Convenience Claim shall instead receive its Pro Rata Share of the $350,000.  The Proposed Plan also contemplates that in the event the aggregate Allowed claims in the Convenience Class are less than $350,000, any excess will revert back to the Debtors, rather than being added to the distributable value available to other unsecured creditors in Class 5.

29.    The Proposed Plan also provides releases to the Prepetition Secured Lenders (among others), but does not release (i) Apollo Global Management, LLC; (ii) Twenty-First Century Fox, Inc.; (iii) Endemol USA Holding, Inc.; (iv) Shine USA Holdings Inc.; and (v) non-

debtor affiliates (among others).   The Committee understands that certain of the unreleased

parties will be the subject of claims and causes of action brought by the Proposed Plan's

litigation trust.

> **E.    Overview of the Solicitation Procedures in the Solicitation Procedures Motion**

30.    The Disclosure Statement provides the following table showing the Classes of

Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or

unimpaired by the Proposed Plan, (b) entitled to vote to accept or reject the Proposed Plan in

accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the

Proposed Plan and not entitled to vote:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | First Lien Lender Claims | Yes | Yes |
| Class 4 | Second Lien Lender Claims | Yes | Yes |
| Class 5 | General Unsecured Claims | Yes | Yes |
| Class 6 | Convenience Claims | Yes | Yes |
| Class 7 | Subordinated Claims | Yes | No (Deemed to reject) |
| Class 8 | Existing Interests | Yes | No (Deemed to reject) |

Disclosure Statement at ¶ 1.3.

31.    As provided for in the Solicitation Procedures Motion (and in each of the

Disclosure Statement and the Proposed Plan), only holders of Allowed claims or Interests in

Classes of Claims or Interests that are "impaired" and that are not deemed to have accepted or rejected a chapter 11 plan are entitled to vote to accept or reject such Proposed Plan.

32.    Accordingly, under the Proposed Plan (a) Claims in Classes 3, 4, 5 and 6 are impaired, will receive a distribution on account of such Claims to the extent provided in the Proposed Plan and are entitled to vote to accept or reject the Proposed Plan, (b) Claims in Classes 1 and 2 are unimpaired and, as a result, are deemed to have accepted the Proposed Plan and are not entitled to vote to accept or reject the Proposed Plan; and (c) Claims and Interests in Classes 7 and 8 are impaired, will not receive any distribution on account of such Claims and Interests, are deemed to have rejected the Proposed Plan and are not entitled to vote to accept or reject the Proposed Plan.

33.    The Solicitation Procedures Motion seeks entry of an order:  (a) approving the Disclosure Statement as containing "adequate information" as that term is defined in section 1125(a)(1) of the Bankruptcy Code; (b) establishing the date of the hearing regarding confirmation of the Proposed Plan; (c) establishing procedures for solicitation and tabulation of votes to accept or reject the Proposed Plan, including (i) approving the form and manner of the solicitation packages, (ii) approving the form and manner of notice of the Confirmation Hearing, (iii) establishing a voting record date and approving procedures for distributing solicitation packages, (iv) approving the forms of ballots, substantially in the forms annexed to the Disclosure Statement Order as Exhibits B-1 through B-4, (v) establishing the deadline for the receipt of ballots, and (vi) approving procedures for tabulating acceptances and rejections of the Proposed Plan; (d) establishing the deadline and procedures for filing objections to confirmation

of the Proposed Plan; (e) approving the Rights Offering Procedures;[13] and (f) granting related

relief.  Solicitation Procedures Motion ¶ 10.

