UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AOG Entertainment, Inc., et al.,[1] | : | Case No. 16-11090 (SMB) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------x

---

### FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR AOG ENTERTAINMENT, INC. AND ITS AFFILIATED DEBTORS

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST AND THIS PLAN IS SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN. ACCEPTANCES OR REJECTIONS WITH RESPECT TO THIS PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. SUCH A SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES AND/OR BANKRUPTCY LAWS.**

Dated:    New York, New York
          July 25, 2016

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for the Debtors and Debtors in Possession*
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as Exhibit A hereto and at http://www.kccllc.net/AOG.  The Debtors' executive headquarters are located at 8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

# TABLE OF CONTENTS

Page

ARTICLE I.  DEFINITIONS AND INTERPRETATION................................................1

ARTICLE II.  CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES ....................18

**2.1.** ***Settlement of Certain Inter-Creditor Issues.***.........................................18

**2.2.** ***Formation of Debtor Groups for Convenience Purposes.*** ...................19

**2.3.** ***Intercompany Claims and Intercompany Interests.*** ...........................19

ARTICLE III.  DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
        FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS.........19

**3.1.** ***DIP Claims.*** ........................................................................................20

**3.2.** ***Administrative Expense Claims.*** .......................................................20

**3.3.** ***Fee Claims.*** ........................................................................................22

**3.4.** ***U.S. Trustee Fees.*** .............................................................................22

**3.5.** ***Priority Tax Claims.*** ..........................................................................22

ARTICLE IV.  CLASSIFICATION OF CLAIMS AND INTERESTS ...................................23

**4.1.** ***Classification of Claims and Interests.*** .............................................23

**4.2.** ***Unimpaired Classes of Claims.***.........................................................23

**4.3.** ***Impaired Classes of Claims.*** .............................................................24

**4.4.** ***Separate Classification of Other Secured Claims.***.............................24

ARTICLE V.  TREATMENT OF CLAIMS AND INTERESTS.............................................24

**5.1.** ***Priority Non-Tax Claims (Class 1).*** .................................................24

**5.2.** ***Other Secured Claims (Class 2).***.......................................................25

**5.3.** ***First Lien Lender Claims (Class 3).*** .................................................25

**5.4.** ***Second Lien Lender Claims (Class 4).*** ..............................................27

**5.5.** ***General Unsecured Claims (Class 5).*** ...............................................27

**5.6.** ***Convenience Claims (Class 6).*** .........................................................28

**5.7.** ***Subordinated Claims (Class 7).*** ........................................................29

**5.8.** ***Existing Interests (Class 8).*** .............................................................29

ARTICLE VI.  ACCEPTANCE OR REJECTION OF
THE PLAN; EFFECT OF REJECTION BY ONE
OR MORE CLASSES OF CLAIMS OR INTERESTS ....................................29

6.1.    *Class Acceptance Requirement.* ..................................................29

6.2.    *Tabulation of Votes on a Non-Consolidated Basis.* ...........................29

6.3.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or*
*"Cramdown."* ...........................................................................29

6.4.    *Elimination of Vacant Classes.* ....................................................30

6.5.    *Voting Classes; Deemed Acceptance by Non-Voting Classes.* ............30

6.6.    *Confirmation of All Cases.* ..........................................................30

ARTICLE VII.  MEANS FOR IMPLEMENTATION.................................................30

7.1.    *The Litigation Trustee and the Litigation Trust.* .............................30

7.2.    *Continued Corporate Existence and Vesting of Assets in Reorganized*
*Debtors.* ..................................................................................34

7.3.    *Plan Funding.* ..........................................................................36

7.4.    *Cancellation of Existing Securities and Agreements.* .......................36

7.5.    *Boards of Directors.* ..................................................................36

7.6.    *Management.* ...........................................................................37

7.7.    *Corporate Action.* .....................................................................37

7.8.    *Authorization, Issuance and Delivery of the Plan Securities.*............38

7.9.    *Rights Offering.* .......................................................................38

7.10.   *New Term Loan Facility.* ............................................................40

7.11.   *Reserved.* ................................................................................40

7.12.   *Insured Claims.* ........................................................................40

7.13.   *Comprehensive Settlement of Claims and Controversies.* ..................40

7.14.   *The New Second Lien Warrants.* ..................................................41

7.15.   *The Sharp Entities.* ...................................................................42

7.16.   *First Lien Lender Fee Claim and Second Lien Lender Fee Claim.* ...................43

7.17.   *Alternative Restructuring Transactions.* ......................................43

ARTICLE VIII.  DISTRIBUTIONS.....................................................................44

8.1.    *Distributions.* ..........................................................................44

8.2.    *No Postpetition Interest on Claims.*..............................................44

8.3.    *Date of Distributions.* ...............................................................45

8.4.    *Distribution Record Date.* ...................................................................45

8.5.    *Disbursing Agent.* .............................................................................45

8.6.    *Delivery of Distribution.* ...................................................................46

8.7.    *Unclaimed Property.* ..........................................................................47

8.8.    *Satisfaction of Claims.* .......................................................................47

8.9.    *Manner of Payment Under Plan.* .........................................................47

8.10.   *Fractional Units/De Minimis Cash Distributions.* .................................47

8.11.   *Distributions on Account of Allowed Claims Only.* ...............................48

8.12.   *No Distribution in Excess of Amount of Allowed Claim.* ........................48

8.13.   *Exemption from Securities Laws.* ........................................................48

8.14.   *Setoffs and Recoupments.* ..................................................................48

8.15.   *Withholding and Reporting Requirements.* ...........................................48

8.16.   *Hart-Scott Rodino Antitrust Improvements Act.* ...................................49

ARTICLE IX.    PROCEDURES FOR RESOLVING CLAIMS ....................................49

9.1.    *Objections to Claims.* .........................................................................49

9.2.    *Amendment to Claims.* .......................................................................50

9.3.    *Disputed Claims.* ...............................................................................50

9.4.    *Estimation of Claims.* .........................................................................50

9.5.    *Expenses Incurred on or After the Effective Date.* .................................50

ARTICLE X.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................51

10.1.   *General Treatment.* ............................................................................51

10.2.   *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* ........52

10.3.   *Cure of Defaults for Assumed or Assumed and Assigned Executory
        Contracts and Unexpired Leases.* .......................................................52

10.4.   *Compensation and Benefit Programs.* ..................................................53

ARTICLE XI.    CONDITIONS PRECEDENT TO
               CONSUMMATION OF THE PLAN ...............................................54

11.1.   *Conditions Precedent to the Effective Date.* .........................................54

11.2.   *Satisfaction and Waiver of Conditions Precedent.* .................................55

11.3.   *Effect of Failure of Conditions.* ..........................................................55

ARTICLE XII.    EFFECT OF CONFIRMATION ......................................................56

12.1.   *Binding Effect.* ..................................................................................56

**12.2.**  *Discharge of Claims Against and Interests in the Debtors.* ...............................56

**12.3.**  *Term of Pre-Confirmation Injunctions or Stays.* ...............................................56

**12.4.**  *Injunction Against Interference with Plan.* ........................................................56

**12.5.**  *Injunction.* ...........................................................................................................57

**12.6.**  *Releases.* ..............................................................................................................58

**12.7.**  *Exculpation and Limitation of Liability.* ............................................................59

**12.8.**  *Injunction Related to Releases and Exculpation.* ..............................................59

**12.9.**  *Retention of Causes of Action/Reservation of Rights.* .......................................60

**12.10.** *Indemnification Obligations.* ..............................................................................60

ARTICLE XIII.  RETENTION OF JURISDICTION .....................................................60

ARTICLE XIV.  MISCELLANEOUS PROVISIONS......................................................62

**14.1.**  *Exemption from Certain Transfer Taxes.* ...........................................................62

**14.2.**  *Retiree Benefits.* ..................................................................................................62

**14.3.**  *Dissolution of Creditors' Committee* ..................................................................63

**14.4.**  *Termination of Professionals.* .............................................................................63

**14.5.**  *Amendments.* ........................................................................................................63

**14.6.**  *Revocation or Withdrawal of this Plan.* ..............................................................63

**14.7.**  *Reserved.* ..............................................................................................................64

**14.8.**  *Allocation of Plan Distributions Between Principal and Interest.*......................64

**14.9.**  *Severability.* .........................................................................................................64

**14.10.** *Governing Law.* ...................................................................................................64

**14.11.** *Section 1125(e) of the Bankruptcy Code.*...........................................................64

**14.12.** *Inconsistency.* ......................................................................................................65

**14.13.** *Time.* ....................................................................................................................65

**14.14.** *Exhibits.* ...............................................................................................................65

**14.15.** *Notices.* ................................................................................................................66

**14.16.** *Filing of Additional Documents.* .........................................................................66

**14.17.** *Reservation of Rights.* .........................................................................................66

## INTRODUCTION[2]

AOG Entertainment, Inc. and the other debtors and debtors in possession in the above-captioned cases propose this joint chapter 11 plan of reorganization for the resolution of the Claims against and Interests in the Debtors.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits and supplements thereto, for a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters including, among other things, certain tax matters, and the securities and other consideration to be issued and/or distributed under this Plan. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and Sections 14.5 and 14.6 of this Plan, the Debtors, with the consent of the Required Consenting Lenders, reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

The only Persons that are entitled to vote on this Plan are the holders of First Lien Lender Claims, Second Lien Lender Claims, General Unsecured Claims and Convenience Claims. Such Persons are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan. No materials other than the Disclosure Statement, the respective schedules, notices and exhibits attached thereto and referenced therein have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1**    *Ad Hoc Group of First Lien Lenders* means the ad hoc group of First Lien Lenders that are signatories to the RSA represented by Klee, Tuchin, Bogdanoff & Stern LLP.

**1.2**    *Additional General Unsecured Claim Cash Distribution* means the portion of the General Unsecured Claim Cash Distribution that would otherwise be distributed to holders of First Lien Lender Claims and Second Lien Lender Claims on account of the Aggregate Lender Deficiency Claim except to the extent that these holders agree to accept such less favorable treatment in the event that Class 5 (General Unsecured Claims) votes to accept this Plan.

**1.3**    *Additional U.K. Proceedings* means any additional recognition proceedings commenced by certain additional Debtors under Article 15 of Schedule 1 to the Cross-Border Insolvency

---

[2]    All capitalized terms used but not defined herein have the meanings set forth in Article I.

Regulations 2006 in the U.K. Court to, among other things, recognize the Reorganization Cases of certain additional Debtors as "foreign main proceedings."

**1.4** *Administrative Bar Date* has the meaning set forth in Section 3.2(a) of this Plan.

**1.5** *Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of the Reorganization Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than a DIP Claim, Fee Claim or U.S. Trustee Fees) incurred during the period from the Petition Date to the Effective Date, including: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by any of the Debtors during the Reorganization Cases; and (b) any payment to be made under this Plan to cure a default under an assumed, or assumed and assigned, executory contract or unexpired lease.

**1.6** *Aggregate Lender Deficiency Claim* means the unsecured deficiency Claim held by the First Lien Lenders and the Second Lien Lenders in the aggregate amount of $295.6 million minus, if applicable, the Additional General Unsecured Claim Cash Distribution retained by the Reorganized Debtors in the event Class 5 votes to reject the Plan pursuant to Section 5.5(a)(ii).

**1.7** *Allowed* means, with respect to a Claim under this Plan, a Claim that is an Allowed Claim or an Allowed _____ Claim.

**1.8** *Allowed Claim or Allowed _____ Claim* (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, disallow, deny or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by this Plan or applicable law, or, if an action to dispute, disallow, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a Debtor in the ordinary course of business during the Reorganization Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

**1.9** *Alternative Restructuring Transactions* means those transactions described in Section 7.17 of this Plan.

**1.10** *Amended By-Laws* means the amended and restated by-laws for the applicable Reorganized Debtor. The substantially final form of Amended By-Laws for Reorganized CORE and a form of Amended By-Laws for the Reorganized Debtor subsidiaries of Reorganized CORE will be filed as part of the Plan Supplement.

**1.11**    ***Amended Certificates of Incorporation*** means the amended and restated certificates of incorporation (or articles of incorporation, as applicable) for the applicable Reorganized Debtor. The substantially final form of Amended Certificate of Incorporation for Reorganized CORE and a form of Amended Certificate of Incorporation for the Reorganized Debtor subsidiaries of Reorganized CORE will be filed as part of the Plan Supplement.

**1.12**    ***Ballot*** means the form approved by the Bankruptcy Court and distributed to holders of impaired Claims entitled to vote on the Plan to be used to indicate (i) their acceptance or rejection of the Plan, (ii) the assignment of claims held by the First Lien Lenders and the Second Lien Lenders to the Litigation Trust and provided in Sections 7.1(b) and 7.1(c) of this Plan and (iii) in the case of an Allowed General Unsecured Claim in an amount greater than $10,000, such holder's agreement to irrevocably elect to reduce its Claim to $10,000 and have its Claim reclassified as a Convenience Claim under the Plan.

**1.13**    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

**1.14**    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court exercising competent jurisdiction over the Reorganization Cases or any proceeding therein.

**1.15**    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases, and any Local Rules of the Bankruptcy Court.

**1.16**    ***Bar Date*** means any deadline for filing proofs of Claim, including Claims arising prior to the Petition Date and Administrative Expense Claims, as established by an order of the Bankruptcy Court or under the Plan.

**1.17**    ***Business Day*** means any day other than a Saturday, Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.18**    ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.19**    ***Causes of Action*** means any and all actions, causes of action (including causes of action under sections 510, 541, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code), suits, accounts, controversies, obligations, judgments, damages, demands, debts, rights, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims (as defined in section 101(5) of the Bankruptcy Code), whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or tort, arising in law, equity or otherwise.

**1.20**    ***Claim*** means any "claim" as defined in section 101(5) of the Bankruptcy Code against any Debtor or property of any Debtor, including any Claim arising after the Petition Date.

**1.21**    ***Claims Agent*** means Kurtzman Carson Consultants LLC, or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. §156(c).

**1.22**    ***Class*** means each category of Claims or Interests established under Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.23**    ***Class A Warrants*** has the meaning set forth in Section 7.14 of this Plan.

