**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AOG Entertainment, Inc., <u>et al.</u>,[1] | : | Case No. 16-11090 (SMB) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------x

## DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR <u>AOG ENTERTAINMENT, INC. AND ITS AFFILIATED DEBTORS</u>

Dated: New York, New York
       July 25, 2016

**WILLKIE FARR & GALLAGHER LLP**

787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel for the Debtors and Debtors in Possession*

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as <u>Exhibit A</u> to the First Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors (attached hereto as Exhibit 1) and at <u>http://www.kccllc.net/AOG</u>.  The Debtors' executive headquarters are located at 8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

IMPORTANT NOTICE

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR AOG ENTERTAINMENT, INC. AND ITS AFFILIATED DEBTORS (THE "**PLAN**").  NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE REORGANIZATION CASES, THE DEBTORS' BUSINESSES, PROPERTIES AND RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT, WITH THE CONSENT OF THE REQUIRED CONSENTING LENDERS, TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, NOR WILL THERE BE ANY DISTRIBUTION OF ANY OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.  DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH, UNLESS OTHERWISE SPECIFIED IN THE PLAN, WILL BE FILED NO LATER THAN 10 CALENDAR DAYS PRIOR TO THE CONFIRMATION HEARING (DEFINED BELOW)), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS ANY CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (PREVAILING EASTERN TIME) ON [_____], 2016,** UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF, OR REGISTERED PURSUANT TO, A REGISTRATION STATEMENT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR

SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER
OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE
BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF CERTAIN NEW
SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE
SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT
AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY
SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR, WITH RESPECT TO
CERTAIN NEW SECURITIES, OTHER APPLICABLE EXEMPTIONS (INCLUDING 4(A)(2)
OF THE SECURITIES ACT), AND EXPECT THAT THE OFFER AND ISSUANCE OF THE
SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER
THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE
APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR, WITH
RESPECT TO CERTAIN NEW SECURITIES, OTHER APPLICABLE EXEMPTIONS
(INCLUDING 4(A)(2) OF THE SECURITIES ACT).

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN
THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE
HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT,
UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE
INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO
THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH
THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY
REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE
STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES
ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS
DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH
INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING
BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE
RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE
TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL
CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE
ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER
PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL
EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION
CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC
ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH
GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**FORWARD-LOOKING STATEMENTS:**

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES.  IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED.  EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

**THE CREDITORS' COMMITTEE DOES NOT SUPPORT THE PLAN AND BELIEVES THAT DISTRIBUTIONS TO UNSECURED CREDITORS SHOULD BE INCREASED.**

**THE DEBTORS AND THE CONSENTING LENDERS DISAGREE WITH THE CREDITORS' COMMITTEE ASSERTIONS AND BELIEVE THAT THE PLAN REPRESENTS THE BEST CHANCE FOR THE DEBTORS TO REORGANIZE.**

**THE DEBTORS AND THE CONSENTING LENDERS SUPPORT CONFIRMATION OF THE PLAN, AND THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

# TABLE OF CONTENTS

Page

ARTICLE I.

    INTRODUCTION ...................................................................................1

1.1.    General. ...............................................................................................1
1.2.    The Confirmation Hearing. ...............................................................3
1.3.    Classification of Claims and Interests. ..............................................3
1.4.    Voting; Holders of Claims Entitled to Vote. ....................................4
1.5.    Important Matters. .............................................................................6

ARTICLE II.

    SUMMARY OF PLAN AND CLASSIFICATION AND
    TREATMENT OF CLAIMS AND INTERESTS THEREUNDER .................7

2.1.    General. ...............................................................................................7
2.2.    Summary of Treatment of Claims and Interests Under the Plan. .....................9

ARTICLE III.

    BUSINESS DESCRIPTION; HISTORICAL INFORMATION ....................17

3.1.    The Debtors' Businesses. .................................................................17
3.2.    Debtors' Prepetition Capital Structure. ...........................................23
3.3.    Related-Party Transactions. ............................................................25

ARTICLE IV.

    EVENTS LEADING TO CHAPTER 11 FILING ........................................26

4.1.    Cancellation of American Idol. ........................................................26
4.2.    Substantial Indebtedness. .................................................................27
4.3.    Inability to Replace Key Revenue Streams. .....................................27
4.4.    Acceleration of First Lien Term Loan Facility. ...............................28
4.5.    Missed Interest Payments Under the Second Lien Term Loan Facility. .........28
4.6.    Simon Fuller and UK Recognition Proceeding. ...............................29
4.7.    Debtors' Efforts to Negotiate a Comprehensive Restructuring. .....................30

ARTICLE V.

    REASONS FOR THE SOLICITATION; RECOMMENDATION ...............31

ARTICLE VI.

    THE PLAN ...................................................................................................31

6.1.    Overview of Chapter 11. ..................................................................31
6.2.    Resolution of Certain Inter-Creditor and Inter-Debtor Issues. .....................32
6.3.    Overview of the Plan. ......................................................................33
6.4.    Acceptance or Rejection of the Plan; Effect of Rejection by One or More
    Classes of Claims or Interests. ........................................................41
6.5.    Post-Emergence Capital Structure. .................................................43

6.6.     Means for Implementation. ..................................................................45
6.7.     Executory Contracts and Unexpired Leases .........................................60
6.8.     Conditions Precedent to Confirmation of the Plan. ............................63
6.9.     Binding Effect. .....................................................................................65
6.10.    Discharge of Claims Against and Interests in the Debtors. ................65
6.11.    Term of Pre-Confirmation Injunctions or Stays. ...............................66
6.12.    Injunction Against Interference with Plan. .........................................66
6.13.    Injunction. ............................................................................................66
6.14.    Releases. ...............................................................................................67
6.15.    Exculpation and Limitation of Liability. ............................................69
6.16.    Injunction Related to Releases and Exculpation. ...............................70
6.17.    Retention of Causes of Action/Reservation of Rights. ......................70
6.18.    Indemnification Obligations. ..............................................................70
6.19.    Retention of Jurisdiction. ....................................................................71
6.20.    Miscellaneous Provisions. ...................................................................72

ARTICLE VII.

         CONFIRMATION OF THE PLAN OF REORGANIZATION ....................77

7.1.     Confirmation Hearing. .........................................................................77
7.2.     Confirmation. .......................................................................................78
7.3.     Standards Applicable to Releases. ......................................................83
7.4.     Classification of Claims and Interests. ...............................................85
7.5.     Consummation. ....................................................................................85

ARTICLE VIII.

         ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
         THE PLAN ...........................................................................................86

8.1.     Liquidation Under Chapter 7 of the Bankruptcy Code. .....................86
8.2.     Alternative Plan(s) of Reorganization. ...............................................86
8.3.     Dismissal of the Reorganization Cases. ..............................................87

ARTICLE IX.

         SUMMARY OF VOTING PROCEDURES ..................................................87

ARTICLE X.

         DESCRIPTION AND HISTORY OF CHAPTER 11 CASES ......................88

10.1.    General Case Background. ...................................................................88
10.2.    U.K. Proceedings. ................................................................................88
10.3.    Retention of Professionals. .................................................................88
10.4.    Employment Obligations. ....................................................................89
10.5.    Continuing Vendor Relations. .............................................................89
10.6.    Cash Management System. ..................................................................90
10.7.    Insurance Obligations .........................................................................90
10.8.    Tax Motion. ..........................................................................................90
10.9.    Schedules and Statements. ..................................................................90
10.10.   Bar Dates. .............................................................................................90

10.11.   Use of Cash Collateral and Approval of the DIP Facility. ..............................91
10.12.   Restructuring Support Agreement. ...................................................................91
10.13.   Appointment of a Creditors' Committee. ........................................................91
10.14.   Section 341 Meeting. .......................................................................................92
10.15.   Adversary Proceeding. .....................................................................................92

ARTICLE XI.

        CERTAIN RISK FACTORS TO BE CONSIDERED ...................................93

11.1.    Certain Bankruptcy Considerations. ................................................................93
11.2.    Risks Relating to the Capital Structure of the Reorganized Debtors..............96
11.3.    Risks Relating to Tax and Accounting Consequences of the Plan. ...............100
11.4.    Risks Associated with the Company's Businesses. .......................................101

ARTICLE XII.

        CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN104

12.1.    Introduction....................................................................................................104
12.2.    Federal Income Tax Consequences to the Debtors........................................105
12.3.    Federal Income Taxation of the Litigation Trust...........................................106
12.5.    Federal Income Tax Consequences – If the Alternative Restructuring
         Transaction is Not Pursued. ..........................................................................109
12.6.    Federal Income Tax Consequences – General. .............................................111
12.7.    Federal Income Tax Consequences to Holders of New Term Loans, New
         Class A LLC Units and New Series P Convertible Preferred Units..............112

ARTICLE XIII.

        SECURITIES LAW MATTERS ...............................................................114

13.1.    General............................................................................................................114
13.2.    New Class A LLC Units, New Series P Convertible Preferred Units and New
         Second Lien Warrants.....................................................................................115

ARTICLE XIV.

        PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN..................117

14.1.    Distributions...................................................................................................117
14.2.    No Postpetition Interest on Claims. ...............................................................118
14.3.    Date of Distributions......................................................................................118
14.4.    Distribution Record Date................................................................................118
14.5.    Disbursing Agent. ..........................................................................................119
14.6.    Delivery of Distribution..................................................................................120
14.7.    Unclaimed Property. .......................................................................................120
14.8.    Satisfaction of Claims.....................................................................................120
14.9.    Manner of Payment Under Plan......................................................................120
14.10.   Fractional Units/De Minimis Cash Distributions. .........................................120
14.11.   Distributions on Account of Allowed Claims Only.......................................121
14.12.   No Distribution in Excess of Amount of Allowed Claim...............................121
14.13.   Exemption from Securities Laws....................................................................121

14.14.    Setoffs and Recoupments............................................................................121
14.15.    Withholding and Reporting Requirements. ...................................................122
14.16.    Hart-Scott Rodino Antitrust Improvements Act. ..........................................122

ARTICLE XV.
        PROCEDURES FOR RESOLVING CLAIMS ..........................................122
15.1.    Objections to Claims....................................................................................122
15.2.    Amendment to Claims. .................................................................................123
15.3.    Disputed Claims...........................................................................................123
15.4.    Estimation of Claims....................................................................................123
15.5.    Expenses Incurred on or After the Effective Date. ......................................124

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1)

- Liquidation Analysis (Exhibit 2)

- Reorganized Debtors' Projected Financial Information (Exhibit 3)

- Disclosure Statement Order (without exhibits) (Exhibit 4)

- Valuation Analysis (Exhibit 5)

- Illustration of Recovery for General Unsecured Claims (Exhibit 6)

- List of Non-Released Parties (Exhibit 7)

# ARTICLE I.

## INTRODUCTION

### 1.1.    *General*.

AOG Entertainment, Inc. and certain of its affiliates as debtors and debtors in possession (collectively, the "**Debtors**"),[2] in chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), hereby transmit this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**"), pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the Debtors' solicitation of votes to confirm the First Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and its Affiliated Debtors, dated as of [_____], 2016 (the "**Plan**"). *All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan and with the consent of the Required Consenting Lenders), which may result in material changes to the terms of the Plan Documents.* On the Effective Date, the Plan, all Plan Documents and all other agreements entered into or instruments issued in connection with the Plan and any Plan Document, shall become effective and binding in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

The purpose of this Disclosure Statement is to set forth information:  (a) regarding the history of the Debtors and their businesses; (b) describing the Reorganization Cases; (c) concerning the Plan; (d) advising the holders of Claims and Interests of their rights under the Plan; and (e) assisting the holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

On [_____], 2016, after notice and a hearing, the Bankruptcy Court entered an order [Docket No. __] (the "**Disclosure Statement Order**"), which, among other things: (a) approved this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (b) authorized the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. **The Disclosure Statement Order establishes [_____ ], 2016 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline for the return of Ballots accepting or rejecting the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

---

[2]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as <u>Exhibit A</u> to the First Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors (attached hereto as Exhibit 1) and at <u>http://www.kccllc.net/AOG</u>.  The Debtors' executive headquarters are located at 8560 West Sunset Boulevard, 8th Floor, West Hollywood, CA 90069.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and the Exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan and all Exhibits hereto and thereto.

**PURSUANT TO THE RSA, THE CONSENTING LENDERS, REPRESENTING 100% IN DOLLAR AMOUNT AND 100% IN NUMBER OF CLASS 3 CLAIMS AND 100% IN DOLLAR AMOUNT AND 100% IN NUMBER OF CLASS 4 CLAIMS, HAVE AGREED TO SUPPORT AND VOTE TO ACCEPT THE PLAN AFTER THE ENTRY OF AN ORDER APPROVING THIS DISCLOSURE STATEMENT AND THE SOLICITATION OF VOTES ON THE PLAN.**

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 5 AND 6 ALSO VOTE TO ACCEPT THE PLAN.**

Additional copies of this Disclosure Statement (including Exhibits) are available upon request to the Debtors' claims and voting agent, Kurtzman Carson Consultants LLC ("**KCC**"), at the following address:

AOG Entertainment, Inc.
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

They may also be obtained by contacting KCC via telephone at (877) 709-4752 or for international calls at (424) 236-7232.  Additional copies of this Disclosure Statement (including Exhibits) can also be accessed free of charge from the following website: http://www.kccllc.net/AOG.

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan.  If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact KCC at the address above.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important

information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

### 1.2.    *The Confirmation Hearing.*

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, One Bowling Green, New York, New York 10004 on **[    ], 2016 at [____] (prevailing Eastern Time)**, to consider confirmation of the Plan.  The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, subject to the terms of the Plan and the consent of the Required Consenting Lenders.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **[____], 2016 at 4:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order.  The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof or an appropriate filing with the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether sufficient majorities in number and amount from each Class entitled to vote have delivered properly executed ballots accepting the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously resolved;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

### 1.3.    *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are:  (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | First Lien Lender Claims | Yes | Yes |
| Class 4 | Second Lien Lender Claims | Yes | Yes |
| Class 5 | General Unsecured Claims | Yes | Yes |
| Class 6 | Convenience Claims | Yes | Yes |
| Class 7 | Subordinated Claims | Yes | No (Deemed to reject) |
| Class 8 | Existing Interests | Yes | No (Deemed to reject) |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

**1.4.    *Voting; Holders of Claims Entitled to Vote.***

(a)    **General Voting Procedures**.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are "impaired" and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan.  Generally, a claim or interest is "impaired" under a plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the chapter 11 plan and are not entitled to vote to accept or reject such plan.

Under the Plan:

- Claims in Classes 3, 4, 5 and 6 are impaired, will receive a distribution on account of such Claims to the extent provided in the Plan and are entitled to vote to accept or reject the Plan;

4

- Claims in Classes 1 and 2 are unimpaired and, as a result, holders of such Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan; and

- Claims and Interests in Classes 7 and 8 are impaired and the holders of such Claims and Interests will not receive any distribution on account of such Claims and Interests.  As a result, the holders of Claims and Interests in those Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the chapter 11 plan.  **Your vote on the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right, with the consent of the Required Consenting Lenders, to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Class.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding non-acceptance of such plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept such plan (excluding any votes of insiders).  Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and it is the Debtors' position that such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

If you are entitled to accept or reject the Plan, please complete and sign your Ballot(s) and return such Ballot to the Debtors' claims and voting agent (the "**Voting Agent**") at the applicable address below:

**AOG Entertainment, Inc. Ballot Processing Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME ON [   ], 2016,** UNLESS

SUCH DEADLINE IS EXTENDED BY THE DEBTORS.  YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER.  FAXED COPIES AND VOTES SENT ON OTHER FORMS WILL NOT BE ACCEPTED EXCEPT IN THE DEBTORS' SOLE DISCRETION.  ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote thereon.  Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent.

The Debtors have fixed **5:00 p.m. (prevailing Eastern Time) on [_____], 2016** (the "**Voting Record Date**") as the time and date for the determination of the Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan.  Accordingly, only holders of Claims of record as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims has accepted the Plan.  **Under the Bankruptcy Code, for the Plan to be "accepted," a specified majority vote is required for each Class of impaired Claims entitled to vote on the Plan.  If no votes are received with respect to any Class of impaired Claims entitled to vote on the Plan, then such Class shall be deemed to have accepted the Plan.  If any impaired Class fails to have any Allowed Claims or Claims temporarily Allowed by the Court as of the date of the Confirmation Hearing, such Class or Classes will be deemed eliminated from the Plan for all purposes.**  The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

## 1.5.    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.  The projected financial information contained herein and in the exhibits annexed hereto, therefore, is not necessarily indicative of the future financial condition or results of operations of the Debtors, which in each case may vary significantly from those set forth in such projected financial information.  Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, the Reorganized Debtors, their advisors, or any other Person that the projected financial conditions or results of operations can or will be achieved.

# ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

### 2.1.    *General.*

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recovery to stakeholders and to enhance the financial viability of the Reorganized Debtors.

Generally, the Plan provides for:[3]

(a)    A balance sheet restructuring regarding the Debtors' current debt obligations under the First Lien Term Loan Facility and the Second Lien Term Loan Facility.

(b)    Holders of the First Lien Lender Claims will receive (on account of their secured and unsecured deficiency claims) their Pro Rata Share of (i) the issuance of obligations under a new term loan facility, (ii) all of the New Class A LLC Units in New CORE Holdings, (iii) interests in the Litigation Trust, (iv) a cash distribution (which the Rights Offering Purchasers will utilize their Pro Rata Share thereof to acquire the Rights Offering Units), (v) Subscription Rights to subscribe for their Pro Rata Share of the Rights Offering Units (solely with respect to the Rights Offering Participants and to the extent set forth in the Plan), and (vi) the General Unsecured Claim Cash Distribution (which Cash will be distributed to holders of Allowed General Unsecured Claims if Class 5 votes in favor of the Plan, or retained by the Reorganized Debtors if Class 5 does not vote in favor of the Plan).

(c)    Holders of the Second Lien Lender Claims will receive (on account of their secured and unsecured deficiency claims) (i) their allocated share of the New Second Lien Warrants, which Warrants shall be exercisable into New Class A LLC Units, and (ii) their Pro Rata Share of (x) interests in the Litigation Trust, and (y) the General Unsecured Claim Cash Distribution (which Cash will be distributed to holders of Allowed General Unsecured Claims if Class 5 votes in favor of the Plan, or retained by the Reorganized Debtors if Class 5 does not vote in favor of the Plan).

(d)    The Existing Interests have no value and will be cancelled.  Upon emergence, New CORE Holdings will be a Delaware Limited Liability Company, and all of New CORE Holdings' New Class A LLC Units will be owned by the First Lien Lenders, and will be subject to dilution by: (i) the New Class A LLC Units issued pursuant to the Management

---

[3]    As noted, above, the summary of the Plan contained herein is qualified in its entirety by the terms the Plan, and in the event of any inconsistency, the Plan shall control in all respects.

Incentive Plan; (ii) the New Class A LLC Units issued upon conversion of the New Series P Convertible Preferred Units by the Rights Offering Participants (who are comprised of certain holders of First Lien Lender Claims); and (iii) the New Class A LLC Units issued upon exercise of the New Second Lien Warrants by the holders of the Second Lien Lenders Claims.  The equity interests issued pursuant to the Plan will not be registered with the SEC or any state securities regulatory authority and will not trade on any public exchange.

(e)     Other secured creditors will receive cash or their collateral, or will retain their liens, as applicable, in satisfaction of their Claims.

(f)     Holders of Allowed General Unsecured Claims will receive their Pro Rata Share of: (i) interests in the Litigation Trust; and (ii) a cash distribution in the aggregate amount of up to $850,000 on account of their Allowed Claims under the Plan; provided that no holder of an Allowed General Unsecured Claim shall receive a share of such cash distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim.  *If the Class of holders of General Unsecured Claims votes in favor of the Plan, they will receive their Pro Rata Share of additional cash that would otherwise be distributed to the First Lien Lenders and Second Lien Lenders on account of their deficiency claims.  If the Class of holders of General Unsecured Claims does not vote in favor of the Plan, such additional cash that would otherwise be distributed to the First Lien Lenders and Second Lien Lenders on account of their deficiency claims will be retained by the Reorganized Debtors.*  An illustration of a potential recovery of claims in this class is attached hereto as Exhibit 6.

(g)     Holders of Convenience Claims that are Allowed in the amount of $10,000 or less, or Allowed in an amount greater than $10,000, but which is reduced to $10,000, will be paid in full in Cash in satisfaction of their Claims; provided, however, that in the event the aggregate total of all Allowed Convenience Claims exceeds $350,000, each holder of an Allowed Convenience Claim shall instead receive its Pro Rata Share of the $350,000.

(h)     Holders of Subordinated Claims will not receive or retain any distribution under the Plan on account of such Subordinated Claims.

The resulting capital structure of the Reorganized Debtors will be substantially de-levered and should provide the Company (as defined in Section 3.1(a) below) with the liquidity needed to support its future operations.  The Debtors believe that the Plan provides for appropriate treatment of all Classes of Claims and Interests, taking into account the valuation of the Company and the differing natures and priorities of the Claims and Interests, and the intercreditor arrangements between the First Lien Lenders and the Second Lien Lenders.

## 2.2.    *Summary of Treatment of Claims and Interests Under the Plan.*

The following table classifies Claims against, and Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on the provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Interests in the Plan.  **As described in Article XI below, the Debtors' businesses are subject to a number of risks.  The uncertainties and risks related to the Reorganized Debtors make it difficult to determine a precise value of the new equity, including warrants, distributed under the Plan.  The recoveries and estimates described in the table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.  All statements relating to the aggregate amount of Claims and Interests in each Class are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims in any particular Class may vary significantly from these estimates.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified.  Except as specifically noted therein, the Plan does not provide for payment of postpetition interest on any Allowed Claims.

---

### Important Note on Estimates

The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims, the existence of Disputed Claims and other factors.  The estimated recovery percentage below does not include any projected recovery from the Litigation Trust.  Statements regarding projected amounts of Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim. | No (Deemed to accept) | $12,850 | 100% |
| Class 2 | Other Secured Claims | The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of the Reorganized Debtors: (a) Cash in an amount equal to such Allowed Claim; or (b) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or order of the Bankruptcy Court.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed | No (Deemed to accept) | $450,000 | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim and shall be classified in Class 5 | | | |
| Class 3 | First Lien Lender Claims | First Lien Lender Claims shall be Allowed under the Plan; provided that nothing in the Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any First Lien Lender Claim asserted by Goldman Sachs Bank USA as predecessor agent under the First Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the First Lien Term Loan Agreement, including any First Lien Lender Claim asserted by or on behalf of Cravath, Swaine & Moore LLP.<br><br>Except to the extent that a holder of a First Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of First Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction of the *secured* portion of its First Lien Lender Claim:  (a) payment in Cash of its Pro Rata Share of the First Lien Lender Cash Distribution; provided that the Rights Offering Purchasers shall, in accordance with Section 7.9(e) of the Plan, utilize their share of the First Lien Lender Cash | Yes | Approximately $208.5 million | 46.8%[4] |

---

[4]    Assumes midpoint of Moelis valuation analysis (see Exhibit 5).

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | Distribution to acquire the Rights Offering Units as described in Section 5.3(a)(iv) of the Plan; (b) receipt of its Pro Rata Share of the First Lien Lender Equity Distribution; (c) receipt of its Pro Rata Share of the New Term Loan Facility Obligations; and (d) solely with respect to the Rights Offering Participants, Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Units for an aggregate purchase price equal to the Subscription Payment Amount.<br><br>The *undersecured* portion of the First Lien Lender Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote in Class 5, and each holder of such undersecured portion of First Lien Lender Claims shall receive, in full and final satisfaction thereof, its Pro Rata Share of:  (i) the First Lien Lender Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and (ii) the General Unsecured Claim Cash Distribution on account of the First Lien Lenders' share of the Aggregate Lender Deficiency Claim; provided, that, to the extent Class 5 (General Unsecured Claims) votes in favor of the Plan, then the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of First Lien Lender Claims shall instead be distributed to the holders of Allowed General Unsecured Claims (such amount constituting the First Lien Lenders' contribution to the Additional General Unsecured Claim Cash Distribution); provided, further, that to the extent that Class 5 (General Unsecured Claims) votes to reject the Plan, the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of First Lien Lender Claims shall instead be retained by the Reorganized Debtors; in each case, with such holders of First Lien Lender Claims | | | |

12

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | agreeing to accept such less favorable treatment. | | | |
| Class 4 | Second Lien Lender Claims | Second Lien Lender Claims shall be Allowed under the Plan; provided that nothing in the Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any Second Lien Lender Claim asserted by Goldman Sachs Bank USA as predecessor agent under the Second Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the Second Lien Term Loan Agreement, including any Second Lien Lender Claim asserted by or on behalf of Cravath, Swaine & Moore LLP.<br><br>Except to the extent that a holder of a Second Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a Second Lien Lender Claim shall receive on account of its Claim against Debtor EPE Holding Corporation, subject to the terms of the Plan, in full and final satisfaction of the *secured* portion of its Second Lien Lender Claim, its allocated share of the Second Lien Lender Warrants Distribution as set forth in Section 7.14 of the Plan.<br><br>The *undersecured* portion of the Second Lien Lender Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote in Class 5, and each holder of such undersecured portion of Second Lien Lender Claims shall receive, in full and final satisfaction thereof, its Pro Rata Share of: (i) the Second Lien Lender Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; | Yes | Approximately $188.8 million | 2.25%[5] |

---

[5]        Assumes midpoint of Moelis valuation analysis (see <u>Exhibit 5</u>).

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | and (ii) the General Unsecured Claim Cash Distribution on account of the Second Lien Lenders' share of the Aggregate Lender Deficiency Claim; provided, that, to the extent Class 5 (General Unsecured Claims) votes in favor of the Plan, then the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of Second Lien Lender Claims shall instead be distributed to the holders of Allowed General Unsecured Claims (such amount constituting the Second Lien Lenders' contribution to the Additional General Unsecured Claim Cash Distribution); provided, further, that to the extent that Class 5 (General Unsecured Claims) votes to reject the Plan, the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of Second Lien Lender Claims shall instead be retained by the Reorganized Debtors. | | | |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and to the extent that such Allowed General Unsecured Claim was not previously paid pursuant to an order of the Bankruptcy Court, each holder of an Allowed General Unsecured Claim shall receive, on the applicable Distribution Date in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata Share of:  (a) **If Class 5 votes to accept the Plan**:  (i) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; (ii) the General Unsecured Claim Cash Distribution; and (iii) the Additional General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim;[6]<br>(b) **If Class 5 votes to reject the Plan**: (i) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and (ii) the General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim; provided, further that the Additional General Unsecured Claim Cash Distribution shall be retained by the Reorganized Debtors.[7] | Yes | $23.92 million[8] | 3.5% |

---

[6]    For the avoidance of doubt, if Class 5 votes to accept the Plan, the First Lien Lenders and the Second Lien Lenders will not receive their respective Pro Rata Share of the Additional General Unsecured Claim Cash Distribution.

