UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :
                                                :
AOG ENTERTAINMENT, INC., *et al*,[1]             :          Chapter 11
                                                :          Case No. 16-11090 (SMB)
                    Debtor.                      :
-------------------------------------------------------X

**MEMORANDUM DECISION DENYING SIMON ROBERT FULLER'S MOTION TO
EXTEND THE CHALLENGE DEADLINE AND *EX PARTE* APPLICATION FOR
AUTHORITY TO CONDUCT A RULE 2004 EXAMINATION**

**A P P E A R A N C E S :**

MCDERMOTT WILL & EMERY LLP
*Counsel for Simon Robert Fuller*
340 Madison Avenue
New York, New York 10173

> Timothy W. Walsh, Esq.
> Darren Azman, Esq.
>         Of Counsel

WILLKIE FARR & GALLAGHER LLP
*Counsel for the Debtors and Debtors in Possession*
787 Seventh Avenue
New York, New York 10019

> Matthew A. Feldman, Esq.
> Paul V. Shalhoub, Esq.
> Matthew Freimuth, Esq.
> Andrew S. Mordkoff, Esq.
>         Of Counsel

KLEE, TUCHIN, BOGDANOFF & STERN LLP
*Counsel for the Ad Hoc Group of First Lien Lenders*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067

> Lee R. Bogdanoff, Esq.
> David A. Fidler, Esq.
> Whitman L. Holt, Esq.
>         Of Counsel

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer
identification number is attached as Schedule 1 to the Declaration of Peter Hurwitz, President of Certain
Debtors, in Support of Chapter 11 Petitions and First Day Pleadings.  (ECF Doc. # 3.)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Counsel for Crestview Media Investors, L.P.*
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

     Eric D. Winston, Esq.
         Of Counsel

     --and--

51 Madison Avenue, 22nd Floor
New York, New York 10010

     Scott C. Shelley, Esq.
         Of Counsel

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
*Counsel for the Official Committee of*
  *Unsecured Creditors*
30 Rockefeller Plaza
New York, New York 10112

     Craig A. Wolfe, Esq.
     Jason R. Alderson, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

     Simon Robert Fuller ("Fuller") is a former director and chief executive officer of debtor

19 Entertainment Limited ("19 Entertainment").  Contemplating a possible challenge to the

Debtors' prepetition secured debt, he has filed two motions that are currently before the Court.

The first seeks to obtain discovery under Federal Rule of Bankruptcy Procedure 2004 ("Rule

2004") from Debtor AOG Entertainment, Inc. ("AOG") and certain of its debtor and non-debtor

affiliates (collectively, the "CORE Entities") regarding the prepetition secured debt, a certain

United Kingdom audit described below, and other matters.  (*See Ex Parte Motion for Order*

*Authorizing Simon Robert Fuller to (A) Conduct a 2004 Examination of AOG Entertainment,*

*Inc. and its Debtor and Non-Debtor Affiliates, and (B) Seek Related Document Production*, dated

Aug. 2, 2016 (the "*Rule 2004 Motion*") (ECF Doc. # 286).)  The second seeks to extend the

deadline for Fuller to bring a challenge to the Debtors' prepetition secured debt.  (*See Simon*

*Robert Fuller's Motion to Extend Challenge Deadline*, dated Aug. 12, 2016 (the "*Extension*

*Motion*") (ECF Doc. # 308).)  The Debtors oppose both motions, and the prepetition lenders

oppose the *Extension Motion*.

The Court denies the *Extension Motion* for the reasons explained below.  Because the

challenge period has run and no party can attack the extent or validity of the prepetition secured

debt, the *Rule 2004 Motion* is moot.  Alternatively, Fuller has failed to show cause for the relief

sought in the *Rule 2004 Motion*.  Accordingly, both motions are denied.

## BACKGROUND[2]

### A.    Relevant Parties and Entities

The Debtors and their non-debtor affiliates and subsidiaries (collectively, the "Debtors"

or the "Company") are in the business of owning, producing, developing and monetizing

entertainment content.  (*Hurwitz Declaration* ¶ 7.)  The Company's portfolio includes the

"IDOL" brand of shows, including American Idol and other similar franchises (collectively,

"IDOLS"), and So You Think You Can Dance ("SYTYCD").  (*Id.*)

Fuller is a former director and chief executive officer of 19 Entertainment and is the

creator of the IDOLS programs and SYTYCD.  (*Rule 2004 Motion* at ¶ 2; *Hurwitz Declaration*

at ¶ 51.)  In January 2010, Fuller left his director and officer positions and entered into certain

---

[2]        The following conventions are used in citing to the record.  Unless otherwise noted, all ECF document
numbers refer to case no. 16-11090.  "Tr." refers to the transcript of the hearing held in these chapter 11 cases on
August 22, 2016 (ECF Doc. # 388), and "*Hurwitz Declaration*" refers to the *Declaration of Peter Hurwitz, President
of Certain Debtors, In Support of Chapter 11 Petitions and First Day Pleadings*, dated April 28, 2016.  (ECF Doc. #
3.)