34.    In connection with these requests, the Debtors propose the following schedule for

matters related to voting and confirmation of the Proposed Plan:

| Proposed Timetable | |
| --- | --- |
| Voting Record Date[14] | August 5, 2016 |
| Solicitation Mailing Date | No later than August 12, 2016 |
| Subscription Commencement Date | The date the Court enters the Disclosure Statement Order |
| Subscription Date | The third Business Day after entry of the Disclosure Statement Order at 5:00 p.m. (prevailing Eastern Time) |
| Deadline to Publish Confirmation Hearing Notice | August 17, 2016 |
| Deadline for Filing Plan Supplement and Proposed Confirmation Order | September 12, 2016 |
| Voting Deadline | September 13, 2016 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to Object to Confirmation of the Proposed Plan | September 14, 2016 at 4:00 p.m. (prevailing Eastern Time) |

---

[13] The Plan includes a proposed rights offering (the "**Rights Offering**") whereby each holder of an Allowed First Lien Lender Claim has the right to subscribe for New Series P Convertible Preferred Units to be issued by the ultimate parent company of the Reorganized Debtors by applying to the purchase price certain cash they otherwise would be Non-Voting Creditor Notices will indicate how Non-Voting Parties may obtain a copy of the Plan and the Disclosure Statement.  Solicitation Procedures Motion ¶ 2.  The Rights Offering is open only to certain Prepetition Secured Lenders and, thus, the procedures with respect thereto are not discussed herein.  The Committee, however, reserves its rights to object to the exclusivity of this Rights Offering (and all other aspects of the Proposed Plan) in its objection to confirmation or other relief sought in these cases.

[14] The Voting Record Date is also the Bar Date established for the filing of all Claims, other than claims of governmental units, pursuant to the *Order Establishing Deadline for Filing Proofs of Claim and the Approving Form and Manner Thereof,* dated June 23, 2016 [Dkt. No 161].

| Reply Deadline | September 21, 2016 at 12:00 p.m. (prevailing Eastern Time) |
| Confirmation Hearing | September 22, 2016 at 10:00 a.m. (prevailing Eastern Time) |

Solicitation Procedures Motion ¶ 11.  Specifically, the Debtors state that they are requesting that the Confirmation Hearing be scheduled to commence on September 22, 2016 at 10:00 a.m. (prevailing Eastern Time) in order to comply with the applicable Bankruptcy Rules and the deadlines set forth in the RSA.  Solicitation Procedures Motion ¶ 17.

35.    The Debtors further request a waiver of any obligation to transmit a Solicitation Package to the holders of claims:  (a) who are unimpaired and deemed to have accepted the Proposed Plan: Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) (collectively, the "**Unimpaired Creditors**"); (b) holders of Claims and Interests in Class 7 (Subordinated Claims) and Class 8 (Existing Interests) (collectively, the "**Non-Voting Impaired Classes**") given that such holders are not entitled to vote on the Proposed Plan.  Instead, the Debtors propose to mail or cause to be mailed to each of the Unimpaired Creditors and Non-Voting Impaired Classes (collectively, the "**Non-Voting Parties**") certain notices setting forth: (a) the non-voting classes; (b) a summary of the treatment of claims and equity interests under the Proposed Plan; (c) the date and time of the Confirmation Hearing; and (d) the deadline and procedures for filing objections to the Proposed Plan.  The Debtors' basis for doing so is the cost associated with providing what promises to be a voluminous Solicitation Package and that doing so would not be in contravention of, and would be supported by, section 1126(f) of the Bankruptcy Code.  Solicitation Procedures Motion ¶ 19.

36.    The Debtors also outline their proposal for providing adequate notice of the time for filing and serving objections, and the date and time of the Confirmation Hearing, to all

interested parties, which includes publication of the Confirmation Hearing Notice once in the national edition of *USA Today*, once in the national edition of *The New York Times*, once in the *Los Angeles Times*, once in *Variety* and once in the United Kingdom edition of *The Guardian* on a date not less than twenty-eight (28) calendar days before the Confirmation Objection Deadline.

37.     The Debtors attach proposed Ballots for creditors entitled to vote on the Proposed Plan to the Solicitation Procedures Motion that reflect the procedures and provisions of the Proposed Plan and the Disclosure Statement.

**Objection**

**I.     The Solicitation Package Should Include the Committee Letter**

38.     A Disclosure Statement must contain adequate "information of a kind and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).   In short, disclosure statements are a critical, if not only, source of information upon which creditors rely to evaluate and make an informed judgment about a plan of reorganization.  *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("[O]f prime importance in the reorganization process is the principle of disclosure"); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.").  Courts determine what constitutes "adequate information" in connection with a disclosure statement  on a case-by-case basis under the facts and circumstances presented by each case.  *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995).