**1.24**    ***Class B Warrants*** has the meaning set forth in Section 7.14 of this Plan.

**1.25**    ***Collateral*** means any property, wherever located, including the United Kingdom, or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim.

**1.26**    ***Competition Laws*** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any other competition or merger control law.

**1.27**    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.28**    ***Confirmation Hearing*** means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.29**    ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.30**    ***Consenting Lenders*** means, as of the relevant time, those First Lien Lenders and Second Lien Lenders that are party to the RSA.

**1.31**    ***Contributed Interests*** has the meaning set forth in Section 7.17(b) of this Plan.

**1.32**    ***Convenience Claim*** means a Claim that would otherwise be an Allowed General Unsecured Claim that is either (i) Allowed in amount of $10,000 or less, or (ii) Allowed in an amount greater than $10,000, but which is reduced to $10,000 and treated as a Convenience Claim for purposes of this Plan in full and final satisfaction of such Claim by an irrevocable written election of the holder of such Claim made on a timely and properly delivered and completed Ballot; provided, however, that any General Unsecured Claim that was originally Allowed in excess of $10,000 may not be subdivided into multiple General Unsecured Claims of $10,000 or less for purposes of receiving treatment as a Convenience Claim.

**1.33**    ***Convenience Claim Cap Amount*** means $350,000.

**1.34**    ***CORE*** means CORE Entertainment Inc., a Delaware corporation.

**1.35**    ***CORE Holdings*** means CORE Entertainment Holdings, Inc., a Delaware corporation.

**1.36**    ***CORE Media*** means CORE Media Group Inc., a Delaware corporation.

**1.37**    ***CORE Operations*** has the meaning set forth in Section 7.17(a)(iii) of this Plan.

**1.38**    ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed in the Reorganization Cases in accordance with section 1102 of the Bankruptcy Code, as the same may be constituted from time to time.

**1.39**    ***Creditors' Committee Parties*** means (i) the Creditors' Committee, (ii) each of the Creditors' Committee's members acting solely in its respective capacity as a member thereof (and not in its individual capacity as a creditor or claimant against any or all of the Debtors), and (iii) each of the foregoing parties' current officers, directors, employees, agents, members, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by the Creditors' Committee), together with their respective successors and assigns, solely with respect to official activities rendered in connection with serving on or providing services to the Creditors' Committee; provided, however, that such attorneys and professional advisors shall only include those that provided services to the Creditors' Committee related to the Reorganization Cases and retained by a Final Order pursuant to section 1103 of the Bankruptcy Code.

**1.40**    ***Crestview*** means Crestview Media Investors, L.P.

**1.41**    ***Cure Amount*** has the meaning set forth in Section 10.3(a) of this Plan.

**1.42**    ***Cure Dispute*** has the meaning set forth in Section 10.3(b) of this Plan.

**1.43**    ***Cure Schedule*** has the meaning set forth in Section 10.3(c) of this Plan.

**1.44**    ***Debtor(s)*** means, individually or collectively, as the context requires, AOG Entertainment, Inc. and each of its affiliated debtors and debtors in possession in the Reorganization Cases listed on Exhibit A hereto that commenced the Reorganization Cases on April 28, 2016.

**1.45**    ***DIP Claim*** means a Claim of the DIP Lender in respect of the obligations of the Debtors arising under the DIP Credit Agreement.

**1.46**    ***DIP Credit Agreement*** means the DIP Credit Agreement, dated as of [___], 2016, by and among the Debtors and the DIP Lender, as the same may have been modified and amended from time to time, in accordance with the terms thereof.

**1.47**    ***DIP Facility*** means the first priority secured intercompany revolving debtor-in-possession credit facility provided to the Debtors pursuant to the DIP Credit Agreement, by and among the Debtors and the DIP Lender, as the same may have been modified and amended from time to time, in accordance with the terms thereof.

**1.48**    ***DIP Lender*** means Elvis Blue Moon Holdings, LLC, a non-Debtor indirect subsidiary of CORE.

**1.49**    ***DIP Order*** means the order or orders of the Bankruptcy Court authorizing and approving the Debtors' entry into the DIP Credit Agreement and the DIP Facility.

**1.50**    ***Disallowed*** means a finding or conclusion of law of the Bankruptcy Court in a Final Order, or provision in the Confirmation Order, disallowing a Claim.

**1.51**    ***Disbursing Agent*** means the Reorganized Debtors or the entity designated by the Debtors or Reorganized Debtors to distribute the Plan Consideration.

**1.52**    ***Disclosure Statement*** means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time).

**1.53**    ***Disclosure Statement Hearing*** means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.54**    ***Disclosure Statement Order*** means an order of the Bankruptcy Court approving the Disclosure Statement as having adequate information in accordance with section 1125 of the Bankruptcy Code.

**1.55**    ***Disputed*** means, with respect to a Claim or Interest, that portion (including, when appropriate, the whole) of such Claim or Interest that: (a) (i) has not been scheduled by the Debtors in their Schedules, or has been scheduled in a lesser amount or priority than the amount or priority asserted by the holder of such Claim or Interest, or (ii) has been scheduled as contingent, unliquidated or disputed and for which no proof of claim has been timely filed; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court which has not been withdrawn and/or overruled by a Final Order; and/or (c) is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by Final Order.

**1.56**    ***Distribution Date*** means: (a) with respect to DIP Claims, First Lien Lender Claims and Second Lien Lender Claims, the Effective Date, (b) with respect to, Administrative Expense Claims, Priority Non-Tax Claims, U.S. Trustee Fees, Priority Tax Claims, Other Secured Claims, General Unsecured Claims and Convenience Claims, the date that is the latest of:  (i) the Effective Date (or any date within thirty (30) days thereafter); (ii) the date such Claim would be due and payable in the ordinary course of business; and (iii) any date that is within thirty (30) days after such Claim becomes an Allowed Claim or otherwise becomes payable under the Plan (or, if such date is not a Business Day, on the next Business Day thereafter), and (c) with respect to Fee Claims, the date (or as soon thereafter as reasonably practicable) that such Claims become Allowed Claims.

**1.57**    ***Distribution Record Date*** means, with respect to all Classes for which Plan Distributions are to be made, the Effective Date.

**1.58**    ***Effective Date*** means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.1 of this Plan have been satisfied or waived and no stay of the Confirmation Order is in effect.

**1.59**    ***ERISA*** means the Employee Retirement Income Security Act of 1974.

1.60    **Estate** means each estate created in the Reorganization Cases pursuant to section 541 of the Bankruptcy Code.

1.61    **Estimation Order** means an order or orders of the Bankruptcy Court estimating for voting and/or distribution purposes (under section 502(c) of the Bankruptcy Code) the Allowed amount of any Claim.  The defined term "**Estimation Order**" includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.62    **Excluded Parties** means, except for those directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date, any of the following: (a) Apollo Global Management, LLC, (b) Twenty-First Century Fox, Inc., (c) AP NMT JV Newco B.V., (d) Endemol USA Holding, Inc., (e) Shine USA Holdings Inc., (f) MediArena Holding B.V, and any prior or subsequent holder(s) of the MediArena Note Claim, (g) Simon Fuller, (h) any affiliates (as defined in section 101 of the Bankruptcy Code) of the Debtors that are not Debtors (other than the Sharp Entities, the DIP Lender and its direct parent entity), or (i) as to any of the foregoing, their appointees to the Debtors' boards, predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, financial advisors or other professionals or representatives.

1.63    **Existing Interests** means all existing Interests (other than Intercompany Interests) that are outstanding immediately prior to the Effective Date, including Interests held by CORE Holdings or AP NMT JV Newco B.V.

1.64    **Existing Securities Law Claim** means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any debt or equity securities of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) reimbursement, contribution, or indemnification on account of any such Claim.

1.65    **Fee Claim** means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Reorganization Cases, including in connection with final fee applications of such Professional Persons.

1.66    **Final Order** means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction, including the U.K. Court) entered by the Clerk of the Bankruptcy Court on the docket in the Reorganization Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or

judgment of the Bankruptcy Court (or other court of competent jurisdiction, including the U.K. Court) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rules in connection with the U.K. Proceeding, has been or may be filed with respect to such order or judgment; *provided*, *further*, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

**1.67** *First Lien Administrative Agent* means U.S. Bank National Association (successor by appointment to Goldman Sachs Bank USA), or its successors and assigns, in its capacity as administrative agent for the First Lien Lenders under the First Lien Term Loan Agreement.

**1.68** *First Lien Lender* means any lender and any Participant (as defined in the First Lien Term Loan Agreement) under the First Lien Term Loan Facility pursuant to the First Lien Term Loan Agreement, and its successors and assigns.

**1.69** *First Lien Lender Cash Distribution* means Cash in the aggregate amount of $32,500,000.

**1.70** *First Lien Lender Claim* means any Claim arising under the First Lien Term Loan Facility and the First Lien Term Loan Agreement.  Subject to the proviso in the first sentence of Section 5.3(a), the First Lien Lender Claims are Allowed Claims under the Plan.

**1.71** *First Lien Lender Equity Distribution* means 100% of the New Class A LLC Units to be issued by New CORE Holdings on the Effective Date to the holders of First Lien Lender Claims pursuant to the Plan, subject to dilution by the Management Incentive Plan, the New Series P Convertible Preferred Units issued pursuant to the Rights Offering and the New Second Lien Warrants.

**1.72** *First Lien Lender Fee Claim* means any Claim, to the extent not previously paid, for fees, expenses, costs and other charges of the First Lien Administrative Agent, the First Lien Lenders party to the RSA (including those of Klee, Tuchin, Bogdanoff & Stern LLP, Michelmores, Fortitude Partners, Inc. (John Mass), Quinn Emanuel Urquhart & Sullivan, LLP, Davis Polk & Wardwell LLP (for tax services only), Millstein & Co. and Houlihan Lokey Capital, Inc.) that are provided for in the DIP Order, the RSA Order or this Plan, which Claims shall be Allowed on the Effective Date.

**1.73** *First Lien Lender Litigation Trust Distribution* means the Litigation Trust Units issued to holders of First Lien Lender Claims.

**1.74** *First Lien Term Loan* means the term loan in the principal amount of $200,000,000 made pursuant to the First Lien Term Loan Agreement.

**1.75** *First Lien Term Loan Agreement* means the First Lien Term Loan Agreement, dated as of December 9, 2011 (as amended, modified or supplemented from time to time), among CORE,

as borrower, CORE Media, the other Debtors as guarantors, the First Lien Administrative Agent and the First Lien Lenders, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.76**    *First Lien Term Loan Facility* means the prepetition term loan facility consisting of the First Lien Term Loan provided to the Debtors pursuant to the First Lien Term Loan Agreement.

**1.77**    *General Unsecured Claim* means any Claim other than: (a) a First Lien Lender Claim; (b) a Second Lien Lender Claim; (c) an Other Secured Claim; (d) a DIP Claim; (e) an Administrative Expense Claim; (f) a Fee Claim; (g) a Priority Tax Claim; (h) a Priority Non-Tax Claim; (i) a Convenience Claim; (j) an Intercompany Claim; (k) a Subordinated Claim; and (l) U.S. Trustee Fees.  Notwithstanding clauses (a) and (b) above, General Unsecured Claims include the Aggregate Lender Deficiency Claim for all purposes, save and except that the Aggregate Lender Deficiency Claim shall be excluded from the definition of General Unsecured Claim for the purpose of calculating Litigation Trust Units as contemplated under Section 7.1 of this Plan.

**1.78**    *General Unsecured Claim Cash Distribution* means a distribution in Cash in the aggregate amount of up to $850,000.

**1.79**    *General Unsecured Claim Litigation Trust Distribution* means the Litigation Trust Units issued to holders of General Unsecured Claims.

**1.80**    *Independent Directors* means Peter C. Brown, Paul P. Huffard IV and Ross Lukatsevich, each in his capacity as an independent director of CORE.

**1.81**    *Intercompany Claim* means any Claim (other than a DIP Claim or a MediArena Note Claim), Cause of Action, or remedy held by or asserted against a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor by (a) another Debtor, or (b) a non-Debtor direct or indirect subsidiary of a Debtor.

**1.82**    *Intercompany Interest* means any Interest held by a Debtor or a non-Debtor direct or indirect subsidiary of a Debtor in another Debtor or a non-Debtor direct or indirect subsidiary of a Debtor, other than an Existing Interest.

**1.83**    *Interest* means the interest (whether legal, equitable, contractual or otherwise) of any holders of any class of equity securities of any of the Debtors, including the Prepetition Preferred Stock, represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

**1.84**    *Key Employees* means Peter Hurwitz, in his capacity as President of most of the Debtors; Scott Frosch, in his capacity as Chief Financial Officer of certain of the Debtors; Kelly Pontano, in her capacity as Senior Vice President and Associate General Counsel for most of the Debtors; Beverly Frank, in her capacity as Executive Vice President of Business Affairs and Operations for Debtor 19 Entertainment, Inc.; Michelle Rosette, in her capacity as Senior Vice President of

Finance for Debtor 19 Entertainment, Inc.; and Jason Morey, in his capacity as Executive Vice President and Worldwide Head of Music for Debtor 19 Entertainment, Inc.

**1.85** *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.86** *Litigation Trust* means the trust to be created on the Effective Date in accordance with Section 7.1 of this Plan and the Litigation Trust Agreement for the benefit of the Litigation Trust Beneficiaries.

**1.87** *Litigation Trust Agreement* means the trust agreement, in form and substance reasonably satisfactory to the Debtors and the Required Consenting Lenders, which will include the terms set forth in Section 7.1 of this Plan, and will be filed as part of the Plan Supplement.

**1.88** *Litigation Trust Assets* means, subject to the releases set forth herein, (i) all rights of the Debtors, their Estates, the Creditors' Committee and non-Debtor wholly-owned or controlled subsidiaries to commence and pursue suits, proceedings or Causes of Action against any party not released under the Plan and (ii) all such other assets assigned or contributed to the Litigation Trust as provided in the Plan, including Causes of Action assigned by the First Lien Lenders and Second Lien Lenders in accordance with Section 7.1(b) and 7.1(c) of this Plan.