[7]    An illustration of a potential recovery of claims in this class is attached hereto as Exhibit 6.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------------------------|---------------------|
| Class 6 | Convenience Claims | Except to the extent that a holder of an Allowed Convenience Claim agrees to a different treatment, and to the extent that such Allowed Convenience Claim was not previously paid pursuant to an order of the Bankruptcy Court, on the applicable Distribution Date, each holder of an Allowed Convenience Claim shall be paid in full in Cash, in full and final satisfaction of and in exchange for each such Allowed Convenience Claim; provided, however, that in the event the aggregate of all Allowed Convenience Claims exceeds the Convenience Claim Cap Amount, each holder of an Allowed Convenience Claim shall instead receive its Pro Rata Share of the Convenience Claim Cap Amount. Distributions to holders of Convenience Claims shall not include postpetition interest. The Convenience Claims will not receive any Litigation Trust Units or any other interest in the Litigation Trust. | Yes | $222,000[9] | 100% |
| Class 7 | Subordinated Claims | Holders of Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims. | No (Deemed to reject) | N/A | 0% |

---

[8]    As of the date of this Disclosure Statement, the deadlines for filing proof of certain claims against the Debtors that arose on or prior to the Petition Date has not yet expired. In addition, the estimated amount of Allowed General Unsecured Claims above excludes estimates of Allowed General Unsecured Claims (i) for which the Debtors have insurance coverage, (ii) Claims relating to contracts that the Debtors intend to assume, and (iii) most Claims relating to contracts that the Debtors intend to reject. See Sections 6.6(k) "Insured Claims," 6.7(c) "Cure of Defaults for Assumed Executory Contracts and Unexpired Leases," and 11.1(h) "Allowance of General Unsecured Claims and Whether Class 5 (General Unsecured Claims) Votes to Accept the Plan Will Impact the Recovery of Holders of General Unsecured Claims Under the Plan." The amount of General Unsecured Claims ultimately Allowed against the Debtors may be greater than the amount set forth herein.

[9]    This amount assumes that certain holders of General Unsecured Claims will elect to reduce the Allowed amount of their Claims to $10,000 to participate in the Convenience Class. As of the date of this Disclosure Statement, the deadlines for filing proof of certain claims against the Debtors that arose on or prior to the Petition Date has not yet expired. Therefore, the amount of Convenience Claims, which is subject to the Convenience Claim Cap Amount, ultimately Allowed against the Debtors may be greater than the amount set forth herein.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------------------------|--------------------|
| Class 8 | Existing Interests | Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests. | No (Deemed to reject) | N/A | 0% |

The recoveries set forth above are estimates and are contingent upon approval of the Plan as proposed.

## ARTICLE III.

## BUSINESS DESCRIPTION; HISTORICAL INFORMATION

### 3.1.    *The Debtors' Businesses.*

(a)    **The Debtors.**

AOG Entertainment, Inc., together with its Debtor and non-Debtor subsidiaries[10] (collectively, the "**Company**"), own, produce, develop and commercially exploit entertainment content.  The Company's portfolio of world-class brands and entertainment properties includes participation in the "IDOL"-branded shows, including American Idol, Deutschland sucht den Superstar, Nouvelle Star and more than fifty other franchises shown around the world (collectively, the "**IDOLS**"), and the popular television series So You Think You Can Dance ("**SYTYCD**"), which is principally produced in the United States, but also has several formats around the world.  The foundation of the Company's business is (i) exploitation of its intellectual property portfolio, including:  (1) the trademarks associated with a broad spectrum of television programs including SYTYCD and the IDOLS; (2) the trademarks and name, image and likeness rights principally associated with certain musical artists who rose to fame through American Idol; and (3) the copyright registrations for a wide range of media content and musical recordings by IDOLS artists; and (ii) development and production of content for television and other platforms.

The Company's properties generate recurring revenue across multiple entertainment platforms, including music and television offerings, licensing and merchandising, talent management and live events.  The Company derives income by licensing its programming

---

[10]    Sharp Entertainment Holdings, LLC and its subsidiaries, the Debtors' joint venture with B17 Entertainment, and certain unrestricted subsidiaries are not Debtors and not part of this chapter 11 process. On Effective Date, each of the First Lien Lenders and Second Lien Lenders party to the RSA shall be deemed to have consented to the release of all claims and liens under the First Lien Term Loan Agreement and Second Lien Term Loan Agreement against the Sharp Entities upon the issuance of the New Term Loan Facility.

and the use of its trademarks and copyrighted materials to media distribution outlets, which use the marks and copyrighted material in promoting and airing the Company's programs on television.  The Company also earns revenue from the sale, broadcast and transmission of its artists' recordings, concerts and public appearances.

Despite its long-running success, however, the Company prior to the Petition Date experienced deterioration in its financial performance, primarily attributable to the decline in ratings for American Idol and the corresponding decline in revenues from IDOLS-related broadcast fees, international tape sales for rebroadcasts, touring fees, sponsorships and IDOLS-related merchandise sales.  Following the ratings decline, FOX Broadcasting Company ("**FOX**") announced that the 2016 season, which concluded on April 7, 2016, would be the final season of American Idol on FOX.  As discussed in more detail below, the Company's unsustainable capital structure, inability thus far to replace the American Idol revenue streams and inability to consummate an out-of-court restructuring with its primary creditor constituencies ultimately gave rise to the Debtors' decision to commence these chapter 11 cases.

(b)  **Key Business Lines.**

The Company conducts its primary business activities through its subsidiary groups, including 19 Entertainment (as defined below).

Debtors 19 Entertainment Limited[11] and 19 Entertainment Worldwide LLC and their respective subsidiaries (collectively, "**19 Entertainment**") own and produce television content.  Based in Los Angeles, 19 Entertainment is the Company's creative production, recording, touring, and artist management arm, responsible for properties, including the IDOLS shows and SYTYCD.

(1)  **IDOLS.**

Through 19 Entertainment, the Debtors own proprietary rights to the IDOLS television format, including American Idol, the singing competition series, which is one of the most influential shows in recent television and music history.  IDOLS is a televised talent contest for musical artists.  The performances on the program are critiqued by a panel of celebrity judges and the program allows the viewing audience to participate in and ultimately select the winning performer via text messaging, internet and telephone voting.  The audience participation generates a pre-established market for the winning artists and other finalists who 19 Entertainment then has the right to represent with respect to artist management, recording, music, touring and merchandising.

The IDOLS format was developed and first broadcast in the United Kingdom in 2001 and in the United States, under the name American Idol: The Search for a Superstar, in

---

[11]  As discussed in more detail below, faced with a potential involuntary winding-up proceeding in the United Kingdom, Debtor 19 Entertainment commenced an ancillary recognition proceeding, in conjunction with its chapter 11 filing in the United States, under the Cross-Border Insolvency Regulations 2006, which implements the UNCITRAL Model Law in Great Britain, in the English High Court of Justice located in London, England.

2002.  IDOLS has 62 unique versions and is collectively broadcast in over 100 countries.  The programs have launched the careers of numerous singers and performers nominated for and awarded Grammy, Oscar and Tony Awards, and have set the blueprint for a generation of competitive reality programs.  The popularity of the IDOLS brand around the world has historically generated substantial revenue for the Debtors across multiple media platforms.

Though the 19 Entertainment entities are party to a variety of commercial relationships with their television and record label partners to produce, broadcast, distribute and finance shows based on the IDOLS brand, 19 Entertainment retains a substantial interest in all aspects of such shows and their multiple revenue streams through its wholly-owned subsidiaries both in the United States and the United Kingdom.  Accordingly, 19 Entertainment's assets include:

- **Ownership and Production Rights**:  owns two-thirds of the intellectual property rights associated with the IDOLS brand and co-produces the show in the United States with FremantleMedia Limited (together with its affiliate, FremantleMedia North America, Inc., "**FremantleMedia**");[12]

- **Fees**:  receives certain licensing, production and other fees and revenue from the sublicensing, production and marketing of the IDOLS brand;

- **Sponsorships**:  receives a percentage of the revenue derived from on-air and off-air sponsorships, as well as sales of IDOLS branded-merchandise;

- **Recording Agreements**:  owns the exclusive recording rights for a certain number of albums from the show's contestants and typically enters into recording agreements with the winner and certain of the finalists of American Idol.  To that end, 19 Entertainment is currently party to long-term recording agreements with numerous best-selling former American Idol contestants, including Kelly Clarkson, Carrie Underwood, Chris Daughtry, Fantasia Barrino, Jordin Sparks, Scotty McCreery and Phillip Phillips;

- **Management Agreements**:  owns the exclusive right to manage the finalists from the American Idol series in the United States.  19 Entertainment collects management fees from, among other things, the artists' performances and personal appearances; and

- **Tours**:  owns the exclusive right to produce IDOLS tours, in addition to the exclusive licensing and merchandizing rights for such tours in the United States. 19 Entertainment has typically engaged the top finalists of the American Idol season as talent for a branded tour, produced by 19 Entertainment, in cities and

---

[12]    FremantleMedia owns the remaining one-third of the IDOLS brand pursuant to a global television and distribution agreement with 19 Entertainment, however, the parties generally hold even economic stakes in the IDOLS brand.  In the United States, the American Idol series aired on the FOX Network under agreements between 19 Entertainment, FremantleMedia and FOX that granted FOX the right to air American Idol.

venues across the United States and the world, although 19 Entertainment made the determination not to hold an IDOLS tour in 2016.  Given the success of the IDOLS brand, touring has been a significant source of revenue for 19 Entertainment and helps expand the reach of the IDOLS brand.[13]

The IDOLS platform, which has been an entertainment juggernaut since its inception, is one of the centerpieces of the Company's business structure.  Despite the program's longstanding success, however, the program experienced significant ratings declines in recent years and it was announced in May 2015 that American Idol will no longer air on FOX in the United States following its fifteenth season, which recently concluded — a reality that contributed to the Company's decision to commence these chapter 11 cases.

### (2)    **So You Think You Can Dance.**

Since 2004, 19 Entertainment Limited ("**19**") and dick clark productions ("**dcp**") have co-owned on a 50%/50% basis the rights in the television series format entitled "So You Think You Can Dance" and all related property.  The SYTYCD television series is a talent competition for dancers from across the country to compete in a wide range of dance styles, which allows the viewing audience to participate in, and ultimately select, the winning performer by voting for their favorite dancer each week. The winner is named "America's Favorite Dancer" and receives a prize package, including cash.  Renewed for its thirteenth season, which is currently in production and premiered on May 30, 2016, SYTYCD has been a part of American television over the last decade.  Since its premiere in 2005, SYTYCD has continued to be one of the most popular summer shows on television.  It has been watched by millions of viewers, won fourteen Emmy Awards, and become a social media phenomenon, generating over 70 million user votes per season.  The format for SYTYCD has been licensed internationally to over 24 different countries, a testament of the show's universal appeal and cross-cultural impact.

FOX has been granted a conditional, perpetual, exclusive option to order and engage 19 and dcp to produce additional seasons, and FOX must exercise its option for any further seasons within three months of the finale of the most current season.  For such series rights, FOX pays a variable license fee per episodic hour, and these fees are used to fund the production costs of the show.  19 and dcp share the balance of any underage from the FOX license fees after payment of production costs and deduction of third party shares.  19 and dcp also generate revenue from sales of the rights to rebroadcast the U.S. show to many countries and the licensing of the format to produce country-specific formats in several foreign countries.  In addition to 19 and dcp, Nigel Lythgoe, FOX and Creative Artists Agency also share in the profit on international tape and format sales.[14]

---

[13]    Similar tours for SYTYCD have also served as a consistent source of revenue for 19 Entertainment.

[14]    On March 3, 2015, 19 Entertainment, Inc. and dcp entered into a Distribution Agreement with Endemol Worldwide Distribution Limited for the international distribution of Season 12 of the U.S. SYTYCD series. By Variation Agreement dated as of March 23, 2016, the parties amended the Distribution Agreement to grant Endemol Shine International Limited, the successor to Endemol Worldwide Distribution Limited, the international distribution rights to Season 13 of the U.S. Series.

19 and dcp currently are exchanging drafts of a written Memorialization Agreement that evidences their relationship in a single written document, as well as setting forth amounts due to dcp as profit share and reimbursements. The Debtors intend to finalize and file the Memorialization Agreement with the Court and include it among contracts to be assumed under the Plan.

### (c)    History of Company.

CORE Media was formerly named CKX, Inc. (and collectively with its subsidiaries, "**CKX**"), which was founded in 2005 and was a publicly traded company. CKX's other assets at the time included ownership of Elvis Presley Enterprises ("**EPE**"), which owned 85% of the rights to trademarks and the name, image and likeness of Elvis Presley, and the operation of the Graceland attraction (collectively, the "**Presley Rights**"), Muhammad Ali Enterprises ("**MAE**"), which owned 80% of the rights to trademarks and the name, image and likeness of boxer Muhammad Ali (the "**Ali Rights**"), a talent agency located in Los Angeles, and a modeling agency in the United Kingdom.

On June 21, 2011, Apollo CORE Holdings, L.P. ("**Apollo CORE Holdings**"), an affiliate of investment funds managed by affiliates of Apollo Global Management, LLC (collectively, "**Apollo**"), acquired indirect control of the Company through a tender offer and subsequent merger of CKX. At the time of the acquisition, the Company's business plan was to invest capital to grow the revenue streams from the Ali Rights and Presley Rights and to increase the Company's focus on development and acquisition of new content. Following the acquisition, however, the board of directors and management team of the Company determined that expansion of the Presley Rights and Ali Rights would require significant capital and personnel investments, which would be inconsistent with the Company's planned expansion into content development. This hurdle, coupled with the Company's new commitment to content development, led to the Company's determination to sell its interests in EPE and MAE and to exit from the Company's other non-television related ventures, including its talent and modeling agencies. The Company planned to invest the proceeds from such divestitures into content development and acquisition.

As part of this transition, the Company shifted its strategic focus. In 2012, CKX, Inc. rebranded itself as CORE Media Group Inc. On July 17, 2012, CORE Media acquired a 100% ownership interest in Sharp Entertainment, LLC, a leading reality television production company. In addition, on November 8, 2013, the Company sold its interests in EPE and MAE. The Company continued to seek further add-on investments in the market place with limited success due principally to the Company's (and its owners') determination that properties for sale in the market place were overvalued during this period. Accordingly, the Company continued to focus its investments on development of new content and partnerships with developers of new content.

As part of this overall strategy, the Company entered into several new partnerships and joint ventures to develop and produce content, and established CORE TV for internal development of new content and production of television programs, which include <u>Sing It On</u> for TV Guide Network, <u>Euros of Hollywood</u> for Bravo, <u>Prison Wives Club</u> for Lifetime and <u>Hair Jacked</u> for TruTV. Additionally, the Company entered into production agreements and

joint ventures with strategic partners such as B17 and Noreen Halpern, and entered (and subsequently exited from) development agreements with Andrew Glassman, Rob Lee, HazyMills, BigMinded, Tedy and others.[15]  To date, the Company's new content development and production efforts have not been profitable.

(d)    **Recent Material Transactions.**

(1)    **Shared Services Agreement.**

On August 13, 2014, CORE Media entered into the Services Agreement (the "**Shared Services Agreement**") with Endemol USA Holding, Inc. ("**Endemol**"),[16] a separate reality programming production company, concurrently with the acquisition of indirect control of Endemol by affiliates of investment funds managed by Apollo.  Under the Shared Services Agreement, Endemol provided certain corporate and administrative services to CORE Media and its subsidiaries,[17] including, but not limited to, accounting, legal, finance, human resources, tax, audit, marketing, investor relations, and other administrative support services.  The Shared Services Agreement originally was to expire by its terms on August 13, 2019, unless earlier terminated in accordance with the terms of the Shared Services Agreement.  While CORE still retained certain employees, the employee base of CORE was reduced significantly after the Shared Services Agreement was entered into.  In addition, the Shared Services Agreement provided that Endemol support CORE Media's efforts in its development and investment in content by providing expertise in television production and distribution to CORE Media's in-house development teams.

CORE Media's payments to Endemol under the Shared Services Agreement were directly tied to the savings realized by reducing its costs.  In exchange for Endemol's services, CORE Media agreed to pay Endemol an annual $2,000,000 administrative fee plus 50% of any savings realized by CORE Media and its subsidiaries by outsourcing such services to Endemol (as compared to the previous costs of procuring the same services from in-house staff or otherwise).

On July 18, 2015, the Company elected to exercise its contractual right not to make the payment due under the Shared Services Agreement.  The Company failed to cure the missed payment within thirty days after receiving notice from Endemol on July 22, 2015, and accordingly, the Company's failure to pay became an event of default under the Shared Services Agreement on August 21, 2015.  The parties then negotiated, and on September 2, 2015, entered

---

[15]    The Company also established (and subsequently exited from) a business line to develop international television opportunities.

[16]    Endemol's production portfolio includes programs such as Big Brother and Deal or No Deal.

[17]    Under the Shared Services Agreement, Endemol also had the right to request CORE Media to perform certain services.

into, a Forbearance Agreement and Amendment to the Shared Services Agreement, pursuant to which the Shared Services Agreement terminated on December 31, 2015.[18]

(2)      <strong>Transfer of Ownership to the Joint Venture.</strong>

On December 12, 2014, 100% of the common shares of CORE Entertainment Holdings, Inc., CORE's direct parent, owned by Apollo CORE Holdings, together with the indirect interest of Endemol owned by affiliates of investment funds managed by Apollo, were contributed to AP NMT JV Newco B.V. (the "**Joint Venture**").  In addition, a subsidiary of Twenty First Century FOX, Inc. ("**21CF**") contributed its indirect equity ownership of the Shine Group, a separate reality television programming company,[19] to the Joint Venture.  Although Endemol and Shine were consolidated in connection with this contribution,[20] CORE Holdings and its subsidiaries retained a separate capital structure under the ownership of the Joint Venture. Apollo maintains a 50% interest in the Joint Venture, with 21CF owning the remaining 50%.

### 3.2.    *Debtors' Prepetition Capital Structure.*

As of the Petition Date, the Debtors had approximately $415 million of consolidated outstanding indebtedness to third parties, exclusive of trade.  The components of the Debtors' outstanding indebtedness are summarized below:

(a)      <strong>First Lien Term Loan Facility.</strong>

CORE (f/k/a CKX Entertainment, Inc.) as borrower, CORE Media and the Debtor guarantors are party to a $200 million term loan facility pursuant to that certain First Lien Term Loan Agreement (the "**First Lien Term Loan Agreement**"), dated as of December 9, 2011, with the lenders party thereto and Goldman Sachs Bank USA, as Administrative and Syndication Agent (the "**First Lien Term Loan Facility**").  In December 2013, U.S. Bank National Association ("**U.S. Bank**") replaced Goldman Sachs as Administrative and Syndication Agent on behalf of the then current lenders under the First Lien Term Loan Facility (the "**First Lien Administrative Agent**").  Pursuant to the First Lien Term Loan Agreement and related agreements, the lenders committed to lend the Debtors up to $200 million, bearing non-default interest at a rate of 9.0% per annum, conditioned on, among other things, the delivery of that certain (i) Master Guarantee Agreement, dated as of December 9, 2011, by CORE Entertainment Holdings, Inc. (f/k/a CKX Entertainment Holdings, Inc.), as a guarantor and those certain subsidiaries of CORE party thereto from time to time (the "**Subsidiary Loan Parties**" and together with CORE and CORE Media, the "**Loan Parties**") in favor of the First Lien Administrative Agent, (ii) U.S. Collateral Agreement, dated as of December 9, 2011, by the Loan Parties in favor of the First Lien Administrative Agent (the "**First Lien Collateral Agreement**") and (iii) Second Lien Intercreditor Agreement by and among the First Lien

---

[18]      The Company continued to rely upon Endemol for the services of a single key employee until April 15, 2016, at which point such individual became an employee of the Company.

[19]      Shine's portfolio includes programs such as MasterChef and The Biggest Loser.

[20]      The Endemol Shine Group provides the international sales and distribution structure for SYTYCD.

Administrative Agent, the Second Lien Administrative Agent, the agent under that certain Revolving Credit Agreement dated as of June 21, 2011, as amended and restated as of December 9, 2011, by and among CORE, CORE Media and the Subsidiary Loan Parties (the "**Second Lien Intercreditor Agreement**").  No principal payments were due over the term of the First Lien Term Loan Facility, which has a maturity date of June 21, 2017.

  The proceeds from the First Lien Term Loan Facility, coupled with the proceeds from the Second Lien Term Loan Facility, were used to refinance an existing bridge loan facility in an aggregate principal amount of $360 million, which was entered into in connection with the acquisition of the Company by Apollo in June 2011, and was set to mature on June 21, 2012 (the "**Preexisting Bridge Facility**").

  Pursuant to the First Lien Collateral Agreement, the Loan Parties pledged substantially all of their assets to secure all of the obligations under the First Lien Term Loan Facility.  Specifically, in addition to their accounts, equipment and fixtures, the Loan Parties pledged as security, among other things, (i) all of their equity interests (with certain restrictions) in their operating subsidiaries, (ii) that certain Global Intercompany Note, dated as of June 21, 2011, by and among CORE and its subsidiaries issued in favor of the Loan Parties, and (iii) all of their intellectual property, which are the rights essential to produce and market the Company's programming, music and other content.

  As of the Petition Date, approximately $209 million, including principal and interest, was outstanding under the First Lien Term Loan Facility.  As discussed in further detail below, an ad hoc group of lenders party to the First Lien Term Loan Agreement was formed and subsequently retained Klee, Tuchin, Bogdanoff & Stern LLP and Houlihan Lokey Capital, Inc. as its advisors in this matter.  Since early summer 2015, the Company had been in regular contact and negotiations with the this ad hoc group of lenders and its advisors.

  As discussed in further detail below, Crestview, as a lender under both the First Lien Term Loan Facility and the Second Lien Term Loan Facility, retained Quinn Emanuel Urquhart & Sullivan, LLP and Millstein & Co. as its advisors in this matter.  Crestview holds approximately 34.8% of the principal amount of debt outstanding under the First Lien Term Loan Facility and holds approximately 79.2% of the principal amount of debt outstanding under the Second Lien Term Loan Facility.  Since early summer 2015, the Company had been in regular contact and negotiations with Crestview and its advisors.

  (b) **Second Lien Term Loan Facility.**

  CORE (f/k/a CKX Entertainment, Inc.) as borrower, CORE Media and the Debtor guarantors also are party to a $160 million term loan facility pursuant to that certain Second Lien Term Loan Agreement (the "**Second Lien Term Loan Agreement**" and, together with the First Lien Term Loan Agreement, the "**Term Loan Agreements**"), dated as of December 9, 2011, with the lenders party thereto and Goldman Sachs Bank USA, as Administrative and Syndication Agent (the "**Second Lien Term Loan Facility**" and, together with the First Lien Term Loan Facility, the "**Term Loan Facilities**").  In November 2012, U.S. Bank subsequently replaced Goldman Sachs as Administrative and Syndication Agent on behalf of the current lenders under the Second Lien Term Loan Facility.  Under the Second Lien Term Loan Agreement and related

agreements, the lenders committed to lend the Debtors up to $160 million, bearing interest at a non-default rate of 13.5% per annum.  No principal payments were due over the term of the Second Lien Term Loan Facility, which has a maturity date of June 21, 2018.

The proceeds from the Second Lien Term Loan Facility, coupled with the proceeds from the First Lien Term Loan Facility, were used to refinance the Preexisting Bridge Facility.  The Company's obligations under the Second Lien Term Loan Facility are secured by junior second priority liens upon and security interests in the same collateral securing the obligations under the First Lien Term Loan Facility.  The relative rights of the lenders under the Term Loan Facilities regarding such collateral are governed by the Second Lien Intercreditor Agreement.

As of the Petition Date, approximately $189 million, including principal and interest, was outstanding under the Second Lien Term Loan Facility.

### 3.3.    *Related-Party Transactions.*

#### (a)    **Senior Unsecured Demand Promissory Note.**

Debtor CORE Media is the issuer of that certain Senior Unsecured Demand Promissory Note, dated as of July 16, 2012, in favor of Apollo CORE Holdings, in the principal amount of $15 million (as amended, restated, or otherwise modified, the "**Senior Unsecured Note**").  The obligations under the Senior Unsecured Note bear interest at 8.0%.  On December 12, 2014, the Senior Unsecured Note was assigned to MediArena Holding B.V., which is a wholly-owned subsidiary of the Joint Venture.

As of the Petition Date, approximately $17 million in principal and interest was outstanding with respect to the Senior Unsecured Note.

#### (b)    **Intercompany Revolver.**

Pursuant to that certain Credit Agreement, dated as of November 26, 2013 (as amended, restated, or otherwise modified from time to time),[21] Debtor CORE Media, as borrower, entered into an intercompany unsecured revolving credit facility with one of the Debtors' non-Debtor affiliates — Elvis Blue Moon Holdings, LLC[22] — in the aggregate principal amount of $35 million (the "**Intercompany Revolving Credit Facility**").  The borrowing limit under the Intercompany Revolving Credit Facility was subsequently increased to $60 million.  The Intercompany Revolving Credit Facility, which bears interest at 5.0% per annum, has a maturity date of November 26, 2018.  As of the Petition Date, approximately $60 million was outstanding with respect to the Intercompany Revolving Credit Facility.

---

[21]    CORE Media has entered into multiple credit agreements in respect of the intercompany borrowing.

[22]    Elvis Blue Moon Holdings, LLC was designated by CORE as an "Unrestricted Subsidiary" as defined in and under the Term Loan Facilities and is therefore not an obligor thereunder.

In connection with the First Lien Term Loan Facility, CORE, as borrower, and the other Debtors and non-debtors party thereto, entered into a Collateral Agreement, dated as of December 9, 2011, and pledged substantially all of their assets to secure the loan. Specifically, in addition to its accounts, equipment, fixtures and that certain Global Intercompany Note, dated as of June 21, 2011 by and among CORE and its subsidiaries issued in favor of the specified loan parties, CORE pledged and caused to be pledged as security all of its direct and indirect equity interests (with certain exceptions) in its operating subsidiaries, as well as all of its intellectual property, which are the rights essential to produce and market the Company's programming, music and other content.