agreements with the Debtors, including a Consultancy Deed with 19 Entertainment.  (*Rule 2004 Motion* at ¶ 2; *Hurwitz Declaration* at ¶ 51.)  Under the Consultancy Deed, Fuller agreed to provide the Debtors with creative services.  (*Rule 2004 Motion* at ¶ 2; *Hurwitz Declaration* at ¶ 51.)  In exchange, he was entitled to receive a share of the profits generated by the IDOLS and SYTYCD business lines for as long as he provided services for the programs.  (*Rule 2004 Motion* at ¶ 2; *Hurwitz Declaration* at ¶ 51.)  The Debtors have rejected the Consultancy Deed pursuant to 11 U.S.C. § 365.  (*See Order Under Section 365(a) of the Bankruptcy Code, Bankruptcy Rule 6006 and Local Bankruptcy Rule 6006-1 Authorizing Rejection of Certain Agreements with Simon Robert Fuller Nunc Pro Tunc to the Petition Date*, dated Aug. 23, 2016 (ECF Doc. # 342).)

Fuller is a creditor of 19 Entertainment, one of the CORE Entities.  The ultimate parent of the CORE Entities is the nondebtor CORE Entertainment Holdings, Inc. ("CORE Holdings").  (*Hurwitz Declaration*, Sched. 2, at 1.)  CORE Holdings owns 100% of the stock of the Debtor CORE Entertainment Inc. ("CORE Entertainment").  (*Id.*)  CORE Entertainment, in turn, owns directly or indirectly all of the enterprise value of the operating CORE Entities through its stock ownership.  (*Id.*)

## B.    The 2011 Transactions

### 1.    Apollo Tender Offer

The basic facts underlying the transactions at issue are not in dispute.  CKX, Inc. (collectively with its subsidiaries, "CKX"), the predecessor to the CORE Entities, was founded in 2005 and was a publicly traded company.  (*Hurwitz Declaration* at ¶ 18.)  On June 21, 2011, affiliates of Apollo Global Management, LLC (collectively, "Apollo") consummated a tender offer and merger of CKX (the "Acquisition"), by which they acquired control of the entities that

now comprise the CORE Entities.  (*Id.* at ¶ 19.)  Apollo paid a purchase price of $5.50 for each share of CKX, representing an enterprise value of approximately $572 million.  (CKX, Inc., Current Report (Form 8-K) (June 16, 2011), Ex. 99.1 (Disclosures Regarding CKX, Inc.) ("*SEC Disclosure*") at 8.)

CKX financed the Acquisition, in part, through the issuance of $360 million of senior secured notes (the "Acquisition Notes").  (*Id.* at 11, 13; *Hurwitz Declaration* at ¶ 29.)  Several CKX affiliates, including 19 Entertainment, guaranteed the Acquisition Notes and pledged their assets as security for their guarantees.  (*SEC Disclosure* at 4, 13.)

### 2.    Delaware Appraisal Litigation

A group of CKX shareholders opted out of the $5.50 per share cash-out price and brought an action in the Delaware Chancery Court to assert their appraisal rights.  *See Huff Fund Inv. P'ship v. CKx, Inc.*, No. CIV 6844-VCG, 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013), *adhered to*, No. CIV 6844-VCG, 2014 WL 2042797 (Del. Ch. May 19, 2014), *judgment entered sub nom. Huff Fund Inv. P'ship v. CKX, Inc.*, No. CIV 6844-VCG, 2014 WL 2763756 (Del. Ch. June 17, 2014), and *aff'd sub nom. Huff Fund Inv. P'ship v. CKx, Inc.*, No. 348, 2014, 2015 WL 631586 (Del. Feb. 12, 2015).  Following a trial, the Chancery Court ruled that the merger price of $5.50 per share represented "the best and most reliable indication of CKX's value."  *Id.* at *11.  It found that the marketing and sale process resulting in the Acquisition was "thorough, effective, and free from any spectre of self-interest or disloyalty," multiple entities had made "unsolicited, credible bids" and the Board of Directors and its advisors had successfully instigated a "bidding war."  *Id.* at *13.  The Delaware Supreme Court affirmed the Chancery Court's findings "on the basis of and for the reasons assigned by" the Chancery Court.  *Huff*, 2015 WL 631586, at *1.