39.     Here, because of the speed at which the Debtors and their lenders wish to confirm the Proposed Plan, the Committee has been unable to complete its diligence on the various financial aspects of the proposed Plan.  The Committee is still in the process of testing the valuation of the Debtors' encumbered and unencumbered assets, including the potentially substantial unencumbered litigation claims.  The Committee thus believes that the Committee Letter represents the most efficient way to convey to creditors its concerns regarding:  (i) the Debtors' valuation that underpins the Proposed Plan; (ii) Plan feasibility; (iii) the propriety of the Debtors' third party releases, including the value of avoidance actions against the Prepetition Secured Lenders that are to be forfeited; (iv) the Debtors' liquidation analysis; and (v) the Committee's investigation of the Prepetition Secured Lenders' liens and security interests.

40.     The Committee also believes that the Disclosure Statement should direct creditors to the Committee Letter in the solicitation package.  This includes, at a minimum, a bolded provision in the opening "Important Notice" section of the Disclosure Statement should be included in sum and substance as follows:

> THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") DOES NOT SUPPORT THE PLAN AND BELIEVES THAT DISTRIBUTIONS TO UNSECURED CREDITORS SHOULD BE INCREASED.  A LETTER FROM THE COMMITTEE SETTING FORTH ITS POSITION ON THE PLAN AND ITS REASONS FOR NOT SUPPORTING IT IS ENCLOSED WITH THE DISCLOSURE STATEMENT (THE "COMMITTEE LETTER").

41.     Courts in this district recognize and grant creditors' committee solicitation package statements as a means to ensure adequate disclosure is truly realized in the plan solicitation process.  *See, e.g.*, *In re Chassix Holdings, Inc., et al*, Case No. 15-10578 (MEW) (Dkt. No. 327, Bankr. S.D.N.Y. Apr. 24, 2015); *In re U.S. Shipping Partners L.P. et al*, Case No.

09-12722 (RDD) (Dkt. No. 375, Bankr. S.D.N.Y. Aug. 26, 2009). The Court should do the same here by approving the inclusion of the Committee Letter in the Solicitation Package.

## II.    Disclosure Statement Must be Modified to Clarify Death Trap Provisions

42.    The plan proponent has the burden of proof regarding the adequacy of a disclosure statement once issues have been identified for additional disclosure. *See, e.g.*, *In re Alaska Fur Gallery, Inc.*, No. 09-00196 (DMD), 2011 WL 494425, at *2 (Bankr. D. Alaska Apr. 29, 2011); *In re McGee*, No. 09-11860, 2010 WL 9463258, at *1 (Bankr. N.D. Ind. Apr. 21, 2010). To be approved, a disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy] Code alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991 (disclosure statement must "clearly and succinctly inform the average . . . creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distributions.").[15] Here, the Committee has identified the following issues that must be clarified or modified in order for the Debtors to meet their burden:

> •    <u>Class 5 Death Trap May be Illusory</u>. The Proposed Plan contains a "death trap" that provides additional cash distributions to Class 5 general unsecured creditors if such creditors vote to accept the Proposed Plan. (*E.g.*, Disclosure Statement, ¶ 6.3(b)(5)). The additional distributions are those portions of the $850,000 that would be set aside for the Prepetition Secured Lenders on account of their alleged deficiency claims. If Class 5 votes to reject the Proposed Plan, the Debtors would instead retain the amounts equal to such additional distributions. The Committee believes the death trap is potentially illusory because the general unsecured creditors (other than alleged deficiency claimants) do not control the outcome. The Prepetition Secured Lenders are entitled to vote under the

---

[15] Even if creditors could find additional information through formal discovery, the availability of such information through discovery does not render a plan proponent's disclosure adequate. *Official Comm. of Unsecured Creditors v. Michelson*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) (citing *In re Braten Apparel Corp.*, 21 B.R. 239, 259-60 (Bankr. S.D.N.Y. 1982) (additional internal citation omitted)).