**1.89** *Litigation Trust Beneficiaries* means holders of Allowed General Unsecured Claims, First Lien Lender Claims and Second Lien Lender Claims.

**1.90** *Litigation Trust Units* means the 10,000 units in the Litigation Trust to be deemed distributed to the Litigation Trust Beneficiaries and the right to receive distributions on account of such beneficial interests.

**1.91** *Litigation Trustee* means the Person selected by the mutual agreement of TCP and Crestview (provided, however, that if TCP and Crestview cannot mutually agree on a Litigation Trustee, the Litigation Trustee will be selected by a majority of the initial holders of the First Lien Lender Litigation Trust Distribution) and identified at or before the Confirmation Hearing to administer the Litigation Trust in accordance with the terms and provisions of Section 7.1 of this Plan and the Litigation Trust Agreement.

**1.92** *Management Incentive Plan* means the management equity participation plan that will be established by the New Board for management of the Reorganized Debtors, to be implemented on or after the Effective Date, as more fully described in Section 7.6(b) of this Plan and Section 6.6(f) of the Disclosure Statement.

**1.93** *Management Incentive Plan Securities* means the options to acquire up to 12.5% of the New Class A LLC Units of New CORE Holdings issued pursuant to the Management Incentive Plan.

**1.94** *MediArena Note Claim* means any Claim, which unless Disallowed, settled or subordinated shall be treated as a General Unsecured Claim, arising from or related to the Senior Unsecured Demand Promissory Note, dated as of July 16, 2012 (as amended, modified or supplemented from time to time) with CORE Media, as issuer, in favor of MediArena Holding B.V. (as assignee of Apollo CORE Holdings).

**1.95** *New Board* means the board of New CORE Holdings, which shall initially consist of seven (7) managers, one of whom shall be the Chief Executive Officer of New CORE Holdings and Reorganized CORE.  The New Board shall operate consistent with the terms of the New CORE Holdings LLC Agreement.

**1.96** *New Class A LLC Units* means, collectively, 25,000,000 new common limited liability company units of New CORE Holdings, to be issued by New CORE Holdings in connection with the implementation of, and as authorized by, this Plan, under the terms and conditions set forth in the New CORE Holdings LLC Agreement.

**1.97** *New CORE Holdings* means a newly formed Delaware limited liability company that will "check the box" to be taxed as a corporation and will own all of the outstanding equity interests of Reorganized CORE as of the Effective Date.

**1.98** *New CORE Holdings LLC Agreement* means the limited liability company agreement of New CORE Holdings, to be dated as of the Effective Date, governing the rights and obligations of New CORE Holdings, the holders of New Class A LLC Units and New Series P Convertible Preferred Units, substantially in the form that will be filed as part of the Plan Supplement.

**1.99** *New Second Lien Warrants* means the warrants, issued pursuant to the New Second Lien Warrant Agreement, that will be distributed to the Second Lien Lenders on account of the Second Lien Lender Claims.

**1.100** *New Second Lien Warrant Agreement* means the warrant agreement, dated as of the Effective Date, governing the New Second Lien Warrants that will be issued to the Second Lien Lenders on account of the Second Lien Lender Claims to purchase New Class A LLC Units, in substantially the form that will be filed as part of the Plan Supplement.

**1.101** *New Series P Convertible Preferred Units* means 18,065,383 new preferred limited liability company units of New CORE Holdings to be issued by the Debtors to the Rights Offering Participants pursuant to the Rights Offering and the Plan.

**1.102** *New Subsidiary I* means, if the Alternative Restructuring Transactions are pursued, "New CORE Subsidiary I LLC," a newly formed Delaware limited liability company that will "check the box" to be taxed as a corporation and will own all of the outstanding equity interests of CORE Operations as set forth in Section 7.17 of this Plan.

**1.103** *New Term Loan Credit Agreement* means the secured credit agreement, by and among Reorganized CORE, as borrower, the other Reorganized Debtors, the Sharp Entities and each unrestricted wholly-owned subsidiary of the Reorganized Debtors, as guarantors, the New Term Loan Facility Agent and the New Term Loan Facility Lenders, which will provide the New Term Loan Facility in the amount of $30,000,000, in substantially the form that will be filed as part of the Plan Supplement; <u>provided</u> that the Debtors and the Required Consenting Lenders may determine to exclude one or more foreign unrestricted wholly-owned subsidiaries of the Reorganized Debtors as guarantors.

**1.104** *New Term Loan Facility* means the term loan facility in the amount of $30,000,000 the terms and conditions of which are set forth in the New Term Loan Credit Agreement.

-11-

**1.105**   *New Term Loan Facility Agent* means the agent for the New Term Loan Facility, solely in its capacity as administrative agent under the New Term Loan Credit Agreement, and any of its successors or assigns.

**1.106**   *New Term Loan Facility Lenders* means the lenders party to the New Term Loan Credit Agreement.

**1.107**   *New Term Loan Facility Obligations* means the obligations of the Reorganized Debtors and the other guarantors party thereto under the New Term Loan Credit Agreement.

**1.108**   *Other Secured Claim* means any Secured Claim against a Debtor other than a First Lien Lender Claim or a Second Lien Lender Claim.

**1.109**   *Oversight Committee* means the oversight committee of the Litigation Trust, whose initial members shall be identified at or before the Confirmation Hearing and shall be selected as follows: one person nominated by TCP, one person nominated by Crestview, one person nominated by Hudson Bay Capital Management L.P., one person nominated by a majority of the holders of the First Lien Lender Claims and one person nominated by the Creditors' Committee.

**1.110**   *Person* means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, governmental unit or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.111**   *Petition Date* means April 28, 2016.

**1.112**   *Plan* means this joint chapter 11 plan proposed by the Debtors, including all applicable exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the terms hereof.

**1.113**   *Plan Consideration* means, with respect to any Class of Claims entitled to distributions under this Plan, one or more of Cash, New Class A LLC Units, Subscription Rights for the Rights Offering Units, New Second Lien Warrants, the Reorganized Debtors' incurrence of the New Term Loan Facility Obligations and Litigation Trust Units, as the case may be.

**1.114**   *Plan Distribution* means the Plan Consideration distributed under the Plan.

**1.115**   *Plan Documents* means the documents, other than the Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement and any and all exhibits to the Plan and the Disclosure Statement.

**1.116**   *Plan Securities* means, collectively, the New Class A LLC Units, the New Series P Convertible Preferred Units, the Subscription Rights, the Rights Offering Units, and the New Second Lien Warrants.

**1.117    *Plan Supplement*** means the supplemental appendix to this Plan (as may be amended, modified and/or supplemented), to be filed no later than ten (10) calendar days prior to the Confirmation Hearing, which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of (i) the New CORE Holdings LLC Agreement, (ii) the New Second Lien Warrant Agreement, (iii) the New Term Loan Credit Agreement, (iv) the Amended Certificates of Incorporation, (v) the Amended By-laws, (vi) the list of proposed officers and directors of the Reorganized Debtors, (vii) the Schedule of Rejected Contracts and Leases, (viii) the Litigation Trust Agreement, (ix) a list of the individuals who will serve in certain senior management positions of the Reorganized Debtors, (x) a list containing the compensation arrangement for any insider of the Debtors who will be an officer of a Reorganized Debtor, (xi) the Post-Emergence Incentive Program, and (xii) any additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement; provided, that each of the documents in the Plan Supplement (whether or not set forth above) shall be in form and substance consistent with the RSA; provided further, that notwithstanding the foregoing, subject to Article X of this Plan, the Schedule of Rejected Contracts and Leases shall be filed no later than ten (10) calendar days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan.

**1.118    *Post-Emergence Bonuses*** means the bonuses to be paid by Reorganized CORE to the Key Employees pursuant to the Post-Emergence Incentive Program in an amount not to exceed $2,350,000 in the aggregate.

**1.119    *Post-Emergence Incentive Program*** means the incentive program that provides for payment of bonuses to the Key Employees, which will be filed as part of the Plan Supplement.

**1.120    *Prepetition Preferred Stock*** means the Series A Convertible Preferred Stock and the Series B Convertible Preferred Stock as set forth in the Third Amended and Restated Certificate of Incorporation of CORE Holdings, dated as of December 11, 2013, and any appendices and schedules thereto.

**1.121    *Priority Non-Tax Claim*** means any Claim, other than an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.122    *Priority Tax Claim*** means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.123    *Professional Person(s)*** means all Persons retained by order of the Bankruptcy Court in connection with the Reorganization Cases, pursuant to sections 327, 328, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court.

**1.124    *Pro Rata Share*** means with respect to any distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

**1.125    *Redemption Party*** has the meaning set forth in Section 7.14 of this Plan.

**1.126** *Released Matters* means (a) any and all Claims and Causes of Action belonging to, relating to, or which have been brought or could have been brought by: (i) the Debtors (including the Sharp Entities) or any of their affiliates (to the extent such affiliate is being released), (ii) the Estates, (iii) the Creditors' Committee, or (iv) any other Person granted standing to assert any Claims and Causes of Action of the Debtors (including the Sharp Entities), their affiliates (to the extent such affiliate is being released), or the Estates arising at any time prior to the Effective Date; (b) all matters related to the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement and any "Claims and Defenses" (as defined in the DIP Order); and (c) any and all claims arising from actions taken or not taken in connection with: (w) the Transaction, (x) the Plan, (y) all documents relating or contemplated by the Transaction and/or the Plan, and (z) the Reorganization Cases.

**1.127** *Released Parties* means, collectively, and each solely in its capacity as such: (a) the Debtors; (b) the First Lien Administrative Agent, the First Lien Lenders and the Ad Hoc Group of First Lien Lenders; (c) the Second Lien Administrative Agent and the Second Lien Lenders; (d) the Independent Directors with respect to any Claims or Causes of Action relating to the Debtors for the period starting March 24, 2015 through the Effective Date; (e) the current directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date; (f) the Creditors' Committee Parties; (g) the Sharp Entities, the DIP Lender and its direct parent entity; and (h) each of such parties' predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, attorneys, financial advisors or other professionals or representatives; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases or the U.K. Proceeding; provided, further, that the Released Parties shall not include any Excluded Party; provided, further, that no Person shall be a Released Party if it objects to and/or opts out of the releases provided for in Article XII of this Plan; provided further, that any First Lien Lender or Second Lien Lender that does not execute the RSA prior to the Confirmation Hearing or vote to accept this Plan shall not be a Released Party.

**1.128** *Reorganization Cases* means the jointly-administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and captioned *In re AOG Entertainment, Inc., et al.*, Case No. 16-11090 (SMB) (Jointly Administered).

**1.129** *Reorganized CORE* means CORE on and after the Effective Date.

**1.130** *Reorganized Debtor(s)* means: (i) the applicable reorganized Debtor(s) or any successors thereto by merger, consolidation or otherwise, on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan and (ii) as the context requires, New CORE Holdings.

**1.131** *Required Consenting Lenders* means the "Required Consenting Lenders" as defined in the RSA.

**1.132** ***Rights Offering*** means the issuance of the Subscription Rights to purchase Rights Offering Units as of the Rights Offering Record Date, in accordance with Section 7.9 of this Plan.

**1.133** ***Rights Offering Amount*** means $18,065,383.

**1.134** ***Rights Offering Participants*** means holders of First Lien Lender Claims, provided, that, pursuant to the RSA, TCP and Crestview (including any of their respective designees) have committed to fully subscribe to the Rights Offering for the full amount of their respective First Lien Lender Cash Distribution, and all other holders of First Lien Lender Claims have determined not to participate in the Rights Offering and have waived their rights to receive a Subscription Form.

**1.135** ***Rights Offering Purchaser*** means a Rights Offering Participant who timely and properly executes and delivers the Subscription Form prior to the expiration of the Subscription Deadline.

**1.136** ***Rights Offering Record Date*** means the Voting Record Date, or such other date as designated in an order of the Bankruptcy Court.

**1.137** ***Rights Offering Units*** means 100% of the New Series P Convertible Preferred Units to be issued and sold through the Rights Offering.

**1.138** ***RSA*** means the Restructuring Support Agreement, dated as of May 16, 2016, inclusive of all exhibits thereto, filed with the Bankruptcy Court on May 20, 2016 [Docket No. 78, Exhibit 1], by and among the Debtors, the Consenting Lenders and any other Person that may become a party to such agreement pursuant to its terms, as the same may be amended from time to time in accordance with its terms.

**1.139** ***RSA Order*** means an order of the Bankruptcy Court authorizing the Debtors to enter into and perform under the RSA.

**1.140** ***Schedule of Rejected Contracts and Leases*** means a schedule of the contracts and leases to be rejected by the Debtors pursuant to section 365 of the Bankruptcy Code and Article X hereof, which will be filed as part of the Plan Supplement, and may be amended from time to time.

**1.141** ***Schedules*** means the schedules of assets and liabilities filed in the Reorganization Cases, as amended or supplemented from time to time.

**1.142** ***Second Lien Administrative Agent*** means U.S. Bank National Association (successor by appointment to Goldman Sachs Bank USA), or its successors and assigns, in its capacity as administrative agent for the Second Lien Lenders under the Second Lien Term Loan Agreement.

**1.143** ***Second Lien ICA*** has the meaning set forth in Section 7.4 of this Plan.

**1.144** ***Second Lien Lender*** means any lender and any Participant (as defined in the Second Lien Term Loan Agreement) under the Second Lien Term Loan Facility pursuant to the Second Lien Term Loan Agreement, and their successors and assigns.

**1.145**   ***Second Lien Lender Claim*** means any Claim arising under the Second Lien Term Loan Facility and the Second Lien Term Loan Agreement.  Subject to the proviso in the first sentence of Section 5.4(a), the Second Lien Lender Claims are Allowed Claims under the Plan.

**1.146**   ***Second Lien Lender Fee Claim*** means any Claim, to the extent not previously paid, for fees, expenses, costs and other charges of the Second Lien Administrative Agent and the Second Lien Lenders party to the RSA that are provided for in the DIP Order, the RSA Order or this Plan, which Claims shall be Allowed on the Effective Date.