### (c)    Intercompany Note.

Debtor CORE Entertainment UK Limited (f/k/a CKX Entertainment UK Limited) issued an intercompany unsecured note, dated as of June 21, 2011, in the principal amount of $360 million (the "**Intercompany Unsecured Note**") in favor of Debtor CORE Entertainment Cayman Limited (f/k/a CKX Entertainment Cayman Limited). The Intercompany Unsecured Note, which bears interest at 9.0% per annum, has a maturity date of June 21, 2019.[23]

### (d)    Equity Ownership.

The Joint Venture owns approximately 99.93% of the outstanding common stock in CORE Holdings, the ultimate parent of the Debtors. The Promenade Trust holds 100% of the outstanding Series A Preferred Stock in CORE Holdings. The issued and outstanding Series B Preferred Stock is owned by certain former owners and related persons of a non-Debtor subsidiary.

## ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING

### 4.1.    *Cancellation of American Idol.*

The decline in overall economics and the announced cancellation of the 2017 season of American Idol on FOX negatively impacted the revenues and profits of the Debtors' business.

The success of the IDOLS series, in particular American Idol, has been unparalleled. For an unprecedented run from 2003 through 2010, the show received among the highest ratings on U.S. television. The program's singing competition format, coupled with the show's ability to serve as a launching pad for the careers of numerous artists, embedded the show in the fabric of American pop culture. By 2012, however, the show's ratings began to wane, in part due to the competitive landscape generally and the emergence of rival singing competition programs, and as a result the Company was unable to obtain comparable fees to prior years in a renegotiation of its contract with FOX. The Company's business model relied

---

[23]    The Intercompany Unsecured Note was put in place to more accurately evidence the business relationship between the entities.

heavily upon the continued appeal of the IDOLS and SYTYCD brands, particularly the American Idol series in the United States. Since the Company's revenue stream from these television programs depends primarily upon such programs' continued acceptance by the public, a decline in the number of television viewers who watch the shows and a reduced number of the show's foreign adaptations has been materially detrimental to the Debtors' businesses. The result is lower advertising revenue for the networks that broadcast the Company's television brands, which in turn, harms the Company's ability to sell future format shows based on these brands. As a consequence of this cycle, the Company's business, operating results and financial condition suffered prepetition.

In 2014, earnings from American Idol decreased $15 million from the prior year. The program suffered fee reductions related to decreased ratings and increased production costs attributable to new creative changes that were implemented to boost the ailing ratings of the series. Moreover, sponsorships, merchandise, tour ticket sales and rebroadcast sales of American Idol in foreign countries were all negatively affected by the program's decreased airtime and decline in popularity.

The show's decline continued further into the 2015 season as well. A further reduction of airtime (42 hours of American Idol ordered in 2015 as compared to 56.5 hours in 2014) resulted in corresponding decreases in premium production fees that the Debtors had been earning. The Company also experienced increased hourly costs as certain fixed production costs had to be spread over fewer production hours. The Company suffered a total revenue decrease of $35.6 million based on consolidated operating results for the first half of 2015 (as compared to the first half of 2014), reflecting lower revenue streams from American Idol as well as other television shows in the Debtors' portfolio. Additional negative ripple effects included, among other things: a decline in re-broadcast fees due to reduced broadcast hours; the loss of both Coca Cola and AT&T as main sponsors of American Idol; and the closure of the American Idol Experience theme park attraction at Walt Disney World.

This decline culminated on May 11, 2015 in FOX announcing that it would no longer air the American Idol series in the United States after its fifteenth season (which began in January 2016). In addition, on-air hours and resulting economics for the final season were further reduced from last season's schedule. Given American Idol's role as a centerpiece of the Company's business model, this announcement has had a detrimental effect on IDOLS' television programming rights and set the Company on an inevitable path towards a restructuring of its balance sheet.

### 4.2.    *Substantial Indebtedness.*

Further, as discussed above, the Debtors had substantial indebtedness under the Term Loan Facilities. As of the Petition Date, the Debtors had approximately $398 million of consolidated outstanding indebtedness related to the Term Loan Facilities, which indebtedness is secured by liens on substantially all assets of the Debtors.

### 4.3.    *Inability to Replace Key Revenue Streams.*

The Company's inability to replace key revenue generators also contributed to the Debtors' decision to commence these chapter 11 cases. Notably, the Company has been unable to replace the revenue generated by <u>American Idol</u> or the consistent, but much lower, revenue streams previously generated by the Ali Rights and the Presley Rights, which were sold in late 2013. Despite the immediate gains received from such sales, the Company has not been able to acquire enough assets to offset the revenue drop off following the sales, and the development of new income-producing programming content has been slower than expected. While the Debtors took many steps to replace this lost revenue (including, as discussed above, entering into the B17 joint venture and the acquisition of Sharp Entertainment, LLC), as of the Petition Date, the Company had not secured new business lines sufficient to justify its balance sheet in order to service its outstanding debts.

### 4.4.   *Acceleration of First Lien Term Loan Facility.*

By letter dated April 13, 2015, U.S. Bank, in its role as First Lien Administrative Agent, alleged that certain defaults under the First Lien Term Loan Agreement existed including that the creation of the Joint Venture and such entity's indirect ownership of the Debtors constituted defaults under the First Lien Term Loan Agreement.[24] U.S. Bank further asserted that the Company's failure to cure such defaults within a 60-day period (<u>i.e.</u>, on or before June 12, 2015) would result in an "Event of Default" under the First Lien Term Loan Agreement. U.S. Bank's counsel sent a similar letter on May 7, 2015 to the Company's board of directors demanding that the purported defaults be cured. The Company responded to these letters on April 20, 2015 and May 15, 2015, respectively, contesting the assertions raised by U.S. Bank, while expressing its willingness to provide U.S. Bank with information that would demonstrate the lack of merit in U.S. Bank's position.

U.S. Bank, by that certain Notice of Default and Acceleration, dated June 17, 2015, stated that because the Company had not cured its purported defaults, U.S. Bank, on behalf of the lenders under the First Lien Term Loan Facility, was accelerating the First Lien Term Loan Facility and that all principal, interest and other liabilities thereunder were due and payable immediately and that a default interest rate of 11.0% per annum would be applicable. Counsel for the Company responded on June 18, 2015, disputing the alleged defaults and rejecting the purported acceleration.

### 4.5.   *Missed Interest Payments Under the Second Lien Term Loan Facility.*

The Company's interest payments under the First Lien Term Loan Facility and Second Lien Term Loan Facility, totaling approximately $10 million, became due on June 11, 2015. While the Debtors made the interest payment under the First Lien Term Loan Facility,[25]

---

[24]   By letter dated March 25, 2015, U.S. Bank previously had raised similar allegations and demanded that the Company immediately produce several categories of information, which the Company promptly delivered shortly thereafter. The Company disputed U.S. Bank's allegations of default at that time as well.

[25]   The interest payment made by the Debtors under the First Lien Term Loan Facility, which was due on September 11, 2015, was made in the amount of $4,711,111.11, which amount included default interest from September 1, 2015.

the Debtors, recognizing that a restructuring could be imminent, elected not to make the interest payment under the Second Lien Term Loan Facility. The 30-day grace period to make the interest payment under the Second Lien Term Loan Agreement expired on July 11, 2015. Further, upon the expiration of this grace period, the Second Lien Term Loan Facility became subject to acceleration. The Debtors, however, continued to make interest payments under the First Lien Term Loan Facility when such payments were due on September 11, 2015 and December 11, 2015.[26]

### 4.6. *Simon Fuller and UK Recognition Proceeding.*

Issues surrounding the Company's relationship with Simon Fuller — the Company's former director and Chief Executive Officer of the 19 Entertainment business and creator of the IDOLS, American Idol and SYTYCD programs — also contributed to the Company's decision to commence these chapter 11 cases. On January 13, 2010, Mr. Fuller left his director and officer positions and entered into a series of agreements with the Company, among other things securing Mr. Fuller's long-term creative services as a consultant. Specifically, Mr. Fuller and Debtor 19 Entertainment Limited entered into that certain Consultancy Deed, dated as of January 13, 2010 (the "**Fuller Consultancy Deed**"), pursuant to which the Company engaged Mr. Fuller to provide services, including executive producer services, in respect of the Company's IDOLS and SYTYCD programs. In consideration for providing these services, Mr. Fuller received, among other things, a profit share from each of the aforementioned programs for the life of the programs as long as Mr. Fuller continues to provide consulting services with respect to such programs.

On April 11, 2016, Mr. Fuller served a statutory demand on 19 Entertainment Limited — the Debtor counterparty to the Fuller Consultancy Deed that is incorporated in the United Kingdom, yet has its center of main interests in the United States[27] — pursuant to section 123(1)(a) of Great Britain's Insolvency Act 1986, demanding payment of $2,949,000 under the Fuller Consultancy Deed. If the statutory demand was not paid in full within twenty-one days of its issuance, Mr. Fuller could have commenced winding-up proceedings in the United Kingdom against Debtor 19 Entertainment Limited.

While the Debtors believed that the commencement of a foreign winding-up proceeding by Mr. Fuller would have been stayed pursuant to the Bankruptcy Code's automatic stay, the Company nonetheless took all precautions necessary to prevent Mr. Fuller's actions to distract the Company's attention and resources away from its chapter 11 reorganization efforts or to jeopardize valuable assets held by Debtor 19 Entertainment Limited. To that end, in conjunction with its chapter 11 filing in the United States, the Company commenced an ancillary recognition proceeding under the Cross-Border Insolvency Regulations 2006, which implements the UNCITRAL Model Law in Great Britain, in the High Court of Justice, England and Wales. The Company sought recognition of these chapter 11 cases by the U.K. Court as a "foreign main

---

[26]   However, the Company did not make the interest payment under the First Lien Term Loan Facility due on March 11, 2016 in accordance with the terms of the Forbearance Agreements (as defined below).

[27]   For example, as part of the Company's restructuring efforts in 2010, the Company closed its office in London and relocated the 19 Entertainment headquarters to its West Hollywood, California office.

proceeding." Such recognition was granted on April 29, 2016, as discussed in further detail in Section 10.2 herein.

### 4.7.  *Debtors' Efforts to Negotiate a Comprehensive Restructuring.*

The Debtors entered chapter 11 having made meaningful progress in respect of their restructuring. With the concerns discussed above in mind, and recognizing the necessity of a balance sheet restructuring, in June 2015, the Debtors retained Moelis & Company LLC ("**Moelis**") as investment banker and financial advisor, and Willkie Farr & Gallagher LLP as restructuring counsel. During the months leading up to the Petition Date, the Company and its professionals worked vigorously, seeking to reach a resolution with its primary creditor constituencies. Indeed, in order to negotiate a comprehensive financial restructuring of the Debtors, the Company and its advisors initiated a dialogue, and entered into confidentiality agreements, with certain prepetition secured lenders and/or their professionals. Commencing on July 26, 2015, the Company entered into forbearance agreements (collectively and as amended, restated, extended or otherwise modified from time to time, the "**Forbearance Agreements**") with:  (a) certain lenders holding the requisite amount of loans under the First Lien Term Loan Facility; and (b) Crestview as lender under the First Lien Term Loan Facility and the Second Lien Term Loan Facility. Pursuant to the Forbearance Agreements, the lenders party thereto agreed to forbear from exercising their remedies on account of any missed payments or certain alleged defaults under the Term Loan Agreements until the earlier of (a) April 30, 2016; and (b) certain events of default under the Forbearance Agreements.

Following an extensive, multi-track negotiation process, the Debtors reached an agreement in principle to restructure the Debtors with their lenders immediately prior to commencing these chapter 11 cases. Such progress was evidenced, in part, by the additional forbearance agreements with the Company's primary lender constituents to avoid needing to file Sharp Entertainment Holdings, LLC and its subsidiaries, which are not currently Debtors in these chapter 11 cases.

Such momentum continued into the days and first weeks following the Petition Date, ultimately culminating in the execution of the RSA on May 16, 2016 between the Debtors and the Consenting Lenders, who are comprised of:  (i) an ad hoc group of lenders (the "**Ad Hoc Group**") party to the First Lien Term Loan Agreement;[28] (ii) Credit Suisse Asset Management, LLC ("**Credit Suisse**") and CIT Bank N.A. ("**CIT**") (including funds and/or accounts managed and/or controlled by such lenders) as lenders under the First Lien Term Loan Agreement;[29] (iii) Oaktree Value Opportunities Fund Holdings, L.P., as a lender under the First Lien Term Loan Agreement; and (iv) Crestview, as a lender under both the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement. Together, the Consenting Lenders hold

---

[28]     The Ad Hoc Group is comprised of the following lenders (including funds and/or accounts managed and/or controlled by such lenders):  (1) Tennenbaum Capital Partners LLC, (2) Bayside Capital, Inc. and (3) Hudson Bay Capital Management, LP.  Tennenbaum Capital Partners LLC also is a lender under the Second Lien Term Loan Agreement.

[29]     While not members of the Ad Hoc Group, Credit Suisse and CIT are parties to a common interest/joint defense agreement with the Ad Hoc Group.

100% of the amount of obligations outstanding under both the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement.

Pursuant to the RSA, which serves as the roadmap for the Debtors' successful emergence from chapter 11, the Consenting Lenders not only are required to vote in favor of the Plan (subject to the requirements and restrictions of applicable law), but also are prohibited from, among other things, opposing confirmation of the Plan for so long as the RSA is in effect. If consummated, the restructuring transactions contemplated in the Plan will substantially de-lever the Debtors. The Debtors believe the Plan represents their best option to maximize value for the estates, exit chapter 11 as expeditiously as possible, and provide their reorganized enterprise with the capital needed to implement their post-reorganization business plan. A summary of the terms of the Plan is contained in Article VI of this Disclosure Statement, and the Plan is attached hereto as <u>Exhibit 1</u>.

## ARTICLE V.

## <u>REASONS FOR THE SOLICITATION; RECOMMENDATION</u>

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan, the holders of Claims in each Class of impaired Claims entitled to vote on the Plan must accept the Plan by the requisite majorities set forth in the Bankruptcy Code. An impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (b) more than one-half (1/2) in number of the holders of Claims in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**").

In light of the significant benefits to be attained by the Debtors and their creditors if the transactions contemplated by the Plan are consummated, the Debtors recommend that all holders of Claims entitled to vote to accept the Plan do so. The Debtors reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' business operations, creditors, and shareholders. These alternatives included alternative restructuring options under chapter 11 of the Bankruptcy Code and liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of their estates for all stakeholders, as compared to any other chapter 11 reorganization strategy or a liquidation under chapter 7. For all of these reasons, the Debtors support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it. The Consenting Lenders also support confirmation of the Plan.

## ARTICLE VI.

## <u>THE PLAN</u>

### 6.1.    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 reorganization case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of the debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes them for the obligations specified under the confirmed plan.

In general, a chapter 11 plan:  (a) divides claims and equity interests into separate classes; (b) specifies the property, if any, that each class is to receive under the plan; and (c) contains other provisions necessary to the restructuring of the debtor that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a chapter 11 plan may not be solicited after the commencement of a chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information.  Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan.  To satisfy the applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

### 6.2.    *Resolution of Certain Inter-Creditor and Inter-Debtor Issues.*

(a)    **Settlement of Certain Inter-Creditor Issues.**

The treatment of Claims and Interests under the Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

(b)    **Formation of Debtor Groups for Convenience Purposes.**

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business

32

enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

(c)    **Intercompany Claims and Intercompany Interests.**

(1)    **Intercompany Claims.**

Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims, shall, at the option of the Reorganized Debtors, either be (1) extinguished, canceled and/or discharged on the Effective Date or (2) reinstated and otherwise survive the Debtors' restructuring either by virtue of: (A) such Intercompany Claims being left unimpaired or (B) on the Effective Date, the recovery to which the First Lien Lenders and Second Lien Lenders are entitled on account of such Intercompany Claims as collateral under the First Lien Term Loan Agreement and Second Lien Term Loan Agreement (whether by virtue of a direct pledge of any such Intercompany Claims or the pledge of the stock in the entity holding such Intercompany Claims), respectively, being contributed to a Reorganized Debtor so as to mirror the Intercompany Claims that existed just prior to the Effective Date.  To the extent any Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court or by the equity holders of any of the Reorganized Debtors.

(2)    **Intercompany Interests.**

Notwithstanding anything to the contrary in the Plan, except as provided in Section 7.17 of the Plan, on or after the Effective Date, any and all Intercompany Interests shall survive the Debtors' restructuring either by virtue of: (1) such Intercompany Interests being left unimpaired to maintain the existing corporate structure of the Debtors or (2) on the Effective Date, contributing equity in a Reorganized Debtor received by the First Lien Lenders and Second Lien Lenders under the Plan on account of their respective Claims to the applicable Reorganized Debtor entity so as to mirror the corporate structure that existed just prior to the Effective Date.

**6.3.**    *Overview of the Plan.*

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARY CONTAINED HEREIN AND THE PLAN, THE PLAN SHALL GOVERN AND CONTROL IN ALL RESPECTS.**

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class.  The Plan separates the various Claims and

Interests (other than those that do not need to be classified) into eight (8) separate Classes.  These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors.  Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan.  Only holders of Allowed Claims — Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan.  For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Claim becomes Allowed, no distributions of new equity, Cash or any other consideration will be made to the holder of such Claim.

The Plan is intended to enable the Debtors to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization.  The Debtors believe that they will be able to perform their obligations under the Plan.  The Debtors also believe that the Plan permits fair and equitable recoveries.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court.  The Effective Date will be the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 11.1 of the Plan have been satisfied or waived, including the consummation of the transactions contemplated by the Plan.  Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests.  The Reorganized Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

The Plan constitutes a joint plan of reorganization for all of the Debtors.  All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Plan and below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

(a) **DIP Claims, Administrative Expense Claims, Fee Claims, U.S.
Trustee Fees and Priority Tax Claims**

(1) **DIP Claims.**

On or after the Effective Date, the DIP Claims shall be reinstated as an intercompany unsecured loan, adjusted, continued, cancelled or discharged to the extent reasonably determined appropriate by the Reorganized Debtors and consistent with the RSA. Any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court.

(2) **Administrative Expense Claims.**

Time for Filing Administrative Expense Claims:  The holder of an Administrative Expense Claim, other than the holder of:  (i) a Fee Claim; (ii) a DIP Claim; (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date; (iv) an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor; (v) an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; (vi) an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; (vii) an Intercompany Claim; or (v) U.S. Trustee Fees, must file with the Bankruptcy Court and serve on the Debtors or Reorganized Debtors (as the case may be), the Claims Agent, and the Office of the U.S. Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date**.  Such proof of Administrative Expense Claim must include at a minimum:  (A) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (B) the name of the holder of the Administrative Expense Claim; (C) the asserted amount of the Administrative Expense Claim; (D) the basis of the Administrative Expense Claim; and (E) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN SUCH CLAIM BEING FOREVER BARRED AND DISCHARGED.  IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

Treatment of Administrative Expense Claims:  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Reorganized Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any of the Debtors,

as debtors in possession, shall be paid by the applicable Debtor or Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

(3)    **Fee Claims.**

Time for Filing Fee Claims:  Any Professional Person seeking allowance of a Fee Claim shall file, with the Bankruptcy Court, its final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than forty-five (45) calendar days after the Effective Date.  Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

Treatment of Fee Claims:  All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Reorganized Debtors.  On the Effective Date, to the extent known, the Reorganized Debtors shall reserve and hold in a segregated account Cash in an amount equal to all accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Fee Claims have been either Allowed and paid in full or Disallowed by Final Order, at which time any remaining Cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtors.

First Lien Lender Fee Claims and Second Lien Lender Fee Claims will be paid pursuant to Section 7.16 of the Plan and without (i) the need for the filing of any claim or request for allowance under Section 3.3 of the Plan or (ii) any further order of the Bankruptcy Court.

(4)    **U.S. Trustee Fees.**

The Debtors or Reorganized Debtors, as applicable, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Reorganization Case, the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(5)    **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive in the Debtors' or Reorganized Debtors' discretion, either:  (1) on the applicable Distribution Date, or as soon thereafter as is reasonably practicable, Cash in an amount equal to such Claim; or (2) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years

after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

(b)    **Classification and Treatment of Claims and Interests.**

(1)    **Priority Non-Tax Claims (Class 1).**

Treatment:  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment, on the applicable Distribution Date, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim.

Voting:  The Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

(2)    **Other Secured Claims (Class 2).**

Treatment:  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive, at the election of the Reorganized Debtors: (1) Cash in an amount equal to such Allowed Claim; or (2) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or order of the Bankruptcy Court.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final satisfaction of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of each Allowed Other Secured Claim in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Deficiency Claims:  To the extent that the value of the Collateral securing any Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as a General Unsecured Claim and shall be classified in Class 5.

Voting:  The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### (3)    First Lien Lender Claims (Class 3).

Treatment:  First Lien Lender Claims shall be Allowed under the Plan; provided that nothing in the Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any First Lien Lender Claim asserted by Goldman Sachs Bank USA as predecessor agent under the First Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the First Lien Term Loan Agreement, including any First Lien Lender Claim asserted by or on behalf of Cravath, Swaine & Moore LLP.  Except to the extent that a holder of a First Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of First Lien Lender Claim shall receive, subject to the terms of the Plan, in full and final satisfaction of the secured portion of its First Lien Lender Claim:

(i)    payment in Cash of its Pro Rata Share of the First Lien Lender Cash Distribution; provided that the Rights Offering Purchasers shall, in accordance with Section 7.9(e) of the Plan, utilize their share of the First Lien Lender Cash Distribution to acquire the Rights Offering Units as described in Section 5.3(a)(iv) of the Plan;

(ii)    receipt of its Pro Rata Share of the First Lien Lender Equity Distribution;

(iii)    receipt of its Pro Rata Share of the New Term Loan Facility Obligations; and

(iv)    solely with respect to the Rights Offering Participants, Subscription Rights to subscribe for its Pro Rata Share of the Rights Offering Units for an aggregate purchase price equal to the Subscription Payment Amount.

Upon acceptance of the Plan by Class 3, Class 3 shall be deemed to have consented to the treatment of Class 4 and the payment and retention of the Plan Consideration provided to the holders of Class 4 Claims under the Plan.

Deficiency Claims:  The undersecured portion of the First Lien Lender Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote in Class 5, and each holder of such undersecured portion of First Lien Lender Claims shall receive, in full and final satisfaction thereof, its Pro Rata Share of:

(1)    the First Lien Lender Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and

(2)    the General Unsecured Claim Cash Distribution on account of the First Lien Lenders' share of the Aggregate Lender Deficiency Claim; provided, that, to the extent Class 5 (General Unsecured Claims) votes in favor of the Plan, then the Pro Rata Share of the

General Unsecured Claim Cash Distribution to be distributed to holders of First Lien Lender Claims shall instead be distributed to the holders of Allowed General Unsecured Claims (such amount constituting the First Lien Lenders' contribution to the Additional General Unsecured Claim Cash Distribution); provided, further, that to the extent that Class 5 (General Unsecured Claims) votes to reject the Plan, the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of First Lien Lender Claims shall instead be retained by the Reorganized Debtors; in each case, with such holders of First Lien Lender Claims agreeing to accept such less favorable treatment.

Voting:  The First Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such First Lien Lender Claims.

(4)    **Second Lien Lender Claims (Class 4).**

Treatment:  Second Lien Lender Claims shall be Allowed under the Plan; provided that nothing in the Plan shall be deemed to allow, and the Debtors, Reorganized Debtors and any other party in interest reserve their rights to object to, or otherwise contest, any Second Lien Lender Claim asserted by Goldman Sachs Bank USA as predecessor agent under the Second Lien Term Loan Agreement, or any counsel or other advisors to Goldman Sachs Bank USA under the Second Lien Term Loan Agreement, including any Second Lien Lender Claim asserted by or on behalf of Cravath, Swaine & Moore LLP.  Except to the extent that a holder of a Second Lien Lender Claim agrees to different treatment, on the Effective Date, or as soon as practicable thereafter, each holder of a Second Lien Lender Claim shall receive on account of its Claim against Debtor EPE Holding Corporation, subject to the terms of the Plan, in full and final satisfaction of the secured portion of its Second Lien Lender Claim, its allocated share of the Second Lien Lender Warrants Distribution as set forth in Section 7.14 of the Plan:

Deficiency Claims: The undersecured portion of the Second Lien Lender Claims shall be treated as Allowed General Unsecured Claims and classified and entitled to vote in Class 5, and each holder of such undersecured portion of Second Lien Lender Claims shall receive, in full and final satisfaction thereof, its Pro Rata Share of:

(i)    the Second Lien Lender Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and

(ii)    the General Unsecured Claim Cash Distribution on account of the Second Lien Lenders' share of the Aggregate Lender Deficiency Claim; provided, that, to the extent Class 5 (General Unsecured Claims) votes in favor of the Plan, then the Pro Rata Share of the General Unsecured Claim Cash Distribution to be distributed to holders of Second Lien Lender Claims shall instead be distributed to the holders of Allowed General Unsecured Claims (such amount constituting the Second Lien Lenders' contribution to the Additional General Unsecured Claim Cash Distribution); provided, further, that to the extent that Class 5 (General Unsecured Claims) votes to reject the Plan, the Pro Rata Share of the General Unsecured Claim Cash

39

Distribution to be distributed to holders of Second Lien Lender Claims shall instead be retained by the Reorganized Debtors.

Voting:  The Second Lien Lender Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Second Lien Lender Claims.

(5)    **General Unsecured Claims (Class 5).**

Treatment:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and to the extent that such Allowed General Unsecured Claim was not previously paid pursuant to an order of the Bankruptcy Court, each holder of an Allowed General Unsecured Claim shall receive, on the applicable Distribution Date in full and final satisfaction of such Allowed General Unsecured Claim, its Pro Rata Share of:

(i)    **If Class 5 votes to accept the Plan**: (A) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; (B) the General Unsecured Claim Cash Distribution; and (C) the Additional General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim.

(ii)    **If Class 5 votes to reject the Plan**: (A) the General Unsecured Claim Litigation Trust Distribution, allocated pursuant to the terms of the Litigation Trust Agreement; and (B) the General Unsecured Claim Cash Distribution; provided, that no holder of an Allowed General Unsecured Claim shall receive a share of the General Unsecured Claim Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim; provided, further that the Additional General Unsecured Claim Cash Distribution shall be retained by the Reorganized Debtors.

Class 5 shall not include any Claim that would otherwise be a General Unsecured Claim if the holder of such Claim has elected to have such Claim treated as a Convenience Claim.