3.        **Acquisition Note Refinancing**

In December of 2011, CORE Entertainment, as borrower, entered into a first lien term loan agreement (the "First Loan") and a second lien term loan agreement (the "Second Loan," and together with the First Loan, the "Prepetition Loans"), in the respective amounts of $200 million and $160 million. (*Hurwitz Declaration* at ¶¶ 28, 32.) The Prepetition Loans were guaranteed by certain CORE Entities (collectively, with the borrower, the "Loan Parties"), including 19 Entertainment. The proceeds of the Prepetition Loans were used to refinance the Acquisition Notes, (*id.* at ¶¶ 29, 33), and as of the Petition Date, the Loan Parties owed the aggregate amount of $398 million on the Prepetition Loans. (*Id.* at ¶¶ 31, 34).

C.        **The Chapter 11 Cases**

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 28, 2016. Two business days later, on May 3, 2016, counsel for Fuller entered an appearance in these cases. (*Notice of Appearance and Request for Service of Papers*, dated May 3, 2016 (ECF Doc. # 48).). The United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") (*Appointment of Official Committee of Unsecured Creditors*, dated May 17, 2016 (ECF Doc. # 70)), and the Committee retained Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin") as its counsel, (*Order Authorizing the Official Committee of Unsecured Creditors to Retain and Employ Sheppard Mullin Richter & Hampton, LLP as its Counsel Nunc Pro Tunc to May 20, 2016*, dated Aug. 2, 2016 (ECF Doc. # 285)), and Zolfo Cooper, LLC ("Zolfo Cooper") as its financial advisors and bankruptcy consultants. (*Order Authorizing the Official Committee of Unsecured Creditors of AOG Entertainment, Inc., et al., to Employ and Retain Zolfo Cooper, LLC as its Financial Advisors and Bankruptcy Consultants, Nunc Pro Tunc to June 16, 2016*, dated Aug. 2, 2016

(ECF Doc. #282).)  Fuller sought membership on the Committee.  (*Debtors' Objection to Ex Parte Motion for Order Authorizing Simon Robert Fuller to (A) Conduct a 2004 Examination of AOG Entertainment, Inc. and its Debtor and Non-Debtor Affiliates, and (B) Seek Related Document Production*, dated Aug. 8, 2016 (the "*Rule 2004 Motion Objection*"), at ¶ 15 (ECF Doc. # 301).)  The United States Trustee did not appoint Fuller to the Committee, and Fuller never asked the Court to direct the United States Trustee to change the composition and appoint him to the Committee.  *See* 11 U.S.C. § 1102(a)(4).

### 1.    Interim and Final DIP Order and Challenge Deadline

On May 16, 2016, the Debtors filed their motion to use cash collateral and obtain debtor in possession financing.  (*Motion for an Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c), 364(d), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Continue to Use Cash and/or Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Granting Related Relief* (the "*DIP Motion*") (ECF Doc. # 67).)  Pursuant to the common practice in this Court, the proposed interim financing order included several stipulations by which the Debtors acknowledged the extent and validity of the Prepetition Loans, guarantees and related security interests.  (*DIP Motion*, Ex. A, at ¶ 4.)  As directed by the Court's debtor in possession financing guidelines, *see* BANKR. S.D.N.Y.R. 4001-2(f), the proposed order included a carve-out from the Debtors' stipulations that allowed any party in interest to challenge any of the stipulated facts within sixty days of the entry of the proposed interim order.  (*DIP Motion*, Ex. A, at ¶ 19.)  If no challenge was filed by the time the deadline expired, the stipulated facts were deemed established for all purposes.

On June 29, 2016, the Court entered the *Second Interim Order Under 11 U.S.C. §§ 105,*

*361, 362, 363(c), 364(c), 364(d), 364(e) and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I)*
*Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to*
*Continue to Use Cash and/or Cash Collateral, (III) Granting Adequate Protection to Prepetition*
*Secured Parties and (IV) Granting Related Relief* (the "*Second Interim DIP Order*") (ECF Doc.
# 185). The *Second Interim DIP Order* set August 27, 2016 as the new challenge deadline
(hereinafter, the "Challenge Deadline"). The Court could extend the Challenge Deadline "for
cause shown." (*Second Interim DIP Order* at ¶ 20.)

On July 27, 2016, the Court entered the *Final Order Under 11 U.S.C. §§ 105, 361, 362,*
*363(c), 364(c), 364(d), 364(e) and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I)*
*Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to*
*Continue to Use Cash and/or Cash Collateral, (III) Granting Adequate Protection to Prepetition*
*Secured Parties and (IV) Granting Related Relief* (the "*Final DIP Order*") (ECF Doc. # 271).
The *Final DIP Order* retained the August 27, 2016 Challenge Deadline and the proviso that the
Court could extend the Challenge Deadline for cause. (*Final DIP Order* at ¶ 20.)