Proposed Plan in Class 5 on account of their alleged deficiency claims, and because of their size, they are positioned to block Class 5's acceptance of the Proposed Plan by voting to reject while opting into the releases. The Debtors, with the encouragement of the Prepetition Secured Lenders that will own the company after emergence from chapter 11, can then seek to cram down Class 5 to confirm the Proposed Plan. Although the RSA appears to commit the Prepetition Secured Lenders to voting to accept the Proposed Plan, a simple modification of the RSA, which does not even require Court approval, could change this.   Death traps may be permissible, but they are generally conditioned solely on a class voting to reject and are not conditioned on a fiduciary or creditors from a different class voting to accepts, as is the case here. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (permitting death trap conditioned on voting); *In re Drexel Burnham Lambert Group*, 140 B.R. 347 (S.D.N.Y. 1992) (same); *In re Mcorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992) (death trap impermissible when conditioned on another class of creditor's conduct).   As a remedy, to ensure that non-deficiency Class 5 creditors are firmly in control of the death trap, the Prepetition Secured Lenders' votes of their deficiency claims should be excluded for the purpose of determining whether Class 5 has voted to accept.

- <u>Class 5 Death Trap – The Flow of Additional Consideration</u>.   The definition of "General Unsecured Claim" should be clarified to exclude the alleged Prepetition Secured Lenders' deficiency claims for purposes of distributing that portion of the $850,000 general unsecured creditor cash that would have otherwise been distributed to such deficiency claimants if Class 5 votes to accept the Proposed Plan.  (Proposed Plan, ¶¶ 1.3, 1.78, 5.3(b), 5.4(b), 5.5).  Because a General Unsecured Claim is defined to <u>include</u> the Prepetition Secured Lenders' deficiency claims for all purposes <u>except</u> for calculating litigation trust units, such lenders conceivably would first give up their pro rata share of the $850,000 if Class 5 votes to accept, but nevertheless receive such pro rata share, defined as the "Additional General Unsecured Claim Cash Distribution," as the holder of a General Unsecured Claim.  The Committee believes this is contrary to the intent of the Proposed Plan.

## III.   Disclosure Statement and Solicitation Procedures Require Clarification and Modification Regarding the Third Party Release Opt Out

43.   The Disclosure Statement contains the following statement regarding releases of the Released Parties under the Proposed Plan:

<u>Releases by Holders of Claims and Interests</u>.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date: (i) each of the Released Parties; (ii) each holder of a Claim or Interest entitled to vote on the Plan that did

not "opt out" of the releases provided in Section 12.6 of the Plan in a timely submitted Ballot; and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors and Reorganized Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied in the Plan and deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan) against the Released Parties.

Disclosure Statement § 6.14(c).  It is unambiguous from the above language that each of the

Released Parties[16] and each holder of a Claim or Interest entitled to vote that did <u>not</u> opt out of

the releases will be agreeing to a release of the Released Parties under the Proposed Plan.

44.    But neither the Disclosure Statement, the Proposed Plan, nor the Solicitation

Procedures Motion make clear (but it appears to be the intent) that that creditors that are not

entitled to vote, or are entitled to vote, but do not timely vote, will nevertheless be releasing the

---

[16] The Disclosure Statement defines "Released Parties" as the following:

> Released Parties. The Released Parties are collectively, and each solely in its capacity as such: (a) the Debtors; (b) the First Lien Administrative Agent, the First Lien Lenders and the Ad Hoc Group of First Lien Lenders; (c) the Second Lien Administrative Agent and the Second Lien Lenders; (d) the Independent Directors with respect to any Claims or Causes of Action relating to the Debtors for the period starting March 24, 2015 through the Effective Date; (e) the current directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date; (f) the Creditors' Committee Parties; and (g) each of such parties' predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, attorneys, financial advisors or other professionals or representatives; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases or the U.K. Proceeding; provided, further, that the Released Parties shall not include any Excluded Party; provided, further, that no Person shall be a Released Party if it objects to and/or opts out of the releases provided for in Article XII of the Plan; provided further that any First Lien Lender or Second Lien Lender that does not execute the RSA prior to the Confirmation Hearing or vote to accept the Plan shall not be a Released Party.