**1.147**   ***Second Lien Lender Litigation Trust Distribution*** means the Litigation Trust Units issued to holders of Second Lien Lender Claims.

**1.148**   ***Second Lien Lender Warrants Distribution*** means the New Second Lien Warrants to be issued by New CORE Holdings on the Effective Date to the holders of Second Lien Lender Claims pursuant to the Plan.

**1.149**   ***Second Lien Term Loan*** means the term loan in the principal amount of $160,000,000 made pursuant to the Second Lien Term Loan Agreement.

**1.150**   ***Second Lien Term Loan Agreement*** means the Second Lien Term Loan Agreement, dated as of December 9, 2011 (as amended, modified or supplemented from time to time), among CORE, as borrower, CORE Media, the other Debtors as guarantors, the Second Lien Administrative Agent and the Second Lien Lenders, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.151**   ***Second Lien Term Loan Facility*** means the prepetition term loan facility consisting of the Second Lien Term Loan provided to the Debtors pursuant to the Second Lien Term Loan Agreement.

**1.152**   ***Secured Claim*** means a Claim: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.153**   ***Securities Act*** means the Securities Act of 1933, as amended.

**1.154**   ***Sharp Entities*** means Sharp Entertainment Holdings, LLC and its direct and indirect subsidiaries.

**1.155**   ***SIR Claim*** means the unsatisfied portion of any self-insured retention as of the date a Claim is Allowed to the extent the Debtors have insurance with respect to such Claim.

**1.156**   ***Subordinated Claim*** means any Existing Securities Law Claim or other Claim against a Debtor that is subordinated pursuant to Bankruptcy Code section 510 or other applicable law.

**1.157**   ***Subscription Agent*** means Kurtzman Carson Consultants LLC or any entity designated as such by the Plan or the Debtors.

**1.158**   *Subscription Commencement Date* means the date on which the Subscription Period commences, which shall be the earliest date reasonably practicable occurring after the Rights Offering Record Date.

**1.159**   *Subscription Deadline* means the date on which the Rights Offering shall expire as set forth in the Subscription Form, which date shall be three (3) business days after the entry of an order approving the Disclosure Statement unless otherwise extended in writing (including by electronic mail) by the Debtors.

**1.160**   *Subscription Form* means the subscription exercise form and subscription procedures, which shall be satisfactory to the Debtors and the Required Consenting Lenders, to be distributed to the Rights Offering Participants pursuant to which such holders may exercise their Subscription Rights.

**1.161**   *Subscription Payment Amount* means, with respect to a particular Rights Offering Purchaser, an amount of Cash equal to such Rights Offering Purchaser's share of the First Lien Lender Cash Distribution.

**1.162**   *Subscription Period* means the time period during which the Rights Offering Participants may subscribe to purchase the Rights Offering Units, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

**1.163**   *Subscription Right* means the non-transferable, non-certificated subscription rights of the Rights Offering Participants to purchase Rights Offering Units in connection with the Rights Offering on the terms and subject to the conditions set forth in the Plan.

**1.164**   *Subsidiary* means any corporation, association or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by a Debtor and/or one or more subsidiaries of the Debtor.

**1.165**   *TCP* means Tennenbaum Capital Partners, LLC.

**1.166**   *Transaction* means the financial restructuring concerning or impacting the Debtors' indebtedness and other obligations as reflected in this Plan and the RSA.

**1.167**   *U.K. Court* means the High Court of Justice, Chancery Division, Companies Court of England and Wales.

**1.168**   *U.K. Proceeding* means the recognition proceedings commenced on April 29, 2016 by Debtor 19 Entertainment Limited under Article 15 of Schedule 1 to the Cross-Border Insolvency Regulations 2006 in the U.K. Court to, among other things, recognize the Reorganization Case of Debtor 19 Entertainment Limited as a "foreign main proceeding."

**1.169**   *U.S. Trustee* means the United States Trustee for the Southern District of New York.

**1.170**   *U.S. Trustee Fees* means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.171**  ***Voting Record Date*** means the date for determining which holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is [_____], 2016, as set forth in the Disclosure Statement Order.

**1.172**  ***Warrant Split*** has the meaning set forth in Section 7.14 of this Plan.

## B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein.  Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.  Whenever this Plan uses the term "including," such reference will be deemed to mean "including, without limitation."  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

## C.    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at http://www.kccllc.net/AOG, or obtain a copy of any of the Plan Documents by a written request sent to the Claims Agent at the following address:

> AOG Entertainment, Inc.
> c/o Kurtzman Carson Consultants
> 2335 Alaska Avenue
> El Segundo, CA 90245
> Telephone: +1-877-709-4752 (Domestic)
> +1-424-236-7232 (International)

## ARTICLE II.

## CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Inter-Creditor Issues.*

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

**2.2.**    *Formation of Debtor Groups for Convenience Purposes.*

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets or the assumption of any liabilities; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

**2.3.**    *Intercompany Claims and Intercompany Interests.*

(a)    <u>Intercompany Claims</u>.

Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims, shall, at the option of the Reorganized Debtors, either be (i) extinguished, canceled and/or discharged on the Effective Date or (ii) reinstated and otherwise survive the Debtors' restructuring either by virtue of: (1) such Intercompany Claims being left unimpaired or (2) on the Effective Date, the recovery to which the First Lien Lenders and Second Lien Lenders are entitled on account of such Intercompany Claims as collateral under the First Lien Term Loan Agreement and Second Lien Term Loan Agreement (whether by virtue of a direct pledge of any such Intercompany Claims or the pledge of the stock in the entity holding such Intercompany Claims), respectively, being contributed to a Reorganized Debtor so as to mirror the Intercompany Claims that existed just prior to the Effective Date. To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court or by the equity holders of any of the Reorganized Debtors.

(b)    <u>Intercompany Interests</u>.

Notwithstanding anything to the contrary herein, except as provided in Section 7.17 of this Plan, on or after the Effective Date, any and all Intercompany Interests shall survive the Debtors' restructuring either by virtue of: (i) such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Debtors or (ii) on the Effective Date, contributing equity in a Reorganized Debtor received by the First Lien Lenders and Second Lien Lenders under this Plan on account of their respective Claims to the applicable Reorganized Debtor entity so as to mirror the corporate structure that existed just prior to the Effective Date.

## ARTICLE III.

## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for all of the Debtors. All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV below. In

accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

**3.1.    *DIP Claims.***

On or after the Effective Date, the DIP Claims shall be reinstated as an intercompany unsecured loan, adjusted, continued, cancelled or discharged to the extent reasonably determined appropriate by the Reorganized Debtors and consistent with the RSA.  Any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court.

**3.2.    *Administrative Expense Claims.***

(a)    Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than the holder of:

(i)    a Fee Claim;

(ii)    a DIP Claim;

(iii)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(iv)    an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

(v)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(vi)    an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding

wages, commissions, accrued benefits, or reimbursement of business expenses;

(vii)    an Intercompany Claim; or

(viii)    U.S. Trustee Fees,

must file with the Bankruptcy Court and serve on the Debtors or Reorganized Debtors (as the case may be), the Claims Agent, and the Office of the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "***Administrative Bar Date***").  Such proof of Administrative Expense Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the asserted amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

(b)    <u>Treatment of Administrative Expense Claims</u>.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Reorganized Debtor Cash in an amount equal to such Allowed Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors, as debtors in possession, shall be paid by the applicable Debtor or Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

**3.3.    *Fee Claims.***

(a)    Time for Filing Fee Claims.

Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

(b)    Treatment of Fee Claims.

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Reorganized Debtors.  On the Effective Date, to the extent known, the Reorganized Debtors shall reserve and hold in a segregated account Cash in an amount equal to all accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Fee Claims have been either Allowed and paid in full or Disallowed by Final Order, at which time any remaining Cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtors.

First Lien Lender Fee Claims and Second Lien Lender Fee Claims will be paid pursuant to Section 7.16 of this Plan and without (i) the need for the filing of any claim or request for allowance under this Section 3.3 or (ii) any further order of the Bankruptcy Court.

**3.4.    *U.S. Trustee Fees.***

The Debtors or Reorganized Debtors, as applicable, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Reorganization Case, the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

**3.5.    *Priority Tax Claims*.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive in the Debtors' or Reorganized Debtors' discretion, either: (a) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all

Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall
be paid in the ordinary course of business as they become due.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 4.1.    *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the
Debtors, and specifies which Classes are: (a) impaired or unimpaired by this Plan; (b) entitled to
vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and
(c) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | First Lien Lender Claims | Yes | Yes |
| Class 4 | Second Lien Lender Claims | Yes | Yes |
| Class 5 | General Unsecured Claims | Yes | Yes |
| Class 6 | Convenience Claims | Yes | Yes |
| Class 7 | Subordinated Claims | Yes | No (Deemed to reject) |
| Class 8 | Existing Interests | Yes | No (Deemed to reject) |

If a controversy arises regarding whether any Claim is properly classified under
the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy
at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim
is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of
such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class
in which the Bankruptcy Court determines such Claim should have been classified, without the
necessity of resoliciting any votes on the Plan.

### 4.2.    *Unimpaired Classes of Claims.*

The following Classes of Claims are unimpaired and, therefore, deemed to have
accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the
Bankruptcy Code:

(a)    Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)    Class 2: Class 2 consists of all Other Secured Claims.

**4.3.** *Impaired Classes of Claims.*

(a)    The following Classes of Claims are impaired and entitled to vote on this Plan:

(i)    Class 3: Class 3 consists of all First Lien Lender Claims.

(ii)    Class 4: Class 4 consists of all Second Lien Lender Claims.

(iii)    Class 5: Class 5 consists of all General Unsecured Claims.

(iv)    Class 6: Class 6 consists of all Convenience Claims.

(b)    The following Classes of Claims and Interests are impaired and deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code:

(i)    Class 7: Class 7 consists of all Subordinated Claims.

(ii)    Class 8: Class 8 consists of all Existing Interests.

**4.4.** *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

## ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

**5.1.** *Priority Non-Tax Claims (Class 1).*

(a)    Treatment: The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim.

(b)    Voting: The Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

**5.2.**    *Other Secured Claims (Class 2).*

(a)    <u>Treatment</u>: The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of the Reorganized Debtors: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or order of the Bankruptcy Court.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided herein.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    <u>Deficiency Claims</u>: To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as a General Unsecured Claim and shall be classified in Class 5.

(c)    <u>Voting</u>: The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

**5.3.**    *First Lien Lender Claims (Class 3).*

(a)    <u>Treatment</u>:  First Lien Lender Claims shall be Allowed under this Plan; <u>provided</u>, <u>that</u>, nothing in this Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any First Lien Lender Claim asserted by or on behalf of Goldman Sachs Bank USA as predecessor agent under the First Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the First Lien Term Loan Agreement, including any First Lien Lender Claim asserted by Cravath, Swaine & Moore LLP.  Except to the extent that a holder of a First Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of First Lien Lender Claim shall receive, subject to the terms of this Plan, in full and final satisfaction of the secured portion of its First Lien Lender Claim:

(i)    payment in Cash of its Pro Rata Share of the First Lien Lender Cash Distribution; <u>provided</u>, <u>that</u>, the Rights Offering Purchasers shall, in accordance with Section 7.9(e) of this Plan, utilize their

share of the First Lien Lender Cash Distribution to acquire the
Rights Offering Units as described in Section 5.3(a)(iv) of this
Plan;

(ii)     receipt of its Pro Rata Share of the First Lien Lender Equity
         Distribution;

(iii)    receipt of its Pro Rata Share of the New Term Loan Facility
         Obligations; and

(iv)     solely with respect to the Rights Offering Participants,
         Subscription Rights to subscribe for its Pro Rata Share of the
         Rights Offering Units for an aggregate purchase price equal to the
         Subscription Payment Amount.

Upon acceptance of this Plan by Class 3, Class 3 shall be deemed to have consented to the
treatment of Class 4 and the payment and retention of the Plan Consideration provided to the
holders of Class 4 Claims under this Plan.

(b)     Deficiency Claims:  The undersecured portion of the First Lien Lender
Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote
in Class 5, and each holder of such undersecured portion of First Lien Lender Claims shall
receive, in full and final satisfaction thereof, its Pro Rata Share of:

(i)      the First Lien Lender Litigation Trust Distribution, allocated
         pursuant to the terms of the Litigation Trust Agreement; and

(ii)     the General Unsecured Claim Cash Distribution on account of the
         First Lien Lenders' share of the Aggregate Lender Deficiency
         Claim; provided, that, to the extent Class 5 (General Unsecured
         Claims) votes in favor of the Plan, then the Pro Rata Share of the
         General Unsecured Claim Cash Distribution to be distributed to
         holders of First Lien Lender Claims shall instead be distributed to
         the holders of Allowed General Unsecured Claims (such amount
         constituting the First Lien Lenders' contribution to the Additional
         General Unsecured Claim Cash Distribution); provided, further,
         that to the extent that Class 5 (General Unsecured Claims) votes to
         reject the Plan, the Pro Rata Share of the General Unsecured Claim
         Cash Distribution to be distributed to holders of First Lien Lender
         Claims shall instead be retained by the Reorganized Debtors; in
         each case, with such holders of First Lien Lender Claims agreeing
         to accept such less favorable treatment.

(c)     Voting:  The First Lien Lender Claims are impaired Claims.  Holders of
such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be
solicited with respect to such First Lien Lender Claims.

### 5.4.    *Second Lien Lender Claims (Class 4).*

(a)    Treatment: Second Lien Lender Claims shall be Allowed under this Plan; provided, that, nothing in this Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any Second Lien Lender Claim asserted by Goldman Sachs Bank USA as predecessor agent under the Second Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the Second Lien Term Loan Agreement, including any Second Lien Lender Claim asserted by or on behalf of Cravath, Swaine & Moore LLP.  Except to the extent that a holder of a Second Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a Second Lien Lender Claim shall receive on account of its Claim against Debtor EPE Holding Corporation, subject to the terms of this Plan, in full and final satisfaction of the secured portion of its Second Lien Lender Claim, its allocated share of the Second Lien Lender Warrants Distribution as set forth in Section 7.14 of this Plan.