Voting:  The General Unsecured Claims are impaired Claims.  Holders of such Claims (including holders of the Aggregate Lender Deficiency Claim) are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such General Unsecured Claims.

(6)    **Convenience Claims (Class 6).**

Treatment:  Except to the extent that a holder of an Allowed Convenience Claim agrees to a different treatment, and to the extent that such Allowed Convenience Claim was not previously paid pursuant to an order of the Bankruptcy Court, on the applicable Distribution Date, each holder of an Allowed Convenience Claim shall be paid in full in Cash, in full and

final satisfaction of such Allowed Convenience Claim; provided, however, that in the event the aggregate of all Allowed Convenience Claims exceeds the Convenience Claim Cap Amount, each holder of an Allowed Convenience Claim shall instead receive its Pro Rata Share of the Convenience Claim Cap Amount.  Distributions to holders of Allowed Convenience Claims shall not include postpetition interest. The Convenience Claims will not receive any Litigation Trust Units or any other interest in the Litigation Trust.

Voting:  The Convenience Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such Convenience Claims.

(7)    **Subordinated Claims (Class 7).**

Treatment:  Holders of Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Subordinated Claims.

Voting:  The Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Claims.

(8)    **Existing Interests (Class 8).**

Treatment:  Existing Interests shall be discharged, cancelled, released and extinguished, and holders thereof shall not receive or retain any distribution under the Plan on account of such Existing Interests.

Voting:  The Existing Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Interests.

**6.4.    *Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests.***

(a)    **Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.

(b)    **Tabulation of Votes on a Non-Consolidated Basis.**

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors, with the consent of the Required Consenting Lenders, reserve the right to seek to substantively consolidate any two

or more Debtors; provided, that, such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

     (c)    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."**

     Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Sections 14.5 and 14.6 of the Plan, the Debtors reserve the right (with the consent of the Required Consenting Lenders) to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Sections 14.5 and 14.6 of the Plan (including the consent of the Required Consenting Lenders), the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

     (d)    **Elimination of Vacant Classes.**

     Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

     (e)    **Voting Classes; Deemed Acceptance by Non-Voting Classes.**

     If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

     (f)    **Confirmation of All Cases.**

     Except as otherwise specified in the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that the Debtors, with the consent of the Required Consenting Lenders, may at any time waive Section 6.6 of the Plan.

### 6.5.    *Post-Emergence Capital Structure.*

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  The summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the applicable Plan Documents.

| Instrument | Description |
|---|---|
| *New Term Loan Facility* | On the Effective Date, Reorganized CORE will enter into a new secured term loan facility, in the amount of $30 million, representing the amount of debt under the First Lien Term Loan Agreement assumed by the Reorganized Debtors.  The obligations under the New Term Loan Facility will be guaranteed by the other Reorganized Debtors, the Sharp Entities and each unrestricted wholly-owned subsidiary of the Reorganized Debtors.[30]  The New Term Loan Facility will be secured by first priority security interests and liens on substantially all property of such entities, provided that such collateral will not include the approximately $18.1 million reinvested in the Reorganized Debtors through the Rights Offering, but will include any property acquired with such cash, until the release of such cash in accordance with the terms of the Rights Offering, and will have the following key terms:<br><br>Interest Rate:  LIBOR + 6% cash interest (1% LIBOR floor) or LIBOR + 8% PIK toggle (1% LIBOR floor).<br><br>Maturity:  Six years.<br><br>Mandatory Prepayments: (a) 100% on dispositions (subject to certain customary exceptions and reinvestments); (b) 100% on issuance or incurrence of debt (other than permitted debt (to be defined in the definitive documents)); and (c) 100% on Extraordinary Receipts (as defined in the RSA).<br><br>Excess Cash Flow Sweep:  75%; baskets to be specified in definitive documents for investments and/or acquisitions.<br><br>Representations and Warranties, Affirmative and Negative Covenants: Usual and customary; provided that certain |

---

[30]    If agreed to by and among the Debtors and the Required Consenting Lenders, one or more wholly-owned foreign subsidiaries may be excluded from being guarantors of the New Term Loan Facility.

| Instrument | Description |
|---|---|
| | affirmative and negative covenants to provide for lender consent thresholds (*i.e.*, "Required Lender" (as defined in the RSA) thresholds), relating to, among other things, restricted payments, investments and acquisitions (other than investments and acquisitions that utilize solely cash acquired through the Rights Offering), subject to certain credit and liquidity requirements, such as minimum pro forma leverage and/or liquidity tests that are to be set forth in the definitive documents.  In addition, the definitive documents will contain meaningful cure periods with respect to breaches of covenants that are not material or repetitive in nature and are capable of cure.<br><br>Limitations on Senior Debt:  No senior or *pari passu* debt, except for up to an $8.0 million revolver facility; provided that the lender(s) that provide the revolver facility shall be unaffiliated with the equity holders of Reorganized CORE. The Reorganized Debtors' entry into the revolver facility shall not be a condition to the Effective Date.<br><br>Financial Covenants:  None. |
| *New Common Equity Units* | On the Effective Date, New CORE Holdings shall issue 25,000,000 New Class A LLC Units, which will be distributed in accordance with the Plan. |
| *New Series P Convertible Units / Rights Offering* | On the Effective Date, New CORE Holdings shall issue 18,065,383 New Series P Convertible Preferred Units, which shall be issued in accordance with the Rights Offering. |
| *New Second Lien Warrants* | The New Second Lien Warrants, issued pursuant to the New Second Lien Warrant Agreement, will be distributed to the Second Lien Lenders on account of the Second Lien Lender Claims, exercisable on a cashless basis into New Class A LLC Units (at an initial strike price equal to $1.51 per warrant), in an amount equal to 22.5% of the aggregate amount of New Class A LLC Units (including New Class A LLC Units issued upon exercise of the New Second Lien Warrants) and New Series P Convertible Preferred Units of New CORE Holdings, subject to dilution by the Management Incentive Plan Securities and future equity raises.  The New Second Lien Warrants will include the following features: (i) 10 year term, (ii) customary strike price adjustments for unit splits, reverse splits, |

| Instrument | Description |
|---|---|
| | combinations, recapitalizations and distributions, and (iii) no adjustment for below market or round down issuances.  Upon any redemption of the New Series P Convertible Preferred Units, the number of New Class A LLC Units into which the New Second Lien Warrants are exercisable shall concurrently be proportionately decreased to maintain the same percentage of New Class A LLC Units that the New Second Lien Warrants were exercisable into immediately prior to any such redemption.<br><br>The New Second Lien Warrants will be issued in two classes in order to implement the Warrant Split, all of which is more fully set forth in Section 6.6(m) herein. |

6.6.    *Means for Implementation.*

(a)    **The Litigation Trustee and the Litigation Trust**

(1)    **General**

The Litigation Trustee is appointed as trustee pursuant to Bankruptcy Code § 1123(a)(7), (b)(3)(B) and (b)(6) and shall have all rights, powers and privileges to commence and pursue suits, proceedings or Causes of Action that constitute Litigation Trust Assets against any party not released under the Plan as if such Liquidating Trustee had been appointed trustee in the Reorganization Cases.  The Litigation Trust shall succeed to and constitute the assignee of all rights, powers and privileges that, before the Effective Date of the Plan, could be exercised by the Debtors, the Estates, the Creditors' Committee, any representative of the Estates, and any comparable authority or equivalent authority in any foreign jurisdiction, including a trustee or examiner with expanded powers, with respect to any suits, proceedings or Causes of Action that constitute Litigation Trust Assets against any party not released under the Plan.

The Litigation Trustee shall distribute, in accordance with Section 7.1 of the Plan, the First Lien Lender Litigation Trust Distribution, the Second Lien Lender Litigation Trust Distribution and the General Unsecured Creditor Litigation Trust Distribution to the applicable Litigation Trust Beneficiaries on, or as soon thereafter as is reasonably practicable, the applicable Distribution Date.

On the Effective Date, the Debtors, the Reorganized Debtors and/or Reorganized CORE, as the case may be, on their own behalf and on behalf of the Litigation Trust Beneficiaries, shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Litigation Trust Agreement.  The Litigation Trustee shall administer the Litigation Trust under the direction of the Oversight Committee and shall serve in accordance with the Litigation Trust Agreement without bond or similar instrument.  On the Effective Date, the Litigation Trust

Assets shall be transferred to and vest in the Litigation Trust. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Debtors, the Reorganized Debtors and/or Reorganized CORE shall have no liability with respect to the distribution of any proceeds of the Litigation Trust Assets to the Litigation Trust Beneficiaries. Any recoveries on account of the Litigation Trust Assets shall be distributed to holders of the Litigation Trust Units in accordance with the Plan and the Litigation Trust Agreement.

(2)    **First Lien Lender Litigation Trust Distribution.**

The First Lien Lender Litigation Trust Distribution shall be issued to holders of First Lien Lender Claims whereby, upon an assignment to the Litigation Trust of Causes of Action arising under or relating to the First Lien Term Loan Agreement held by a holder of claims under the First Lien Term Loan Agreement against any party not released under the Plan, which assignment shall be evidenced by a vote in favor of the Plan, such holder shall receive its Pro Rata Share of Litigation Trust Units, the aggregate number of which shall be calculated as follows: (1) the numerator shall equal 46.0% of the Aggregate Lender Deficiency Claim, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000.

(3)    **Second Lien Lender Litigation Trust Distribution.**

The Second Lien Lender Litigation Trust Distribution shall be issued to holders of Second Lien Lender Claims whereby, upon an assignment to the Litigation Trust of Causes of Action arising under or relating to the Second Lien Term Loan Agreement held by a holder of claims under the Second Lien Term Loan Agreement against any party not released under the Plan, which assignment shall be evidenced by a vote in favor of the Plan, such holder shall receive its Pro Rata Share of Litigation Trust Units, the aggregate number of which shall be calculated as follows: (1) the numerator shall equal 54.0% of the Aggregate Lender Deficiency Claim, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000.

(4)    **General Unsecured Claim Litigation Trust Distribution.**

The General Unsecured Claim Litigation Trust Distribution shall be issued to holders of Allowed General Unsecured Claims with the aggregate number of such Litigation Trust Units calculated as follows: (1) the numerator shall equal the total amount of Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash Distribution and the Additional General Unsecured Claim Cash Distribution, (2) the denominator shall equal the sum of: (A) all Allowed General Unsecured Claims that receive Litigation Trust Units minus any satisfaction of such Allowed General Unsecured Claims from the General Unsecured Claim Cash

Distribution and the Additional General Unsecured Claim Cash Distribution and (B) the Aggregate Lender Deficiency Claim, and (3) the resulting fraction shall be multiplied by 10,000. An illustration of a potential recovery of claims in Class 5 is attached hereto as <u>Exhibit 6</u>.

(5)    **Cooperation.**

The Reorganized Debtors and their non-Debtor wholly owned or controlled subsidiaries shall reasonably cooperate with the Litigation Trustee and counsel to the Litigation Trust in the prosecution and defense of claims involving the Litigation Trust, including providing documents or communications as reasonably required. In connection with the transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege or other privilege or immunity of the Debtors, the Reorganized Debtors, and/or their non-Debtor wholly owned or controlled subsidiaries, as the case may be, attaching to any documents or communications (whether written or oral), associated with all defenses, claims, counterclaims and rights of setoff or recoupment, shall be transferred to and vest in the Litigation Trust and may be asserted by the Litigation Trustee and its representatives; provided, that the Reorganized Debtors shall not be required to transfer or deliver: (1) any privileged documents created during (or in preparation for) the Reorganization Cases or the U.K. Proceeding (or any Additional U.K. Proceeding) except to the extent that they contain analysis of the merits of the Litigation Trust Assets and not the conduct or strategy of any aspect of the Reorganization Cases or the U.K. Proceeding (or any Additional U.K. Proceeding); (2) any privileged documents created by or at the direction of the Reorganized Debtors on or after the Effective Date; or (3) any document that the Reorganized Debtors are under a legal obligation due to personal privacy issues of an employee or contractual obligation to refrain absent a subpoena or formal discovery request from providing to a third party, whether or not privileged. The Debtors, the Reorganized Debtors and/or Reorganized CORE, as the case may be, and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges. The Confirmation Order shall provide that the Litigation Trustee's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors' Estates.

(6)    **Litigation Trust Assets.**

The Litigation Trust Assets shall be vested in the Litigation Trust on the Effective Date and the Litigation Trust may pursue such suits, proceedings or Causes of Action that constitute Litigation Trust Assets, as appropriate, in accordance with the Litigation Trust Agreement. The transfer of the Litigation Trust Assets to the Litigation Trust shall be made, as provided in the Plan, for the benefit of the Litigation Trust Beneficiaries. Upon the transfer of the Litigation Trust Assets, the Debtors and/or the Reorganized Debtors, as the case may be, shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtors and the Litigation Trustee shall be deemed to have been designated as a representative of the Reorganized Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtors. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the

Litigation Trust to be distributed to the Litigation Trust Beneficiaries consistent with the terms of the Plan and the Litigation Trust Agreement.  **Except for parties expressly released under the Plan, no Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action against them.  The Litigation Trust expressly reserves all rights to prosecute any and all such Causes of Action against any Person, except as otherwise expressly provided in the Plan**.  Exhibit 7 to this Disclosure Statement contains a non-exhaustive list of potential parties against whom Causes of Action may be brought.

For the avoidance of doubt, the transfer and preservation of the Litigation Trust Assets described in Section 7.1 of the Plan includes, the Litigation Trust's right to object to any Claims held or asserted by Excluded Parties, if any.

The Litigation Trust shall be established for the sole purpose of liquidating the Litigation Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  Additionally, the interests in the Litigation Trust will not otherwise be transferrable except as provided in the Litigation Trust Agreement. The Litigation Trustee shall provide certain information to the holders of interests in the Litigation Trust.

(7)    **Reserves.**

The Litigation Trustee may establish a reserve on account of Claims that are Disputed.  The Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat such reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to such reserve, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (iii) distribute assets from the reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved.  The Litigation Trust Beneficiaries shall be bound by such election, if made by the Litigation Trustee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

In the event the exact number of Litigation Trust Units to be issued to each Litigation Trust Beneficiary cannot be determined on or prior to the Effective Date (e.g., because certain General Unsecured Claims are disputed or otherwise not Allowed Claims as of the Effective Date), the Litigation Trust Agreement shall permit the Litigation Trust to issue estimated or provisional Litigation Trust Units to the Litigation Trust Beneficiaries on the Effective Date and thereafter the Litigation Trustee may make adjustments to each Litigation Trust Beneficiary's Units as required to reflect the subsequent allowance or disallowance of Claims after the Effective Date.

(8)     **Dissolution.**

The Litigation Trust shall be dissolved no later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion made within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary or appropriate to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets.

(9)     **Exemption.**

The Debtors believe the interests in the Litigation Trust should not be deemed to be "securities," but to the extent the interests in the Litigation Trust are deemed to be "securities," the Debtors believe the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

(10)     **Fees and Expenses; Initial Funding of the Litigation Trust.**

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Litigation Trust and the Litigation Trustee (including the reasonable and necessary fees and expenses of any professionals assisting the Litigation Trust in carrying out its duties under the Plan) will be funded by the proceeds of the Litigation Trust Assets in accordance with the Litigation Trust Agreement without further order from the Bankruptcy Court; provided, that the initial funding of the Litigation Trust shall be in the amount of $5,000,000 as approved by the New Board and a majority of the Oversight Committee with an additional amount up to $5,000,000 to be made available with the approval of the "requisite members" as provided in the New CORE Holdings LLC Agreement (subject to the approval rights contained within the New CORE Holdings LLC Agreement), which amount shall be funded from the Cash on hand of the Reorganized Debtors; provided further that such initial funding shall be repaid with interest at a rate set forth in the Litigation Trust Agreement prior to any distribution to the Litigation Trust Beneficiaries, and the "requisite members" referenced above shall determine the terms of repayment with respect to any additional amount made available.

(b)     ***Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.***

(i)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and Amended By-Laws, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.  On or after the Effective Date, each Reorganized Debtor, in its discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized

49

Debtor may determine is reasonable and appropriate, subject in each case, to the terms and conditions of the New CORE Holdings LLC Agreement, including causing: (1) a Reorganized Debtor to be merged into another Reorganized Debtor, or its Subsidiary and/or affiliate; (2) a Reorganized Debtor to be dissolved; (3) the legal name of a Reorganized Debtor to be changed; or (4) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter; provided, that the issuance of new equity interests in Reorganized CORE to New CORE Holdings shall be authorized by operation of the Plan as of the Effective Date without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action.

(ii)     Prior to the Effective Date, New CORE Holdings will be formed as a new Delaware limited liability company by filing a certificate of formation in form and substance reasonably acceptable to the Required Consenting Lenders (with the input of the Debtors) with the Secretary of State of the State of Delaware, and a "check the box" election shall be filed with the Internal Revenue Service so that New CORE Holdings will be taxed as a corporation.  On the Effective Date, Reorganized CORE shall issue 100 shares of common stock to New CORE Holdings, which shares shall constitute the only issued and outstanding shares of capital stock of Reorganized CORE as of the Effective Date.  From and after the Effective Date, the business and affairs of New CORE Holdings shall be governed by the New CORE Holdings LLC Agreement.

(iii)     Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates, wherever located, including the United Kingdom, including all claims, rights and Causes of Action (except for the Litigation Trust Assets) and any property, wherever located, including the United Kingdom, acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  Subject to Section 7.2(a) of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property, wherever located, including the United Kingdom, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action (except for the Litigation Trust Assets) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(iv)     On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the

applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(c)   **Plan Funding.**

The Plan Distributions to be made in Cash under the terms of the Plan shall be funded from the Debtors' (and/or one or more of their non-Debtor subsidiaries') Cash on hand as of and after the Effective Date.

(d)   **Cancellation of Existing Securities and Agreements.**

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date all agreements, instruments, and other documents evidencing, related to or connected with any Claim or Interest, (including, for the avoidance of doubt, the Second Lien ICA), other than Intercompany Claims and Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding anything to the contrary in the Plan, (i) each of the First Lien Term Loan Agreement and Second Lien Term Loan Agreement shall continue in effect solely to the extent necessary to (1) permit holders of First Lien Lender Claims and Second Lien Lender Claims to receive Plan Distributions in accordance with the terms of the Plan; (2) permit the Reorganized Debtors to make Plan Distributions on account of the First Lien Lender Claims and Second Lien Lender Claims, respectively; and (3) permit the First Lien Administrative Agent and the Second Lien Administrative Agent, respectively, to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan, and (ii) nothing in the Plan shall be deemed or construed to abrogate or release Causes of Action arising under or relating to the First Lien Term Loan Agreement or the Second Lien Term Loan Agreement assigned to the Litigation Trust.  Except as provided pursuant to the Plan, upon the satisfaction of the First Lien Lender Claims and Second Lien Lender Claims, each of the First Lien Administrative Agent and Second Lien Administrative Agent and their respective agents, successors and assigns shall be discharged of all of their obligations associated with the First Lien Term Loan Facility and Second Lien Term Loan Facility, respectively.

(e)   **Boards of Directors.**

On the Effective Date, the New Board and the initial board of directors of each of the other Reorganized Debtors shall consist of those individuals identified in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

Unless reappointed pursuant to Section 7.5(a) of the Plan, the members of the board of directors of each Debtor prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors in their capacities as such on and after the Effective Date and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the

directors of each of the Reorganized Debtors shall serve pursuant to the terms of the New CORE Holdings LLC Agreement or the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance therewith, as applicable.

(f)    **Management.**

New Management:  As of the Effective Date, the individuals that will serve in certain senior management positions of the Reorganized Debtors shall consist of those individuals set forth in the Plan Supplement, including the current President of CORE Entertainment, Peter Hurwitz, who shall serve as the Chief Executive Officer of Reorganized CORE Entertainment.  The compensation arrangement for any insider of the Debtors that shall become an officer of a Reorganized Debtor shall be disclosed in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

Management Incentive Plan:  On or after the Effective Date, the New Board shall adopt a Management Incentive Plan to provide for up to 12.5% of the outstanding New Class A LLC Units of New CORE Holdings, on a fully diluted basis, in the form of initial options exercisable at a $1.51 strike price and future options to be issued at fair market value, to be reserved for issuance to management of the Reorganized Debtors as determined by the New Board.  The other terms of the Management Incentive Plan shall be determined by the New Board; provided that such options shall include customary strike price adjustments for unit splits, reverse splits, combinations, recapitalizations and distributions.  The Management Incentive Plan Securities shall dilute the New Class A LLC Units (including any New Class A LLC Units issued upon the exercise of any New Second Lien Warrants) and the New Series P Convertible Preferred Units to be issued pursuant to the Plan.

Post-Emergence Incentive Program.  On or as soon as reasonably practicable following the Effective Date, Reorganized CORE (or New Subsidiary I, as the case may be) shall make payments to six of its key employees (the "**Key Employees**") pursuant to the Post-Emergence Incentive Program, which will be contained in the Plan Supplement.

An incentive program was adopted in July 2015 and thereafter was amended in April 2016.  The program was the product of a thorough review of the historical compensation provided to the Key Employees as well as approval by the Compensation Committee of the Board of Directors of CORE Holdings and significant discussions and input from key independent directors of the Boards of Directors of CORE and CORE Holdings.  The Boards recognized that losses of the Key Employees could have a crippling effect on the Debtors' businesses and, determined that there was a need to provide incentive-based bonuses to the Key Employees.[31]  Accordingly, the Compensation Committee, chartered with making these types of decisions, approved the implementation of the incentive program.  At the time the program was adopted and thereafter amended, the Key Employees' expectations were that they would be paid concurrent with the applicable objectives.  However, postpetition, after discussions with the First Lien Lenders and the Second Lien Lenders, as a show of good faith and to further solidify and

---

[31]    Two of the Key Employees had additional incentives that were met, and the employees were paid in respect thereof, prior to the Petition Date.

evidence each of their individual commitments to the Company, the Key Employees agreed to convert the incentive program to the Post-Emergence Incentive Program. The Required Consenting Lenders have agreed that absent any order limiting or prohibiting the Reorganized Debtors from taking action, they will take commercially reasonable steps to cause the Reorganized Debtors to approve the Post-Emergence Bonuses to the Key Employees consistent with the Post-Emergence Incentive Program.

The Post-Emergence Incentive Program is supported by the Debtors' secured lenders, who will own the Reorganized Debtors after the Effective Date.

(g)    **Corporate Action.**

The Reorganized Debtors shall serve on the U.S. Trustee quarterly reports of the disbursements made by each Reorganized Debtor on an entity-by-entity basis until such time as a final decree is entered closing the applicable Reorganization Case or the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise. Any deadline for filing Administrative Expense Claims shall not apply to U.S. Trustee Fees.

On the Effective Date, the New CORE Holdings LLC Agreement, the Amended Certificates of Incorporation, the Amended By-Laws and any other applicable amended and restated corporate organizational documents of each of the Reorganized Debtors shall be deemed authorized in all respects.

Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including, the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, the implementation of the Management Incentive Plan, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' equity holders, sole members, boards of directors or boards of managers, or similar body, as applicable.

The Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited liability company, board, member, or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of New CORE Holdings and the other Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or equity holders of the applicable Reorganized Debtor.

(h)    **Authorization, Issuance and Delivery of the Plan Securities.**

On the Effective Date, New CORE Holdings is authorized to issue or cause to be issued the Plan Securities in accordance with the terms of the Plan, the Rights Offering, the New

Second Lien Warrant Agreement and the New CORE Holdings LLC Agreement, without the need for any further corporate, limited liability company, member or shareholder action.

On the Effective Date, New CORE Holdings shall issue and cause to be delivered the New Class A LLC Units and New Series P Convertible Preferred Units directly to the First Lien Lenders for distribution in accordance with the terms of the Plan.

On the Effective Date, New CORE Holdings shall issue, and cause to be delivered directly to the Second Lien Lenders, the New Second Lien Warrants to purchase New Class A LLC Units pursuant to the New Second Lien Warrant Agreement.

As a condition to receiving any Plan Securities under the Plan, each holder of a First Lien Lender Claim and Second Lien Lender Claim shall have executed and delivered to New CORE Holdings a signature page to the New CORE Holdings LLC Agreement.  As a condition to receiving any New Second Lien Warrants under the Plan, each holder of a Second Lien Lender Claim shall have executed and delivered to New CORE Holdings a signature page to the New Second Lien Warrant Agreement

(i)    **Rights Offering.**

(1)    **Rights Offering Amount.**

The Rights Offering Amount shall be $18,065,383.

(2)    **Rights Offering Participants.**

The Rights Offering Participants are the holders of First Lien Lender Claims, provided, that, pursuant to the RSA, TCP and Crestview (including any of their respective designees) have committed to fully subscribe to the Rights Offering for the full amount of their respective First Lien Lender Cash Distribution, and all other holders of First Lien Lender Claims have determined not to participate in the Rights Offering and have waived their rights to receive a Subscription Form.

(3)    **Issuance of Rights.**

Each Rights Offering Participant as of the Rights Offering Record Date will receive a Subscription Form to subscribe for the Rights Offering Units in an amount equal to such Rights Offering Participant's share of the First Lien Lender Cash Distribution for an aggregate purchase price equal to the applicable Subscription Payment Amount.  The Rights Offering Units will be issued to the Rights Offering Purchasers for an aggregate purchase price equal to the Rights Offering Amount.  On the Effective Date, New CORE Holdings shall consummate the transactions contemplated by the Rights Offering, including any agreement or document entered into in connection therewith, and all such agreements and documents shall become effective and binding in accordance with their respective terms (to the extent not effective and binding prior to the Effective Date) and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.

(4)    **Subscription Rights.**

The Rights Offering shall commence on the Subscription Commencement Date and shall expire on the Subscription Deadline.  Each Rights Offering Participant as of the Rights Offering Record Date is required to participate in the Rights Offering and must affirmatively elect to exercise its Subscription Rights by completing and returning its Subscription Form to the entities specified in the applicable Subscription Form (and causing its nominee to complete and return any required Subscription Form to the entities specified in the applicable nominee's Subscription Form).

(5)    **Exercise of Subscription Rights and Payment of Subscription Payment Amount.**

On the Subscription Commencement Date, the Subscription Agent will deliver the Subscription Form to each Rights Offering Participant and their applicable nominees known as of the Rights Offering Record Date, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Form.  The Debtors may adopt such additional procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Subscription Rights.  Each Rights Offering Participant as of the Rights Offering Record Date must return a duly completed Subscription Form (making a binding and irrevocable commitment to participate in the Rights Offering) to the entities specified in the applicable Subscription Form (and causing its nominee to complete and return any required Subscription Form to the entities specified in the applicable nominee's Subscription Form).  If the Subscription Agent for any reason does not receive from a given holder of Subscription Rights a duly completed Subscription Form (and a duly completed Subscription Form of such holder's nominee) on or prior to the Subscription Deadline, then such holder shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.