### 2.      The Committee's Investigation

Following its appointment, the Committee, through its attorneys and advisers, conducted
an investigation of the liens securing the Debtors' obligations and potential causes of action that
the Committee might bring. (Tr. at 45:20-24.) The Committee sought to determine the validity
of liens on intellectual property and other business assets as well as of liens on equity interests in
affiliates, particularly non-debtor, cash-holding affiliates. (*Id.* at 46:23-47:13.) Its professionals
conducted diligence regarding the Acquisition, including a factual and legal review of subsidiary
guarantor solvency. (*Id.* at 65:12-66:15.) With respect to potential causes of action, the
Committee focused on potential tort claims and facts that might support equitable subordination

of senior creditors. (*Id.* at 47:14-18.) It also examined valuation issues and, in the course of its valuation inquiry, sought to determine the actual value of lien avoidance and other potential causes of action to the creditor body given the value of the secured lenders' deficiency claims in these cases. (*Id.* at 47:23-48:6.)

In conducting its investigation, the Committee reviewed documents relating to the Prepetition Loans, including perfection documents and UCC statements, (Tr. at 51:18-52:2), as well as "guarantee documents" relating to subsidiary guarantees. (*Id.* at 58:6-15). The Committee also reviewed documents provided by Committee members and by the Debtors' lenders. (*Id.* at 72:7-14.) Additionally, Zolfo Cooper directly engaged with the Debtors' advisers in order to develop a deeper understanding of issues related to the Debtors' valuation. (*Id.* at 52:3-8.) Sheppard Mullin had "extensive" contact with Fuller's counsel during this investigation, including a telephone call during which Fuller and his counsel explained Fuller's theories regarding various causes of action to the Committee and its advisors. (*Id.* at 33:4-23.)

The Committee's counsel testified that the Committee "very carefully" considered the merits of seeking to avoid subsidiary obligations with respect to the Prepetition Loans and related guarantees. (*Id.* at 58:6-15.) Following its investigation, the Committee concluded that it "had an uphill battle" and faced "numerous obstacles" with respect to any potential litigation, (*id.* at 52:24-53:4; 55:19-21), including the expiration of the statute of limitations on fraudulent transfer claims depending on which jurisdiction's law (Delaware, California or New York) governed the claims, (*id.* at 38:12-39:16, 53:12-20), and the conclusion that the enterprise was worth in 2011 the roughly $500 million Apollo paid for it. (*Id.* at 65:12-66:15.)

Simultaneously with its investigation, the Committee engaged the Debtors and their

prepetition secured creditors in settlement discussions aimed at securing a "pot" of funds "that would be available for general unsecured creditors." (*Id.* at 46:16-22.) The Committee's investigation and these negotiations resulted in a "settlement" pursuant to which the plan consideration for general unsecured creditors was increased from a *pro rata* share of $850,000 to a pro rata share of $2.375 million and conditions and restrictions on that consideration were removed. (*Letter from Craig A. Wolfe, Esq., to the Court*, dated Aug. 8, 2016, at 2 (ECF Doc. # 300); *see also* Tr. at 56:11-17 (referring to settlement).) Given the Committee's views that potential litigation would face significant hurdles, the Committee decided that the interests of all general unsecured creditors would be best served by agreeing to this "settlement" with the Debtors. (Tr. at 56:11-57:8.) On August 4, 2016, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and its Affiliated Debtors* (the "*Second Amended Plan*") (ECF Doc. # 294), reflecting the aforementioned "settlement." (*See Second Amended Plan* §§ 1.78, 5.3(b)(ii), 5.4(b)(ii), 5.5(a) (setting forth distribution to general unsecured creditors).)

### 3.    Fuller's Involvement

In addition to assisting the Committee in its investigation, Fuller undertook his own investigation into potential causes of action related to the Prepetition Loans and a 2015 audit of certain of the Debtors' finances in the United Kingdom (the "UK Audit"). (Tr. at 10:3-21.) Fuller's counsel sent the Debtors "an informal document request in the form of a [motion to authorize a Rule 2004 examination]" on June 9, 2016. (*See id.* at 10:17-21 (describing document request and approximate timing); *see also Rule 2004 Motion Objection* at ¶ 16 (noting date of Fuller's document request).) In response to Fuller's request, the Debtors compiled and produced over 2,000 pages of publicly available information. (*Rule 2004 Motion Objection* at ¶ 16; Tr. at

10

11:2-7.)  According to Fuller, the production did not satisfy the request.  (*Letter from Darren Azman, Esq., to the Court*, dated Aug. 3, 2016 (the "*Azman Letter*"), at 1 (ECF Doc. # 291) ("In an effort to obtain the required discovery without this Court's intervention, Mr. Fuller delayed the filing of the 2004 Motion and sent a copy of it to the Debtors on June 9, 2016.  The Debtors have refused to provide Mr. Fuller with the requested documents.").)

Fuller also shared his draft Rule 2004 motion with the Committee.  The Committee told Fuller that it did not see a need to file the motion but that it would not seek to dissuade Fuller from filing his own motion.  (Tr. at 34:4-17.)