Disclosure Statement, at § 6.14(a).

Released Parties automatically.  This is a problem with the Disclosure Statement and Solicitation Procedures and also presents a Proposed Plan confirmation issue unless addressed before solicitation.

45.    Classes 1 (Priority Non-Tax Claims), 2 (Other Secured Claims), 7 (Subordinated Classes) and 8 (Existing Interests) are deemed to accept or reject, as the case may be, the Proposed Plan and are not entitled to vote.  Disclosure Statement ¶ 2.2.  Yet it appears from the Disclosure Statement that they will be deemed to have automatically released the Released Parties because they did not "opt out."

46.    Classes 3 (First Lien Lender Claims), 4 (Second Lien Lender Claims), and 5 (General Unsecured Claims) are impaired and are entitled to vote on the Proposed Plan.  *Id.* at § 2.2.  Classes 3, 4, 5 and 6 will receive ballots and will have an opportunity to opt out of the third party releases, but if they fail to return their ballots at all or on time, they will be deemed to have granted the releases.[17]  *See* Solicitation Procedures Motion at ¶¶ 55, 66, 78, and 88.

47.    Courts in this District have rejected third party releases by unimpaired parties that did not have an opportunity to consent to the releases.  *In re Chassix Holdings, Inc.,* 533 B.R. 64, 81-82 (Bankr. S.D.N.Y. 2015); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 270 (Bankr. S.D.N.Y. 2014)  ("The Court agrees that simply classifying a party as unimpaired does not mean that they should be somehow automatically deemed to grant a release where the requirements of *Metromedia* have not been met."); s*ee also In re Washington Mut. Inc.,* 442 B.R. 314, 355 (Bankr.D.Del.2011) (holding that "inaction" was not a sufficient manifestation of consent to support a release).  *Chassix* also held that the failure to return a ballot by a creditor does not

---

[17] The Disclosure Statement indicates, in some places, that the Class 6 is not entitled to vote (*see* Disclosure Statement at § 1.3 compared to § 2.2), while the Proposed Plan appears to make clear that Class 6 creditors are entitled to vote on the Proposed Plan, the Debtors should be sure to make this clear as a result of the inconsistencies.

result in a third party release by that creditor. *Chassix*, 533 B.R. at 80 ("[A]s to creditors who were entitled to vote, but who chose to take no action at all: under the circumstances of this case it would be inappropriate to treat such inaction as a 'consent' to third party releases."). "Creditors and interest holders who were deemed to reject the Proposed Plan should similarly be deemed to have rejected the third party releases in the absence of an affirmative act manifesting a contrary consent." *Chassix*, 533 B.R. at 81.

48.    Voting creditors can opt out of the releases simply by checking the opt out box on the ballot. Non-voting creditors or those who fail to submit timely ballots will be bound by the releases pursuant to Section 6.14(c)(iii) of the Proposed Plan.[18] Creditors that are entitled to vote, but for any reason, receive their Solicitation Packages late or learn of the importance of the releases after the bid deadline, will be automatically bound by releases they would otherwise have rejected. Not only is this a confirmation problem, it is also an infirmity in the Solicitation Procedures pursuant to the law applicable in this District, and is not adequately disclosed in the Disclosure Statement.

49.    The Solicitation Procedures thus require modification to (a) allow Unimpaired Creditors to "opt out" or (b) provide that Unimpaired Creditors are not deemed to have opted out of the releases. The Disclosure Statement, Proposed Plan, and the Solicitation Procedures and notices should also better disclose the issue and establish a deadline to submit release opt out forms not later than the Effective Date of the Proposed Plan to mitigate the problem with voting creditors missing the voting deadline.

---

[18] The foregoing is inconsistent with case law in this District. Specifically, Classes 1 (Priority Non-Tax Claims) and 2 (Other Secured Claims) are deemed to accept the Proposed Plan and are not entitled to vote. Disclosure Statement ¶ 2.2.