(b)    Deficiency Claims: The undersecured portion of the Second Lien Lender Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote in Class 5, and each holder of such undersecured portion of Second Lien Lender Claims shall receive, in full and final satisfaction thereof, its Pro Rata Share of:

(i)    the Second Lien Lender Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and

(ii)    the General Unsecured Claim Cash Distribution on account of the Second Lien Lenders' share of the Aggregate Lender Deficiency Claim; provided, that, to the extent Class 5 (General Unsecured Claims) votes in favor of the Plan, then the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of Second Lien Lender Claims shall instead be distributed to the holders of Allowed General Unsecured Claims (such amount constituting the Second Lien Lenders' contribution to the Additional General Unsecured Claim Cash Distribution); provided, further, that to the extent that Class 5 (General Unsecured Claims) votes to reject the Plan, the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of Second Lien Lender Claims shall instead be retained by the Reorganized Debtors.

(c)    Voting: The Second Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Second Lien Lender Claims.

### 5.5.    *General Unsecured Claims (Class 5).*

(a)    Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and to the extent that such Allowed General Unsecured Claim was not previously paid pursuant to an order of the Bankruptcy Court, each

holder of an Allowed General Unsecured Claim shall receive, on the applicable Distribution Date in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata Share of:

    (i)    **If Class 5 votes to accept the Plan:** (1) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; (2) the General Unsecured Claim Cash Distribution; and (3) the Additional General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim.

    (ii)    **If Class 5 votes to reject the Plan**: (1) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and (2) the General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim; provided, further that the Additional General Unsecured Claim Cash Distribution shall be retained by the Reorganized Debtors.

For the avoidance of doubt, Class 5 shall not include any Claim that would otherwise be a General Unsecured Claim if the holder of such Claim has elected to have such Claim treated as a Convenience Claim.

(b)    Voting:  The General Unsecured Claims are impaired Claims.  Holders of such Claims (including holders of the Aggregate Lender Deficiency Claim) are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such General Unsecured Claims.

### 5.6.    *Convenience Claims (Class 6).*

(a)    Treatment:  Except to the extent that a holder of an Allowed Convenience Claim agrees to a different treatment, and to the extent that such Allowed Convenience Claim was not previously paid pursuant to an order of the Bankruptcy Court, on the applicable Distribution Date, each holder of an Allowed Convenience Claim shall be paid in full in Cash, in full and final satisfaction of such Allowed Convenience Claim; provided, however, that in the event the aggregate of all Allowed Convenience Claims exceeds the Convenience Claim Cap Amount, each holder of an Allowed Convenience Claim shall instead receive its Pro Rata Share of the Convenience Claim Cap Amount.  Distributions to holders of Allowed Convenience Claims shall not include postpetition interest.  The Convenience Claims will not receive any Litigation Trust Units or any other interest in the Litigation Trust.

(b)    Voting:  The Convenience Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such Convenience Claims.

**5.7.**    *Subordinated Claims (Class 7).*

(a)    <u>Treatment</u>: Holders of Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims.

(b)    <u>Voting</u>: The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Claims.

**5.8.**    *Existing Interests (Class 8).*

(a)    <u>Treatment</u>:  Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

(b)    <u>Voting</u>:  The Existing Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Interests.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## <u>OR MORE CLASSES OF CLAIMS OR INTERESTS</u>

**6.1.**    *Class Acceptance Requirement.*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.

**6.2.**    *Tabulation of Votes on a Non-Consolidated Basis.*

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors, with the consent of the Required Consenting Lenders, reserve the right to seek to substantively consolidate any two or more Debtors; <u>provided</u>, <u>that</u>, such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

**6.3.**    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Sections 14.5

and 14.6 of this Plan, the Debtors reserve the right (with the consent of the Required Consenting Lenders) to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Sections 14.5 and 14.6 of this Plan (including the consent of the Required Consenting Lenders), the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

### 6.4. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 6.5. *Voting Classes; Deemed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

### 6.6. *Confirmation of All Cases.*

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the Debtors, with the consent of the Required Consenting Lenders, may at any time waive this Section 6.6.

## ARTICLE VII.

## MEANS FOR IMPLEMENTATION

### 7.1. *The Litigation Trustee and the Litigation Trust.*

(a)    General.

The Litigation Trustee is appointed as trustee pursuant to Bankruptcy Code § 1123(a)(7), (b)(3)(B), and (b)(6) and shall have all rights, powers and privileges to commence and pursue suits, proceedings or Causes of Action that constitute Litigation Trust Assets against any party not released under the Plan as if such Liquidating Trustee had been appointed trustee in the Reorganization Cases.  The Litigation Trust shall succeed to and constitute the assignee of all rights, powers and privileges that, before the Effective Date of the Plan, could be exercised by the Debtors, the Estates, the Creditors' Committee, any representative of the Estates, and any comparable authority or equivalent authority in any foreign jurisdiction, including a trustee or examiner with expanded powers, with respect to any suits, proceedings or Causes of Action that constitute Litigation Trust Assets against any party not released under the Plan.

The Litigation Trustee shall distribute, in accordance with this Section 7.1 of this Plan, the First Lien Lender Litigation Trust Distribution, the Second Lien Lender Litigation Trust Distribution and the General Unsecured Creditor Litigation Trust Distribution to the applicable Litigation Trust Beneficiaries on, or as soon thereafter as is reasonably practicable, the applicable Distribution Date.

On the Effective Date, the Debtors, the Reorganized Debtors and/or Reorganized CORE, as the case may be, on their own behalf and on behalf of the Litigation Trust Beneficiaries, shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Litigation Trust Agreement. The Litigation Trustee shall administer the Litigation Trust under the direction of the Oversight Committee and shall serve in accordance with the Litigation Trust Agreement without bond or similar instrument. On the Effective Date, the Litigation Trust Assets shall be transferred to and vest in the Litigation Trust. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Debtors, the Reorganized Debtors and/or Reorganized CORE shall have no liability with respect to the distribution of any proceeds of the Litigation Trust Assets to the Litigation Trust Beneficiaries. Any recoveries on account of the Litigation Trust Assets shall be distributed to holders of the Litigation Trust Units in accordance with the Plan and the Litigation Trust Agreement.

(b)    First Lien Lender Litigation Trust Distribution.

The First Lien Lender Litigation Trust Distribution shall be issued to holders of First Lien Lender Claims whereby, upon an assignment to the Litigation Trust of Causes of Action arising under or relating to the First Lien Term Loan Agreement held by a holder of claims under the First Lien Term Loan Agreement against any party not released under this Plan, which assignment shall be evidenced by a vote in favor of this Plan, such holder shall receive its Pro Rata Share of Litigation Trust Units, the aggregate number of which shall be calculated as follows: (1) the numerator shall equal 46.0% of the Aggregate Lender Deficiency Claim, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000.

(c)    Second Lien Lender Litigation Trust Distribution.

The Second Lien Lender Litigation Trust Distribution shall be issued to holders of Second Lien Lender Claims whereby, upon an assignment to the Litigation Trust of Causes of Action arising under or relating to the Second Lien Term Loan Agreement held by a holder of claims under the Second Lien Term Loan Agreement against any party not released under this Plan, which assignment shall be evidenced by a vote in favor of the Plan, such holder shall receive its Pro Rata Share of Litigation Trust Units, the aggregate number of which shall be calculated as follows: (1) the numerator shall equal 54.0% of the Aggregate Lender Deficiency Claim, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General

Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000.

      (d)     <u>General Unsecured Claim Litigation Trust Distribution</u>.

The General Unsecured Claim Litigation Trust Distribution shall be issued to holders of Allowed General Unsecured Claims with the aggregate number of such Litigation Trust Units calculated as follows: (1) the numerator shall equal the total amount of Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000.

      (e)     <u>Cooperation</u>.

The Reorganized Debtors and their non-Debtor wholly owned or controlled subsidiaries shall reasonably cooperate with the Litigation Trustee and counsel to the Litigation Trust in the prosecution and defense of claims involving the Litigation Trust, including providing documents or communications as reasonably required.  In connection with the transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege or other privilege or immunity of the Debtors, the Reorganized Debtors, and/or their non-Debtor wholly owned or controlled subsidiaries, as the case may be, attaching to any documents or communications (whether written or oral), associated with all defenses, claims, counterclaims and rights of setoff or recoupment, shall be transferred to and vest in the Litigation Trust and may be asserted by the Litigation Trustee and its representatives; <u>provided</u>, <u>that</u> the Reorganized Debtors shall not be required to transfer or deliver: (i) any privileged documents created during (or in preparation for) the Reorganization Cases or the U.K. Proceeding (or any Additional U.K. Proceeding) except to the extent that they contain analysis of the merits of the Litigation Trust Assets and not the conduct or strategy of any aspect of the Reorganization Cases or the U.K. Proceeding (or any Additional U.K. Proceeding); (ii) any privileged documents created by or at the direction of the Reorganized Debtors on or after the Effective Date; or (iii) any document that the Reorganized Debtors are under a legal obligation due to personal privacy issues of an employee or contractual obligation to refrain absent a subpoena or formal discovery request from providing to a third party, whether or not privileged.  The Debtors, the Reorganized Debtors and/or Reorganized CORE, as the case may be, and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges.  The Confirmation Order shall provide that the Litigation Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates.

      (f)     <u>Litigation Trust Assets</u>.

The Litigation Trust Assets shall be vested in the Litigation Trust on the Effective Date and the Litigation Trust may pursue such suits, proceedings or Causes of Action that constitute Litigation Trust Assets, as appropriate, in accordance with the Litigation Trust

Agreement.  The transfer of the Litigation Trust Assets to the Litigation Trust shall be made, as provided herein, for the benefit of the Litigation Trust Beneficiaries.  Upon the transfer of the Litigation Trust Assets, the Debtors and/or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust.  To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtors.  Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to the Litigation Trust Beneficiaries consistent with the terms of the Plan and the Litigation Trust Agreement.  **Except for parties expressly released under the Plan, no Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  The Litigation Trust expressly reserves all rights to prosecute any and all such Causes of Action against any Person, except as otherwise expressly provided in the Plan**.  For the avoidance of doubt, the transfer and preservation of the Litigation Trust Assets described in this Section 7.1 includes, the Litigation Trust's right to object to any Claims held or asserted by Excluded Parties, if any.

The Litigation Trust shall be established for the sole purpose of liquidating the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(g)    Reserves.

The Litigation Trustee may establish a reserve on account of Claims that are Disputed.  The Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat such reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to such reserve, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (iii) distribute assets from the reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved.  The Litigation Trust Beneficiaries shall be bound by such election, if made by the Litigation Trustee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

In the event the exact number of Litigation Trust Units to be issued to each Litigation Trust Beneficiary cannot be determined on or prior to the Effective Date (e.g., because certain General Unsecured Claims are disputed or otherwise not Allowed Claims as of the Effective Date), the Litigation Trust Agreement shall permit the Litigation Trust to issue estimated or provisional Litigation Trust Units to the Litigation Trust Beneficiaries on the

Effective Date and thereafter the Litigation Trustee may make adjustments to each Litigation Trust Beneficiary's Units as required to reflect the subsequent allowance or disallowance of Claims after the Effective Date.

(h)    <u>Dissolution</u>.

The Litigation Trust shall be dissolved no later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion made within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary or appropriate to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets.

(i)    <u>Exemption</u>.

To the extent the interests in the Litigation Trust are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

(j)    <u>Fees and Expenses; Initial Funding of the Litigation Trust</u>.

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Litigation Trust and the Litigation Trustee (including the reasonable and necessary fees and expenses of any professionals assisting the Litigation Trust in carrying out its duties under the Plan) will be funded by the proceeds of the Litigation Trust Assets in accordance with the Litigation Trust Agreement without further order from the Bankruptcy Court; <u>provided</u>, <u>that</u> the initial funding of the Litigation Trust shall be in the amount of $5,000,000 as approved by the New Board and a majority of the Oversight Committee with an additional amount up to $5,000,000 to be made available with the approval of the "requisite members" as provided in the New CORE Holdings LLC Agreement (subject to the approval rights contained within the New CORE Holdings LLC Agreement), which amount shall be funded from the Cash on hand of the Reorganized Debtors; <u>provided further</u> that such initial funding shall be repaid with interest at a rate set forth in the Litigation Trust Agreement prior to any distribution to the Litigation Trust Beneficiaries, and the "requisite members" referenced above shall determine the terms of repayment with respect to any additional amount made available.

**7.2.    *Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.***

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and Amended By-Laws, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.  On or after the Effective Date, each Reorganized Debtor, in its discretion, may take such action as permitted by

applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, subject in each case, to the terms and conditions of the New CORE Holdings LLC Agreement, including causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its Subsidiary and/or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter; provided, that the issuance of new equity interests in Reorganized CORE to New CORE Holdings shall be authorized by operation of this Plan as of the Effective Date without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action.

(b)    Prior to the Effective Date, New CORE Holdings will be formed as a new Delaware limited liability company by filing a certificate of formation in form and substance reasonably acceptable to the Required Consenting Lenders (with the input of the Debtors) with the Secretary of State of the State of Delaware, and a "check the box" election shall be filed with the Internal Revenue Service so that New CORE Holdings will be taxed as a corporation.  On the Effective Date, Reorganized CORE shall issue 100 shares of common stock to New CORE Holdings, which shares shall constitute the only issued and outstanding shares of capital stock of Reorganized CORE as of the Effective Date.  From and after the Effective Date, the business and affairs of New CORE Holdings shall be governed by the New CORE Holdings LLC Agreement.

(c)    Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates, wherever located, including the United Kingdom, including all claims, rights and Causes of Action (except for the Litigation Trust Assets) and any property, wherever located, including the United Kingdom, acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  Subject to Section 7.2(a) hereof, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property, wherever located, including the United Kingdom, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action (except for the Litigation Trust Assets) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(d)    On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation,

conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 7.3.    *Plan Funding.*

The Plan Distributions to be made in Cash under the terms of this Plan shall be funded from the Debtors' (and/or one or more of their non-Debtor subsidiaries') Cash on hand as of and after the Effective Date.