(6)    **No Transfer; Detachment Restrictions; No Revocation.**

The Subscription Rights are not transferable or detachable.  Any transfer or detachment, or attempted transfer or detachment, in violation of this restriction will be null and void ab initio and the Debtors will not treat any purported transferee of the Subscription Rights separate from the First Lien Lender Claims as the holder of any Subscription Rights.  Once a holder has exercised any of its Subscription Rights, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors.

(7)    **Distribution of Rights Offering Units.**

On the Effective Date, or as soon as reasonably practicable thereafter, New CORE Holdings or another Disbursing Agent shall distribute the Rights Offering Units purchased by such Rights Offering Purchaser set forth in the Subscription Form to such Rights Offering Purchaser set forth in the Subscription Form.  As a condition to receiving any New Series P Convertible Preferred Units, each Rights Offering Purchaser shall have (i) irrevocably directed the Debtors and/or Reorganized Debtors to apply, and the Debtors and/or Reorganized Debtors shall have applied, any First Lien Lender Cash Distribution that such Rights Offering

Purchaser would otherwise be entitled to receive under the Plan towards payment of the
Subscription Payment Amount payable by such Rights Offering Purchaser in connection with
its purchase of such New Series P Convertible Preferred Units in connection with the Rights
Offering, and (ii) executed and delivered to New CORE Holdings a signature page to the New
CORE Holdings LLC Agreement.

(8)    **Rights Offering Proceeds.**

All Subscription Payment Amounts retained by the Reorganized Debtors
pursuant to Section 7.9(e) hereof shall be transferred to and held in a segregated and restricted
account of New CORE Holdings free and clear of any lien, claim or encumbrance until utilized
as set forth in the Plan and the New CORE Holdings LLC Agreement, or until the New Series P
Convertible Preferred Units are converted into New Class A LLC Units, as described in the
New CORE Holdings LLC Agreement.  Such restricted Cash may only be used (i) for
acquisitions, partnerships, joint ventures or other investments as determined by the New Board
(subject to any approval rights contained within the New CORE Holdings LLC Agreement) or
(ii) to fund redemptions of the New Series P Convertible Preferred Units.  Cash used by the
Reorganized Debtors for an Extraordinary Investment will be funded by and reduce such
restricted Cash prior to the use of any other Cash on hand of the Reorganized Debtors for any
Extraordinary Investment.  To the extent any holders of New Series P Convertible Preferred
Units elect to convert such units (other than New Series P Convertible Preferred Units issued as
dividends) into New Class A LLC Units, as more fully described in the New CORE Holdings
LLC Agreement, an amount of Cash equal to the number of New Series P Convertible Preferred
Units so converted shall be released from such restricted Cash account and transferred to the
general corporate account of Reorganized CORE or one of the other Reorganized Debtors
(whereupon such funds shall serve as collateral to secure the New Term Loan Facility).

(j)    **New Term Loan Facility.**

On the Effective Date, without any requirement of further action by equity
holders or directors of the Debtors, each of the Reorganized Debtors shall be authorized to enter
into the New Term Loan Facility, as well as any notes, documents or agreements in connection
therewith, including any documents required in connection with the creation or perfection of the
Liens on any Collateral securing the New Term Loan Facility.

(k)    **Insured Claims.**

Notwithstanding anything to the contrary contained in the Plan, to the extent the
Debtors have insurance with respect to any Allowed General Unsecured Claim or Allowed
Existing Securities Law Claim, the holder of such Allowed Claim shall (i) have an Allowed
Claim in its applicable Class for any SIR Claim, and (ii) be paid any amount in excess of any
SIR Claim from the proceeds of insurance to the extent that the Claim is insured.

(l)    **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions
and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith
compromise and settlement of all Claims and controversies relating to the rights that a holder of

a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof. To that end, the requisite First Lien Lenders under the Second Lien ICA have consented to the treatment set forth for Second Lien Lenders in Section 5.4 of the Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Estates, the Reorganized Debtors, and their respective property and stakeholders; and (ii) fair, equitable and reasonable.

      (m)  **The New Second Lien Warrants.**

      The New Second Lien Warrants, issued pursuant to the New Second Lien Warrant Agreement, will be distributed to the Second Lien Lenders on account of the Second Lien Lender Claims, exercisable on a cashless basis into New Class A LLC Units (at an initial strike price equal to $1.51 per warrant), in an amount equal to 22.5% of the aggregate amount of New Class A LLC Units (including New Class A LLC Units issued upon exercise of the New Second Lien Warrants) and New Series P Convertible Preferred Units of New CORE Holdings, subject to dilution by the Management Incentive Plan Securities and future equity raises. The New Second Lien Warrants will include the following features: (i) 10 year term, (ii) customary strike price adjustments for unit splits, reverse splits, combinations, recapitalizations and distributions, and (iii) no adjustment for below market or round down issuances. Upon any redemption of the New Series P Convertible Preferred Units, the number of New Class A LLC Units into which the New Second Lien Warrants are exercisable shall concurrently be proportionately decreased to maintain the same percentage of New Class A LLC Units that the New Second Lien Warrants were exercisable into immediately prior to any such redemption.

      Notwithstanding anything to the contrary or the actual claims held by TCP and Crestview under the Second Lien Term Loan Agreement, subject to the adjustment mechanism set forth in the New Second Lien Warrant Agreement to account for any redemption of the New Series P Convertible Preferred Units, the New Second Lien Warrants shall be allocated initially as follows: 75.692% to Crestview and 24.308% to TCP. Crestview shall be deemed to have agreed to a less favorable treatment in respect of the percentage of Second Lien Warrants to which it shall receive, in accordance with section 1123(a)(4) of the Bankruptcy Code. If TCP and/or Crestview elects to redeem any portion of its respective New Series P Convertible Preferred Units, the number of New Second Lien Warrants held by each of TCP and Crestview will be adjusted as described below.

      In order to implement the foregoing Warrant Split, the New Second Lien Warrants will be issued in two classes, Class A Warrants and Class B Warrants. The Class A Warrants and the Class B Warrants will have the same strike price and same expiration date and will be exercisable into New Class A LLC Units. Class A Warrants will be exercisable into a number of New Class A LLC Units equal in the aggregate to 22.5% of the New Class A LLC Units (fully diluted) issued on the Effective Date. Class A Warrants will be issued as follows: (i) 79.167% to Crestview and (ii) 20.833% to TCP. Class B Warrants will be exercisable into a number of New Class A LLC Units equal in the aggregate to 22.5% of the New Series P Convertible Preferred Units (fully diluted) issued pursuant to the Rights Offering. Class B Warrants will be issued as follows: (i) 70.884% to Crestview and (ii) 29.116% to TCP. In the

57

aggregate, the combined Warrant Split of the Class A Warrants and the Class B Warrants initially will equal (i) 75.692% to Crestview and (ii) 24.308% to TCP and, for the avoidance of doubt, the sum Class A Warrants and Class B Warrants shall equal the total number of New Second Lien Warrants described in the preceding paragraph.

Class B Warrants will not be exercisable until the earliest to occur of the following: (i) eighteen (18) months following the Effective Date, (ii) the date no New Series P Convertible Preferred Units issued to TCP and Crestview are outstanding, and (iii) immediately prior to a liquidity event; the intent being that TCP and Crestview would be able to exercise respective Class B Warrants prior to such liquidity event in order to receive their respective pro rata share of any distribution or other consideration the holders of New Class A LLC Units will be entitled to receive as a result of such liquidity event. Each time either TCP or Crestview has any of its New Series P Convertible Preferred Units redeemed, such Redemption Party will lose a percentage of its Class B Warrants (with the other holder of Class B Warrants losing a smaller portion of its Class B Warrants as set forth below). This reduction of Class B Warrants will happen in two steps. In the first step, the Redemption Party will have its Class B Warrants reduced by an amount equal to the percentage of its redeemed New Series P Convertible Preferred Units (calculated as the number of New Series P Convertible Preferred Units redeemed divided by the number of New Series P Convertible Preferred Units the Redemption Party received upon consummation of the Rights Offering) multiplied by the amount of Class B Warrants it held upon consummation of the Rights Offering. In other words, if 50% of a Redemption Party's New Series P Convertible Preferred Units are redeemed, such Redemption Party's Class B Warrants would be reduced by 50% in the first step. In the second step, there will be an adjustment mechanism in which the total pool of outstanding Class B Warrants will be further adjusted such that the total number of Class B Warrants remaining represents 22.5% ownership of the New Series P Convertible Preferred Units (plus any New Class A LLC Units for which New Series P Convertible Preferred Units have been converted into already) (fully diluted) prior to taking into account Management Incentive Plan Securities. Such reduction will be borne by both TCP and Crestview in an amount equal to their respective ownership of the remaining Class B Warrants after step one. For the avoidance of doubt, all of the foregoing adjustments are applicable upon any redemption of New Series P Convertible Preferred Units and such adjustments will be made only to the Class B Warrants and never to the Class A Warrants.

(n)    **The Sharp Entities.**

On the Effective Date: (1) each of the First Lien Lenders and Second Lien Lenders party to the RSA shall be deemed to have consented to the release of all claims and liens under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement against the Sharp Entities upon the issuance of the New Term Loan Facility; (2) the Reorganized Debtors will cause the Sharp Entities and each unrestricted wholly owned subsidiary of the Reorganized Debtors (and such entities shall be deemed to have agreed) to guarantee the Reorganized Debtors' obligations under the New Term Loan Facility; provided that the Debtors and the Required Consenting Lenders may determine to exclude one or more foreign unrestricted wholly–owned subsidiaries of the Reorganized Debtors as guarantors; and (3) the Confirmation Order shall include provisions effectuating (1) and (2).

58

(o)    **First Lien Lender Fee Claim and Second Lien Lender Fee Claim.**

The Debtors or the Reorganized Debtors, on the Effective Date or as soon as reasonably practicable thereafter, shall pay the First Lien Lender Fee Claim and Second Lien Lender Fee Claim.

(p)    **Alternative Restructuring Transaction**

On or as soon as reasonably practicable after the Effective Date, the distributions provided for under the Plan may, if and solely to the extent agreed to by the Debtors and the Required Consenting Lenders, be effectuated pursuant to the following Alternative Restructuring Transactions, which shall take place, *in seriatim*, pursuant to documentation satisfactory to the Debtors and the Required Consenting Lenders, which documentation shall be included in the Plan Supplement:

(1)    **Formation of the New Companies.**

On or prior to the Effective Date:

- first, New CORE Holdings shall be formed by CORE as a new Delaware limited liability company;

- second, New CORE Holdings shall form New Subsidiary I; and

- third, New Subsidiary I shall form CORE Operations Inc. ("**CORE Operations**"), a wholly owned subsidiary of New Subsidiary I, which shall be incorporated under Delaware law.

(2)    **Consideration.**

On the Effective Date, prior to making any Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of the Plan, (i) Debtor EPE Holding Corporation shall dividend $32.5 million to CORE Media, (ii) New CORE Holdings then shall contribute all but one New Class A LLC Units, all New Series P Convertible Preferred Units and all New Second Lien Warrants (collectively, the "**Contributed Interests**") to New Subsidiary I, (iii) New Subsidiary I then shall contribute the Contributed Interests to CORE Operations, and (iv) New Subsidiary I shall issue to CORE Operations indebtedness in a principal amount equal to $30,000,000 (which shall constitute New Term Loan Facility Obligations under the New Term Loan Facility) in exchange for a note from CORE Operations in the amount of the New Term Loan Facility

(3)    **Transfer to CORE Media.**

On the Effective Date, immediately after the consummation of the transactions described in clause (2) immediately above, CORE Media shall sell, assign and transfer to CORE Operations all of its assets, including all of CORE Media's subsidiaries, in

59

exchange for the Contributed Interests and the New Term Loan Facility Obligations; provided that, with the consent of the Required Consenting Lenders and the Debtors, in lieu of purchasing all of CORE Media's assets, including all of its subsidiaries, CORE Operations may purchase all assets, including all subsidiaries, of a CORE Media direct or indirect parent company.

(4)    **Consummation; Distributions; Dissolution of Parent Entities.**

The Debtors shall consummate the Plan in part by making distributions to holders of (x) First Lien Lender Claims on account of their secured claim as set forth in Section 5.3(a); and (y) Second Lien Lender Claims on account their secured claim against Debtor EPE Holding Corporation as set forth in Section 5.4(a).  The Alternative Restructuring Transaction would require certain definitional changes in the Plan to conform to Section 7.17 of the Plan, including (i) the definition of "New CORE Holdings" would be updated to reflect that it will own all of the outstanding equity interests of New Subsidiary I rather than Reorganized CORE, (ii) the definition of "New Term Loan Credit Agreement" would be updated to reflect that New Subsidiary I rather than Reorganized CORE would be the borrower under such facility, (iii) the definition of Reorganized Debtors would include New Subsidiary I and CORE Operations, as the context requires, and (iv) references in the Plan to Reorganized CORE generally would be changed to New Subsidiary I, as the context requires.  On or as soon as reasonably practicable after the Effective Date, each of CORE Media's parent companies (other than CORE Holdings) that are Debtors shall be dissolved as provided in Section 7.2(a) of the Plan; provided that if, in lieu of purchasing all of CORE Media's, assets, including all of its subsidiaries, CORE Operations, with the consent of the Required Consenting Lenders and the Debtors, purchases all assets, including all subsidiaries, of a CORE Media direct or indirect parent company, then each of such entity's parent companies (other than CORE Holdings) that are Debtors shall be dissolved as provided in Section 7.2(a) of the Plan.

(5)    **Reservation of Rights.**

Notwithstanding Sections 7.17(a)-(d) of the Plan, to the extent agreed by the Debtors and the Required Consenting Lenders, one or more of the preceding steps comprising the Alternative Restructuring Transactions may be modified to carry out the intent of such sections.

**6.7.    *Executory Contracts and Unexpired Leases***

(a)    **General Treatment.**

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Debtors shall be deemed assumed or assumed and assigned, except that: (i) any executory contracts and unexpired leases that previously have been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; (ii) any executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases shall be deemed rejected as of the Effective Date; and (iii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided for in the

Final Order resolving such motion; provided, that any executory contracts or unexpired leases that were in effect on the Petition Date and are rejected pursuant to a Final Order of the Bankruptcy Court, listed on the Schedule of Rejected Contracts and Leases or are rejected through a separate motion to reject under section 365 of the Bankruptcy shall be deemed terminated upon rejection, provided that rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise will not constitute a termination of obligations owed to the Debtors or the Reorganized Debtors under such contracts or leases that survive rejection under applicable law.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments and rejections described in Section 10.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to Section 10.1 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.  The listing of a document on the Schedule of Rejected Contracts or the Cure Schedule shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease.

As of the Effective Date, notwithstanding any applicable non-bankruptcy law to the contrary, if the Alternative Restructuring Transactions occur, all executory contracts and unexpired leases between CORE Media (or the applicable direct or indirect parent company of CORE Media) and the applicable counterparty, other than executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases, shall be assumed by CORE Media (or the applicable direct or indirect parent company of CORE Media) and assigned to CORE Operations or such other entity or entities as may be formed to the extent the Alternative Restructuring Transactions are modified consistent with Section 7.17(e) of the Plan.  To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned in connection with the Alternative Restructuring Transaction shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

(b)   <b>Claims Based on Rejection of Executory Contracts or Unexpired Leases.</b>

Except as otherwise explicitly set forth in the Plan, all Claims arising from the rejection of executory contracts or unexpired leases, if evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims.  Upon receipt of the Plan Distribution provided in Section 5.5 of the Plan, all such Claims shall be discharged as of the Effective Date,

and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors or their respective properties or interests in property.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 10.3(c) of the Plan, or pursuant to an order of the Bankruptcy Court).

(c)    **Cure of Defaults for Assumed or Assumed and Assigned Executory Contracts and Unexpired Leases.**

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease to be assumed or assumed and assigned pursuant to the Plan, any monetary defaults arising under such executory contract or unexpired lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in full in Cash on the later of thirty (30) days after: (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

No later than twenty-one (21) calendar days prior to the commencement of the Confirmation Hearing, the Debtors shall file the Cure Schedule setting forth the Cure Amount, if any, for each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to Section 10.1 of the Plan, and serve such Cure Schedule on each applicable counterparty.  Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within fourteen (14) calendar days of the filing thereof shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.  The proposed Cure Amount for any executory contract or unexpired lease not listed on the Cure Schedule shall be $0.

In the event of a Cure Dispute regarding: (1) the Cure Amount; (2) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (3) any other matter pertaining to the proposed assumption, or assumption and assignment the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption or assumption and assignment.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent the Cure Dispute is resolved or

determined against the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease after such determination, and the counterparty may thereafter file a proof of claim in the manner set forth in Section 10.2 of the Plan.

(d)   **Compensation and Benefit Programs.**

Except as otherwise expressly provided in the Plan, in a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, with the consent of the Required Consenting Lenders, all employment and severance policies (that were in place as of the Petition Date and relate to employees whose employment will continue with the Reorganized Debtors following the occurrence of the Effective Date), and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors (other than any of the foregoing who are Excluded Parties) including, all savings plans, unfunded retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Each of the Debtors may, prior to the Effective Date and with the consent of the Required Consenting Lenders, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of the Plan.  Any such agreements (or a summary of the material terms thereof) shall be in form and substance acceptable to the Required Consenting Lenders and be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing. For the avoidance of doubt, all workers' compensation policies issued at any time to the Debtors, their affiliates or predecessors of any of the foregoing and all agreements related thereto shall be treated in accordance with Section 7.12 of the Plan.

All collective bargaining agreements to which one or more of the Debtors is a party shall be treated as executory contracts under the Plan and on the Effective Date will be assumed by the applicable Reorganized Debtors pursuant to the provisions of section 365 of the Bankruptcy Code.

**6.8.   *Conditions Precedent to Confirmation of the Plan.***

(a)   **Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date is subject to:

(i)   the Disclosure Statement Order, in form and substance acceptable to the Debtors and the Required Consenting Lenders, having been entered by the Bankruptcy Court and remaining in full force and effect;

(ii)   the Confirmation Order, in form and substance acceptable to the Debtors and the Required Consenting Lenders, having become a Final Order and remaining in full force and effect;

(iii)    the Plan Documents, including the Plan Supplement, in form and substance satisfactory to the Debtors and the Required Consenting Lenders, being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(iv)    except as set forth in Section 7.1 of the Plan, a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of any of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Reorganization Cases;

(v)    all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents required in connection with the Plan, if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(vi)    the New CORE Holdings LLC Agreement and the Amended Certificates of Incorporation, in form and substance satisfactory to the Debtors and the Required Consenting Lenders, shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation and shall have become effective in accordance with such jurisdictions' corporation laws;

(vii)    the New Term Loan Credit Agreement having been consummated, and being in full force and effect;

(viii)    all fees and expenses incurred as of the Effective Date by the First Lien Administrative Agent, the First Lien Lenders, the Second Lien Administrative Agent and the Second Lien Lenders that are provided for under any DIP Order, other financing or cash collateral order approved by the Bankruptcy Court, the RSA Order or the Plan having been paid in full in cash by the Debtors; provided, that, payment of any such amounts incurred by such parties as of the Effective Date but not invoiced to the Debtors shall not be a condition precedent to the effectiveness of the Plan and shall be payable by the Reorganized Debtors after receipt by the Reorganized Debtors of one or more invoices therefor (redacted as appropriate to preserve privilege); and

(ix)    the RSA and the RSA Order remaining in full force and effect, and not having been terminated.

(b)    **Satisfaction and Waiver of Conditions Precedent.**

Except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 11.1 of the Plan may be waived in whole or part upon agreement by the Debtors and Required Consenting Lenders, without notice and a hearing, and the Debtors' benefits under the "mootness doctrine" shall be unaffected by any provision of the Plan.  The failure to satisfy or waive any

condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any act, action, failure to act or inaction by the Debtors). The failure of the Debtors to assert the non-satisfaction of any such conditions shall not be deemed a waiver of any other rights hereunder, and each such right shall be deemed an ongoing right that may be asserted or waived (as set forth in the Plan) at any time or from time to time.

### (c)    Effect of Failure of Conditions.

If all of the conditions to effectiveness have not been satisfied (as provided in Section 11.1 of the Plan) or duly waived (as provided in Section 11.2 of the Plan) and the Effective Date has not occurred on or before the first Business Day that is more than 30 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors, with the consent of the Required Consenting Lenders (subject to Section 4 of the RSA), may file a motion to vacate the Confirmation Order. Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.1 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 11.3 of the Plan, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no Plan Distributions shall be made, the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (iii) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

### 6.9.    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 6.10.    *Discharge of Claims Against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the Plan Distributions, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents for or on behalf of such Person) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or

asserting any such discharged Claim against or terminated Interest in any Debtor, any Reorganized Debtor or any property, wherever located, including the United Kingdom, of the Estates.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in the United Kingdom and other relevant jurisdictions to implement the transactions set out in the Plan, including the Plan's discharge provisions, in order to ensure that they are fully effective.

### 6.11.    *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided in the Plan, all injunctions or stays provided in the Reorganization Cases arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All stays and suspensions provided for in the U.K. Proceeding (and any Additional U.K. Proceeding, if applicable) pursuant to any order of the U.K. Court shall remain in full force and effect until the Effective Date unless otherwise ordered by the U.K. Court.

### 6.12.    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other Persons, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions, whether in the United States, the United Kingdom or elsewhere, to interfere with the implementation or consummation of the Plan.  Moreover, Bankruptcy Code section 1141(c) provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests.  As such, to the fullest extent permissible under applicable law, no Person holding a Claim or Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan.  As of the Confirmation Date, to the fullest extent permissible under applicable law, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

### 6.13.    *Injunction.*

(a)    Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, including the United Kingdom, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor;

(ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, including the United Kingdom, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates (including any of the foregoing located in the United Kingdom) or any of their property, wherever located, including the United Kingdom, or any direct or indirect transferee of any property, wherever located, including the United Kingdom, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever (including in the United Kingdom), that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place (including in the United Kingdom), any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.  For the avoidance of doubt, ancillary security enforcement, insolvency processes and/or other proceedings may be deployed in the United Kingdom and other relevant jurisdictions to implement the transactions set out in the Plan, including the injunctions set forth in Section 12.5 of the Plan, in order to ensure that they are fully effective.

(b)    By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the Injunctions set forth in the Plan.

**6.14.   *Releases.***

(a)    **Released Parties.  The Released Parties are collectively, and each solely in its capacity as such: (a) the Debtors; (b) the First Lien Administrative Agent, the First Lien Lenders and the Ad Hoc Group of First Lien Lenders; (c) the Second Lien Administrative Agent and the Second Lien Lenders; (d) the Independent Directors with respect to any Claims or Causes of Action relating to the Debtors for the period starting March 24, 2015 through the Effective Date; (e) the current directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date; (f) the Creditors' Committee Parties; (g) the Sharp Entities, the DIP Lender and its direct parent; and (h) each of such parties' predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, attorneys, financial advisors or other professionals or representatives; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases or the U.K. Proceeding; provided, further, that the Released Parties shall not include any Excluded Party;** [32] **provided, further, that no Person shall be a**

---

[32]    **The Excluded Parties are, except for those directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date, any of the following:  (a) Apollo Global Management, LLC, (b) Twenty-First Century Fox, Inc., (c) AP NMT JV Newco B.V., (d) Endemol USA Holding, Inc., (e) Shine USA Holdings Inc., (f) MediArena Holding**

**Released Party if it objects to and/or opts out of the releases provided for in Article XII of the Plan; provided further that any First Lien Lender or Second Lien Lender that does not execute the RSA prior to the Confirmation Hearing or vote to accept the Plan shall not be a Released Party.**

> **(b)      Releases by the Debtors.  For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors (including the Sharp Entities), any of their affiliates (to the extent such affiliate is being released under the Plan) and the Reorganized Debtors, in their individual capacities and as debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, other agreements and documents delivered thereunder) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the parties released pursuant to Section 12.6 of the Plan, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceedings, the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Released Matters, or the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, other than claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtors that constitutes gross negligence, willful misconduct or breach of fiduciary duty (if any).**

> **(c)      Releases by Holders of Claims and Interests.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date: (i) each of the Released Parties; (ii) each holder of a Claim or Interest entitled to vote on the Plan that did not "opt out" of the releases provided in Section 12.6 of the Plan in a timely submitted Ballot; and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors and Reorganized Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Plan for all purposes and the**

---

B.V, and any prior or subsequent holder(s) of the MediArena Note Claim, (g) Simon Fuller, (h) any affiliates (as defined in section 101 of the Bankruptcy Code) of the Debtors that are not Debtors (other than Sharp Entities, the DIP Lender and its direct parent entity), or (i) as to any of the foregoing, their appointees to the Debtors' boards, predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, financial advisors or other professionals or representatives.

restructuring embodied in the Plan and deemed to forever release, waive and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action and liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceeding, the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Released Matters, or the Plan or this Disclosure Statement; **provided**, that, notwithstanding anything to the contrary herein or the Plan, the terms of Section 12.6(b) of the Plan shall not apply to (i) the Excluded Parties that are affiliates of the Debtors and (ii) each of Twenty-First Century Fox, Inc. and Apollo Global Management, LLC and each of their respective affiliates.

(d)     Notwithstanding anything to the contrary contained in the Plan: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in Section 12.6 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, or (y) any criminal laws of the United States or any state, city or municipality; and (ii) the releases set forth in Section 12.6 of the Plan shall not release any (x) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives and (y) claims against any Person arising from or relating to such Person's gross negligence, willful misconduct or breach of fiduciary duty (if any), each as determined by a Final Order of the Bankruptcy Court.

6.15.     *Exculpation and Limitation of Liability.*

On the Effective Date, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Creditors' Committee Parties or other Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceeding, the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence, or willful misconduct, each as determined by a Final Order of the Bankruptcy Court. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross

**negligence, or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Reorganization Cases, the Plan, and administration thereof.**

      **6.16.**    *Injunction Related to Releases and Exculpation.*

      **The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in or encompassed by Sections 12.6 and 12.7 of the Plan.**

      **6.17.**    *Retention of Causes of Action/Reservation of Rights.*

      Subject to Sections 7.1 and 12.6 of the Plan and except as expressly set forth in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors (and as applicable, the Litigation Trust) shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 in the Plan, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.  THE LITIGATION TRUST SPECIFICALLY RESERVES ALL CAUSES OF ACTION AGAINST ANY AND ALL OF THE EXCLUDED PARTIES.