In addition, Fuller discussed the settlement of his personal claims and the continuation of his consulting arrangement with the Committee, (*Reply of Simon Robert Fuller to Debtors' Objection to Ex Parte Motion for Order Authorizing Simon Robert Fuller to (A) Conduct a 2004 Examination of AOG Entertainment, Inc. and its Debtor and Non-Debtor Affiliates, and (B) Seek Related Document Production*, dated Aug. 10, 2016 (the "*Rule 2004 Motion Reply*"), at ¶ 17 (ECF Doc. # 304)), but not with the Debtors.  (Tr. at 15:18-25).  The negotiations led nowhere, and according to Committee counsel, "at no time did we ever indicate that we were there, or were almost there, or we were getting there."  (*Id.* at 35:5-12.)

Fuller eventually filed the *Rule 2004 Motion* on August 2, 2016, two days prior to the date on which the Debtors filed the *Second Amended Plan* and filed the *Extension Motion* on August 12, 2016.

**D.    Parties' Contentions**

**1.    The *Rule 2004 Motion***

Fuller contends that a Rule 2004 examination is warranted because it would permit him

to "determine, *inter alia*, (a) the effect that the Prepetition Loans had on 19 Entertainment, and

(b) the merits of potential causes of action arising from the Prepetition Loans and the UK Audit,"

(*Rule 2004 Motion* at ¶ 14), the Debtors have refused to comply with Fuller's informal discovery

requests, (*id.* at ¶ 16), and the chapter 11 cases are proceeding on an "expedited track," which

necessitates an immediate Rule 2004 examination.  (*Id.* at ¶ 15.)  Further, this "expedited track"

gives rise to an obligation on the part of the Debtors to provide "complete and expeditious access

to documents and information necessary to evaluate claims and causes of action that may

significantly impede the Debtors' ability to confirm a plan."  (*Id.* at ¶ 17.)  Fuller does not

believe that the Committee's investigation was "comprehensive," (*Azman Letter* at 1), and

contends that in any event, the Committee did not investigate the UK Audit, (*Rule 2004 Motion*

*Reply* at ¶ 13), and its investigation should not preclude his own investigation.  (*See Rule 2004*

*Motion Reply* at ¶ 5 (disputing Debtors' contention that duplicative discovery is improper).)

Additionally, Fuller excuses his delay in filing the *Rule 2004 Motion* asserting his belief

that he was engaged in good-faith negotiations regarding a settlement of his claims and a

potential continuation of his consulting relationship, (*Rule 2004 Motion Reply* at ¶¶ 17-18), and

he wanted to defer to the Committee's investigation while it was ongoing.  (Tr. at 13:10-15.)

Accordingly, his delay cannot be taken as evidence of intent to harass.  (*See Rule 2004 Motion*

*Reply* at ¶ 23.)

The Debtors oppose the *Rule 2004 Motion*.  They contend that Fuller bears the burden of

establishing "good cause," and in making its determination, the Court must consider the relative

benefits and burdens of a Rule 2004 examination on the parties, the necessity of the examination to establish Fuller's claims and the potential undue hardship or injustice that denial of the *Rule 2004 Motion* would cause Fuller. (*Rule 2004 Motion Objection* at ¶¶ 19-20.) The Debtors assert that Fuller cannot demonstrate good cause because his proposed investigation is duplicative of the Committee's investigation, (*id.* at ¶ 23), the discovery that Fuller seeks is overly broad, burdensome and "tangential" in nature, (*id.* at ¶¶ 29-31), and Fuller's requests are harassing in nature as evidenced by their breadth. (*Id.* at ¶ 35.) Fuller also cannot demonstrate prejudice given the Committee's investigation and the resulting "settlement," (*id.* at ¶ 39-41), and any time pressure to conduct an examination at this juncture is purely the result of Fuller's delay in filing the *Rule 2004 Motion*. (*Id.* at ¶ 42.) According to the Debtors, Fuller's purpose in pursuing the *Rule 2004 Motion* is to "derail the Debtors' reorganization process and harass the Debtors in order to cut a better deal for himself" rather than to vindicate any legitimate claim the Debtors' estates might have against the prepetition lenders. (*Id.* at ¶ 31.)

The Committee has not formally opposed the *Rule 2004 Motion*, but has expressed its view that a Rule 2004 examination would be "a waste of time" because it believes the claims that Fuller seeks to investigate "were fully vetted." (Tr. at 66:16-67:3.) It does not, therefore, make sense to expend further resources and delay the plan confirmation process to investigate such claims. (*Id.*) The Committee has also expressed its view that the size of the deficiency claims arising from the Prepetition Loans significantly attenuates the potential value of any lien avoidance actions in these cases. (Tr. at 47:19-48:16.)