IV.     **The Proposed Plan Cannot Strip the Committee's Members or Professionals of Their Qualified Immunity**

50.     The Proposed Plan appears to leave the Committee with an unconfirmable Hobson's choice of preserving its rights to exculpation under Article XII of the Proposed Plan, or in the alternative, abdicating its fiduciary duty to contest inappropriate releases thereunder. Courts routinely hold that, if a plan is not confirmable as a matter of law, the related disclosure statement should not be approved. *See, e.g.*, *In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile).   Indeed, courts should not approve a disclosure statement and engage in the "wasteful and fruitless exercise of sending the disclosure statement to creditors . . . when the plan is unconfirmable on its face." *In re Atlanta W. VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) ("A court may refuse to approve a disclosure statement when it is apparent that the plan which accompanies the disclosure statement is not confirmable.").

51.     As noted in the Committee Letter, the Committee believes the third party releases in Article XII are inappropriate, but that issue will be litigated at confirmation.  The issue here, however, stems from the right of the members of the Committee to qualified immunity in the exercise of their  official duties under section 1103(c) of the Bankruptcy Code. *E.g.*, *In re PWC Holding Corp.*, 228 F.3d 224, 246 (3d. Cir. 2000) (explaining that limited or qualified immunity "covers members for actions within the scope of their duties"); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994) ("Because of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency, an official committee . . . enjoys qualified immunity that corresponds to, and is intended to further, the Committee's statutory duties and powers.").

52.     Notwithstanding the Committee members' right to qualified immunity, the

Proposed Plan appears to provide that this right may be forfeited.  Specifically, the Proposed

Plan provided that the Committees' status as Released Parties under Sections 1.111 and 1.126 of

the Proposed Plan will be rescinded if the Committee objects to any of the releases provided for

in Article XII of the Proposed Plan.  When read together with section 12.7 of the Proposed Plan,

parties that would otherwise be entitled to qualified immunity may only receive it if they become

Released Parties.  Therefore, if the Committee objections to the Proposed Plan, the Committee

and its members and professionals are precluded from qualified immunity.  The Committee must

therefore decide between exercising its fiduciary duty to oppose the Proposed Plan that the

Committee believes is likely unconfirmable in its present form and the qualified immunity to

which they are entitled in the performance of their official duties under section 1103(c) of the

Bankruptcy Code.  The Proposed Plan's construction is thus untenable, unconfirmable on its

face, and contrary to public policy.  Accordingly, any provision that attempts to shackle the

proper exercise of the Committee's fiduciary duties must be stricken.

### Reservation of Rights

53.     The Committee reserves all rights, claims, defenses, and remedies, including,

without limitation, to supplement and amend this Objection, to raise further and other objections,

to introduce evidence prior to or at any hearing regarding the Disclosure Statement and

Solicitation Procedures Motion in the event the Committee's objections are not resolved prior to

such hearing, or to seek to introduce documents or other relevant information in support of the

positions set forth in this Objection.

54.     The Committee and its members reserve all of their respective rights, claims,

defenses, and remedies in connection with the Proposed Plan or any other proposed chapter 11

plan in the cases including, without limitation, to seek discovery in connection with the

confirmation of such plan.

### Conclusion

WHEREFORE, the Committee respectfully requests that the Court grant relief consistent

with the foregoing and such other and further relief as it deems just and proper.

Dated: July 19, 2016
      New York, New York      **SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: */s/ Craig A. Wolfe*
Craig A. Wolfe
Malani J. Cademartori
Jason R. Alderson
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 653-8700
Fax: (212) 653-8701
E-mail: cwolfe@sheppardmullin.com
        mcademartori@sheppardmullin.com
        jalderson@sheppardmullin.com

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors*

## <u>Exhibit A</u>

**Committee Letter**

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF AOG ENTERTAINMENT, INC., et al.
c/o Sheppard Mullin Richter & Hampton, LLP
30 Rockefeller Plaza, New York, NY 10112

July [ ], 2016

To All Unsecured Creditors of AOG Entertainment, Inc., et al.:

The Official Committee of Unsecured Creditors (the "Committee") of AOG
Entertainment, Inc.  ("AOG") and its affiliated debtors and debtors-in-possession in the above-
captioned chapter 11 cases (collectively, the "Debtors") was appointed on May 17, 2015, to act
as the fiduciary body representing the interests of unsecured creditors in the Debtors' chapter 11
cases (the "Chapter 11 Cases").  The Committee submits this letter regarding the *Joint Chapter
11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors* [Dkt. No. 144]
(the "Plan").[1]

For the reasons set forth below, the Committee does not support the Plan at this time and
has significant concerns regarding what the Committee believes is an inadequate allocation of
value to unsecured creditors.  The Committee is in the process of investigating its concerns and
at this time, ***cannot*** recommend that creditors vote in favor of the Plan.  Rather, the Committee
recommends that, prior to voting on the Plan, each unsecured creditor carefully review the
materials provided to them, including, and especially, this letter, and continue to monitor the
docket of these Chapter 11 Cases at the following website:
http://www.kccllc.net/AOG/documents/list.  For a further discussion of the Committee's
positions on the Plan and the subject matter of this letter, the Committee recommends that
unsecured creditors contact counsel to the Committee, Sheppard Mullin Richter & Hampton LLP
("Sheppard Mullin"), by emailing jalderson@sheppardmullin.com or calling (212) 653-8700 and
asking for Jason Alderson.

1.    **The Plan**

The Plan implements a restructuring of the Debtors that was negotiated by the Debtors
and certain of their stakeholders before the Committee was appointed.  The Committee was not
involved in the development of the Plan.  Rather, the Consenting Lenders (representing 100% of
the First Lien Lenders and Second Lien Lenders (collectively, the "Prepetition Secured
Lenders") negotiated a Restructuring Support Agreement, dated as of May 16, 2016, and as
amended from time to time thereafter (the "RSA").  The RSA was first filed in these Chapter 11
Cases for approval by the Bankruptcy Court on May 20, 2016.  As stated above, the Committee
was appointed on May 17, 2016, and thereafter chose Sheppard Mullin as counsel on May 20,
2016.  The RSA provided for, and consequently the Plan provides that almost all of the available
assets and value of the Debtors, including all or substantially all of the new equity interests (and
therefore, ownership) in the reorganized Debtors, will flow to certain of the Prepetition Secured
Lenders in exchange for the deleveraging of debt.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan or the
Disclosure Statement, as applicable.

The Plan also entitles the First Lien Lenders to pro rata distributions of $32.5 million in cash, with certain of these lenders intending to reinvest their allocation (approximately $18 million) into the reorganized Debtors.  Following the Plan effective date, the reorganized Debtors also intend to implement a management incentive plan that will provide options for up to 12.5% of the New Class A LLC Units of the reorganized company.

In contrast, the Plan provides that general unsecured creditors, which have asserted claims exceeding $25 million plus the Prepetition Secured Lenders' alleged deficiency claims of approximately $300 million, will receive only a small amount under the Plan.  Unsecured creditors are to receive only (i) $850,000 in aggregate cash, to be shared on a pro rata basis among all holders of allowed general unsecured claims; provided that no general unsecured creditor shall be entitled to a distribution representing more than 3.5% of such creditors' allowed claim, and (ii) participation rights in a litigation trust pursuant to a formula along with the participation of the Prepetition Secured Lenders on account of alleged deficiency claims.  To incent unsecured creditors to vote for the Plan, it provides that general unsecured creditors will receive that portion of the $850,000 that would otherwise be distributed to the Prepetition Secured Lenders for their alleged deficiency claims **only** if the class of general unsecured creditors votes to accept the Plan.  Conversely, if the class of general unsecured creditors does not vote to accept the Plan, the Prepetition Secured Lenders' portion of the $850,000 will be retained by the Debtors.