### 7.4.    *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth herein, on the Effective Date all agreements, instruments, and other documents evidencing, related to or connected with any Claim or Interest (including, for the avoidance of doubt, that certain Second Lien Intercreditor Agreement, dated as of December 9, 2011 (the "***Second Lien ICA***")), other than Intercompany Claims and Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein, (i) each of the First Lien Term Loan Agreement and Second Lien Term Loan Agreement shall continue in effect solely to the extent necessary to (a) permit holders of First Lien Lender Claims and Second Lien Lender Claims to receive Plan Distributions in accordance with the terms of this Plan; (b) permit the Reorganized Debtors to make Plan Distributions on account of the First Lien Lender Claims and Second Lien Lender Claims, respectively; and (c) permit the First Lien Administrative Agent and the Second Lien Administrative Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan, and (ii) nothing in the Plan shall be deemed or construed to abrogate or release Causes of Action arising under or relating to the First Lien Term Loan Agreement or the Second Lien Term Loan Agreement assigned to the Litigation Trust.  Except as provided pursuant to this Plan, upon the satisfaction of the First Lien Lender Claims and Second Lien Lender Claims, each of the First Lien Administrative Agent and Second Lien Administrative Agent and their respective agents, successors and assigns shall be discharged of all of their obligations associated with the First Lien Term Loan Facility and Second Lien Term Loan Facility, respectively.

### 7.5.    *Boards of Directors.*

(a)    On the Effective Date, the New Board and the initial board of directors of each of the other Reorganized Debtors shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

(b)    Unless reappointed pursuant to Section 7.5(a) hereof, the members of the board of directors of each Debtor prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors in their capacities as such on and after the Effective Date and each

such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the New CORE Holdings LLC Agreement or the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance therewith, as applicable.

### 7.6.    *Management.*

(a)    <u>New Management</u>.  As of the Effective Date, the individuals who will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement.  The compensation arrangement for any insider of the Debtors that shall become an officer of a Reorganized Debtor shall be disclosed in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

(b)    <u>Management Incentive Plan</u>.  On or after the Effective Date, the New Board shall adopt a Management Incentive Plan to provide for up to 12.5% of the outstanding New Class A LLC Units of New CORE Holdings, on a fully diluted basis, in the form of initial options exercisable at a $1.51 strike price and future options to be issued at fair market value, to be reserved for issuance to management of the Reorganized Debtors as determined by the New Board.  The other terms of the Management Incentive Plan shall be determined by the New Board; <u>provided</u>, <u>that</u>, such options shall include customary strike price adjustments for unit splits, reverse splits, combinations, recapitalizations and distributions.  The Management Incentive Plan Securities shall dilute the New Class A LLC Units (including any New Class A LLC Units issued upon the exercise of any New Second Lien Warrants) and the New Series P Convertible Preferred Units to be issued pursuant to this Plan.

(c)    <u>Post-Emergence Incentive Program</u>.  No later than three (3) Business Days after the Effective Date, Reorganized CORE shall pay the Post-Emergence Bonuses to the Key Employees.

### 7.7.    *Corporate Action.*

(a)    The Reorganized Debtors shall serve on the U.S. Trustee quarterly reports of the disbursements made by each Reorganized Debtor on an entity-by-entity basis until such time as a final decree is entered closing the applicable Reorganization Case or the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

(b)    On the Effective Date, the New CORE Holdings LLC Agreement, the Amended Certificates of Incorporation, the Amended By-Laws and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors shall be deemed authorized in all respects.

(c)    Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, the implementation of the Management Incentive Plan, or the selection of officers or directors, shall be authorized and approved in all

respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

(d)     The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of New CORE Holdings and the other Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor.

## 7.8.    *Authorization, Issuance and Delivery of the Plan Securities.*

(a)     On the Effective Date, New CORE Holdings is authorized to issue or cause to be issued the Plan Securities in accordance with the terms of this Plan, the Rights Offering, the New Second Lien Warrant Agreement and the New CORE Holdings LLC Agreement, without the need for any further corporate, limited liability company, member or shareholder action.

(b)     On the Effective Date, New CORE Holdings shall issue and cause to be delivered the New Class A LLC Units and New Series P Convertible Preferred Units directly to the First Lien Lenders for distribution in accordance with the terms of the Plan.

(c)     On the Effective Date, New CORE Holdings shall issue, and cause to be delivered directly to the Second Lien Lenders, the New Second Lien Warrants to purchase New Class A LLC Units pursuant to the New Second Lien Warrant Agreement.

(d)     As a condition to receiving any Plan Securities under this Plan, each holder of a First Lien Lender Claim and Second Lien Lender Claim shall have executed and delivered to New CORE Holdings a signature page to the New CORE Holdings LLC Agreement. As a condition to receiving any New Second Lien Warrants under this Plan, each holder of a Second Lien Lender Claim shall have executed and delivered to New CORE Holdings a signature page to the New Second Lien Warrant Agreement.

## 7.9.    *Rights Offering.*

(a)     Issuance of Rights. Each Rights Offering Participant as of the Rights Offering Record Date will receive a Subscription Form to subscribe for the Rights Offering Units in an amount equal to such Rights Offering Participant's share of the First Lien Lender Cash Distribution for an aggregate purchase price equal to the applicable Subscription Payment Amount. The Rights Offering Units will be issued to the Rights Offering Purchasers for an aggregate purchase price equal to the Rights Offering Amount. On the Effective Date, New CORE Holdings shall consummate the transactions contemplated by the Rights Offering, including any agreement or document entered into in connection therewith, and all such

agreements and documents shall become effective and binding in accordance with their respective terms (to the extent not effective and binding prior to the Effective Date) and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

(b)     Subscription Rights.  The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline.  Each Rights Offering Participant as of the Rights Offering Record Date is required to participate in the Rights Offering and must affirmatively elect to exercise its Subscription Rights by completing and returning its Subscription Form to the entities specified in the applicable Subscription Form (and causing its nominee to complete and return any required Subscription Form to the entities specified in the applicable nominee's Subscription Form).

(c)     Exercise of Subscription Rights and Payment of Subscription Payment Amount.  On the Subscription Commencement Date, the Subscription Agent will deliver the Subscription Form to each Rights Offering Participant and their applicable nominees known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form.  The Debtors may adopt such additional procedures consistent with the provisions of this Plan to more efficiently administer the exercise of the Subscription Rights.  Each Rights Offering Participant as of the Rights Offering Record Date must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the entities specified in the applicable Subscription Form (and causing its nominee to complete and return any required Subscription Form to the entities specified in the applicable nominee's Subscription Form).  If the Subscription Agent for any reason does not receive from a given holder of Subscription Rights a duly completed Subscription Form (and a duly completed Subscription Form of such holder's nominee) on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.

(d)     No Transfer; Detachment Restrictions; No Revocation.  The Subscription Rights are not transferable or detachable.  Any transfer or detachment, or attempted transfer or detachment, in violation of this restriction will be null and void *ab initio* and the Debtors will not treat any purported transferee of the Subscription Rights separate from the First Lien Lender Claims as the holder of any Subscription Rights.  Once a holder has exercised any of its Subscription Rights, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(e)     Distribution of Rights Offering Units.  On the Effective Date, or as soon as reasonably practicable thereafter, New CORE Holdings or another Disbursing Agent shall distribute the Rights Offering Units purchased by such Rights Offering Purchaser set forth in the Subscription Form to such Rights Offering Purchaser set forth in the Subscription Form.  As a condition to receiving any New Series P Convertible Preferred Units, each Rights Offering Purchaser shall have (i) irrevocably directed the Debtors and/or Reorganized Debtors to apply, and the Debtors and/or Reorganized Debtors shall have applied, any First Lien Lender Cash Distribution that such Rights Offering Purchaser would otherwise be entitled to receive under the

Plan towards payment of the Subscription Payment Amount payable by such Rights Offering Purchaser in connection with its purchase of such New Series P Convertible Preferred Units in connection with the Rights Offering, and (ii) executed and delivered to New CORE Holdings a signature page to the New CORE Holdings LLC Agreement.

(f)    Rights Offering Proceeds.  All Subscription Payment Amounts retained by the Reorganized Debtors pursuant to Section 7.9(e) hereof shall be transferred to and held in a segregated and restricted account of New CORE Holdings free and clear of any lien, claim or encumbrance until utilized as set forth herein and the New CORE Holdings LLC Agreement, or until the New Series P Convertible Preferred Units are converted into New Class A LLC Units, as described in the New CORE Holdings LLC Agreement.  Such restricted Cash may only be used (i) for acquisitions, partnerships, joint ventures or other investments as determined by the New Board (subject to any approval rights contained within the New CORE Holdings LLC Agreement) (each such transaction an "**Extraordinary Investment**") or (ii) to fund redemptions of the New Series P Convertible Preferred Units.  Cash used by the Reorganized Debtors for an Extraordinary Investment will be funded by and reduce such restricted Cash prior to the use of any other Cash on hand of the Reorganized Debtors for any Extraordinary Investment.  To the extent any holders of New Series P Convertible Preferred Units elect to convert such units (other than New Series P Convertible Preferred Units issued as dividends) into New Class A LLC Units, as more fully described in the New CORE Holdings LLC Agreement, an amount of Cash equal to the number of New Series P Convertible Preferred Units so converted shall be released from such restricted Cash account and transferred to the general corporate account of Reorganized CORE or one of the other Reorganized Debtors (whereupon such funds shall serve as collateral to secure the New Term Loan Facility).

### 7.10.    *New Term Loan Facility.*

On the Effective Date, without any requirement of further action by equity holders or directors of the Debtors, each of the Reorganized Debtors shall be authorized to enter into the New Term Loan Facility, as well as any notes, documents or agreements in connection therewith, including any documents required in connection with the creation or perfection of the Liens on any Collateral securing the New Term Loan Facility.

### 7.11.    *Reserved.*

### 7.12.    *Insured Claims.*

Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim or Allowed Existing Securities Law Claim, the holder of such Allowed Claim shall (i) have an Allowed Claim in its applicable Class for any SIR Claim, and (ii) be paid any amount in excess of any SIR Claim from the proceeds of insurance to the extent that the Claim is insured.

### 7.13.    *Comprehensive Settlement of Claims and Controversies.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a

holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof. To that end, the requisite First Lien Lenders under the Second Lien ICA have consented to the treatment set forth for Second Lien Lenders in Section 5.4 of this Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Estates, the Reorganized Debtors, and their respective property and stakeholders; and (b) fair, equitable and reasonable.

### 7.14. *The New Second Lien Warrants.*

The New Second Lien Warrants, issued pursuant to the New Second Lien Warrant Agreement, will be distributed to the Second Lien Lenders on account of the Second Lien Lender Claims, exercisable on a cashless basis into New Class A LLC Units (at an initial strike price equal to $1.51 per warrant), in an amount equal to 22.5% of the aggregate amount of New Class A LLC Units (including New Class A LLC Units issued upon exercise of the New Second Lien Warrants) and New Series P Convertible Preferred Units of New CORE Holdings, subject to dilution by the Management Incentive Plan Securities and future equity raises. The New Second Lien Warrants will include the following features: (i) 10 year term, (ii) customary strike price adjustments for unit splits, reverse splits, combinations, recapitalizations and distributions, and (iii) no adjustment for below market or round down issuances. Upon any redemption of the New Series P Convertible Preferred Units, the number of New Class A LLC Units into which the New Second Lien Warrants are exercisable shall concurrently be proportionately decreased to maintain the same percentage of New Class A LLC Units that the New Second Lien Warrants were exercisable into immediately prior to any such redemption.

Notwithstanding anything to the contrary or the actual claims held by TCP and Crestview under the Second Lien Term Loan Agreement, subject to the adjustment mechanism set forth in the New Second Lien Warrant Agreement to account for any redemption of the New Series P Convertible Preferred Units, the New Second Lien Warrants shall be allocated initially as follows: 75.692% to Crestview and 24.308% to TCP (such percentages, the "*Warrant Split*"). Crestview shall be deemed to have agreed to a less favorable treatment in respect of the percentage of Second Lien Warrants to which it shall receive, in accordance with section 1123(a)(4) of the Bankruptcy Code. If TCP and/or Crestview elects to redeem any portion of its respective New Series P Convertible Preferred Units, the number of New Second Lien Warrants held by each of TCP and Crestview will be adjusted as described below.

In order to implement the foregoing Warrant Split, the New Second Lien Warrants will be issued in two classes, "*Class A Warrants*" and "*Class B Warrants*." The Class A Warrants and the Class B Warrants will have the same strike price and same expiration date and will be exercisable into New Class A LLC Units. Class A Warrants will be exercisable into a number of New Class A LLC Units equal in the aggregate to 22.5% of the New Class A LLC Units (fully diluted) issued on the Effective Date. Class A Warrants will be issued as follows: (i) 79.167% to Crestview and (ii) 20.833% to TCP. Class B Warrants will be exercisable into a number of New Class A LLC Units equal in the aggregate to 22.5% of the New Series P Convertible Preferred Units (fully diluted) issued pursuant to the Rights Offering. Class B Warrants will be issued as follows: (i) 70.884% to Crestview and (ii) 29.116% to TCP. In the

aggregate, the combined Warrant Split of the Class A Warrants and the Class B Warrants initially will equal (i) 75.692% to Crestview and (ii) 24.308% to TCP and, for the avoidance of doubt, the sum Class A Warrants and Class B Warrants shall equal the total number of New Second Lien Warrants described in the preceding paragraph.