      **6.18.**    *Indemnification Obligations.*

      Notwithstanding anything to the contrary contained in the Plan, including Section 10.1 of the Plan, subject to the occurrence of the Effective Date, the obligations of the Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who shall continue to be directors or officers of any of the Debtors at any time after the Effective Date, against any Causes of Action, remain unaffected thereby after the Effective Date and are not discharged.  On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such directors and/or officers remain in such positions after the Effective Date, provided, that, nothing in the Plan shall be deemed or construed to require the Reorganized Debtors to renew or extend such polices.

6.19.    *Retention of Jurisdiction.*

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    To ensure that Plan Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(e)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(g)    To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To hear and determine all Fee Claims;

(j)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)      To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following consummation;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      To resolve any disputes concerning whether a Person had sufficient notice of the Reorganization Cases or the U.K. Proceeding or any Additional U.K. Proceeding, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)      To recover all assets of the Debtors and property of the Estates, wherever located, including the United Kingdom; and

(r)      To enter a final decree closing each of the Reorganization Cases.

As of the Effective Date, notwithstanding anything in Article XIII of the Plan to the contrary, the New Term Loan Facility shall be governed by the respective jurisdictional provisions therein.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Reorganization Cases, the provisions of Article XIII of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 6.20.   *Miscellaneous Provisions*

(a)   **Exemption from Certain Transfer Taxes.**

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

(b)    **Retiree Benefits.**

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which any applicable Debtor had obligated itself to provide such benefits.  Nothing in the Plan shall: (a) restrict the Debtors' or the Reorganized Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

(c)    **Dissolution of Creditors' Committee.**

The Creditors' Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee (including each officer, director, employee, agent, consultant or representative thereof) and each Professional Person retained by the Creditors' Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan or the Reorganization Cases, except with respect to any matters concerning any Fee Claims held or asserted by any Professional Persons retained by the Creditors' Committee.

(d)    **Termination of Professionals.**

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee, if any, shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for allowance and payment of such Fee Claims and the Reorganized Debtors shall be responsible for the reasonable and documented fees, costs and expenses associated with the prosecution of such Fee Claims.  Nothing in the Plan shall preclude any Reorganized Debtor from engaging a former Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

(e)    **Amendments.**

The Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Required Consenting Lenders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may, with the consent of the Required Consenting Lenders, make appropriate technical adjustments, remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the

purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(f)    **Revocation or Withdrawal of the Plan.**

Subject to Section 4 of the RSA, the Debtors reserve the right, with the consent of the Required Consenting Lenders, to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption, assumption and assignment, or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (2) prejudice in any manner the rights of such Debtors or any other Person or (3) constitute an admission of any sort by the Debtors or any other Person.

(g)    **Reserved.**

(h)    **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

(i)    **Severability.**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (and subject to the consent of the Required Consenting Lenders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

(j)    **Governing Law.**

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides

otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

(k)   **Section 1125(e) of the Bankruptcy Code.**

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors and the Consenting Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under the Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

(l)   **Inconsistency.**

In the event of any inconsistency among the Plan, this Disclosure Statement, the Plan Documents, the RSA Order, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

(m)   **Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

(n)   **Exhibits.**

All exhibits to the Plan are incorporated and are a part of the Plan as if set forth in full in the Plan.

(o)  **Notices.**

In order to be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> AOG Entertainment, Inc.
> 8560 West Sunset Boulevard, 8th Floor
> West Hollywood, California  90069
> Attn:   Peter Hurwitz, Esq.
>           Scott Frosch
> Telephone:  (310) 777-1940
>
> -and-
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York  10019-6099
> Attn:   Matthew A. Feldman, Esq.
>           Paul V. Shalhoub, Esq.
>           Andrew S. Mordkoff, Esq.
> Telephone:  (212) 728-8000
> Facsimile:  (212) 728-8111
>
> Counsel to the Debtors

(p)  **Filing of Additional Documents.**

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(q)  **Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors  or the Consenting Lenders with respect to the Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors or the Consenting Lenders with respect to any Claims or Interests prior to the Effective Date.

# ARTICLE VII.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

**7.1.**     *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Confirmation Hearing with respect to the Plan is scheduled to commence on [_____], 2016 at [__ _.m.] (prevailing Eastern Time).  The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing (or an appropriate filing with the Bankruptcy Court) or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("**CM/ECF**") System at https://ecf.nysb.uscourts.gov (a CM/ECF password will be required),[33] and by mailing a hard copy of such objection to the chambers of the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, One Bowling Green, New York, New York 10004, together with proof of service, and served upon: (a) Willkie Farr & Gallagher LLP, counsel for the Debtors, 787 Seventh Avenue, New York, New York 10019 (Attn:  Matthew A. Feldman, Esq., Robin Spigel, Esq. and Andrew S. Mordkoff, Esq.); (b) Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn:  Richard C. Morrissey, Esq.); (c) counsel to the official committee of unsecured creditors, Sheppard, Mullin, Richter & Hampton LLP, 30 Rockefeller Plaza, New York, New York 10112 (Attn:  Malani Cademartori, Esq. and Craig A. Wolfe, Esq.); (d) counsel to the ad hoc group of lenders party to the Debtors' prepetition first lien secured credit agreement, Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067-6049 (Attn:  Lee R. Bogdanoff, Esq. and David A. Fidler, Esq.); and (e) counsel to Crestview Media Investors, L.P., as lender under the Debtors' prepetition first and second lien secured credit agreements, Quinn Emanuel Urquhart & Sullivan, LLP, 865 S. Figueroa Street, 10th Floor, Los Angeles, California 90017 (Attn:  Eric Winston, Esq.).

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

---

[33]     A CM/ECF password may be obtained via the Bankruptcy Court's CM/ECF website at https://ecf.nysb.uscourts.gov.

### 7.2.    *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

### (a)    **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

(1)    **Acceptance.**

Claims in Classes 3, 4, 5 and 6 are impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 1 and 2 are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 7 and 8 are impaired and not receiving any property under the Plan, and thus are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit, or schedule thereto or any Plan Document, with the consent of the Required Consenting Lenders, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors

believe that the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 7 and 8.

The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class.  There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (2)    Fair and Equitable Test and Unfair Discrimination.

To obtain non-consensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### (3)    Feasibility; Financial Projections.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.  The Debtors estimate that the total amount of Cash payments required to be made to holders of Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, First Lien Lender Claims, Second Lien Lender Claims, Allowed General Unsecured Claims and Allowed Convenience Claims is approximately $34 million.[34]  The Debtors expect sufficient liquidity from their Cash on hand and post-Effective Date operations to fund these Cash payments (as well as Cash payments due to holders of Allowed Administrative Expense Claims, Allowed Fee Claims and payments on account of the First Lien Lender Fee Claim and the Second Lien Lender Fee Claim) as and when they become due.

---

[34]    Of this amount, approximately, $18.1 million (from the First Lien Lender Cash Distribution) shall be used by the Rights Offering Purchasers as payment to the Reorganized Debtors to acquire the Rights Offering Units as described in Section 5.3(a)(iv) of the Plan.  Thus, the total out of pocket Cash that will be required to be paid is approximately $15.9 million, plus Allowed Administrative Expense Claims, Allowed Fee Claims and any other fees and expenses permitted to be paid under the Plan.

To that end, in connection with developing the Plan, the Debtors have prepared detailed financial projections (the "**Financial Projections**"), attached as Exhibit 3 hereto, which detail, among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a pro forma basis, that the projected level of Cash flow is sufficient to satisfy all of the Reorganized Debtors' future debt and debt related interest cost, research and development, capital expenditure and other obligations during this period. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information is not prepared in accordance with accounting principles generally accepted in the United States ("**GAAP**"). The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(b)   **Valuation of the Debtors.**

In conjunction with formulating the Plan, the Debtors determined it was necessary to perform a valuation analysis in respect of the Reorganized Debtors (the "**Valuation Analysis**"). The Valuation Analysis, performed by Moelis, the Debtors' investment banker, is set forth in Exhibit 5.

THE VALUATION ANALYSIS SET FORTH IN EXHIBIT 5 REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT

PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATE SET FORTH IN THE VALUATION ANALYSIS.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OR ASSETS OF THE REORGANIZED DEBTORS MAY TRADE OR BE SOLD AFTER GIVING EFFECT TO THE TRANSACTIONS SET FORTH IN THE PLAN.  ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

    (c)   **Best Interests Test.**

The "best interests" test requires that the bankruptcy court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

The Cash that would be available for satisfaction of Claims and Interests would consist of the proceeds from the disposition of the assets and properties of the Debtors, augmented by the Cash and Cash Equivalents held by the Debtors.  Such Cash amount would be: (i) first, reduced by the amount of the secured portion of each of the First Lien Lender Claims, Second Lien Lender Claims and Allowed Other Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a chapter 7 trustee and the fees payable to professionals that such trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' businesses; and (iii) third, reduced by the amount of the Allowed Administrative Expense Claims, U.S. Trustee Fees, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.  Any remaining net Cash would be allocated to creditors and stakeholders in strict order of priority contained in section 726 of the Bankruptcy Code.  Additional claims would arise by reason of the breach or rejection of obligations under unexpired leases and executory contracts and leases and executory contracts assumed or entered into by the Debtors prior to the filing of the chapter 7 cases.

To determine if the Plan is in the best interests of each impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after

subtracting the amounts discussed above, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Reorganization Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan (other than Subordinated Claims, which will receive the same distribution (i.e., $0) whether under the Plan or in a chapter 7 liquidation) and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that a liquidation of the Debtors' assets could take more than six months to complete, and distribution of the proceeds of the liquidation could be delayed for up to six months after the completion of such liquidation to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by creditors and equity interest holders in the event of liquidation as of June 30, 2016 (the "**Liquidation Analysis**", which is attached hereto as Exhibit 2.) The Liquidation Analysis provides: (i) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates; and (ii) the expected recoveries of the Debtors' creditors and equity interest holders under the Plan.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last six months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations as individual assets, the collection of receivables and the finalization of tax affairs. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### 7.3.    *Standards Applicable to Releases.*

**Article XII of the Plan provides for releases for certain claims against non-Debtors in consideration of services provided to the Debtors and the contributions made by the Released Parties to the Debtors' chapter 11 cases. The Released Parties are collectively, and each solely in its capacity as such: (a) the Debtors; (b) the First Lien Administrative**

**Agent, the First Lien Lenders and the Ad Hoc Group of First Lien Lenders; (c) the Second Lien Administrative Agent and the Second Lien Lenders; (d) the Independent Directors with respect to any Claims or Causes of Action relating to the Debtors for the period starting March 24, 2015 through the Effective Date; (e) the current directors, officers, employees, managing agents and attorneys of the Debtors who shall continue to occupy such roles after the Effective Date; (f) the Creditors' Committee Parties; and (g) each of such parties' predecessors, successors and assigns, subsidiaries, funds, portfolio companies, affiliates, respective professionals, and each of their respective officers, directors, employees, managers, attorneys, financial advisors or other professionals or representatives; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases or the U.K. Proceeding; provided, further, that the Released Parties shall not include any Excluded Party; provided, further, that no Person shall be a Released Party if it objects to and/or opts out of the releases provided for in Article XII of the Plan; provided further, that any First Lien Lender or Second Lien Lender that does not execute the RSA prior to the Confirmation Hearing or vote to accept the Plan shall not be a Released Party.**

**Except as set forth in the Plan, the releases are given by (i) the Released Parties, (ii) each holder of a Claim or Interest entitled to vote on the Plan that did not "opt out" of the releases provided in Section 12.6 of the Plan in a timely submitted Ballot, and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, to the Released Parties. The released claims are limited to those claims or causes of action taking place on or prior to the Effective Date that may have arisen in connection with, related to or arising out of the Debtors, the Reorganized Debtors, the Reorganization Cases, the U.K. Proceeding, any Additional U.K. Proceeding the RSA, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Released Matters,[35] or the Plan or this Disclosure Statement.**

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are limited to those parties that have provided value to the Debtors and materially aided in the reorganization process, including, with respect to certain Released Parties, by entry into the RSA, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties, including, the Debtors' independent directors, has played an integral role in these chapter 11 cases and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

---

[35]    "Released Matters" means (a) any and all Claims and Causes of Action belonging to, relating to, or which have been brought or could have been brought by: (i) the Debtors (including the Sharp Entities) or any of their affiliates (to the extent such affiliate is being released), (ii) the Estates, (iii) the Creditors' Committee, or (iv) any other Person granted standing to assert any Claims and Causes of Action of the Debtors (including the Sharp Entities), their affiliates (to the extent such affiliate is being released), or the Estates arising at any time prior to the Effective Date; (b) all matters related to the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement and any "Claims and Defenses" (as defined in the DIP Order); and (c) any and all claims arising from actions taken or not taken in connection with: (w) the Transaction, (x) the Plan, (y) all documents relating or contemplated by the Transaction and/or the Plan, and (z) the Reorganization Cases.

The United States Court of Appeals for the Second Circuit has determined that releases of non-debtors may be approved as part of a chapter 11 plan of reorganization if there are "unusual circumstances" that render the release terms important to the success of the plan. Deutsche Bank AG v. Metromedia Fiber Network Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 143 (2d Cir. 2005). Courts have approved releases of non-debtors when, for example, (a) the estate received substantial consideration; (b) the enjoined claims were channeled to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consented to the release. Id. at 142. Before a determination can be made as to whether releases are appropriate as warranted by "unusual circumstances," a court must address the threshold jurisdictional question of whether a court has subject matter jurisdiction to grant such releases. In re Johns-Manville Corp., 517 F.3d 52, 65 (2d Cir. 2008); see also In re Dreier LLP, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) (finding no jurisdiction to approve releases of claims that did not affect the estate); In re Metcalf & Mansfield Alternative Investments, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) (discussing and approving releases in a case under chapter 15 of the Bankruptcy Code). Courts have jurisdiction over a third party cause of action or claim if it will "directly and adversely impact the reorganization." Dreier, 429 B.R. at 132. Conversely, the court may lack jurisdiction if the released claim is one that would "not affect the property of the estate or the administration of the estate." Id. at 133. Here, each of the non-Debtor Released Parties contributed significantly to the Debtors' reorganization process, including, among other things, through entry into the RSA. Absent execution of the RSA, the Debtors could not have filed for chapter 11 protection with a clear path to reorganization and emergence. Additionally, parties entitled to vote on the Plan may elect to opt-out of providing non-Debtor releases consistent with applicable law. Accordingly, the Debtors contends that the circumstances of the Debtors' chapter 11 cases satisfy the Metromedia requirements.

Further, the Debtors are not aware of any cognizable claims of any material value against any of the Released Parties that the Debtors would be releasing in connection with Section 12.6 of the Plan. As such, the release of any Estate claims and Causes of Actions against the Released Parties as part of the overall compromise and settlement embodied by the Plan is fair, equitable, reasonable, and well within the boundaries permitted by law.

### 7.4.    *Classification of Claims and Interests.*

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### 7.5.    *Consummation.*

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in Section 11.1 of the Plan, have been satisfied or waived pursuant to the Plan.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

# ARTICLE VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors will be unable to satisfy in full their debt obligations.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### 8.1.    *Liquidation Under Chapter 7 of the Bankruptcy Code.*

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement.  The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those distributions provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VII and attached as Exhibit 2 to this Disclosure Statement.

### 8.2.    *Alternative Plan(s) of Reorganization.*

The Debtors believe that failure to confirm the Plan inevitably will lead to expensive and protracted Reorganization Cases, whereas the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their business and allowing creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation may be preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to holders of Claims than the Plan because the Plan provides for a greater return to holders of Claims and results in Reorganized Debtors that will continue operating, and hence continue interacting with vendors, employees, and others, post-bankruptcy.

Moreover, the prolonged continuation of the Reorganization Cases is likely to adversely affect the Debtors' business and operations.  So long as the Reorganization Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  Prolonged continuation of the Reorganization Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the Reorganization Cases continue, the more likely it is that the Debtors' suppliers, distributors and agents will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Reorganization Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the Reorganization Cases.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries over any alternative

capable of rational consideration (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns. Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time-consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### 8.3.    *Dismissal of the Reorganization Cases.*

Dismissal of the Reorganization Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Reorganization Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiations with their creditors, possibly resulting in costly and protracted litigation in various jurisdictions. Moreover, holders of Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens, which is likely all of the Debtors' assets. Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Reorganization Cases is not a viable alternative to the Plan.

### ARTICLE IX.

### <u>SUMMARY OF VOTING PROCEDURES</u>

This Disclosure Statement, including all exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 3, 4, 5 and 6, which are the only Claims entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot(s) enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed [_____], 2016, at 5:00 p.m. (prevailing Eastern Time) as the Voting Record Date. Ballots must be **RECEIVED** by the Voting Agent no later than the Voting Deadline, **4:00 p.m. (prevailing Eastern Time) on [_____], 2016**, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (prevailing Eastern Time) on such extended date. <u>See</u> Section 1.4 "*Voting; Holders of Claims Entitled to Vote*" above for additional disclosures regarding voting.

Pursuant to Bankruptcy Rule 3018(a), Ballots previously delivered may only be changed, withdrawn or revoked with the consent of the Bankruptcy Court. In addition, neither the Debtors nor the Voting Agent shall have any obligation to recognize any change to, modification, withdrawal or revocation of a Ballot occurring after the commencement of the Confirmation Hearing.

## ARTICLE X.

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

### 10.1.    *General Case Background.*

On April 28, 2016, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On April 28, 2016, the Bankruptcy Court entered an order [Docket No. 23] authorizing the joint administration of the Reorganization Cases, for procedural purposes only, under Case No. 16-11090. The Honorable Stuart M. Bernstein is presiding over the Reorganization Cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On May 17, 2016, a statutory committee of unsecured creditors was appointed in these cases. As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.

The following is a brief description of certain significant events that have occurred during the pendency of the Reorganization Cases.

### 10.2.    *U.K. Proceedings.*

On April 29, 2016, Debtor 19 Entertainment Limited commenced a proceeding in the U.K. Court, seeking recognition of its chapter 11 case as a foreign main proceeding in accordance with Article 17 of Schedule 1 to the Cross-Border Insolvency Regulations 2006, which was granted by the U.K. Court on April 29, 2016. Notice of the U.K. Court's recognition order was filed in the Reorganization Cases on May 2, 2016 [Docket No. 45].

### 10.3.    *Retention of Professionals.*

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Reorganization Cases, on May 16, 2016, the Debtors filed applications with the Bankruptcy Court seeking to retain Willkie Farr & Gallagher, LLP as restructuring counsel [Docket No. 65], Moelis & Company as investment banker and financial advisor [Docket No. 63], and PricewaterhouseCoopers LLP as independent auditors and tax consultants [Docket No. 62], which were approved by the Bankruptcy Court on June 3, 2016 [Docket Nos. 122, 128 and 120, respectively].

In addition, on the Petition Date, the Debtors filed with the Bankruptcy Court an application seeking entry of an order, pursuant to 28 U.S.C. § 156(c), authorizing the Debtors to retain KCC as the Debtors' claims and noticing agent [Docket No. 15], which was approved by the Bankruptcy Court on May 2, 2016 [Docket No. 42]. On May 16, 2016, the Debtors also filed an application with the Bankruptcy Court, pursuant to section 327(a) of the Bankruptcy Code,

authorizing the Debtors to retain KCC as administrative agent for the Debtors [Docket No. 61], which was approved by the Bankruptcy Court on June 3, 2016 [Docket No. 119].

Additionally, on May 16, 2016, the Debtors filed with the Bankruptcy Court a motion seeking authority, pursuant to section 327(e) of the Bankruptcy Code, to employ certain additional professionals, utilized in the ordinary course, to assist the Debtors in their day-to-day business operations [Docket No. 64]. On June 29, 2016, the Bankruptcy Court entered an order granting the relief requested in the motion [Docket No. 183].

### 10.4. *Employment Obligations.*

The Debtors believe that they have a valuable asset in their workforce, and that the efforts of the Debtors' employees are critical to a successful reorganization. On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order authorizing the Debtors to pay certain prepetition employee wage and benefit obligations [Docket No. 12] (the "**Employee Wage Motion**"). In the Employee Wage Motion, the Debtors requested to, among other things, satisfy certain of their prepetition obligations to their current employees, reimburse employees for prepetition travel and other business expenses that were incurred on behalf of the Debtors, pay prepetition payroll-related taxes and withholdings associated with the Debtors' employee wage claims and the employee benefit obligations and other similar tax obligations, and to continue any employee benefit programs in place as of the Petition Date (including satisfying any prepetition obligations associated with such programs). On May 2, 2016, the Bankruptcy Court entered an order granting final approval of the Employee Wage Motion [Docket No. 38].

Additionally, on July 12, 2016, the Debtors filed with the Bankruptcy Court an omnibus motion to assume certain of their collective bargaining agreements with their unions [Docket No. 204]. A hearing to consider entry of an order granting the relief requested in the motion is scheduled for July 26, 2016.

### 10.5. *Continuing Vendor Relations.*

The Debtors believe that maintaining good relationships with their vendors is necessary to the continuity of the Debtors' business operations during the Reorganization Cases. Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain critical vendors [Docket No. 6] (the "**Critical Vendor Motion**"). On May 2, 2016 and June 3, 2016, the Bankruptcy Court entered orders granting interim and final approval of the Critical Vendor Motion, respectively [Docket Nos. 39 and 118], and issued a corrected Final Order on June 10, 2016 [Docket No. 130].

In addition, to preserve their business relationships with their networks and other business partners, on May 16, 2016, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the payment of reimbursable claims in the ordinary course of business [Docket No. 66] (the "**Reimbursable Claims Motion**"). On June 3, 2016, the Bankruptcy Court entered an order granting the Reimbursable Claims Motion [Docket No. 123].

### 10.6. *Cash Management System.*

The Debtors believe it would have been disruptive to their operations if they were forced to change significantly their cash management system upon the commencement of the Reorganization Cases. Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to maintain their current cash management system as well as to authorize certain intercompany transactions [Docket No. 4] (the "**Cash Management Motion**"). On May 2, 2016 and June 3, 2016, the Bankruptcy Court entered orders granting interim and final approval of the Cash Management Motion, respectively [Docket Nos. 41 and 117].

### 10.7. *Insurance Obligations*

On June 20, 2016, the Debtors filed with the Bankruptcy Court a motion seeking an order authorizing the Debtors to continue honoring their obligations pursuant to certain prepetition insurance policies and agreements [Docket No. 149]. The Bankruptcy Court entered an order [Docket No. 203] approving the motion on July 12, 2016.

### 10.8. *Tax Motion.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing them to pay various prepetition sales and use taxes and other taxes to various federal, state, local and foreign authorities, and certain licensing, permitting and regulatory fees to certain federal, state, local and foreign government agencies on a periodic basis, in each case, as and when such obligations become due [Docket No. 11] (the "**Tax Motion**"). On May 2, 2016, the Bankruptcy Court entered an order granting final approval of the Tax Motion [Docket No. 40].

### 10.9. *Schedules and Statements.*

By order of the Bankruptcy Court dated May 2, 2016 [Docket No. 43], the Debtors obtained an extension of time to file their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "**Schedules**") until June 13, 2016. On June 9, 2016, the Debtors filed a motion for a further extension of time to file their Schedules until June 22, 2016 [Docket No. 129], which was approved by the Bankruptcy Court on June 27, 2016 [Docket No. 172]. On June 22, 2016, each Debtor filed with the Bankruptcy Court its Schedules. The Schedules are available electronically free of charge at http://www.kccllc.net/AOG.

### 10.10. *Bar Dates*

On June 23, 2016, the Bankruptcy Court entered an order [Docket No. 161] (the "**Bar Date Order**") establishing the deadlines (each, a "**Bar Date**") for filing proofs of certain claims against the Debtors that arose on or prior to the Petition Date and approving the form and manner of notice of each Bar Date. The Bar Date Order fixed 5:00 p.m. (prevailing Eastern Time) on August 5, 2016 as the Bar Date to file proofs of claim for all creditors other than governmental units, and October 25, 2016 as the Bar Date for governmental units.

### 10.11.    *Use of Cash Collateral and Approval of the DIP Facility.*

On May 3, 2016, the Bankruptcy Court entered an interim order [Docket No. 47] authorizing, on an interim basis, the Debtors to use cash and/or cash collateral.  On June 3, 2016, the Bankruptcy Court entered an order [Docket No. 124] approving the Debtors' senior secured intercompany debtor-in-possession financing facility (the "**DIP Facility**") and authorizing the Debtors to obtain postpetition financing on an interim basis (the "**Interim DIP Order**").  On June 29, 2016, the Bankruptcy Court entered a second interim order [Docket No. 185], continuing the relief obtained in the Interim DIP Order (the "**Second Interim DIP Order**").  A hearing to consider the DIP Facility on a final basis (the "**Final DIP Order**" and collectively with the Interim DIP Order and the Second Interim DIP Order, the "**DIP Orders**") is scheduled for July 26, 2016.  The DIP Orders authorize, among other things, the Debtors to obtain secured postpetition loans, advances and other financial accommodations from Elvis Blue Moon Holdings, LLC ("**Blue Moon**"), a non-Debtor subsidiary, pursuant to the DIP Credit Agreement and to grant superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of advances extended by Blue Moon under the DIP Credit Agreement following the Petition Date.

### 10.12.    *Restructuring Support Agreement.*

As discussed in Article IV, the RSA is the lynchpin of the Debtors' restructuring. In the period leading up to and immediately following the Petition Date, the Debtors negotiated the terms of the Plan and the RSA with the Consenting Lenders, who together hold 100% of the First Lien Lender Claims and 100% of the Second Lien Lender Claims.  Pursuant to the RSA, the Debtors and the Consenting Lenders agreed to support a pre-negotiated plan of reorganization, consistent with the proposed plan term sheet annexed to the RSA, which served as the basis for the Plan.  The RSA was designed to implement a comprehensive balance sheet restructuring that will significantly reduce the Debtors' funded indebtedness and allow the Debtors to navigate through their reorganization process efficiently and expeditiously.

A motion seeking authority for the Debtors to enter into and perform under the RSA was filed on May 20, 2016 [Docket No. 78].  A hearing to consider entry of an order granting the relief requested in the motion was held on June 28, 2016.  On June 29, 2016, the Bankruptcy Court entered an order approving the motion [Docket No. 184].