### 2.    The *Extension Motion*

Fuller argues that if this Court grants the *Rule 2004 Motion*, he will lack sufficient time to conduct his own investigation and commence an adversary proceeding given that the Challenge

Deadline expired on August 27, 2016, (*Extension Motion* at ¶¶ 5, 11), after he made the *Extension Motion*.

The Debtors respond that Fuller's decision not to commence an investigation of the collateral securing the Prepetition Loans does not constitute cause because Fuller had ample time to bring a challenge.   The Debtors filed and properly served the *DIP Motion* on May 16, 2016, and the proposed interim order included a challenge deadline.  (*Debtors' Objection to Simon Robert Fuller's Motion to Extend Challenge Deadline*, dated Aug. 22, 2016 (the "*Extension Motion Objection*"), at ¶ 16 (ECF Doc. # 332).)  Indeed, the deadline is required under the Court's financing guidelines incorporated into its Local Rules.  The August 27, 2016 Challenge Deadline was initially set in the *Second Interim DIP Order*, which was entered on June 29, 2016, and the Challenge Deadline was fixed under the terms of the *Final DIP Order*, which was entered on July 27, 2016.  (*Extension Motion Objection*, at ¶¶ 8, 16.)

The Debtors also argue that Fuller has not alleged that any aspects of the transactions and financings he wishes to investigate are "unusually complicated" so as to warrant an extension of the Challenge Deadline, (*id.* at ¶ 17), and the discovery Fuller seeks goes far beyond the scope of the stipulations contained in the *Final DIP Order*, including by veering into an investigation of the unrelated UK Audit.  (*Id.* at ¶ 19.)  In addition, the Debtors reiterate their contention that Fuller's litigation strategy is to "harass the Debtors in order to cut a better deal for himself," and that "[s]uch efforts do not constitute 'cause shown' for extending the Challenge Deadline."  (*Id.* at ¶ 21.)

The ad hoc group of lenders under the First Loan (the "Ad Hoc Group") and Crestview Media Investors, L.P., a lender under both Prepetition Loans (together with the Ad Hoc Group,

14

the "Objecting Creditors") also object to the *Extension Motion*.  In addition to reiterating certain

of the Debtors' arguments, the Objecting Creditors emphasize that the Challenge Deadline

"exists to prompt all parties in interest to timely pursue an investigation, formulate their theories,

and articulate proposed derivative claims within the specified timeline."  (*Joint Opposition of (i)*

*Ad Hoc Group of First Lien Lenders and (ii) Crestview Media Investors, L.P. to Simon Robert*

*Fuller's Motion to Extend Challenge Deadline*, dated Aug. 22, 2016, at ¶ 5 (ECF Doc. # 330).)

Fuller failed to act for a period of months and the "interests of finality" embedded in the

Challenge Deadline ought to prevail over the interests Fuller asserts.  (*Id*.)

Additionally, counsel to the Ad Hoc Group points out that the transaction documents

expressly grant indemnity and contribution rights to each guarantor.  The CORE Entities were

worth over $500 million and solvent when the Debtors entered into the Prepetition Loans, and to

the extent any guarantor pays on its guarantee it could look to that enterprise value for

reimbursement.  (Tr. at 78:25-79:8)  Accordingly, the guarantees could not have rendered any

guarantor insolvent.  (*Id.*)

## DISCUSSION

A.    **The *Extension Motion***

Fuller has failed to demonstrate cause to extend the Challenge Deadline.  First, he sat on

his rights, making the tactical choice not to pursue a Rule 2004 examination earlier in these

cases.  In June 2016, he asked for and received documents from the Debtors.  Although he now

complains that the production was inadequate, he did not pursue further discovery at that time.

He also shared his proposed Rule 2004 request with the Committee.  The Committee

declined to file the motion but told him he should feel free to do so.  Fuller then waited almost

two full months before filing the *Rule 2004 Motion*.  He attempts to excuse the delay stating he wanted to await the results of the Committee's investigation and he believed that he would be able to settle his personal claim.  Both of these rationales, however, highlight Fuller's tactical decision not to follow through on his investigation earlier.

Second, the Challenge Deadline exists for the benefit of the prepetition secured lenders and is part of a larger bargain struck by the parties and approved by the Court.  To establish cause, the challenging party must show that someone prevented or interfered with its investigation.  The paradigm for cause is the prepetition lenders' delay in producing requested discovery or obstructing that discovery.  No one other than Fuller delayed the discovery process in this case.  No one, including the prepetition lenders, led Fuller to believe that an investigation was unnecessary and/or his claim would be settled.  Absent a third party's efforts to prevent, frustrate or delay an investigation that is being pursued diligently, there is no reason to deprive the prepetition lenders of the benefit of the bargain embodied in the *Final DIP Order* that induced them to consent to the use of their cash collateral.

Accordingly, the *Extension Motion* is denied.