The Committee has yet to verify that the Prepetition Secured Lenders' are actually secured creditors.  The Committee has been provided with a "challenge period" expiring on August 27, 2016, to investigate and challenge the validity, perfection, character and enforceability of the liens asserted by the First Lien Lenders and the Second Lien Lenders against the Debtors.  The Debtors' presumption of the valid, perfected, enforceable and binding nature of the liens asserted by the First Lien Lenders and the Second Lien Lenders are at the very heart of the Plan.  Unfortunately, because the Debtors are working under such a compressed time schedule mandated by the Prepetition Secured Lenders in the RSA, the Debtors' mailing of the Plan ballots to creditors had to be completed before the Committee's deadline to complete its critical investigation of the Prepetition Secured Lenders' liens.  It is, of course, possible that the results of the Committee's investigation of these issues would significantly change the presumptions underlying the Plan and, therefore, affect the analysis of whether the Plan's structure and considerations are inherently fair.  Accordingly, before such an investigation is complete and, to the extent that such investigation yields information regarding the unenforceability of any portion of the liens asserted by the Prepetition Secured Lenders, the Committee cannot recommend that creditors vote in favor of the Plan.

2.    **The Valuation Methodology, Projections, and Unsecured Claims Pool on Which the Plan is Premised May Not Allocate Sufficient Value to Unsecured Creditors**

The Debtors estimate that as of the Effective Date, the Reorganized Debtors will have an overall value of $97.5 million comprised of (i) the asserted going concern enterprise value of the Reorganized Debtors which ranges from $50 million to $80 million, with a midpoint of $65 million, plus (ii) the cash distribution of the excess cash balance management has estimated the Reorganized Debtors will have at the Effective Date of $32.5 million.  This valuation would

leave no distributable value for general unsecured creditors and would leave each of the First
Lien Lenders and the Second Lien Lenders with deficiency claims.

While the Committee and its financial advisor are continuing to perform their analysis,
the Committee's preliminary view is that the Debtors' valuation conclusions raise serious
concerns that warrant further investigation.

**Foreign Assets**: The Committee is investigating whether any of the Debtors' foreign
non-Debtor affiliates is unsecured, which, if such investigations prove that they and their
assets are not, may yield significant value for the general unsecured creditors.

**Value of Potential Avoidance Actions and Other Causes of Action**: The Plan
contemplates the Litigation Trust that will be vested with (i) all rights of the Debtors,
their Estates, the Committee and non-Debtor wholly-owned or controlled subsidiaries to
commence and pursue suits, proceedings or Causes of Action against any party not
released under the Plan and (ii) all such other assets assigned or contributed to the
Litigation Trust as provided in the Plan, including Causes of Action assigned by the First
Lien Lenders and Second Lien Lenders. The Litigation Trust, however, will be controlled
by an Oversight Committee to be overwhelmingly constituted by appointees of, and thus
controlled by, certain of the Prepetition Secured Lenders.  Although the assets to be held
by the Litigation Trust may be quite valuable, the general unsecured creditors would still
receive very little, if any, additional distributable value therefrom based on the formulas
provided for in the Plan.

The Committee believes that in order to determine whether to accept or reject the Plan,
unsecured creditors must have a better understanding of these matters, which will enable them to
determine whether the Debtors' value conclusions, and the concomitant recoveries to general
unsecured creditors, are appropriate.  The Committee is continuing to investigate, and
encourages unsecured creditors to monitor the cases and/or contact the Committee's advisors
before the deadline to submit ballots to accept or reject the Plan.

3.    **The Plan Completes a Structure to Strip the Estate of Potential Causes of Action**

The Plan incorporates the provision of general releases to the Prepetition Secured
Lenders on claims that the Committee is still investigating and that could otherwise yield a
significant amount of value for the general unsecured creditors in terms of assets recovered and
reduction in secured positions.  The Committee is currently investigating these potential causes
of action.

**4.**    **Conclusion**

The Committee hopes that the information in this letter is helpful to unsecured creditors in understanding the issues with the Plan that the Committee has identified to date.  As noted above, the Committee is investigating these issues and many others, and cannot in good faith recommend that unsecured creditors vote in favor of, or against, the Plan until the Committee's analysis has concluded

Very truly yours,


The Official Committee of Unsecured Creditors of AOG Entertainment, Inc., et al.