Class B Warrants will not be exercisable until the earliest to occur of the following: (i) eighteen (18) months following the Effective Date, (ii) the date no New Series P Convertible Preferred Units issued to TCP and Crestview are outstanding, and (iii) immediately prior to a liquidity event; the intent being that TCP and Crestview would be able to exercise respective Class B Warrants prior to such liquidity event in order to receive their respective pro rata share of any distribution or other consideration the holders of New Class A LLC Units will be entitled to receive as a result of such liquidity event. Each time either TCP or Crestview has any of its New Series P Convertible Preferred Units redeemed (such party, the "***Redemption Party***"), such Redemption Party will lose a percentage of its Class B Warrants (with the other holder of Class B Warrants losing a smaller portion of its Class B Warrants as set forth below). This reduction of Class B Warrants will happen in two steps. In the first step, the Redemption Party will have its Class B Warrants reduced by an amount equal to the percentage of its redeemed New Series P Convertible Preferred Units (calculated as the number of New Series P Convertible Preferred Units redeemed divided by the number of New Series P Convertible Preferred Units the Redemption Party received upon consummation of the Rights Offering) multiplied by the amount of Class B Warrants it held upon consummation of the Rights Offering. In other words, if 50% of a Redemption Party's New Series P Convertible Preferred Units are redeemed, such Redemption Party's Class B Warrants would be reduced by 50% in the first step. In the second step, there will be an adjustment mechanism in which the total pool of outstanding Class B Warrants will be further adjusted such that the total number of Class B Warrants remaining represents 22.5% ownership of the New Series P Convertible Preferred Units (plus any New Class A LLC Units for which New Series P Convertible Preferred Units have been converted into already) (fully diluted) prior to taking into account Management Incentive Plan Securities. Such reduction will be borne by both TCP and Crestview in an amount equal to their respective ownership of the remaining Class B Warrants after step one. For the avoidance of doubt, all of the foregoing adjustments are applicable upon any redemption of New Series P Convertible Preferred Units and such adjustments will be made only to the Class B Warrants and never to the Class A Warrants.

### 7.15. *The Sharp Entities.*

On the Effective Date: (a) each of the First Lien Lenders and Second Lien Lenders party to the RSA shall be deemed to have consented to the release of all claims and liens under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement against the Sharp Entities upon the issuance of the New Term Loan Facility; (b) the Reorganized Debtors will cause the Sharp Entities and each unrestricted wholly owned subsidiary of the Reorganized Debtors (and such entities shall be deemed to have agreed) to guarantee the Reorganized Debtors' obligations under the New Term Loan Facility; provided that the Debtors and the Required Consenting Lenders may determine to exclude one or more foreign unrestricted wholly–owned subsidiaries of the Reorganized Debtors as guarantors; and (c) the Confirmation Order shall include provisions effectuating (a) and (b).

**7.16.** *First Lien Lender Fee Claim and Second Lien Lender Fee Claim.*

The Debtors or the Reorganized Debtors, on the Effective Date or as soon as reasonably practicable thereafter, shall pay the First Lien Lender Fee Claim and Second Lien Lender Fee Claim.

**7.17.** *Alternative Restructuring Transactions.*

On or as soon as reasonably practicable after the Effective Date, the distributions provided for under this Plan may, if and solely to the extent agreed to by the Debtors and the Required Consenting Lenders, be effectuated pursuant to the following Alternative Restructuring Transactions, which shall take place, *in seriatim*, pursuant to documentation satisfactory to the Debtors and the Required Consenting Lenders, which documentation shall be included in the Plan Supplement:

(a)    Formation of the New Companies.  On or prior to the Effective Date:

(i)     first, New CORE Holdings shall be formed by CORE as a new Delaware limited liability company;

(ii)    second, New CORE Holdings shall form New Subsidiary I; and

(iii)   third, New Subsidiary I shall form CORE Operations Inc. ("*CORE Operations*"), a wholly owned subsidiary of New Subsidiary I, which shall be incorporated under Delaware law.

(b)    Consideration.  On the Effective Date, prior to making any Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of this Plan, (i) Debtor EPE Holding Corporation shall dividend $32.5 million to CORE Media, (ii) New CORE Holdings then shall contribute all but one New Class A LLC Units, all New Series P Convertible Preferred Units and all New Second Lien Warrants (collectively, the "*Contributed Interests*") to New Subsidiary I, (iii) New Subsidiary I then shall contribute the Contributed Interests to CORE Operations, and (iv) New Subsidiary I shall issue to CORE Operations indebtedness in a principal amount equal to $30,000,000 (which shall constitute New Term Loan Facility Obligations under the New Term Loan Facility) in exchange for a note from CORE Operations in the amount of the New Term Loan Facility.

(c)    Transfer to CORE Media.  On the Effective Date, immediately after the consummation of the transactions described in clause (b) above, CORE Media shall sell, assign and transfer to CORE Operations all of its assets, including all of CORE Media's subsidiaries, in exchange for the Contributed Interests and the New Term Loan Facility Obligations; provided that, with the consent of the Required Consenting Lenders and the Debtors, in lieu of purchasing all of CORE Media's assets, including all of CORE Media's subsidiaries, CORE Operations may purchase all assets, including all subsidiaries, of a CORE Media direct or indirect parent company.

(d)    Consummation; Distributions; Dissolution of Parent Entities.  The Debtors shall consummate the Plan in part by making distributions to holders of (x) First Lien Lender

Claims on account of their secured claim as set forth in Section 5.3(a); and (y) Second Lien Lender Claims on account their secured claim against EPE Holding Corporation as set forth in Section 5.4(a).  The Alternative Restructuring Transaction would require certain definitional changes in this Plan to conform to this Section 7.17, including (i) the definition of "New CORE Holdings" would be updated to reflect that it will own all of the outstanding equity interests of New Subsidiary I rather than Reorganized CORE, (ii) the definition of "New Term Loan Credit Agreement" would be updated to reflect that New Subsidiary I rather than Reorganized CORE would be the borrower under such facility, (iii) the definition of Reorganized Debtors would include New Subsidiary I and CORE Operations, as the context requires, and (iv) references in the Plan to Reorganized CORE generally would be changed to New Subsidiary I, as the context requires.  On or as soon as reasonably practicable after the Effective Date, each of CORE Media's parent companies (other than CORE Holdings) that are Debtors shall be dissolved as provided in Section 7.2(a); provided that if, in lieu of purchasing all of CORE Media's assets, including CORE Media's subsidiaries, CORE Operations, with the consent of the Required Consenting Lenders and the Debtors, purchases all assets, including all subsidiaries, of a CORE Media direct or indirect parent company, then each of such entity's parent companies (other than CORE Holdings) that are Debtors shall be dissolved as provided in Section 7.2(a).

(e)    Reservation of Rights.  Notwithstanding the preceding Sections 7.17(a)-(d), to the extent agreed by the Debtors and the Required Consenting Lenders, one or more of the preceding steps comprising the Alternative Restructuring Transactions may be modified to carry out the intent of this section.

## ARTICLE VIII.

## DISTRIBUTIONS

**8.1.**    ***Distributions.***

The Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of this Plan; provided, however, that all Plan Consideration distributable to the First Lien Lenders and Second Lien Lenders on account of the First Lien Lender Claims and Second Lien Lender Claims shall be made directly to the applicable First Lien Lenders and Second Lien Lenders.  At a First Lien Lender's or a Second Lien Lender's election, New Class A LLC Units and/or New Series P Convertible Preferred Units may be distributed directly to such lender's designee so long as such designee is an affiliate of such lender.

**8.2.**    ***No Postpetition Interest on Claims.***

Unless otherwise specifically provided for in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3.**    *Date of Distributions.*

Unless otherwise provided herein, any Plan Distributions and deliveries to be made hereunder shall be made on the applicable Distribution Date; provided, that the Reorganized Debtors may utilize periodic distribution dates to the extent that use of a periodic distribution date does not delay payment of the Allowed Claim more than thirty (30) days.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Notwithstanding the preceding sentence or anything to the contrary in this Plan, (a) as the holders of Allowed Class 5 Claims shall receive their Pro Rata Share of General Unsecured Claim Cash Distribution (and, if applicable the Additional General Unsecured Claim Cash Distribution), which amounts may not be calculable as of the applicable Distribution Date, the Disbursing Agent shall not be required to make Cash distributions to the holders of Allowed Class 5 Claims until the amount of such Cash distribution is reasonably calculable and (b) in the event holders of Allowed Class 6 Claims receive their Pro Rata Share of the Convenience Claim Cap Amount, which amounts may not be calculable as of the applicable Distribution Date, the Disbursing Agent shall not be required to make Cash distributions to the holders of Allowed Class 6 Claims until the amount of such Cash distribution is reasonably calculable; provided, that, the Disbursing Agent shall nonetheless be permitted to make interim Cash distributions to holders of Allowed Class 5 Claims and Allowed Class 6 Claims in its discretion.

**8.4.**    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

**8.5.**    *Disbursing Agent.*

(a)    Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable Plan Distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court

(including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        (b)      Expenses Incurred by the Disbursing Agent on or After the Effective Date.

        Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash by the Reorganized Debtors and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent. The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtors and without the need for approval by the Bankruptcy Court, as set forth in Section 3.2(b) of this Plan. In the event that the Disbursing Agent and the Reorganized Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

        (c)      Bond.

        The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

        (d)      Cooperation with Disbursing Agent.

        The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.15 of this Plan.

        **8.6.**      *Delivery of Distribution.*

        Subject to the provisions contained in this Article VIII, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010 and except as provided in Section 8.1 of this Plan, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by this Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court. In the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder

without interest; provided, however, such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of 180 days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

### 8.7. *Unclaimed Property.*

One hundred and eighty (180) days from the later of: (i) the Effective Date, and (ii) the date that a Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the Reorganized Debtors or the successors or assigns of the Reorganized Debtors, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

### 8.8. *Satisfaction of Claims.*

Unless otherwise specifically provided herein, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 8.9. *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Reorganized Debtors.

### 8.10. *Fractional Units/De Minimis Cash Distributions.*

No fractional Plan Securities or Litigation Trust Units shall be distributed. When any distribution would otherwise result in the issuance of a number of Plan Securities or Litigation Trust Units that is not a whole number, the Plan Securities or Litigation Trust Units, as applicable, subject to such distribution will be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than ½ will be rounded to the next higher whole number; and (b) fractions less than ½ will be rounded to the next lower whole number. The total number of Plan Securities or Litigation Trust Units, as applicable, to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in this Plan. No consideration will be provided in lieu of fractional units that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Class A LLC Unit, New Series P Convertible Preferred Unit, New Second Lien Warrant or Litigation Trust Unit or $50.00 in Cash. Fractional Plan Securities or Litigation Trust Units that are not distributed in accordance with this Section 8.10 shall be returned to New CORE Holdings and cancelled.

**8.11.    *Distributions on Account of Allowed Claims Only.***

Notwithstanding anything herein to the contrary, no Plan Distribution shall be made on account of a Claim until such Claim becomes an Allowed Claim.  Furthermore, notwithstanding anything to the contrary, no Plan Distribution shall be made on account of a Claim, even if such Claim becomes an Allowed Claim, to the extent a Litigation Trust Asset is being pursued against the holder of such Claim or Allowed Claim and has not been finally disposed.

**8.12.    *No Distribution in Excess of Amount of Allowed Claim.***

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

**8.13.    *Exemption from Securities Laws.***

The issuance of and the distribution of the Plan Securities, including the Subscription Rights, the Rights Offering Units, the First Lien Lender Equity Distribution, and the Second Lien Lender Warrants Distribution, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, to the maximum extent permitted thereunder.  Subject to any transfer restrictions contained in the New CORE Holdings LLC Agreement, the Plan Securities may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.  The availability of the exemption under section 1145 of the Bankruptcy Code and/or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

**8.14.    *Setoffs and Recoupments.***

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Clam or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.

**8.15.    *Withholding and Reporting Requirements.***

In connection with this Plan and all Plan Distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized

to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' satisfaction, established an exemption therefrom.

### 8.16.  *Hart-Scott Rodino Antitrust Improvements Act.*

Any New Class A LLC Units or New Series P Convertible Preferred Units to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Competition Laws shall not be distributed until the notification and waiting periods applicable under such Competition Laws to such entity shall have expired or been terminated or any applicable authorizations, approvals, clearances or consents have been obtained.

## ARTICLE IX.

## PROCEDURES FOR RESOLVING CLAIMS

### 9.1.  *Objections to Claims.*

Other than with respect to Fee Claims, only the Reorganized Debtors and, as applicable, the Litigation Trust shall be entitled to object to Claims after the Effective Date.  Any objections to those Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof (for the avoidance of doubt, this objection deadline may be extended one or more times by the Bankruptcy Court).  Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors or, as applicable, the Litigation Trust, unless the Person wishing to file such untimely Claim has received the Bankruptcy Court's authorization to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn).  From

and after the Effective Date, the Reorganized Debtors, and, as applicable, the Litigation Trust may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 9.2.    *Amendment to Claims.*

From and after the Confirmation Date, no proof of Claim may be amended to increase or assert additional claims not reflected in a previously timely filed Claim (or Claim scheduled on the applicable Debtor's Schedules, unless superseded by a filed Claim), and any such Claim shall be deemed Disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors, or, as applicable, the Litigation Trust unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

### 9.3.    *Disputed Claims.*

Disputed Claims shall not be entitled to any Plan Distributions unless and until they become Allowed Claims.

### 9.4.    *Estimation of Claims.*

The Debtors, the Reorganized Debtors and/or the Litigation Trust (as applicable) may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims).  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

### 9.5.    *Expenses Incurred on or After the Effective Date.*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of this Plan, including reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Reorganized Debtors, save and except that in accordance with Section 7.1(j) of this Plan, the reasonable fees and expenses incurred by the Litigation Trustee and its professionals in connection with the reconciliation of, objection to, and settlement of Claims held or asserted by Excluded Parties, shall be paid by the Litigation Trust.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1. *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtors shall be deemed assumed or assumed and assigned, except that: (a) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases shall be deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the Final Order resolving such motion; provided, that any executory contracts or unexpired leases that were in effect on the Petition Date and are rejected pursuant to a Final Order of the Bankruptcy Court, listed on the Schedule of Rejected Contracts and Leases or are rejected through a separate motion to reject under section 365 of the Bankruptcy shall be deemed terminated upon rejection, provided that rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtors or the Reorganized Debtors under such contracts or lease that survive rejection under applicable law. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments and rejections described in this Section 10.1 pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Section 10.1 shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law. The listing of a document on the Schedule of Rejected Contracts or the Cure Schedule shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease.