### 10.13.    *Appointment of a Creditors' Committee.*

The Creditors' Committee was appointed by the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code on May 17, 2016 to represent the interests of the Debtors' unsecured creditors [Docket No. 70].  On June 24, 2016, the Creditors' Committee filed with the Bankruptcy Court applications seeking entry of an order authorizing the Creditors' Committee to retain Sheppard Mullin Richter & Hampton, LLP as counsel [Docket No. 256]. Additionally, on July 12, 2016, the Creditors' Committee filed with the Bankruptcy Court an application to retain Zolfo Cooper, LLC as its financial advisor and bankruptcy consultant [Docket No. 205].  A hearing to approve such retention applications is currently scheduled for July 26, 2016.

The current members of the Creditors' Committee are set forth below:

Marc Graboff
1225 Corsica Drive
Pacific Palisades, CA 90272

Sony Music Entertainment
301 Route 17 North
Rutherford, NJ 07070
Attention:  Susan S. Danz
V.P. Credit & Collections

Fremantle Media Group Ltd.
c/o Fremantle Media N. America, Inc.
2900 W. Alameda Avenue, 8th Floor
Burbank, CA 91505
Attention:  Suzanne S. Lopez
EVP, Business and Legal Affairs

### 10.14.    *Section 341 Meeting.*

On June 24, 2016, the United States Trustee convened a meeting of creditors (the
"**341 Meeting**") pursuant to section 341(a) of the Bankruptcy Code.  The 341 Meeting was
closed on June 24, 2016.

### 10.15.    *Adversary Proceeding.*

On June 2, 2016, Debtors19 Entertainment, Inc., 19 Recordings, Inc. and 19
Publishing Inc. (collectively, "**Plaintiffs**"), commenced an adversary proceeding against Phillip
Phillips ("**Phillips**") seeking a declaratory judgment that each of Phillips' contracts with
Plaintiffs continues in full force and effect as well as related relief  Adv. Proc. No. 16-01074
(SMB) [Docket No. 1].  On July 19, 2016, Phillips filed an answer denying the allegations in the
complaint [Docket No. 10], and filed a motion seeking (a) either abstention and dismissal of the
adversary proceeding or a stay of the adversary proceeding, and (b) relief from the automatic
stay [Docket No. 11].  The Debtors intend to oppose such motion.  A pre-trial conference is set
for August 2, 2016 at 10:00 a.m. [Docket No. 12].

## ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

---

**Important Risks to Be Considered**

Holders of Claims should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan, before voting to accept or reject the Plan.

These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

---

**11.1.** *Certain Bankruptcy Considerations.*

(a) **General.**

Although the Plan is designed to implement the restructuring transactions contemplated thereby and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Additionally, pursuant to the RSA, if the Debtors fail to meet the deadlines set forth in the RSA, the various conditions precedent to the enforcement of the obligations of the parties thereto are not satisfied or the Debtors otherwise breach their obligations thereunder, the Consenting Lenders are no longer obligated to support the Plan. Such scenarios could jeopardize the Debtors' relationships with their key vendors and employees, which, in turn, would have an adverse effect on the Debtors' operations. A material deterioration in the Debtors' operations likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors may not have sufficient liquidity to operate in bankruptcy for such an extended period.

(b) **Failure to Receive Requisite Acceptances.**

Claims in Classes 3, 4, 5 and 6 are the only Claims that are entitled to vote to accept or reject the Plan. Although the Debtors believe they will receive the requisite acceptances, the Debtors cannot provide assurances that the requisite acceptances to confirm the Plan will be received for at least one of these Classes. If the requisite acceptances are not received for at least one of these Classes, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. In

93

such a circumstance, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances of an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Consenting Lenders and/or may be required to liquidate these estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to, or as favorable to the Debtors' creditors as, those proposed in the Plan.

(c)    <b>Failure to Secure Confirmation of the Plan.</b>

Even if the requisite acceptances are received, the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

(d)    <b>Failure to Consummate the Plan.</b>

Section 11.1 of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents, in form and substance satisfactory to the Required Consenting Lenders, and all conditions precedent to effectiveness of such agreements having been satisfied or waived in accordance with the terms thereof.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or

94

waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If the Plan is not consummated and the restructuring completed, these Reorganization Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

Moreover, the Plan is predicated on, among other things, receipt of the Rights Offering Amount.  Because the Rights Offering has not been completed, there can be no assurance that the Debtors will receive any or all of the Rights Offering Amount.  Similarly, the Plan is predicated on, among other things, the support of the Consenting Lenders and consideration described in the RSA.  Under the RSA, unless waived by the Required Consenting Lenders, the RSA automatically terminates if, among other reasons, the deadlines set forth in such agreement or the various conditions precedent to the enforcement of the obligations of the parties thereto are not satisfied.  If the RSA is terminated, the Debtors may not be able to consummate the Plan in its current form.

### (e)   Objections to Treatment of Claims.

Section 1129(b) of the Bankruptcy Code provides that a plan must not discriminate unfairly with respect to each class of Claims or Interests.  Holders of Claims or Interests may argue that the Plan discriminates unfairly with respect to their Claims or Interests.  The Debtors believe that the treatment of each class of Claims or Interests complies with the requirements set forth in the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### (f)   Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### (g)   The Debtors May Object to the Amount or Classification of Your Claim.

The Debtors reserve the right to object to the amount or classification of any Claim.  It is the Debtors' position that the estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection.  Any such Claim holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### (h)   Allowance of General Unsecured Claims and Whether Class 5 (General Unsecured Claims) Votes to Accept the Plan Will Impact the Recovery to Holders of General Unsecured Claims Under the Plan.

The Plan provides for holders of Allowed General Unsecured Claims to receive their Pro Rata Share of certain Litigation Trust Units, the General Unsecured Claim Cash

Distribution (i.e., up to $850,000) and, if they vote to accept the Plan, a Pro Rata Share of such General Unsecured Claim Cash Distribution that otherwise would have be distributed to the First Lien Lenders and the Second Lien Lenders; provided that no holder of an Allowed General Unsecured Claim shall receive a share of General Unsecured Clam Cash Distribution in an amount greater than 3.5% of such holder's Allowed General Unsecured Claim. There are various reasons why the ultimate value of this package of consideration for any particular holder of an Allowed General Unsecured Claim is uncertain. First, the value of the Litigation Trust Units is dependent upon the success of any litigation commenced by the Litigation Trust. There can be no assurance that the Litigation Trust will be successful in any litigation. Second, the Plan provides that no holder of an Allowed General Unsecured Claim shall receive a share of the First Lien Lenders' or the Second Lien Lenders' Pro Rata Share of the General Unsecured Claim Cash Distribution unless Class 5 (General Unsecured Claims) votes to accept the Plan. Thus, if Class 5 does not vote to accept the Plan, holders of Allowed General Unsecured Claims will receive a reduced recovery because such holders will receive only a Pro Rata Share of the General Unsecured Claim Cash Distribution, the calculation of such Pro Rata Share including the First Lien Lenders' and Second Lien Lenders' $295.6 million Aggregate Lender Deficiency Claim. Third, the bar date for all claims (other than claims of governmental units) is August 5, 2016. Thus, as of the date of this Disclosure Statement, the aggregate amount of General Unsecured Claims asserted against the Debtors in excess of the amounts set forth in the Schedules is unknown. Further, because the bar date is August 5, 2016, as of the date of this Disclosure Statement, the Debtors will not have had the opportunity to review, analyze and reconcile the scheduled and filed Claims. Objections likely will be filed as the claims resolution process progresses. The aggregate amount of General Unsecured Claims that will ultimately be allowed is not presently determinable, and the claims resolution process may not be completed until after the Effective Date. In addition, the amount of Allowed General Unsecured Claims may be materially increased if material rejection damage claims are asserted and ultimately Allowed. Because holders of General Unsecured Claims will receive a proportionate share of the General Unsecured Claim Cash Distribution, any increase in the amount of Allowed General Unsecured Claims over the amount estimated by the Debtors would reduce the recovery to the holders of such Claims.

(i)    **The Debtors May Adjourn Certain Deadlines.**

In certain circumstances, the Debtors may deem it appropriate to adjourn either or both of the Voting Deadline and/or the Confirmation Hearing. While the Debtors estimate that the Effective Date will occur in the early Fall (which would allow a more rapid emergence from Chapter 11 than what the RSA milestones require — i.e., November 23, 2016) they cannot provide assurances that applicable dates related to the foregoing will not be extended and the Effective Date will not be delayed.

**11.2.    *Risks Relating to the Capital Structure of the Reorganized Debtors.***

(a)    **Variances from Financial Projections.**

The Financial Projections included as Exhibit 3 to this Disclosure Statement reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as

assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize, particularly given the current difficult economic environment.  Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, environmental or safety issues, workforce disruptions, competition or changes in the regulatory environment, could result in significant differences from the Financial Projections.  The Debtors believe that the assumptions underlying the Financial Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Debtors' and the Reorganized Debtors' ability to initiate the endeavors and meet the financial benchmarks contemplated by the Plan.  Therefore, the actual results achieved throughout the period covered by the Financial Projections necessarily will vary from the projected results, and these variations may be material and adverse.

(b)    **Leverage.**

Although the Reorganized Debtors will have significantly less indebtedness than the Debtors, on the Effective Date, after giving effect to the transactions contemplated by the Plan, in addition to payment of Claims, if any, that require payment beyond the Effective Date and ordinary course debt, the Reorganized Debtors will, on a consolidated basis, still have $30 million in secured indebtedness under the New Term Loan Facility.

**The degree to which the Reorganized Debtors will be leveraged could have important consequences because:**

- it could affect the Reorganized Debtors' ability to satisfy their obligations under their secured indebtedness following the Effective Date;

- a portion of the Reorganized Debtors' cash flow from operations will be used for debt service and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and

- the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be limited.

(c)    **Ability to Service Debt.**

Although the Reorganized Debtors will have significantly less indebtedness than the Debtors, the Reorganized Debtors will still have material interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business,

financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

### (d)    Obligations Under Certain Financing Agreements.

The Reorganized Debtors' obligations under certain financing agreements, including, but not limited to, the New Term Loan Credit Agreement, will be secured by liens on substantially all of the assets of the Reorganized Debtors as well as the unrestricted wholly-owned subsidiaries of the Debtors (subject to certain exclusions set forth therein). If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the New Term Loan Credit Agreement, the lenders thereto would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

### (e)    Restrictive Covenants.

The financing agreements governing the Reorganized Debtors' indebtedness will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of their assets. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

### (f)    Lack of a Trading Market.

It is anticipated that New CORE Holdings will be a private company and that there will be no active trading market for the New Class A LLC Units, the New Series P Convertible Preferred Units, or the New Second Lien Warrants. The New Class A LLC Units, the New Series P Convertible Preferred Units, and the New Second Lien Warrants, are subject to

restrictions on transfer, and New CORE Holdings has no present intention to register any of the securities under the Securities Act, nor to apply to list any of the foregoing on any national securities exchange.  Accordingly, there can be no assurance that any market will develop for the new securities or as to the liquidity of any market that may develop for any such securities.  In addition, New CORE Holdings will not be required to file periodic reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.  Furthermore, the lack of liquidity may adversely affect the price at which the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants may be sold, if at all.

(g)    **Restrictions on Transfer.**

Holders of the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants issued under section 1145 of the Bankruptcy Code who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  These Persons will be permitted to transfer or sell such securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  New CORE Holdings has no current plans to register at a later date, post-emergence, any of its securities under the Securities Act or under equivalent state securities laws such that the recipients of the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants would be able to resell their securities pursuant to an effective registration statement.  Moreover, New CORE Holdings does not currently intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants to avail themselves of Rule 144.

The New CORE Holdings LLC Agreement contains restrictions on a holder's ability to transfer the New Class A LLC Units and the New Series P Convertible Preferred Units.  The New Second Lien Warrant Agreement contains restrictions on a holder's ability to transfer the New Second Lien Warrants.  In addition to the foregoing transfer restrictions, any holder that proposes to effect a transfer may be required to submit a written request that includes, among other things, reasonably sufficient information to establish that the transfer does not violate or result in registration being required under applicable securities laws or laws relating to investment companies or advisors.

*See* Article XIII "*Securities Law Matters*," herein, for additional information regarding restrictions on resale of the New Class A LLC Units, the New Series P Convertible Preferred Units, or the New Second Lien Warrants.

(h)    **The Valuation of the New Class A LLC Units is Not Intended to Represent the Trading Value of the New Class A LLC Units.**

The Valuation Analysis of the Reorganized Debtors, which is annexed hereto as Exhibit 5 and based on the Financial Projections developed by the Debtors, is not intended to

represent the trading values of New Class A LLC Units in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and (iv) other factors that generally influence the prices of securities. Actual market prices of the New Class A LLC Units also may be affected by the Reorganization Cases or by other factors not possible to predict. Accordingly, the implied value stated herein and the Plan of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Class A LLC Units in the public or private markets.

(i)       **Dividend Policies.**

It is expected that all of the Reorganized Debtors' cash flow will be required to be used in the foreseeable future (i) to make payments under the New Term Loan Facility, (ii) to fund the Reorganized Debtors' other obligations under the Plan, and (iii) for working capital and capital expenditure purposes. Accordingly, New CORE Holdings does not anticipate paying dividends or distributions on the New Class A LLC Units in the foreseeable future.

**11.3.    *Risks Relating to Tax and Accounting Consequences of the Plan.***

(a)    **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.**

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Plan. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.

(b)    **Use of Historical Financial Information.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules. Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP.

11.4.    *Risks Associated with the Company's Businesses.*

**THE FOLLOWING PROVIDES A SUMMARY OF CERTAIN OF THE RISKS ASSOCIATED WITH THE COMPANY'S BUSINESSES.**

(a)    **The Debtors' Reorganization Cases May Negatively Impact the Company's Future Operations.**

While the Debtors believe that they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11.  Additionally, notwithstanding the support of the Consenting Lenders, the Reorganization Cases may adversely affect the Company's ability to retain vendors and employees, develop new entertainment properties, and maintain contracts that are critical to its operations.

(b)    **The Popularity of the Company's Entertainment Properties Is Dependent on a Variety of Factors.**

The Company relies heavily on the continued appeal of the IDOLS and SYTYCD brands.  The Company's revenue and income derived from those television programs depend primarily upon the initial and continued acceptance of that programming by the public.  Public acceptance of particular programming is dependent upon, among other things, the quality of the programming, the strength of networks on which the programming is broadcast, the promotion and scheduling of the programming and the quality and acceptance of competing television programming and other sources of entertainment and information.  Popularity of programming can also be impacted by the strength, appeal and continuity of on-air talent.

Any one or more of these factors could result in one of the television series losing its popularity among viewers.  Regardless of the reason, a decline in the number of television viewers who tune in to the shows and a reduced number of their foreign adaptations could result in lower advertising revenue for the networks that broadcast television shows based on the aforementioned brands and could hurt the Company's ability to sell future format shows based on the brands.  This in turn would have a material adverse effect on the Company's business, operating results and financial condition.

(c)    **The Company Depends on Its Relationships with Third Parties, Including Its Co-Producers, Television Broadcasters and Record Companies.**

The Company's ability to exploit new entertainment content depends on its ability to have that content produced and distributed on favorable terms.  Although the Company has strong relationships in the entertainment industry, there can be no guarantee that these relationships will endure or that its production and distribution partners will honor their obligations to the Company.  For example, the Company has historically depended heavily on the companies that co-produce and broadcast the American Idol series in the United States, namely FOX and FremantleMedia.  Similarly, the Company depends on affiliates of Sony Music and Universal Music to make and distribute recordings by IDOLS winners in the United States and other significant markets and to pay royalties on record sales and advance monies against

those royalties.  The Company advances funds to the winners, after they sign recording contracts, from the monies the Company receives from the record companies.  Any failure of FOX, FremantleMedia, Sony Music, Universal Music or other third parties on whom the Company relies to continue to honor their obligations to the Company and adhere to the past course of dealing and conduct could have a material adverse effect on the Company's ability to realize continued revenue from the <u>IDOLS</u> platform.

(d)    <b>The Company Depends on Its Intellectual Property Rights.</b>

The Company's intellectual property, including the rights to the name, trademark and service mark "<u>IDOLS</u>," is material to its operations.  If the Company does not or cannot protect its material intellectual property rights against infringement or misappropriation by third parties (whether for legal reasons or for business reasons relating, for example, to the cost of litigation), its revenue may be materially adversely affected.

The Company attempts to protect its intellectual property rights through a combination of patent, trademark, copyright, rights of publicity and other laws, as well as licensing agreements and confidentiality and assignment agreements.  Because of the differences in foreign trademark, patent, copyright and other laws concerning proprietary rights and various foreign and U.S. state laws concerning publicity rights, the Company's intellectual property rights may not receive the same degree of protection in one jurisdiction as in another.  Although the Company believes that its intellectual property is enforceable in most jurisdictions, they cannot guarantee such validity or enforceability.  The Company's failure to obtain or maintain adequate protection of its intellectual property rights for any reason could have a material adverse effect on their business, financial condition and results of operations.

The Company relies on trademarks, trade names, and brand names to distinguish its products, services and content from those of its competitors, and have registered or applied to register certain of these trademarks in jurisdictions around the world.  In addition, FremantleMedia has registered on the Company's behalf certain trademarks that the Company co-owns with them, including the trademark "<u>American Idol</u>" and its logo.  With respect to applications to register trademarks that have not yet been accepted, the Company cannot assure that such applications will be approved.  Third parties may oppose the trademark applications, seek to cancel existing registrations or otherwise challenge the Company's use of the trademarks. If the third parties are successful, the Company could be forced to re-brand their products, services and content, which could result in loss of brand recognition, and could require the Company to devote resources to advertising and marketing new brands.  The Company also grants third parties the right to use the Company's trademarks.  In an effort to preserve trademark rights, the Company enters into license agreements with these third parties, which govern the use of the trademarks, and which require the licensees to abide by quality control standards with respect to the goods and services that they provide under the trademarks.  Although the Company makes efforts to police the use of the trademarks by the licensees, the Company cannot make assurances that these efforts will be sufficient to ensure that the licensees abide by the terms of their licenses.  In the event that the licensees fail to do so, the trademark rights could be diluted, or subject to challenge or invalidation.

102

Although the Company relies on copyright laws to protect the works of authorship created by them or transferred to them via assignment or by operation of law as work made for hire, it does not typically register all of its works. Copyrights in works of U.S. origin authored after January 1, 1978 exist as soon as the works are authored and fixed in a tangible medium; however, the works must be registered before the copyright owners may bring an infringement action in the United States. Furthermore, if a copyrighted work of U.S. origin is not registered within three months of publication of the underlying work or before the act of infringement, the copyright owner cannot recover statutory damages or attorneys' fees in any U.S. enforcement action; rather, the owner must prove he suffered actual damages or lost profits. Accordingly, if one of the Company's unregistered works of U.S. origin is infringed by a third party, the Company will need to register the work before it can file an infringement suit in the United States, and the remedies in any such infringement suit could be limited. Furthermore, copyright laws vary from country to country. Although copyrights that arise under the laws of the United States and the United Kingdom will be recognized in most other countries (as most countries are signatories of the Berne Convention and the Universal Copyright Convention), the Company cannot guarantee that courts in other jurisdictions will afford its copyrights with the same treatment as courts in the United States or the United Kingdom.

> (e)    **The Loss of One or More of the Company's Key Personnel Could Disrupt Operations and Adversely Affect Financial Results.**

The Company is highly dependent upon the availability and performance of its executive officers. Accordingly, the loss of services of any of the Company's executive officers could materially adversely affect the Company's business, financial condition and operating results.

> (f)    **Continued Weakness or Worsening of Economic Conditions Could Continue to Adversely Affect the Reorganized Debtors' Financial Performance and Liquidity.**

The global economic environment and declines in consumption in the Company's end markets have adversely affected demand for the Company's programs and other entertainment properties. This environment and decline was a factor leading to these chapter 11 cases. Further, global financial markets have been experiencing volatility. Economic conditions could accelerate the continuing decline in demand for the Company's programs and other properties, which could also place pressure on its results of operations and liquidity. There is no guarantee that anticipated economic growth levels in markets that have experienced some economic recovery will continue in the future, or that the Company will succeed in expanding sales in these markets. If the global economic weakness and tightness in credit markets continue for a greater period of time than anticipated or worsen, the Company's profitability and related Cash generation capability could be adversely affected and, therefore, affect the Reorganized Debtors' ability to meet its anticipated Cash needs or impair its liquidity.

> (g)    **Legal Matters.**

The Company is party to routine litigation incidental to its businesses. It is not anticipated that any current or pending lawsuit, either individually or in the aggregate, is likely to

have a material adverse effect on the Company's financial condition. No assurance can be provided, however, that the Company will be able to successfully defend or settle all pending or future purported claims, and the Company's failure to do so may have a material adverse effect on the Reorganized Debtors.

## ARTICLE XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 12.1. *Introduction.*

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders entitled to vote on the Plan. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

For purposes of this discussion, the term "**Old Term Loans**" is used to refer to the obligations under the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement, and the term "**New Term Loans**" is used to refer to the obligations under the New Term Loan Credit Agreement. This discussion assumes that holders of the Old Term Loans have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and holders will hold the New Term Loans, the New Class A LLC Units and the New Series P Convertible Preferred Units as capital assets. In addition, this discussion assumes that the Debtors' obligations under the Old Term Loans and New Term Loans will be treated as debt for federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances or to holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, holders who are not citizens or residents of the U.S., holders subject to the alternative minimum tax, holders holding Claims relating to the Old Term Loans, the New Term Loans, New Class A LLC Units or New Series P Convertible Preferred Units as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, holders who have a functional

currency other than the U.S. dollar and holders that acquired the Old Term Loans in connection with the performance of services.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW TERM LOANS, NEW CLASS A LLC UNITS AND NEW SERIES P CONVERTIBLE PREFERRED UNITS RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**12.2.**    *Federal Income Tax Consequences to the Debtors.*

(a)    **Cancellation of Indebtedness and Reduction of Tax Attributes.**

The Debtors generally should realize cancellation of indebtedness income ("**COD Income**") to the extent the (i) Cash and the fair market value of any property received by creditors is less than (ii) the sum of (x) the adjusted issue price of any debt exchanged for Cash or other property pursuant to the Plan, and (y) the amount of any unpaid accrued interest on such debt to the extent previously deducted by the Debtors.

The Debtors expect that the amount of COD Income realized upon consummation of the Plan will be significant; however, the ultimate amount of COD Income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of the New Class A LLC Units and the New Series P Convertible Preferred Units, on the Effective Date.  Estimated recoveries for the Debtors' various Claims are set forth in Article II above.

COD Income realized by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD Income realized as a result of the implementation of the Plan.

A debtor that does not recognize COD Income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries).  Usually a debtor must reduce its own assets first before reducing tax basis in stock of subsidiaries, following which the assets of subsidiaries may be reduced.  A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness.  If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member.  NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.  However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first.  If the debtor is a member of a

consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property.  If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply.  The Debtors have not yet determined whether they will make the Section 108(b)(5) Election.

The Debtors believe that, for federal income tax purposes, the Debtors' consolidated group generated approximately $118 million of consolidated NOLs through the end of the 2015 tax year, of which approximately $118 million are expected to be carried forward, and likely will generate additional NOLs during the 2016 tax year.  However, the amount of the Debtors' 2015 and 2016 NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for such periods.  Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS.  Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.

The Debtors currently anticipate that the application of IRC Section 108(b) (assuming no Section 108(b)(5) Election is made) will completely eliminate its NOLs and NOL carryforwards.  However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD Income realized by the Debtors.

**12.3.   *Federal Income Taxation of the Litigation Trust.***

(a)      **Classification of the Litigation Trust.**

The Debtors intend that (i) the Litigation Trust qualify as a "Liquidating Trust," as defined in Treasury Regulations section 301.7701-4(d), and (ii) the Litigation Trust be treated as a grantor trust and the holders of Claims entitled to receive beneficial interests in the Litigation Trust be treated as the grantors of such Litigation Trust. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a Liquidating Trust under a chapter 11 plan.

The following discussion assumes that the Litigation Trust will be respected as a grantor trust for federal income tax purposes.  To the extent possible and commercially reasonable, the Debtors will comply with the requirements and guidelines set forth in Revenue Procedure 94-45.  However, the Debtors do not intend to request any advance ruling from the IRS regarding the tax characterization of the Litigation Trust as a liquidating trust.  There can be no assurance that the IRS will treat the Litigation Trust as a liquidating trust.  If the IRS were to challenge successfully such classification, the federal income tax consequences to the Litigation Trust, the Litigation Trust's beneficiaries, and the Debtors could be materially different than is discussed herein (including the potential for an entity level tax on any income of the Litigation Trust and materially adverse tax effects to the holders of certain Claims).

(b)      **General Tax Reporting by the Litigation Trust and Beneficiaries.**

The Litigation Trust Agreement will require all parties (including the Debtors, the Litigation Trustee, and the Litigation Trust's beneficiaries) to treat the transfer of assets by the Debtors to the Litigation Trust, for federal income tax purposes, as a transfer of such assets

directly to the beneficiaries of the Litigation Trust, followed by the transfer of such assets by the beneficiaries to the Litigation Trust. As a consequence, the Litigation Trust's beneficiaries (and any subsequent transferees of interests in the Litigation Trust) will be treated for federal income tax purposes as the direct owners of a specified undivided interest in the assets of the Litigation Trust.

The federal income tax reporting obligation of a trust beneficiary is not dependent upon a trust distributing any cash or other proceeds. Except as discussed below, the Litigation Trust Agreement will provide that the Litigation Trust will allocate items of income, gain, loss, expense and other tax items to its beneficiaries in accordance with their relative beneficial interest. Therefore, a Litigation Trust beneficiary may incur an income tax liability with respect to its allocable share of the income of a Litigation Trust whether or not the Litigation Trust has made any concurrent distribution to the Litigation Trust beneficiary.

The Litigation Trust Agreement will require the Litigation Trustee to file tax returns for the Litigation Trust as a "grantor trust" pursuant to Treasury Regulations section 1.671-4(a). The Litigation Trust is expected to send each beneficiary a separate statement setting forth the Litigation Trust beneficiary's share of items of income, gain, loss, deduction, or credit, and such beneficiary will be responsible for the payment of taxes on a current basis that result from such allocations.