B.      **The *Rule 2004 Motion***

   1.      **The *Rule 2004 Motion* is Moot**

The Challenge Deadline in these cases expired on August 27, 2016.  Because the

*Extension Motion* is denied for the reasons set forth above, Fuller can no longer challenge the

stipulations contained in the *Final DIP Order*, and as such, cannot demonstrate any cause to

conduct the Rule 2004 examination he seeks.[3]  The *Rule 2004 Motion* is therefore moot.

   2.      **Fuller Has Failed to Show Good Cause**

Rule 2004 provides in relevant part, that the Court may authorize the examination of any

entity relating "to the acts, conduct, or property or to the liabilities and financial condition of the

debtor, or to any matter which may affect the administration of the debtor's estate."  FED. R.

BANKR. P. 2004(b).  In chapter 11 cases, the examination may extend to matters relating "to the

operation of any business and the desirability of its continuance, the source of any money or

property acquired or to be acquired by the debtor for purposes of consummating a plan and the

consideration given or offered therefor, and any other matter relevant to the case or to the

formulation of a plan."  *Id.*  The party seeking Rule 2004 discovery has the burden to show good

cause for the examination it seeks, and relief lies within the sound discretion of the Bankruptcy

Court.  *Picard v. Marshall* (*In re Bernard L. Madoff Inv. Secs. LLC*), Adv. Pro. No. 08-01789,

2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014); *see In re Bd. of Dirs. of Hopewell*

---

[3]      Fuller also seeks to investigate a statement in the UK Audit that CORE Entertainment had provided a letter,
sometime prior to September 2015, stating its intention to provide the necessary financial support to ensure that the
Company continued as a going concern for the next twelve months.  (Tr. at 7:15-24).  Fuller implies that the letter
speaks as of the date that the auditors signed off on the UK Audit rather than on the undisclosed date it was written,
and questions why the Debtors had to file chapter 11 before the year was up.  (*Id.* at 7:15-8:4.)  The Debtors have
attributed their financial problems primarily to the cancellation of "American Idol" in May 2015.  (*Hurwitz
Declaration* at ¶15.)  In any event, Fuller has not pointed to any relationship between CORE Entertainment's
representation of support in 2015 and the issues surrounding the 2011 financing.

*Int'l Ins. Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) (Rule 2004 gives the Court "significant" discretion).

A party seeking to conduct a Rule 2004 examination typically shows good cause by establishing that the proposed examination "'is necessary to establish the claim of the party seeking the examination, or . . . denial of such request would cause the examiner undue hardship or injustice.'" *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (quoting *In re Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993)); *accord In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). In evaluating a request to conduct a Rule 2004 examination, the Court must "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination. That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production." *Drexel Burnham*, 123 B.R. at 712.

Even if the *Rule 2004 Motion* were not moot, Fuller has not demonstrated good cause to grant it. First, Fuller does not contend that his proposed investigation is needed to establish his claim. He has already filed a claim.

Second, he has not shown that the denial of his application will result in undue hardship or injustice. The CORE Entities have been the subject of at least two investigations that examined the events relevant to the transactions that Fuller now seeks to investigate. The first investigation occurred in the context of the *Huff* shareholder litigation in the Delaware state courts. Although Fuller is not bound by the decisions of the Delaware courts, the outcome of the *Huff* litigation demonstrated that the CORE Entities had, as a group, an enterprise value of over $500 million in June 2011, when they issued the Acquisition Notes and 19 Entertainment

executed its guarantee and pledge, and by extension in December 2011, when the Loan Parties

entered into the Prepetition Loans.  Fuller, who has touted his "intimate knowledge of the

Debtors' operations obtained during [his] employment with 19 Entertainment and during the

more recent consultancy period," (*Rule 2004 Motion* at ¶ 4), has not suggested otherwise.

The CORE Entities' enterprise value in 2011 is the key to any fraudulent transfer claim.

In order to successfully pursue a constructive fraudulent transfer claim on behalf of 19

Entertainment, Fuller must show that 19 Entertainment was insolvent at the time it gave the

guarantee or was rendered insolvent by giving the guarantee.[4]  At the time of the Prepetition

Loans, 19 Entertainment undertook a contingent guarantee liability of $360 million.  However, a

guarantor has a right of indemnity against the principal obligor.  RESTATEMENT (THIRD) OF

SURETYSHIP & GUARANTY § 22 (1996); *see Varsames v. Palazzolo*, 96 F.Supp.2d 361, 368

(S.D.N.Y. 2000) (noting that if a guarantee is enforced, a guarantor may pursue remedies against

the primary obligor for the amount to be paid); *Fredericks v. Shapiro*, 160 F.R.D. 26, 28

(S.D.N.Y. 1995) ("If a guarantee is enforced, the original obligor is liable to the guarantor for the

amounts required to be paid."); *J.T. Moran Fin. Corp. v. Phonetel Techs., Inc.* (*In re J.T. Moran