As of the Effective Date, notwithstanding any applicable non-bankruptcy law to the contrary, if the Alternative Restructuring Transactions occur, all executory contracts and unexpired leases between CORE Media (or the applicable direct or indirect parent company of CORE Media) and the applicable counterparty, other than executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases, shall be assumed by CORE Media (or the applicable direct or indirect parent company of CORE Media) and assigned to CORE Operations or such other entity or entities as may be formed to the extent the Alternative Restructuring Transactions are modified consistent with Section 7.17(e) of this Plan. To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned in connection with the Alternative Restructuring Transaction shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the

extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

### 10.2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Except as otherwise explicitly set forth in the Plan, all Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section 5.5 of this Plan, all such Claims shall be discharged as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors or their respective properties or interests in property. In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 10.3(c) of this Plan, or pursuant to an order of the Bankruptcy Court).

### 10.3.    *Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases.*

(a)    Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "***Cure Amount***") in full in Cash on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)    No later than twenty-one (21) calendar days prior to the commencement of the Confirmation Hearing, the Debtors shall file a schedule (the "***Cure Schedule***") setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of this Plan, and serve such Cure Schedule on each applicable counterparty. Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as

set forth on the Cure Schedule.  The proposed Cure Amount for any executory contract or unexpired lease not listed on the Cure Schedule shall be $0.

(c)     In the event of a dispute (each, a "***Cure Dispute***") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to the proposed assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute <u>provided</u>, <u>that</u>, such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent the Cure Dispute is resolved or determined against the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 10.2 of this Plan.

### 10.4.  *Compensation and Benefit Programs.*

(a)     Except as otherwise expressly provided hereunder, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, with the consent of the Required Consenting Lenders, all employment and severance policies (that were in place as of the Petition Date and relate to employees whose employment will continue with the Reorganized Debtors following the occurrence of the Effective Date), and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors (other than any of the foregoing who are Excluded Parties) including all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Each of the Debtors may, prior to the Effective Date and with the consent of the Required Consenting Lenders, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of this Plan.  Any such agreements (or a summary of the material terms thereof) shall be in form and substance acceptable to the Required Consenting Lenders and be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.  For the avoidance of doubt, all workers' compensation policies issued at any time to the Debtors, their affiliates or predecessors of any of the foregoing and all agreements related thereto shall be treated in accordance with Section 7.12 of this Plan.

(b)     All collective bargaining agreements to which one or more of the Debtors is a party shall be treated as executory contracts under this Plan and on the Effective Date will be assumed by the applicable Reorganized Debtors pursuant to the provisions of section 365 of the Bankruptcy Code.

# ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

**11.1.** *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to:

(a)    the Disclosure Statement Order, in form and substance acceptable to the Debtors and the Required Consenting Lenders, having been entered by the Bankruptcy Court and remaining in full force and effect;

(b)    the Confirmation Order, in form and substance acceptable to the Debtors and the Required Consenting Lenders, having become a Final Order and remaining in full force and effect;

(c)    the Plan Documents, including the Plan Supplement, in form and substance satisfactory to the Debtors and the Required Consenting Lenders, being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(d)    except as set forth in Section 7.1 of this Plan, a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of any of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Reorganization Cases;

(e)    all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents required in connection with the Plan, if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(f)    the New CORE Holdings LLC Agreement and the Amended Certificates of Incorporation, in form and substance satisfactory to the Debtors and the Required Consenting Lenders, shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation and shall have become effective in accordance with such jurisdictions' corporation laws;

(g)    the New Term Loan Credit Agreement having been consummated, and being in full force and effect;

(h)    all fees and expenses incurred as of the Effective Date by the First Lien Administrative Agent, the First Lien Lenders, the Second Lien Administrative Agent and the Second Lien Lenders that are provided for under any DIP Order, other financing or cash collateral order approved by the Bankruptcy Court, the RSA Order or this Plan having been paid

in full in cash by the Debtors; provided, that, payment of any such amounts incurred by such parties as of the Effective Date but not invoiced to the Debtors shall not be a condition precedent to the effectiveness of this Plan and shall be payable by the Reorganized Debtors after receipt by the Reorganized Debtors of one or more invoices therefor (redacted as appropriate to preserve privilege); and

(i)       the RSA and the RSA Order remaining in full force and effect, and not having been terminated.

**11.2.    *Satisfaction and Waiver of Conditions Precedent.***

Except as otherwise provided herein, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 11.1 of this Plan may be waived in whole or part upon agreement by the Debtors and Required Consenting Lenders, without notice and a hearing, and the Debtors' benefits under any "mootness" doctrine shall be unaffected by any provision hereof.  The failure to satisfy or waive any condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any act, action, failure to act or inaction by the Debtors).  The failure of the Debtors to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth herein) at any time or from time to time.

**11.3.    *Effect of Failure of Conditions.***

If all of the conditions to effectiveness have not been satisfied (as provided in Section 11.1 hereof) or duly waived (as provided in Section 11.2 hereof) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors, with the consent of the Required Consenting Lenders (subject to Section 4 of the RSA), may file a motion to vacate the Confirmation Order.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.1 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this Section 11.3, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

## ARTICLE XII.

## EFFECT OF CONFIRMATION

### 12.1.    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such holder has accepted this Plan.

### 12.2.    *Discharge of Claims Against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided herein or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor, any Reorganized Debtor or any property, wherever located, including the United Kingdom, of the Estates.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in the United Kingdom and other relevant jurisdictions to implement the transactions set out in this Plan, including this Plan's discharge provisions, in order to ensure that they are fully effective.

### 12.3.    *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided herein, all injunctions or stays provided in the Reorganization Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All stays and suspensions provided for in the U.K. Proceeding (and any Additional U.K. Proceeding, if applicable) pursuant to any order of the U.K. Court shall remain in full force and effect until the Effective Date unless otherwise ordered by the U.K. Court.

### 12.4.    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States, the United Kingdom or elsewhere, to interfere with the implementation or consummation of this Plan.  Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by this Plan is free and clear of all Claims and Interests.  As such, to the

fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Person under this Plan.  As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under this Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in this Plan or the Confirmation Order.

       **12.5.**   *Injunction.*

       (a)   Except as otherwise provided in this Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, including the United Kingdom, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, including the United Kingdom, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, including the United Kingdom, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever (including in the United Kingdom), that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place (including in the United Kingdom), any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in the United Kingdom and other relevant jurisdictions to implement the transactions set out in this Plan, including the injunctions set forth in this Section 12.5, in order to ensure that they are fully effective.

       (b)   By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in this Section.

12.6.    *Releases.*

(a)    **Releases by the Debtors. For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, the Debtors (including the Sharp Entities), any of their affiliates (to the extent such affiliate is being released under this Plan) and the Reorganized Debtors, in their individual capacities and as debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce this Plan and the contracts, instruments, releases, agreements and documents delivered thereunder) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the parties released pursuant to this Section 12.6, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceedings, the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Released Matters, or this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtors that constitutes gross negligence, willful misconduct or breach of fiduciary duty (if any).**

(b)    **Releases by Holders of Claims and Interests. Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date: (i) each of the Released Parties; (ii) each holder of a Claim or Interest entitled to vote on this Plan that did not "opt out" of the releases provided in this Section 12.6 in a timely submitted Ballot; and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors and Reorganized Debtors under this Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to this Plan for all purposes and the restructuring embodied herein and deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceeding, the RSA, the First Lien Term**

Loan Agreement, the Second Lien Term Loan Agreement, the Released Matters, or this Plan or the Disclosure Statement; <u>provided</u>, that, notwithstanding anything to the contrary herein, the terms of Section 12.6(b) of this Plan shall not apply to (i) the Excluded Parties that are affiliates of the Debtors and (ii) each of Twenty-First Century Fox, Inc. and Apollo Global Management, LLC and each of their respective affiliates.

(c)    Notwithstanding anything to the contrary contained herein: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.6 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, or (y) any criminal laws of the United States or any state, city or municipality; and (ii) the releases set forth in this Section 12.6 shall not release any (x) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives and (y) claims against any Person arising from or relating to such Person's gross negligence, willful misconduct or breach of fiduciary duty (if any), each as determined by a Final Order of the Bankruptcy Court.

12.7.    *Exculpation and Limitation of Liability.*

On the Effective Date, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Creditors' Committee Parties or the Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of this Plan, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceeding, the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence, or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence, or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Reorganization Cases, the Plan, and administration thereof.

12.8.    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to this Plan, including the claims, obligations, suits, judgments,

**damages, demands, debts, rights, Causes of Action or liabilities released in or encompassed by Sections 12.6 and 12.7 of this Plan.**

### 12.9. *Retention of Causes of Action/Reservation of Rights.*

Subject to Sections 7.1 and 12.6 of this Plan and except as expressly set forth herein, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 of this Plan, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.

### 12.10. *Indemnification Obligations.*

Notwithstanding anything to the contrary contained herein, including Section 10.1 of this Plan, subject to the occurrence of the Effective Date, the obligations of the Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who shall continue to be directors or officers of any of the Debtors at any time after the Effective Date, against any Causes of Action, remain unaffected thereby after the Effective Date and are not discharged. On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such directors and/or officers remain in such positions after the Effective Date, provided, that, nothing in this Plan shall be deemed or construed to require the Reorganized Debtors to renew or extend such polices.

### ARTICLE XIII.

### RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided herein;

(e)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)    To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To hear and determine all Fee Claims;

(j)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)    To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(m)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     To resolve any disputes concerning whether a Person had sufficient notice of the Reorganization Cases or U.K. Proceeding or any Additional U.K. Proceeding, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)     To recover all assets of the Debtors and property of the Estates, wherever located, including the United Kingdom; and

(r)     To enter a final decree closing each of the Reorganization Cases.

As of the Effective Date, notwithstanding anything in this Article XIII to the contrary, the New Term Loan Facility shall be governed by the respective jurisdictional provisions therein.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Reorganization Cases, the provisions of this Article XIII shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1.     *Exemption from Certain Transfer Taxes.*

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 14.2.     *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which any applicable Debtor had obligated itself to provide such benefits.  Nothing herein shall: (a) restrict the Debtors' or the Reorganized Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

### 14.3.   *Dissolution of Creditors' Committee*.

The Creditors' Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee (including each officer, director, employee, agent, consultant or representative thereof) and each Professional Person retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan or the Reorganization Cases, except with respect to any matters concerning any Fee Claims held or asserted by any Professional Persons retained by the Creditors' Committee.

### 14.4.   *Termination of Professionals.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee, if any, shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims and the Reorganized Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims.  Nothing herein shall preclude any Reorganized Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.5.   *Amendments.*

This Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Required Consenting Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may, with the consent of the Required Consenting Lenders, make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

### 14.6.   *Revocation or Withdrawal of this Plan.*

Subject to Section 4 of the RSA, the Debtors reserve the right, with the consent of the Required Consenting Lenders, to revoke or withdraw this Plan prior to the Effective Date.  If the Debtors revoke or withdraw this Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by

this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 14.7.    *Reserved.*

### 14.8.    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.9.    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (and subject to the consent of the Required Consenting Lenders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.10.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.11.    *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors and the Consenting Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this

Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

**14.12.** *Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, the RSA Order, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

**14.13.** *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**14.14.** *Exhibits.*

All exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

*[The remainder of this page is intentionally left blank.]*

### 14.15. *Notices.*

In order to be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

AOG Entertainment, Inc.
8560 West Sunset Boulevard, 8th Floor
West Hollywood, California  90069
Attn:   Peter Hurwitz, Esq.
           Scott Frosch
Telephone:  (310) 777-1940

-and-

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019-6099
Attn:   Matthew A. Feldman, Esq.
           Paul V. Shalhoub, Esq.
           Andrew S. Mordkoff, Esq.
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

Counsel to the Debtors

### 14.16. *Filing of Additional Documents.*

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 14.17. *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors or the Consenting Lenders with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors or the Consenting Lenders with respect to any Claims or Interests prior to the Effective Date.

Dated:  July 25, 2016
        West Hollywood, California

                                  Respectfully submitted,

                                  AOG Entertainment, Inc.
                                  on behalf of itself and its affiliated Debtors

                                By: _____
                                       Peter Hurwitz
                                       President and/or Authorized Signatory of
                                       Debtors and Debtors in Possession

Counsel:

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Andrew S. Mordkoff, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Counsel for the Debtors and Debtors in Possession

## Exhibit A

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| 19 Entertainment Limited (8517) | CORE Group Productions Limited (8504) |
| 19 Entertainment Worldwide LLC (1986) | CORE Media Group Inc. (8168) |
| 19 Entertainment, Inc. (0323) | CORE Media Group Productions Inc. (8505) |
| 19 Management Limited (8501) | CORE MG UK Holdings Limited (8518) |
| 19 Merchandising Limited (8512) | CTA Productions, Inc. (5879) |
| 19 Productions Limited (8490) | Dance Nation Productions Inc. (9622) |
| 19 Publishing Inc. (0800) | Double Vision Film Limited (8492) |
| 19 Recording Services, Inc. (0641) | EPE Holding Corporation (2295) |
| 19 Recordings Limited (8507) | Focus Enterprises, Inc. (4396) |
| 19 Recordings, Inc. (9492) | Fresh Start Productions, LLC (2204) |
| 19 Touring Limited (8499) | Gilded Entertainment, LLC (4153) |
| 19 Touring LLC (7157) | IICD LLC (N/A) |
| 19 TV Limited (8511) | J2K Productions, Inc. (2687) |
| 7th Floor Productions, LLC (9160) | Magma Productions, LLC (4711) |
| All Girl Productions (5760) | Masters of Dance Productions Inc. (3417) |
| Alta Loma Entertainment, LLC (3015) | Native Management Limited (6634) |
| AOG Entertainment, Inc. (4420) | Native Songs Limited (N/A) |
| Brilliant 19 Limited (N/A) | On the Road Productions (3468) |
| Clown Car Productions, LLC (5459) | Pioneer Production Services LLC (4822) |
| CORE Entertainment Cayman Limited (4886) | Sonic Transformation, LLC (7828) |
| CORE Entertainment Offeror, LLC (2685) | Southside Productions Inc. (1908) |
| CORE Entertainment UK Limited (2685) | Sunset View Productions, LLC (1692) |
| CORE Entertainment Inc. (4420) | SYTYCD DVD Productions Inc. (1976) |
| CORE G.O.A.T. Holding Corp. (3459) | This Land Productions, Inc. (9523) |