LITIGATION TRUST BENEFICIARIES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPROPRIATE FEDERAL INCOME TAX REPORTING OF THE LITIGATION TRUST.

**12.4.**    *Federal Income Tax Consequences – Alternative Restructuring Transaction.*

If the Alternative Restructuring Transaction (as set forth in Section 7.17 of the Plan) is pursued, the federal income tax consequences will be as described in this section 12.4.

(a)    **Gain on Acquisition by CORE Operations.**

If the Alternative Restructuring Transaction is pursued, the Plan will be structured as an acquisition by CORE Operations, a newly formed and wholly owned subsidiary of CORE, of all the assets and liabilities of CORE Media in exchange for New CORE Holdings units and New Subsidiary I's debt (i.e., the New Term Loan Facility) intended to be treated as a taxable asset acquisition for federal income tax purposes. Assuming that the transfer is taxable, when CORE Operations acquires the assets and liabilities of CORE Media, CORE Media will recognize gain (or loss) equal to the difference between the fair market value of the assets (encumbered by the transferred liabilities) and CORE Media's adjusted tax basis in the exchanged assets and liabilities. CORE Operations would obtain a fair market value tax basis in the assets. The Debtors believe that they will recognize a loss as a result of this transaction. The Debtors believe that, therefore, they will not have any significant federal income tax liability as a result of the transfer. The income tax laws of various states and local governments differ from the federal income tax laws with respect to the availability and use of NOLs, and the Debtors anticipate that there may be additional liability under those laws.

Although the transfer is structured to be a taxable transaction with the consequences described above, there can be no assurance that the transactions would be treated as such by the IRS.  For example, if the transfer of the assets and liabilities to CORE Operations was deemed to constitute a tax-free reorganization under IRC section 368(a)(1)(G) (a "**G Reorganization**"), no gain or loss generally would be recognized by the Debtors.  Rather, CORE Operations would succeed to certain tax attributes of CORE Media, including CORE Media's tax basis in the transferred assets, but only after taking into account the reduction in such tax attributes and tax basis on account of the discharge of debt pursuant to the Plan.  Thus, CORE Operations would have no NOLs and would have a significantly diminished tax basis in the transferred assets, with the result that future tax depreciation and amortization with respect to the transferred assets would be less than expected.

For the transaction to be treated as a G Reorganization, it would be necessary for CORE Media to (1) transfer substantially all of its assets to CORE Operations in exchange for CORE Operations or New Subsidiary I shares and (2) distribute such units and all other property held by CORE Operations to CORE Media's shareholders.  The Debtors believe that the transfer of assets to CORE Operations would not qualify as a G Reorganization because CORE Media intends to transfer assets to CORE Operations in exchange for New CORE Holdings units and not for CORE Operations shares or New Subsidiary I shares.

(b)    **CORE Operations' Tax Attributes.**

Assuming that the transfer is taxable, CORE Operations will obtain an aggregate tax basis in the transferred assets equal to their fair market value as of the Effective Date and would not succeed to any of CORE Media's tax attributes.  Therefore, the depreciation and amortization deductions in future years will be materially greater than they would have been absent the taxable transaction because CORE Operations' aggregate tax basis in the transferred assets would be greater than CORE Media's aggregate tax basis in the transferred assets.

Under IRC section 197, any portion of the consideration allocable to goodwill and certain other intangible assets in a taxable transaction generally is amortizable and deductible by the acquirer over fifteen years for federal income tax purposes, unless certain exceptions apply to limit or deny such deductibility.  Based on the anticipated ownership of CORE Operations on the Effective Date, it is anticipated that CORE Operations will be entitled to such amortization deductions to the extent the value of the transferred assets is allocable to amortizable intangible assets.  There can be no assurance, however, that the IRS will not challenge CORE Operations ability to amortize its intangible assets.

(c)    **Federal Income Tax Consequences to Creditors.**

Creditors will receive a distribution from CORE Media after the transfer of assets and liabilities by CORE Media to CORE Operations.  Creditors will generally recognize gain or loss upon the distribution from CORE Media in an amount equal to the difference between the sum of the fair market value of the assets and liabilities received by such creditor, including any assets deemed received in exchange for Litigation Trust Interests, and such creditor's adjusted tax basis in its Claim.  Any such gain or loss will generally be capital gain or loss, and such capital gain or loss will be long-term capital gain or loss if such creditor held the

Claim for more than one year as of the Effective Date.  Creditors should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

**12.5.**    *Federal Income Tax Consequences – If the Alternative Restructuring Transaction is Not Pursued.*

If the Alternative Restructuring Transaction is not pursued, the federal income tax consequences will be as described in this section 12.5.

(a)    **Holders of First Lien Secured Lender Claims (Class 3).**

(1)    **Tax Securities.**

The tax consequences of the Plan to a holder of a Claim may depend in part upon (1) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes and (2) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for federal income tax purposes.  The determination of whether a debt obligation constitutes a security for federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim.  Generally, obligations arising out of the extension of trade credit have been held not to be tax securities, while corporate debt obligations evidenced by written instruments with original maturities of ten years or more have been held to be tax securities.  It is uncertain whether the Old Term Loans or the New Term Loans will be considered securities for federal income tax purposes and Holders are advised to consult their tax advisors with respect to this issue.

(2)    **Exchange of Secured Lender Claims for New Class A LLC Units and the Indebtedness Under the New Term Loans**.

If the Old Term Loans are treated as securities for federal income tax purposes, the exchange of Old Term Loans for Cash, New Term Loans and New Class A LLC Units or New Series P Convertible Preferred Units, as applicable, will constitute a recapitalization and holders of the Old Term Loans will not recognize gain or loss on the exchange except to the extent Cash is received, assuming that the New Term Loans are treated as securities for federal income tax purposes.  A First Lien Lender's holding period in the New Term Loan Facility and the New Class A LLC Units or New Series P Convertible Preferred Units would include the First Lien Lender's holding period in its Old Term Loans, and the First Lien Lender would have a basis in the New Term Loan Facility and the New Class A LLC Units or New Series P Convertible Preferred Units, as applicable, equal to the First Lien Lender's basis in its Old Term Loans less the Cash received plus the amount of gain, if any, recognized on the exchange.  Such basis would be apportioned between the New Term Loan Facility and the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable, in proportion to their respective fair market values.

If the Old Term Loans are treated as securities for federal income tax purposes, but the New Term Loans are not treated as securities, each First Lien Lender will recognize gain, but not loss, in an amount equal to the lesser of (1) Cash plus the issue price of the New Term Loans and (2) the excess of (A) the sum of fair market value of the Cash plus the New Class A

LLC Units or the New Series P Convertible Preferred Units, as applicable, plus the issue price of the New Term Loans over (B) the adjusted basis of the Secured Lender in the Old Term Loans. A Secured Lender's holding period in the New Class A LLC Units or the New Series P Convertible Preferred Units would include the First Lien Lender's holding period in its Old Term Loans, while the Secured Lender would start a new holding period in the New Term Loans. The Secured Lender's basis in the New Term Loans would equal their issue price, and the First Lien Lender's basis in the New Class A LLC Units or the New Series P Convertible Preferred Units would equal the First Lien Lender's basis in its First Lien Lender Claim and/or Second Lien Lender Claim, as applicable, less the issue price of the New Term Loans and the Cash received plus the amount of gain, if any, recognized on the exchange.

If the Old Term Loans are not treated as securities for federal income tax purposes, a First Lien Lender will generally recognize gain or loss on the exchange of the Old Term Loans for the Cash plus the New Term Loans and New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable. Such gain or loss will generally be equal to the difference between the sum of the fair market value of the cash plus the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable, and the issue price of the New Term Loans and the First Lien Lender's tax basis in the Old Term Loans. Any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the Old Term Loans for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(b)    **Second Lien Lender Claims (Class 4).**

New Second Lien Warrants. The New Second Lien Warrants will be treated as securities with a principal amount equal to zero for federal income tax purposes. Therefore, if the Old Term Loans are treated as securities for federal income tax purposes, the exchange of Old Term Loans for New Second Lien Warrants will constitute a recapitalization and holders of the Old Term Loans will not recognize gain or loss on the exchange. A holder's holding period in the New Second Lien Warrants will include the holder's holding period in the Old Term Loans and the holder will have a basis in the New Second Lien Warrants equal to the holder's basis in its Old Term Loans

However, if the Old Term Loans are not treated as securities for federal income tax purposes, holders of the Old Term Loans will generally recognize gain or loss on the exchange of the Old Term Loans for the New Second Lien Warrants. Such gain or loss will generally be equal to the difference between the fair market value of the New Second Lien Warrants and the holder's tax basis in the Old Term Loans. Any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the Old Term Loans for more than one year as of the date of disposition. A holder's holding period in the New Second Lien Warrants will begin on the day after the Effective Date and a holder's tax basis in the New Second Lien Warrants will be equal to the fair market value of the New Second Lien Warrants. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

**12.6.** *Federal Income Tax Consequences – General.*

The federal income tax consequences described in this section 12.6 are applicable whether or not the Alternative Restructuring Transaction is pursued.

(a) **Accrued Interest.**

There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. The Reorganized Debtors intend to take the position, and the Plan provides, that cash or property distributed pursuant to the Plan will first be allocable to the principal amount of a holder's Allowed Claims and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the holder. A holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

(b) **Market Discount.**

A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization.

(c) **Information Reporting and Backup Withholding.**

The Reorganized Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Plan. In addition, the Reorganized Debtors will be required to report annually to the IRS with respect to each holder (other than corporations and other exempt holders) the amount of interest paid and OID, if any, accrued on the New Term Loans, the amount of dividends paid on the New Class A LLC Units, and the amount of any tax withheld from payment thereof.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Backup withholding may also apply to interest, OID and principal payments on the New Term Loans, dividends paid on the New Class A LLC Units and proceeds received upon sale or other disposition of the New Term Loans or New Class A LLC Units. Certain holders (including corporations) generally are not subject to backup

111

withholding.  A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

**12.7.**    ***Federal Income Tax Consequences to Holders of New Term Loans, New Class A LLC Units and New Series P Convertible Preferred Units.***

(a)    **Holders of First Lien Lender Claims (Class 3).**

(1)    **New Term Loans**.

Interest and Original Issue Discount:  Payments of stated interest under the New Term Loans will constitute payments of "qualified stated interest" and generally will be taxable to holders as ordinary income at the time the payments are received or accrued, in accordance with the holder's method of tax accounting.

The preceding discussion assumes the amount of the New Term Loans will not be issued with original issue discount ("**OID**").  The New Term Loans generally would be treated as issued with OID if the principal amount of the New Term Loans plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the notes by more than a *de minimis* amount.  The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date.  If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest.  If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance.  If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium.  Because the relevant trading period is generally in the future, it is impossible to predict whether the Secured Lender Claims or the New Term Loans will be publicly traded during the relevant period.

Sale, Retirement or Other Taxable Disposition:  A holder of the New Term Loans will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New Term Loans equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which

generally will be taxable as ordinary income) and the holder's adjusted tax basis in the New Term Loans.  Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Term Loans for more than one year as of the date of disposition.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(2)    **New Class A LLC Units and New Series P Convertible Preferred Units.**

Entity Classification.  New CORE Holdings will make an election under Treasury Regulations section 301.7701-3 to be treated as a corporation for federal income tax purposes.  Accordingly, the New Class A LLC Units and the New Series P Convertible Preferred Units will be treated as stock for federal income tax purposes.

Distributions.  A holder of New Class A LLC Units or New Series P Convertible Preferred Units generally will be required to include in gross income as dividend income the amount of any distributions paid on the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable, to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes.  Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a holder's adjusted tax basis in the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable, but not below zero.  Any excess amount will be treated as gain from a sale or exchange of the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable.  Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

Sale or Other Taxable Disposition.  A holder of New Class A LLC Units or New Series P Convertible Preferred Units will recognize gain or loss upon the sale or other taxable disposition of New Class A LLC Units or New Series P Convertible Preferred Units equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Class A LLC Units or the New Series P Convertible Preferred Units, as applicable.  Subject to the rules discussed above in "*Federal Income Tax Consequences – General.—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Class A LLC Units or the New Series P Convertible Preferred Units for more than one year as of the date of disposition.  Under the IRC Section 108(e)(7) recapture rules, a holder may be required to treat gain recognized on the taxable disposition of the New Class A LLC Units or the New Series P Convertible Preferred Units as ordinary income if the holder took a bad debt deduction with respect to the Secured Lender Claims or recognized an ordinary loss on the exchange of the Secured Lender Claims for New Class A LLC Units or New Series P Convertible Preferred Units, as applicable.  Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(3)    **New Second Lien Warrants.**

No gain or loss will be recognized upon exercise of a New Second Lien Warrant and the holder will have a tax basis in the New Class A LLC Units equal to the cash paid to exercise the New Second Lien Warrant plus the holder's tax basis in the New Second Lien Warrant. If a holder undertakes a cash exercise of New Second Lien Warrants, the holding period for the resulting New Class A LLC Units will not include the time during which the holder held the New Second Lien Warrants. If a holder undertakes a cashless exercise of New Second Lien Warrants, the holding period for the resulting New Class A LLC Units will include the time during which the holder held the New Second Lien Warrants.

Upon the sale or other taxable disposition of a New Second Lien Warrant, a holder will recognize gain or loss equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Second Lien Warrants. Subject to the rules discussed above in "*Federal Income Tax Consequences – General.—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Second Lien Warrants for more than one year as of the date of disposition.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

**13.1.    *General.***

The Plan provides for the Reorganized Debtors to issue New Class A LLC Units to the First Lien Lenders on account of the First Lien Lender Claims pursuant to Section 5.3 of the Plan. The Plan also provides for the issuance of the New Second Lien Warrants (and New Class A LLC Units upon the exercise of the New Second Lien Warrants) to the Second Lien Lenders pursuant to the New Second Lien Warrant Agreement. The Plan further provides for the issuance of the New Series P Convertible Preferred Units to certain First Lien Lenders pursuant to the Rights Offering.

The Debtors believe that the New Class A LLC Units, the New Second Lien Warrants and the New Series P Convertible Preferred Units each constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws. The Debtors anticipate that no registration statement will be filed under the Securities Act or any state securities laws with respect to the New Class A LLC Units,

the New Second Lien Warrants or the New Series P Convertible Preferred Units, because, as discussed below, the Debtors believe that the offer and distribution of such securities are exempt from federal and state securities registration requirements.

13.2.    ***New Class A LLC Units, New Series P Convertible Preferred Units and New Second Lien Warrants.***

(a)    **Issuance of New Class A LLC Units, New Series P Convertible Preferred Units and New Second Lien Warrants.**

The Debtors believe that the offer and sale of the New Class A LLC Units, the New Series P Convertible Preferred Units and the New Second Lien Warrants pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code. Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or a claim for administrative expense against, the debtor, and (c) the securities are issued entirely in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon section 1145 of the Bankruptcy Code, the New Class A LLC Units, the New Series P Convertible Preferred Units and the New Second Lien Warrants will not be registered under the Securities Act or any state securities laws.

The exemptions provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Subject to specified exemptions and except with respect to "ordinary trading transactions" of an entity that is not an "issuer," an entity is an "underwriter" if the entity:

•    purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor with a view to distribution of any security received or to be received in exchange for such claim or interest;

•    offers to sell securities offered or sold under a plan for the holders of such securities;

•    offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) made under an agreement in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

•    is an "issuer" of the securities within the meaning of section 2(a)(11) of the Securities Act.

In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Although the Debtors believe each of the securities are issuable under section 1145 of the Bankruptcy Code, to the extent that section 1145 of the Bankruptcy Code is not available with respect to any such securities, such securities may be issued under other exemptions provided in the Securities Act and other restrictions may apply.

(b)     **Resale of New Class A LLC Units, New Series P Convertible Preferred Units and New Second Lien Warrants.**

(1)     **Securities Law Restrictions.**

The Debtors further believe that subsequent transfers of the New Class A LLC Units, the New Series P Convertible Preferred Units and the New Second Lien Warrants by the holders thereof that are not "underwriters," as defined in section 2(a)(11) of the Securities Act and section 1145(b)(1) of the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws. In addition, the New Class A LLC Units, the New Series P Convertible Preferred Units and New Second Lien Warrants generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the New Class A LLC Units, New Series P Convertible Preferred Units and New Second Lien Warrants are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Resales of the New Class A LLC Units, New Series P Convertible Preferred Units or New Second Lien Warrants by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Class A LLC Units, New Series P Convertible Preferred Units and New Second

Lien Warrants who are deemed to be "underwriters" may be entitled to resell their New Class A LLC Units, New Series P Convertible Preferred Units or New Second Lien Warrants, as applicable, pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  However, the Reorganized Debtors do not presently intend to make publicly available the requisite information regarding the Reorganized Debtors and, as a result, Rule 144 will not be available for resales of New Class A LLC Units, New Series P Convertible Preferred Units or New Second Lien Warrants by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Class A LLC Units, the New Series P Convertible Preferred Units or the New Second Lien Warrants.  In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell New Class A LLC Units, New Series P Convertible Preferred Units or New Second Lien Warrants.  **Accordingly, the Debtors recommend that potential recipients of New Class A LLC Units, New Series P Convertible Preferred Units and New Second Lien Warrants consult their own counsel concerning whether they may freely trade such securities without compliance with the federal and state securities laws.**

(2)    **Restrictions in the New CORE Holdings LLC Agreement.**

The New CORE Holdings LLC Agreement contains restrictions on a holder's ability to transfer the New Class A LLC Units and the New Series P Convertible Preferred Units. In addition to the foregoing transfer restrictions, any holder that proposes to effect a transfer may be required to submit a written request that includes, among other things, reasonably sufficient information to establish that the transfer does not violate or result in registration being required under applicable securities laws or laws relating to investment companies or advisors.

(3)    **Restrictions in the New Second Lien Warrant Agreement.**

The New Second Lien Warrant Agreement contains restrictions on a holder's ability to transfer the New Second Lien Warrants.

## ARTICLE XIV.

## PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

**14.1.    *Distributions*.**

The Disbursing Agent shall make all Plan Distributions to the applicable holders of Allowed Claims in accordance with the terms of the Plan; provided, however, that all Plan Consideration distributable to the First Lien Lenders and Second Lien Lenders on account of the

First Lien Lender Claims and Second Lien Lender Claims shall be made directly to the applicable First Lien Lenders and Second Lien Lenders.  At a First Lien Lender's or a Second Lien Lender's election, New Class A LLC Units and/or New Series P Convertible Preferred Units may be distributed directly to such lender's designee so long as such designee is an affiliate of such lender.

**14.2.    *No Postpetition Interest on Claims*.**

Unless otherwise specifically provided for in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**14.3.    *Date of Distributions*.**

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made hereunder shall be made on the applicable Distribution Date; provided, that the Reorganized Debtors may utilize periodic distribution dates to the extent that use of a periodic distribution date does not delay payment of the Allowed Claim more than thirty (30) days.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Notwithstanding the preceding sentence or anything to the contrary in the Plan, (a) as the holders of Allowed Class 5 Claims shall receive their Pro Rata Share of General Unsecured Claim Cash Distribution (and, if applicable the Additional General Unsecured Claim Cash Distribution), which amounts may not be calculable as of the applicable Distribution Date, the Disbursing Agent shall not be required to make Cash distributions to the holders of Allowed Class 5 Claims until the amount of such Cash distribution is reasonably calculable and (b) in the event holders of Allowed Class 6 Claims receive their Pro Rata Share of the Convenience Claim Cap Amount, which amounts may not be calculable as of the applicable Distribution Date, the Disbursing Agent shall not be required to make Cash distributions to the holders of Allowed Class 6 Claims until the amount of such Cash distribution is reasonably calculable; provided, that, the Disbursing Agent shall nonetheless be permitted to make interim Cash distributions to holders of Allowed Class 5 Claims and Allowed Class 6 Claims in its discretion.

**14.4.    *Distribution Record Date*.**

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date.  Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable

executory contract or unexpired lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

**14.5.  *Disbursing Agent*.**

(a)    Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effectuate all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable Plan Distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred by the Disbursing Agent on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including reasonable attorney and other professional fees and expenses) of the Disbursing Agent shall be paid in Cash by the Reorganized Debtors and will not be deducted from Plan Distributions made to holders of Allowed Claims by the Disbursing Agent.  The foregoing fees and expenses shall be paid in the ordinary course, upon presentation of invoices to the Reorganized Debtors and without the need for approval by the Bankruptcy Court, as set forth in Section 3.2(b) of the Plan.  In the event that the Disbursing Agent, the Reorganized Debtors are unable to resolve a dispute with respect to the payment of the Disbursing Agent's fees, costs and expenses, the Disbursing Agent may elect to submit any such dispute to the Bankruptcy Court for resolution.

(c)    Bond.

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

(d)    Cooperation with Disbursing Agent.

The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the withholding and reporting requirements outlined in Section 8.15 of the Plan.

**14.6.**   *Delivery of Distribution*.

Subject to the provisions contained in Article VIII of the Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, all Plan Consideration, and subject to Bankruptcy Rule 9010 and except as provided in Section 8.1 of the Plan, make all Plan Distributions or payments to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.  In the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such Plan Distribution shall be made to such holder without interest; provided, however, such Plan Distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of 180 days from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

**14.7.**   *Unclaimed Property.*

One hundred and eighty (180) days from the later of: (i) the Effective Date, and (ii) the date that a Claim is first Allowed, all unclaimed property, wherever located, or interests in property distributable hereunder on account of such Claim shall revert to the Reorganized Debtors or the successors or assigns of the Reorganized Debtors, and any claim or right of the holder of such Claim to such property, wherever located, or interest in property shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, and the proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

**14.8.**   *Satisfaction of Claims.*

Unless specifically otherwise provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**14.9.**   *Manner of Payment Under Plan.*

Except as specifically provided in the Plan, at the option of the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors or Reorganized Debtors.

**14.10.**   *Fractional Units/De Minimis Cash Distributions.*

No fractional Plan Securities or Litigation Trust Units shall be distributed.  When any distribution would otherwise result in the issuance of a number of Plan Securities or Litigation Trust Units that is not a whole number, the Plan Securities or Litigation Trust Units, as

applicable, subject to such distribution will be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than ½ will be rounded to the next higher whole number; and (b) fractions less than ½ will be rounded to the next lower whole number.  The total number of Plan Securities or Litigation Trust Units, as applicable, to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan.  No consideration will be provided in lieu of fractional units that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Class A LLC Unit, New Series P Convertible Preferred Unit or New Second Lien Warrant or Litigation Trust Unit or $50.00 in Cash.  Fractional Plan Securities or Litigation Trust Units that are not distributed in accordance with Section 8.10 of the Plan shall be returned to New CORE Holdings and cancelled.

### 14.11. *Distributions on Account of Allowed Claims Only.*

Notwithstanding anything in the Plan to the contrary, no Plan Distribution shall be made on account of a Claim until such Claim becomes an Allowed Claim.  Furthermore, notwithstanding anything to the contrary, no Plan Distribution shall be made on account of a Claim, even if such Claim becomes an Allowed Claim, to the extent a Litigation Trust Asset is being pursued against the holder of such Claim or Allowed Claim and has not been finally disposed.

### 14.12. *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution of a value in excess of the Allowed amount of such Claim.

### 14.13. *Exemption from Securities Laws.*

The issuance of and the distribution of the Plan Securities, including the Subscription Rights, the Rights Offering Units, the First Lien Lender Equity Distribution, and the Second Lien Lender Warrants Distribution, shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, to the maximum extent permitted thereunder.  Subject to any transfer restrictions contained in the New CORE Holdings LLC Agreement, the Plan Securities may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.  The availability of the exemption under section 1145 of the Bankruptcy Code and/or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

### 14.14. *Setoffs and Recoupments*.

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, setoff and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (b) otherwise

adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.

### 14.15. *Withholding and Reporting Requirements*.

In connection with the Plan and all Plan Distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan: (a) each holder of an Allowed Claim that is to receive a Plan Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' satisfaction, established an exemption therefrom.

### 14.16. *Hart-Scott Rodino Antitrust Improvements Act*.

Any New Class A LLC Units or New Series P Convertible Preferred Units to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Competition Laws (if any) shall not be distributed until the notification and waiting periods applicable under such Competition Laws to such entity shall have expired or been terminated or any applicable authorizations, approvals, clearances or consents have been obtained.

## ARTICLE XV.

## PROCEDURES FOR RESOLVING CLAIMS

### 15.1. *Objections to Claims.*

Other than with respect to Fee Claims, only the Reorganized Debtors and, as applicable, the Litigation Trust shall be entitled to object to Claims after the Effective Date.  Any objections to those Claims (other than Administrative Expense Claims) shall be served and filed on or before the later of: (a) the date that is 180 days after the Effective Date; and (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof (for the avoidance of doubt, this objection deadline may be extended one or

more times by the Bankruptcy Court). Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors or, as applicable, the Litigation Trust, unless the Person wishing to file such untimely Claim has received the Bankruptcy Court's authorization to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors, and, as applicable, the Litigation Trust may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 15.2. *Amendment to Claims.*

From and after the Confirmation Date, no proof of Claim may be amended to increase or assert additional claims not reflected in a previously timely filed Claim (or Claim scheduled on the applicable Debtor's Schedules, unless superseded by a filed Claim), and any such Claim shall be deemed Disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, the Reorganized Debtors, or, as applicable, the Litigation Trust unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

### 15.3. *Disputed Claims.*

Disputed Claims shall not be entitled to any Plan Distributions unless and until they become Allowed Claims.

### 15.4. *Estimation of Claims.*

The Debtors, the Reorganized Debtors and/or the Litigation Trust (as applicable) may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims). In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative

and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

**15.5.   *Expenses Incurred on or After the Effective Date.***

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of the Plan, including reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Reorganized Debtors, save and except that in accordance with Section 7.1(j) of the Plan, the reasonable fees and expenses incurred by the Litigation Trustee and its professionals in connection with the reconciliation of, objection to, and settlement of Claims held or asserted by Excluded Parties, shall be paid by the Litigation Trust.

*[The remainder of this page is intentionally left blank.]*

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. **The Debtors urge the holders of impaired Claims in Classes 3, 4, 5 and 6 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on [        ], 2016.**

Dated: July 25, 2016
      West Hollywood, California

                                      Respectfully submitted,

                                        AOG Entertainment, Inc., et al.,
                                        Debtors and Debtors in Possession

                                      _____
                                        Peter Hurwitz
                                        President and/or Authorized Signatory of
                                        Debtors and Debtors in Possession

Counsel:

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Andrew S. Mordkoff, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
*Counsel for the Debtors and
Debtors in Possession*