Fin. Corp.*), 124 B.R. 926, 930 (Bankr. S.D.N.Y. 1991) ("Even though not expressly provided

for in the guaranty, a promise to indemnify the surety is implied by law when a party agrees to

become a guarantor at the behest of the principal obligor.").  The guarantor who pays also has a

right of contribution from any co-guarantors.  *De Paris v. Wilmington Trust Co.*, 104 A. 691, 695

(Del. 1918) ("[T]he duty of one guarantor to reimburse his co-guarantor" is "an equitable

principle based on natural justice and was originally enforcible in equity only, but is now

---

[4]     The constructive fraudulent transfer laws include alternative financial tests other than insolvency, but they
were not mentioned by the parties.

enforcible at law." (internal citations omitted)); *Hard v. Mingle*, 99 N.E. 542, 543-44 (N.Y. App. Div. 1912) ("[S]o long as [one] is legally liable upon his guaranty, he may pay the claim, and may then seek contribution from his coguarantors.").)

When 19 Entertainment incurred a contingent obligation under its guarantee of the Prepetition Loans it simultaneously obtained a contingent right to indemnity from CORE Entertainment, the primary obligor, as well as contingent rights to contribution from its co-guarantors. As noted, CORE Entertainment is the direct or indirect parent of all the operating CORE Entities, and directly or indirectly owns all of the operating CORE Entities' enterprise value. In June 2011, Apollo paid approximately $500 million for that enterprise value and the Delaware courts confirmed that the price was fair. Thus, 19 Entertainment had a contingent right of indemnity against a primary obligor ultimately worth in excess of $500 million, and as the Ad Hoc Group argues, the transaction had no apparent effect on 19 Entertainment's solvency.

The second investigation was undertaken by the Committee in these cases. The testimony from the Committee's counsel regarding the Committee's investigation indicates that the Committee was able to gain a clear picture of the condition of the Debtors' estates, including the viability of potential avoidance actions relating to the Prepetition Loans. The investigation weighed the merits of a challenge to the Prepetition Loans and guarantees, including issues relating to the statute of limitations, solvency and the ultimate benefits of a successful challenge. The Committee concluded that the Debtors' *Second Amended Plan* represents a superior opportunity for unsecured creditors to realize value when compared to potential litigation. (Tr. at 56:11-17.)

It is true that Fuller and the Committee have different perspectives.  The Committee considered the interests of the Debtors' general creditors as a whole whereas Fuller's concern is solely himself as a creditor of 19 Entertainment.  But if Fuller believed that the Committee's approach did not adequately take into account the interests of the creditors of 19 Entertainment, he could have asked the United States Trustee to appoint a separate committee for 19 Entertainment, and if United States Trustee refused, sought that relief from the Court.  *See* 11 U.S.C. §§ 1102(a)(2).  He never did.

Given the speculative nature of the claim to avoid 19 Entertainment's guarantee and pledge and the posture of the chapter 11 cases, countervailing considerations of cost and delay weigh against granting the *Rule 2004 Motion*.  Chapter 11 is an expensive process.  The Committee's counsel has estimated that Sheppard Mullin is incurring fees at the approximate rate of $300,000 per month.  (Tr. at 68:7-18).  Debtors' counsel has incurred fees and expenses between $500,000 and $1 million in each of the first three months of these cases.  (*See Statement of Services Rendered and Expenses Incurred by Willkie Farr & Gallagher LLP, Counsel for AOG Entertainment, Inc., et al., for the Period April 28, 2016 Through May 31, 2016*, dated June 20, 2016 (ECF Doc. # 151) (April and May fees and expenses); *Statement of Services Rendered and Expenses Incurred by Willkie Farr & Gallagher LLP, Counsel for AOG Entertainment, Inc., et al., for the Period June 1, 2016 Through June 30, 2016*, dated July 20, 2016 (ECF Doc. # 238) (June fees and expenses); *Statement of Services Rendered and Expenses Incurred by Willkie Farr & Gallagher LLP, Counsel for AOG Entertainment, Inc., et al., for the Period July 1, 2016 Through July 31, 2016*, dated Aug. 19, 2016 (ECF Doc. #328) (July fees and expenses).)  In addition, the *Final DIP Order* requires the Debtors to pay the professional fees of the prepetition lenders and their agents.  (*Final DIP Order* ¶¶ 13(c), 16(c).)  A confirmation hearing is

scheduled for September 22, 2016, and extending these chapter 11 cases to allow an investigation of speculative claims may add significant costs that the Debtors' estates and their creditors will have to bear.  Accordingly, Fuller has failed to demonstrate cause to conduct a Rule 2004 investigation, and the *Rule 2004 Motion* is denied.

Settle separate orders for each motion on notice.

Dated: New York, New York
September 16, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge